1   ART HASAN, CA Bar No. 167323
    art.hasan@cph.com
2   BRIAN K. BROOKEY, CA Bar No. 149522
    brian.brookey@cph.com
3   G. WARREN BLEEKER, CA Bar No. 210834
    warren.bleeker@cph.com
4   CHRISTIE, PARKER & HALE, LLP
    350 West Colorado Boulevard, Suite 500
5   Post Office Box 7068
    Pasadena, California 91109-7068
6   Telephone: (626) 795-9900
    Facsimile: (626) 577-8800
7
    Attorneys for Plaintiffs,
8   CALCAR, INC. and AMERICAN CALCAR, INC.

9

10                  UNITED STATES DISTRICT COURT

11                  NORTHERN DISTRICT OF CALIFORNIA

12

13
    CALCAR, INC., a California corporation;        Case No. 3:08-MC-80083 MHP (WDBx)
14  and AMERICAN CALCAR, INC., a
    Delaware corporation,                          Underlying Civil Action Pending in U.S.
15                                                  District Court for the Central District of
                    Plaintiff(s),                   California (Civil Action Case No. SACV07-
16                                                  00723)
            vs.
17                                                  **SUPPLEMENTAL DECLARATION OF**
    THE CALIFORNIA CARS INITIATIVE,                 **G. WARREN BLEEKER IN SUPPORT**
18  INC., an unknown business entity; and           **OF PLAINTIFFS' MOTION TO**
    FELIX KRAMER, an individual,                    **COMPEL DEPOSITION TESTIMONY**
19                                                  **OF DAVE BAGSHAW**
                    Defendant(s).
20                                                  DATE:      August 6, 2008
                                                    TIME:      4:00 p.m.
21                                                  CTRM:      4, 3rd Floor

22                                                  Honorable Wayne D. Brazil

23

24

25

26

27

28

CHRISTIE, PARKER & HALE, LLP

I, G. Warren Bleeker, declare and state as follows:

1.     I am an associate with the law firm Christie, Parker & Hale, LLP, counsel for Plaintiffs in this Action, and am admitted to practice before the Federal District Courts for the Central and Northern Districts of California. I have personal knowledge of the contents of this declaration and, if called as a witness, could and would competently testify thereto.

2.     Attached as Exhibit H is a true copy of CalCars Memorandum of Points and Authorities in Support of CalCars' Motion For Summary Judgment, filed on June 30, 2008.

3.     Attached as Exhibit I is a true copy of CalCars' Reply Brief in Support of CalCars' Motion For Summary Judgment filed on July 14, 2008.

4.     I deposed Ron Gremban on June 19, 2008. Mr. Gremban testified during his deposition that he had not searched his records for any documents. During the deposition, I asked Mr. Gremban to provide us with relevant documents. Other than a business card he produced at the deposition, it is my understanding that CalCars has not produced any documents from Mr. Gremban's files.

5.     Attached as Exhibit J is a true copy of relevant portions of the June 25, 2008 deposition transcript of Felix Kramer.

6.     On July 17, 2008, Judge Andrew Guilford issued an Order rescheduling the trial date in this matter to September 23, 2008. Attached as Exhibit K is a true copy of that Order.

7.     Attached as Exhibits L through P are true copies of the following patents: Registration Numbers 6,438,465; 6,330,497; 6,587,759; 6,542,795; and 6,459,961.

8.     Attached as Exhibit Q is a true copy of the Declaration of Michael Obradovich in Support of Plaintiffs' Motion For Partial Summary Judgment.

9.     If Mr. Bagshaw has misplaced his witness fees check, Plaintiffs will gladly provide Mr. Bagshaw a replacement check prior to his deposition.

10.     Earlier in this litigation, a different process server from the one who served Mr. Bagshaw, personally served a subpoena and witness fee check on an assistant for another of CalCars' Senior Advisors, Mr. Kammen. The assistant agreed to accept service on Mr. Kammen's behalf. Attached as Exhibit R is a true copy of the that proof of service. The proof

CHRISTIE, PARKER & HALE, LLP

of service, however, contains a typo, stating that service was completed at 3:49 a.m., when in fact it occurred at 3:49 p.m. The witness fee check was served in conjunction with the subpoena.

11. Mr. Kammen, however, refused to comply with the subpoena. Although Plaintiffs ultimately decided to depose other individuals instead of moving to compel the deposition of Mr. Kammen (Plaintiffs were limited to four additional depositions), Plaintiffs certainly could have moved to compel enforcement of that subpoena, and in hindsight, maybe should have, given that Plaintiffs' decision not to move to compel apparently emboldened Mr. Pistorino to instruct additional clients to not comply with deposition subpoenas.

12. Mr. Pistorino, counsel for Mr. Bagshaw, previously obstructed the deposition testimony of deponent Mr. Gremban. Mr. Pistorino started the deposition by objecting to my question "And is there any reason you can´t give your best testimony today" as vague and ambiguous. Mr. Pistorino objected to nearly every question on such grounds as the words "education" and "type" were vague and ambiguous. Mr. Pistorino had obviously instructed Mr. Gremban that any time Mr. Pistorino objected to a term as "vague and ambiguous" that Mr. Gremban (a highly intelligent engineer) should pretend not to understand the question. Mr. Pistorino also instructed Mr. Gremban not to answer several questions regarding a conversation Mr. Gremban had with his girlfriend about this litigation, on attorney-client privilege grounds, even though at the time of those conversations, neither Mr. Gremban nor his girlfriend were represented by counsel. This obstructionist behavior by Mr. Pistorino went on throughout the deposition of Mr. Gremban.

13. Attached as Exhibit S is a true copy of relevant portions of the April 3, 2008 deposition transcript of Felix Kramer.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

This declaration is executed on July 23, 2008 in Pasadena, California.

G. Warren Bleeker

CHRISTIE, PARKER & HALE, LLP

# EXHIBIT H

1   William C. Rooklidge (SBN 134483)
    Frank P. Coté (SBN 204529)
2   HOWREY LLP
    4 Park Plaza, Suite 1700
3   Irvine, CA 92614-2559
    Telephone: (949) 721-6900
4   Facsimile: (949) 721-6910
    E-mail: rooklidgew@howrey.com
5   E-mail: cotef@howrey.com

6   Bobby A. Ghajar (SBN 198719)
    Eric J. Moore (SBN 221995)
7   HOWREY LLP
    550 South Hope Street, Suite 1100
8   Los Angeles, California 90071
    Telephone: (213) 892-1800
9   Facsimile: (213) 892-2300
    E-mail: ghajarb@howrey.com
10  E-mail: mooree@howrey.com

11  Attorneys for Defendants
    The California Cars Initiative, Inc. and
12  Felix Kramer

13

14                  UNITED STATES DISTRICT COURT

15                  CENTRAL DISTRICT OF CALIFORNIA

16                         SOUTHERN DIVISION

17

18  CALCAR, INC., a California            )   Case No. SACV07-723 AG (JWJx)
    Corporation; and AMERICAN CALCAR,     )
    INC., a Delaware corporation,         )   DEFENDANTS' MEMORANDUM OF
19                                        )   POINTS AND AUTHORITIES IN
                 Plaintiffs,              )   SUPPORT OF THEIR MOTION FOR
20                                        )   SUMMARY JUDGMENT
                                          )
21         vs.                            )   Honorable Andrew J. Guilford
                                          )
22  THE CALIFORNIA CARS INITIATIVE,       )
    INC., an unknown business entity; and )   Date:     July 21, 2008
23  FELIX KRAMER, an individual,          )   Time:     10:00 a.m.
                                          )   Ctrm:     10-D
24               Defendants.              )
                                          )
25                                        )
                                          )
26                                        )
                                          )
27  _____ )

28

HOWREY LLP

EXHIBIT H
PAGE 4

# TABLE OF CONTENTS

Page(s)

I.    INTRODUCTION ................................................................................ 1

II.    FACTUAL BACKGROUND ............................................................. 2

    A.    The California Cars Initiative and its Use of the Name "CalCars" .......................................................................................... 2

    B.    Calcar, Inc. and American Calcar, Inc. and Their Use of "Calcar" ........................................................................................... 6

III.    THE COURT SHOULD GRANT DEFENDANTS SUMMARY JUDGMENT BECAUSE PLAINTIFFS DO NOT OWN A VALID TRADEMARK AND CANNOT PROVE THEIR CLAIMS ................................................................................ 9

    A.    Plaintiffs Cannot Prove That They Own a Protectable Right to the Name "CALCAR" Which Extends to TCCI's Unrelated Use ................................................................... 9

        1.    Plaintiffs' Rights to "CALCAR" Are Limited and the Mark has No Recognition ......................................... 9

        2.    Plaintiffs' CALCAR Trademark Registration Is Invalid Because It Was Obtained Through Fraud on the USPTO ................................................................. 12

    B.    Plaintiffs Cannot Prove Their Trademark Infringement, False Designation or Unfair Competition Claims ..................... 14

        1.    Plaintiffs' "Calcar" Name is Weak ................................. 14

        2.    The Parties Provide Unrelated Products and Services to Different Groups of People and Plaintiffs Have no Evidence of Expansion Into TCCI's Field ................................................................... 15

        3.    The Parties' Respective Audiences are Sophisticated .................................................................. 16

        4.    After Nearly *Six* Years, There Has Been No Actual Confusion ......................................................... 18

        5.    TCCI Adopted The Nickname "CalCars" In Good Faith ................................................................................ 19

        6.    The Parties' Marks and Marketing Are Dissimilar ........ 19

    C.    Plaintiffs Cannot Prove Their Dilution Claim ........................... 21

    D.    Plaintiffs Cannot Prove Their Damages Claim .......................... 22

IV.    CONCLUSION ................................................................................ 24

HOWREY LLP

EXHIBIT H
PAGE 5

1

# TABLE OF AUTHORITIES

2

## CASES

3  *Accuride International, Inc. v. Accuride Corp.,*
4    871 F.2d 1531 (9th Cir. 1989) ...................................................................... 16, 17

5  *Adray v. Adry-Mart Inc.,*
     76 F.3d 984 (9th Cir. 1995) ............................................................................. 23

6  *Brookfield Communications, Inc. v. West Coast Ent. Corp.,*
7    174 F.3d 1036 (9th Cir. 1999) .......................................................................... 14

8  *Cairns v. Franklin Mint, Co.,*
     24 F. Supp. 1013 (C.D. Cal. 1998) ................................................................... 19

9  *In re Canadian Pacific Ltd.,*
10   224 U.S.P.Q. 971 (Fed Cir. 1985) ...................................................................... 9

11 *Century 21 Real Estate Corp. v. Sandlin,*
     846 F.2d 1175 (9th Cir. 1988) ..................................................................... 10, 14

12 *Cohn v. Petsmart, Inc.,*
13   281 F.3d 837 (9th Cir. 2002) .......................................................................... 9, 17

14 *Dreamwerks Prod. Group. Inc. v. SKG Studio,*
     142 F.3d 1127 (9th Cir. 1998) .......................................................................... 14

15 *EA Engineering, Sci. & Tech., Inc. v. Environmental Audit, Inc.,*
16   703 F. Supp. 853 (C.D. Cal. 1989) ................................................................... 17

17 *Entrepreneur Media, Inc. v. Smith,*
     279 F.3d 1135 (9th Cir. 2002) .......................................................................... 14

18 *Glow Industrial, Inc. v. Lopez,*
19   252 F. Supp. 2d 962 (C.D. Cal. 2002) .............................................................. 14

20 *GoTo.com, Inc. v. Walt Disney Co.,*
     202 F.3d 1199 (9th Cir. 2000) .......................................................................... 19

21 *Japan Telecom, Inc. v. Japan Telecom Amer., Inc.,*
22   287 F.3d 866 (9th Cir. 2002) ............................................................................ 18

23 *KP Permanent Make Up, Inc. v. Lasting Impression I, Inc.,*
     543 U.S. 111 (2004) ........................................................................................... 9

24 *In re Letica Corp.,*
25   226 U.S.P.Q. 276 (TTAB 1985) ......................................................................... 9

26 *Lindy Pen Co., Inc. v. Bic Pen Corp.,*
     982 F.2d 1400 (9th Cir. 1993) ..................................................................... 22, 24

27 *Medinol Ltd. v. Neuro Vasx, Inc.,*
28   67 U.S.P.Q. 2d (BNA) 1205 (T.T.A.B. 2003) .................................................. 11

-ii-

HOWREY LLP

EXHIBIT H
PAGE 6

*Perfumebay.com Inc. v. eBay Inc.*,
   506 F.3d 1165 (9th Cir. 2007) ............................................................. 21

*Playboy Enterprises, Inc. v. Netscape Commc'n. Corp.*,
   55 F. Supp. 2d 1070 (C.D. Cal. 1999) .................................................. 19

*Sinclair Oil Corp. v. Kendrick*,
   85 U.S.P.Q. 2d (BNA) 1032 (T.T.A.B. June 6, 2007) ........................... 12

*Standard Knitting, Ltd. v. Toyota Jidosha Kabushiki Kaisha*,
   77 U.S.P.Q. 2d (BNA) 1917 (T.T.A.B. January 10, 2006) ..................... 12

*Surfvivor Media, Inc. v. Survivor Products*,
   406 F.3d 625 (9th Cir. 2005) ............................................. 8, 15, 20, 24

*Thane International, Inc. v. Trek Bicycle Corp.*,
   305 F.3d 894 (9th Cir. 2002) .......................................................... 16, 21

*U-Haul International, Inc. v. Jartran, Inc.*,
   793 F.2d 1034 (9th Cir. 1986) .............................................................. 23

*Universal Nutrition Corp. v. Carbolite Foods, Inc.*,
   325 F. Supp. 2d 526 (D.N.J. 2004) ....................................................... 11

*Walter v. Mattel*,
   210 F.3d 1108 (9th Cir. 2000) .............................................................. 14

### STATUTES

15 U.S.C. § 1114(1) ......................................................................... 9, 13

15 U.S.C. § 1117(a) ............................................................................. 23

15 U.S.C. § 1119 .................................................................................. 13

15 U.S.C. § 1125(c)(2) ......................................................................... 21

Fed. R. Civ. P. 37(c)(1) ....................................................................... 22

HOWREY LLP

EXHIBIT H
PAGE 5

## I.    INTRODUCTION

The merits of Plaintiffs' case have not improved since this Court rejected their preliminary injunction motion a year ago. In their motion, Plaintiffs asserted extensive use and renown of "CALCAR," and they alleged that Defendants had committed "willful" trademark infringement, false designation of origin, trademark dilution, and unfair competition. In its tentative order explaining the unlikelihood of Plaintiffs' success on the merits, however, this Court recognized that CALCAR is not strongly and uniquely associated with Plaintiffs' business, that the parties' goods and services are unrelated, that the parties' consumers exercise a high degree of care, that Defendants did not intend to copy CALCAR in an effort to deceive consumers, and that one purported instance of actual confusion over a five-year period of contemporaneous use is insufficient to establish likelihood of actual confusion.

Plaintiffs have since refused to produce financial data on their sales, revenue, marketing expenditures, pricing, profits, or any other admissible evidence that might suggest strength or fame of the CALCAR mark. Plaintiffs have failed to produce a consumer confusion survey or any other evidence of likelihood of confusion between the parties and their activities. Plaintiffs have even waived their claim for damages, conceding that after six years of co-existence without any consumer confusion, they cannot prove that they have been damaged. Given Plaintiffs' failure of proof, this Court should grant Defendants' summary judgment on Plaintiffs' claims.

Discovery also has revealed that Plaintiffs committed fraud before the United States Patent and Trademark Office ("USPTO") in obtaining the very trademark registration upon which Plaintiffs rely. Specifically, during prosecution of the CALCAR trademark application and its renewal, Plaintiffs represented that they had used the CALCAR mark in connection with the sale of specific goods and services, including "computer hardware" and "providing telecommunications connections to a global computer network." Because Plaintiffs have no proof that they used CALCAR as a trademark in connection with those goods and services and have admitted that they

HOWREY LLP

EXHIBIT H
PAGE 8

1  did not, this Court should grant summary judgment on Defendants' defense that

2  Plaintiffs' trademark registration is invalid.

3  **II.    FACTUAL BACKGROUND**

4        *A.    The California Cars Initiative and its Use of the Name "CalCars"*

5        In July 2002, Felix Kramer founded The California Cars Initiative ("TCCI"), a

6  Palo Alto-based non-profit group.  (Declaration of Felix Kramer in Support of

7  Defendants' Motion for Summary Judgment ("Kramer Decl.") ¶¶ 1-2.)  Mr. Kramer

8  joined other entrepreneurs, engineers, environmentalists, and automobile drivers with

9  the objective of getting plug-in hybrid electric vehicles (PHEVs) on the road in the

10  largest quantities possible in order to reduce oil usage and greenhouse gases.  In other

11  words, through advocacy and technology development TCCI seeks to encourage, as

12  soon as possible, the successful commercialization of PHEVs, (*id.* at Ex. 4),

13  automobiles that combine both hybrid technology and electric battery technology to

14  replace much of the reliance on gasoline.  (*Id.* ¶ 2.)  For example, TCCI's volunteer

15  members were able to demonstrate that a converted Toyota Prius could obtain as much

16  as 100 miles per gallon through the use of PHEV technology.  (*Id.* at Ex.4 at p.7.)

17  TCCI's modified Priuses have been built to show the feasibility of PHEVs to

18  consumers, politicians and the automotive industry.  (*Id.* at Ex.4.)  TCCI holds open

19  forums with diverse public audiences, with the hope that powering vehicles with

20  electricity will decrease reliance on foreign oil, lower emissions, and develop new

21  cleantech economic opportunities.  (*Id.* at ¶ 5.)

22        In order to sway public opinion and encourage manufacturers that economical

23  PHEVs are viable as a commercially successful enterprise, TCCI's intermittently paid

24  consultants and volunteers attend speaking engagements, demonstrate TCCI-converted

25  PHEVs at public and private events directed at audiences including government,

26  opinion leaders, corporate executives, and non-governmental organizations, and present

27  the technology and its benefits to print, broadcast and online media.  (*Id.* at ¶ 6;

28  Declaration of Eric Moore in Support of Defendants' Motion for Summary Judgment

HOWREY LLP

**EXHIBIT H
PAGE 9**

1  ("Moore Decl."), at Ex. 43: Kramer Depo at 71:15-20, 47:1-10, 15:17-21.)[1]  These

2  public events and speaking engagements have taken place across the United States and

3  internationally.  (Kramer Decl. at ¶7).  On a grassroots level, TCCI has several dozen

4  volunteers and senior advisors, a network of approximately 6,000 subscribers to its

5  online newsletter, "CalCars News," and many visitors to its informative website,

6  "www.CalCars.org."   (Id. at ¶ 6, Ex.1; Moore Decl. Exs. 13, 15.)

7      Mr. Kramer chose the name "The California Cars Initiative" to reflect the state of

8  California's spirit of innovation and its role as a leader in the development of advanced

9  environmental automotive technology and initiatives.  TCCI immediately began using

10  "CalCars" as the shortened version or nickname of TCCI, and Mr. Kramer registered the

11  corresponding domain name calcars.org.  (Kramer Decl. at ¶ 4; Moore Decl. Ex. 43:

12  Kramer Depo at 53:16-54:2.)

13      TCCI is an advocacy organization.  (Kramer Decl. at ¶ 3, Ex.2 and 4)  TCCI is

14  not in the business of selling modified PHEVs to the public, and it is not a wholesale or

15  consumer products company.  (Id. at ¶¶ 5 and 12; Moore Decl. Ex. 43: Kramer Depo at

16  210:16.)  It does not sell automobiles, automobile parts, visual displays, computer

17  software or hardware, or manuals, and it has no future plans to do so.  (Kramer Decl. at

18  ¶¶ 17, 25.)  To be sure, TCCI has given t-shirts, bumper stickers and the like to its

19  donors, and allows a third party to sell those promotional items, but it has received little

20  revenue from such sales and has not made a profit on those sales.[2]  (Id. at ¶ 17; Moore

21  _____

22  [1] Citations to names or abbreviations of names (i.e., "Kramer") refer to the deposition
    transcripts or declarations of or by that individual, contained in the Moore Decl. The

23  "Confidential Moore Decl."contains exhibits and testimony labeled "Confidential" or
    "Highly Confidential – Attorneys' Eyes Only" by the parties and is therefore filed under

24  seal.  References to specific discovery requests will be abbreviated as follows: Requests
    for Production of Documents and Things ("RFPD") and Interrogatories ("ROG").

25  Unless otherwise specified, the citation is referring to text contained in Plaintiffs' most
    recent response to Defendant Kramer's discovery requests.

26

27  [2] The website recently updated its offerings to include stamps and a link to a volunteer-
    created line of bumper stickers and license-plate frames that have yet to generate any

28  income to TCCI.  (Kramer Decl. ¶ 13.)

HOWREY LLP

EXHIBIT H
PAGE 10

1   Decl. Ex. 44: Kramer II Depo. at 381:3-383:4, 564:3-565:11.)  TCCI's technology

2   demonstration efforts result in technology that TCCI places in the public domain, free

3   for all to use.  (Kramer Decl. at ¶¶ 20, 25; Moore Decl. Ex. 44: Kramer II Depo. at

4   525:10-24.)  And although TCCI provides website links to and otherwise encourages

5   for-profit entities that perform or provide components for plug-in conversions, neither

6   TCCI nor Mr. Kramer receive revenue from those activities or hold an ownership stake

7   in those entities.  (Kramer Decl. at ¶ 12.)

8       TCCI registered the domain names calcars.us and calcars.org on July 23 and 30

9   2002, respectively.  (Id. at ¶ 15.)  TCCI's website repeatedly makes clear that CalCars,

10  or "The California Cars Initiative" is a non-profit, that is, "an activity of the

11  International Humanities Center."  (Id. at ¶ 2; Moore Decl. Ex. 13.)  The website

12  describes CalCars as "a non-profit startup formed by entrepreneurs, engineers,

13  environmentalists and consumers … [whose] projects tackle national security, jobs and

14  global warming – at the same time."  (Kramer Decl. ¶ 15.)  The website, a screen shot of

15  which is depicted below, also explains that:

16      The California Cars Initiative (CalCars.org) is a Palo Alto-based nonprofit startup
        of entrepreneurs, engineers, environmentalists and consumers promoting
17      100+MPG plug-in hybrid electric vehicles (PHEVs). Somewhat uniquely, we're
        ourselves a hybrid, focusing both on public policy and technology development,
18      and harnessing buyer demand to help commercialize PHEVs. We're building
        demand among highly receptive markets to encourage auto makers to produce
19      100+MPG "no-sacrifices" high-performance, clean hybrid cars." (Moore Decl.
        Ex. 13.)
20

21
        
22

23

24

25

26

27

28

-4-

EXHIBIT H
PAGE 11

1    The ".org" domain suffix communicates to the general public that TCCI is a non-
2    profit organization, and helps its audience to quickly pinpoint how to find its website.
3    (*Id.* at Ex. 43: Kramer Depo at 103:14-25.)  The purpose of the website is to provide the
4    most complete and up-to-date introductions to PHEVs, campaign news, track the
5    progress of automakers and of conversions, and to fundraise through tax-deductible
6    donations to TCCI.  (Kramer Decl. at ¶ 15.)

7    TCCI's advocacy efforts in support of PHEVs have resulted in considerable name
8    recognition as "CalCars" among the green automobile and environmental community.
9    Among the many accolades that TCCI has received for its advocacy and technology
10   development and research include the Keith Crook Technical Achievement Award from
11   the Electric Auto Association for being the first organization to convert a Toyota Prius
12   to a PHEV, the Aspen Institute Energy & Environment 2008 award for a non-
13   governmental organization, and the South Coast Earth Day 2008 Environmental Hero
14   Award.  (*Id.* at ¶ 8, Exs. 2 and 3.)  Google.org recognized TCCI's advocacy efforts and
15   awarded it a $200,000 grant.  (*Id.* at ¶6; Moore Decl. Ex. 43: Kramer Depo at 92:12-25.)
16   TCCI has also received extensive press recognition and notoriety for its advocacy
17   efforts in leading publications such as the Los Angeles Times, the LA Times Magazine
18   cover story, the New York Times, Scientific American, the Washington Post, Popular
19   Mechanics, the Christian Science Monitor, and on broadcast media including Good
20   Morning America, NPR Science Friday, the Discovery Channel, CNN, and many
21   others.  (Kramer Decl. at ¶ 9, Ex. 9; Moore Decl. Ex. 14.)

22   As it typically appears in the marketplace, "CalCars" is used in connection with
23   TCCI's full name and its mission:

24
25   
26   (*See, e.g.* Kramer Decl. ¶ 17; Moore Decl. Exs. 13, 15.)
27
28

HOWREY LLP

EXHIBIT H
PAGE 12

1     **B.**     *Calcar, Inc. and American Calcar, Inc. and Their Use of "Calcar"*

2       Plaintiffs Calcar, Inc. and American Calcar, Inc. are owned by Mr. Michael

3 Obradovich. (Moore Decl. Ex. 31 at ¶ 1.) Both use the term "Calcar" within their

4 company names, and in the past 4-5 years, Calcar, Inc. began using the "Calcar"

5 company name alongside a horse-like logo on its website:

6

7 

8

9 (*See* Moore Decl. Ex. 47: Michael O. Depo. 44:25-48:21.) Plaintiff American Calcar,

10 Inc.'s business is licensing and enforcing patents, while Calcar, Inc.'s business is

11 printed and electronic car manuals. (*Id.* at Ex. 47: Michael O. Depo. at 13:8-15:20; Ex.

12 48; Ex. 6; Ex. 32 at ¶¶ 2, 4.) Plaintiffs' allegedly have "oral" agreements with several

13 car makers (none written), such as Audi, pursuant to which Plaintiffs produce guides

14 such as the "Quick Tips" that Audi distributes with certain of its cars to provide car

15 buyers a DVD or written guide on how to use the car's media player or navigation

16 system. (*Id.* at ¶ 3; Ex. 2; Ex. 41 at RFPD 61.) Plaintiffs maintain that these instruction

17 manuals convey a "safety message," which equates to the purported environmental

18 cause of "safety for all." (*Id.* at Ex. 47: Michael O. Depo. at 154:24-155:10.)

19       Plaintiffs' "how-to" automotive manuals are not offered under the CALCAR

20 trademark, but names such as "Quick Tips," "Startup Tips," and "Know to Go." (*See,*

21 *e.g. id.* at ¶¶ 2-4; Exs. 2-3; Ex. 5 at CALCAR 0020 © notation; Ex. 47: Michael O.

22 Depo. at 42:1-20.) In fact, the only consistent reference to the term "Calcar" in the

23 Quick Tips guide appears in the copyright notification at the back of the instruction

24 manual, often noting that "QuickTips® is a trademark of Calcar." (*Id.* at Ex. 2.) Karen

25 Obradovich, Vice President of Sales and Customer Satisfaction, only recalled one use of

26 "Calcar QuickTips" on the cover of a manual that it allegedly created for BMW, dated

27 1994. (Confidential Moore Decl. Ex. 9: Karen O. Depo. at 108:14-19; *see also,* Moore

28 Decl. ¶¶ 3-4; Ex. 1.) The Quick Tips guides themselves caution end-users to contact the

HOWREY LLP

EXHIBIT H
PAGE 13

1    dealership with any questions, further removing any relationship between Plaintiffs and

2    the general consumer.  (Moore Decl. Ex. 2 at CALCAR 0342, 368.)

3        Plaintiffs own the domain name www.calcar.net, but keep no record of web hits

4    or user traffic, cannot identify their web host, and have produced no evidence of the

5    extent to which the website is accessed by Plaintiffs' purported automobile clients or the

6    general public.  (*Id.* at Ex. 31 at ¶ 3; Ex. 41 at 1st RFPD 56, 3rd RFPD 97, and ROG 15.)

7    The calcar.net website's password-protection section is not even operative.  (*Id.* at Ex.

8    47: Michael O. Depo. at 180:14-182:1; Confidential Moore Decl. Ex. 5 at ROG 16.)

9        Plaintiffs' business is unknown outside a small group of auto manufacturers and

10   select individuals who work for them.  Plaintiffs admit that their target audience is

11   limited to automakers, of which there are a *total* of twenty.  (*Id.* at Ex. 33 at ¶¶ 11-12.)

12   In terms of "marketing," Plaintiffs rely solely on Mr. Obradovich and his wife's

13   personal contacts to make a sale by sending mailings, making "cold calls," handing out

14   business cards at events like Motor Press guild luncheons, and giving presentations. (*Id.*

15   at Ex.47: Michael O. Depo. at 68:1-19; Ex. 38 at ROG 1; Ex. 42 at TCCI ROG 3;

16   Confidential Moore Decl.  Ex. 9: Karen O. Depo. at 7:7-8:7; Ex. 1.)  Plaintiffs do not

17   keep track of expenditures on promotional materials and produced no advertising

18   expenditures or evidence of who received any promotional material, how the contact

19   arose, or what resulted from it.  (Moore Decl. Ex. 34 at ¶9; Ex. 41 at ROG 8; Ex. 31 ¶6.)

20   In an interrogatory asking Plaintiffs to identify all points of contact among current

21   customers of their products and services, Plaintiffs provided *three* names– two of whom

22   were in-house legal counsel who gained familiarity with Plaintiffs after they sued the

23   automakers for patent infringement.  (*Id.* at Ex. 48; Confidential Moore Decl., Ex. 5 at

24   ROG 17.)

25       Plaintiffs refused to produce tangible evidence of customer contracts, sales,

26   profits, advertising budgets or marketing data, or any other financial data.  (Moore Decl.

27   Ex. 29 at pp.251-253, 305-06.)  The only evidence relating to the quantity of

28   "CALCAR" products and services Plaintiffs have sold is a one-page summary of

HOWREY LLP

EXHIBIT H
PAGE 14

1 | "Calcar® Quick Tips ® Totals" that Plaintiffs produced on June 11, 2008.

2 | (Confidential Moore Decl., Ex. 2.)  This home-made summary has not been supported

3 | by any sufficient backup data and this limited production defied Magistrate Judge

4 | Johnson's Order (Moore Decl. Ex. 29 at pp.251-253.)[3]  By denying Defendants

5 | supporting documentation and the ability to question Plaintiffs' 30(b)(6) witnesses

6 | about this chart (*Id*. at ¶¶ 17-29; Exs. 16-28.), Plaintiffs deprived Defendants of the

7 | opportunity to challenge the authenticity of Plaintiffs' purported evidence of their

8 | "presence" in any automotive marketplace.

9 |       In their complaint and preliminary injunction motion, Plaintiffs claimed to be

10 | developing "hybrid technology," but have provided no such proof in discovery.  (*Id*. at

11 | Ex. 32 at ¶ ; Ex. 41 at ROG 18; 1st RFPD 54-55.)  Indeed, Plaintiffs conceded in the

12 | Joint Stipulation on Defendants' Motion to Compel that they "have no intention of

13 | expanding into hybrid technology per se but that their products, Quick Tip guides, could

14 | be used in cars with internal combustion engines so, theoretically, in hybrid cars as

15 | well."  (*Id*. at Ex. 41 at ROG 8, 54-55.)  From the beginning of this lawsuit, Plaintiffs

16 | have alleged the broad scope of use and renown of the mark "CALCAR," yet find

17 | themselves at the end of discovery with no evidence to support any of their claims.

18

19

20

21

22

---

23 | [3] On June 26th, many months after Defendants served discovery calling for such documents; after the close of written discovery; two business days before the filing of this Motion; and without providing Defendants an opportunity to depose Plaintiffs –

24 | Plaintiffs produced over a thousand pages of highly-redacted shipping receipts, ostensibly to show that Plaintiffs in fact distributed a certain number of Quick Tip

25 | guides. (Confidential Moore Decl. ¶ 10, Ex. 10.)  In addition to its late, prejudicial production, the evidence fails to make that showing because any relevant delivery

26 | recipient has been completely redacted, and is entitled to no evidentiary weight.  (*Id*.) The shipping receipts fail to identify what countries the shipments were, the identity of

27 | the contacts of the auto-makers, or whether those products were ever distributed to end users.  (*Id*.)

28

HOWREY LLP

EXHIBIT H
PAGE 15

III.   **THE COURT SHOULD GRANT DEFENDANTS SUMMARY JUDGMENT BECAUSE PLAINTIFFS DO NOT OWN A VALID TRADEMARK AND CANNOT PROVE THEIR CLAIMS**

The Ninth Circuit has not hesitated to affirm grants of summary judgment to defendants in appropriate trademark cases. *See, e.g., Surfvivor Media, Inc. v. Survivor Prods*, 406 F.3d 625, 635 (9th Cir. 2005) (granting defendant's summary judgment motion where four factors favored plaintiff, finding that that "facts of this case does not raise a material issue of fact regarding actual confusion between the Surfvivor and Survivor marks."); *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 842 (9th Cir. 2002) (affirming summary judgment even though parties sell related goods and services, finding that evidence "fails to create a genuine issue that confusion is "probable, not simply a possibility.")  This is such an appropriate case.

A.   ***Plaintiffs Cannot Prove That They Own a Protectable Right to the Name "CALCAR" Which Extends to TCCI's Unrelated Use***

A successful trademark infringement claim requires a showing that the claimant holds a valid, protectable mark and that the accused mark is similar enough to "cause confusion, or to cause mistake, or to deceive" as to the origin of the alleged infringer's goods or services. *See* 15 U.S.C. § 1114(1)(a)-(b); *KP Permanent Make Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 117-118 (2004).  Because Plaintiffs' use of "CALCAR" is limited to use as a trade name, not as a trademark, Plaintiffs' rights to the name "Calcar" must be narrowly drawn.  Plaintiffs cannot rely on their federal trademark registration for the mark CALCAR because that registration is invalid based on Plaintiffs' fraudulent misrepresentations to the USPTO regarding its scope of use.

1.   **Plaintiffs' Rights to "CALCAR" Are Limited and the Mark has No Recognition**

Any protection afforded to Plaintiffs depends on their rights to a valid, protectable mark and the way the parties use the marks at issue in commerce. *KP Permanent*, 543 U.S. at 117.  As a threshold matter, Section 43(a) of the Lanham Act may not be used to

HOWREY LLP

EXHIBIT H
PAGE 10

1  assert infringement of a trade name in federal court. "Congress had a clear intent 'to

2  draw a line between indicia which perform only trade name functions and indicia which

3  perform or also perform the function of trademarks or services marks.'" *In re Letica*

4  *Corp.*, 226 U.S.P.Q. 276, 277 (TTAB 1985) (citing *In re Canadian Pacific Ltd.*, 224

5  U.S.P.Q. 971, 974 n.6 (Fed Cir. 1985).)

6      Plaintiffs consistently point to their Quick Tip guides as proof of use. It is

7  undisputed that those guides use the trademarks "Quick Tips" or "Startup Tips"– not

8  "Calcar" – as product identifiers. With the exception of one "Calcar's QUICK TIPS™

9  BMW 3 SERIES" version (of which there is no evidence of sale), the only mention of

10  the word "Calcar" on any of the alleged "millions" of QuickTips that Plaintiffs have

11  printed is the notice in tiny font at the back of the manual stating that "QuickTips® is a

12  registered trademark of Calcar, Inc."[4]  (Moore Decl. ¶¶ 3-4; Exs. 2-3.)  Plaintiffs

13  produced no evidence that any consumer refers to the guides as a "CALCAR" guide;

14  that any consumers have ever seen the Quick Tip guide (as Plaintiffs refused to produce

15  proof of sales); or that any consumer has ever connected the guide with Calcar, as

16  opposed to the company from which the consumer purchased her vehicle.  Nor have

17  Plaintiffs identified to what countries the shipments were, the identity of the contacts of

18  the auto-makers, or whether those products were ever distributed to end users.

19      To the extent the Quick Tip guides use CALCAR as a trademark at all, this Court

20  has already recognized that the bald statement that Plaintiffs have distributed "ten

21  million" Quick Tip guides was "insufficient to convert CALCAR into a strong mark."

22  (Moore Decl. Ex. 1 at p.7.)  A mark may be "strengthened by [proof of] extensive

23  advertising, length of time in business, public recognition and uniqueness," *Century 21*

24

25  _____

26  [4] While some of Plaintiffs' Quick Tips materials give notice of their ownership in and
    rights to trademarks such as "Quick Tips" or "Auto Director," none identify "Calcar" as
27  one of the registered trademarks, making it even more unlikely that somebody viewing
    the materials would perceive "Calcar" as a trademark. (*See, e.g.* Moore Decl. Ex. 2; Ex.
28  5 at CALCAR 0018-20 at © footer.)

-10-

HOWREY LLP

1  *Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1179 (9th Cir. 1988).  Plaintiffs, however,

2  have produced no evidence of advertising, no advertising or marketing data, no survey

3  or recognition studies, no evidence of public recognition, and no declarations from third

4  parties (or a single car company) attesting to their familiarity with Plaintiffs.

5       Plaintiffs' use of the company name on Calcar, Inc. business supplies is also not

6  use as a trademark.  (*Id.* at Ex. 47: Michael O. Depo. at 44:25-48:21 (describing

7  products Calcar, Inc. sells under its various trademarks and identifying business cards,

8  letterhead, and website as other "uses" of the mark); *see, e.g. id.* at Ex. 5 at CALCAR

9  0027; Confidential Moore Decl. Ex. 1.) There is no evidence that anybody outside of a

10  select group of individuals personally approached by Mr. or Mrs. Obradovich, among a

11  finite set of major automobile manufacturers, has heard, or would have occasion to hear,

12  of "Calcar."  (Confidential Moore Decl. Ex. 9: Karen O. Depo at 125:18-127:9; Ex. 1;

13  Moore Decl. Ex. 33 at ¶¶ 11-12.)  In fact, Ron Gremban, a TCCI consultant and

14  volunteer who has been in the electric car industry for forty years, had never heard of

15  Plaintiffs until they brought this lawsuit.  (Moore Decl. Ex. 45: Gremban Depo. at

16  257:21-258:12.)  Likewise, the head of marketing, product manager, environmental

17  manager, and other BMW employees had no knowledge or awareness of Plaintiffs

18  before this lawsuit.  (*Id.* at Ex. 46: Klein Depo. at 23:18-24:23, 25:8-21, 28:23-30:6.)

19       In response to an interrogatory calling for verification of Plaintiffs' sales of all

20  products and services branded under the name CALCAR from 2000-present, Plaintiffs

21  pointed only to the alleged sales of the Quick Tips guides to eight automobile

22  manufacturers (*id.* at Ex. 39 at ROG 1; Confidential Moore Decl., Ex. 2), further

23  undermining any claim that anybody beyond a small group of individuals who have

24  worked with Plaintiffs to develop Quick Tips guides would have heard of Plaintiffs.

25  Similarly, there is no evidence that anybody recognizes "CALCAR" as a trademark.

26

27

28

HOWREY LLP

EXHIBIT H
PAGE 16

2.     **Plaintiffs' CALCAR Trademark Registration Is Invalid Because It Was Obtained Through Fraud on the USPTO**

Plaintiffs rely heavily on a federal CALCAR trademark registration.  (*See, e.g.,* Moore Decl. Ex. 30: Complaint at ¶11, 13, 21.)  That registration is invalid due to Plaintiffs' misrepresentations to the USPTO regarding their actual trademark use.

The law is clear — misstatements regarding the use of a mark on certain goods or services constitute fraud.  "[W]here a registrant makes a false statement as to the use of the mark in connection with the goods or services listed in its registration, cancellation of the mark is proper."  *Universal Nutrition Corp. v. Carbolite Foods, Inc.*, 325 F. Supp. 2d 526, 531 (D.N.J. 2004); *see, e.g. Medinol Ltd. v. Neuro Vasx, Inc.*, 67 U.S.P.Q.2d (BNA) 1205, 1209-10 (T.T.A.B. 2003) (entire registration cancelled because the applicant's statement of use claimed that the mark was in use on catheters and stents, but the mark had never been used on stents).  In recent years, the USPTO's appellate panel has essentially created a strict liability fraud rule, regardless of any subjective intent or mistake on the part of the applicant or registrant.  *See, e.g. Standard Knitting, Ltd. v. Toyota Jidosha Kabushiki Kaisha*, 77 U.S.P.Q. 2d (BNA) 1917, 1928 (T.T.A.B. January 10, 2006) (cancellation based on registrant's admissions during discovery that the company neither made all of the goods identified, nor sold all the goods in the United States); *also Sinclair Oil Corp. v. Kendrick*, 85 U.S.P.Q. 2d (BNA) 1032, 1035 (T.T.A.B. June 6, 2007).

During the process of obtaining and renewing Registration No. 2419611, in both 2000 and 2007, respectively, Plaintiffs filed statements with the USPTO under penalty of perjury, claiming that the CALCAR mark was in use on a laundry list of goods, namely: *computer hardware* and computer software for use in telecommunications, *weather reporting, messaging, global positioning, database access, imaging,* and pre-recorded software on CD-Rom relating to automobiles, advertising, *global computer networks,* web sites, and *telecommunications* in class 9, and *providing telecommunications connections to a global computer network in class 38.* (Moore

-12-

EXHIBIT H
PAGE 19

1  Decl. Ex. 22.) (*italics* indicating goods/services unused.)  Specifically, when Plaintiff

2  Calcar, Inc. (who was not even the registered owner at the time) filed a "Statement of

3  Use" on July 10, 2000, it claimed in a sworn declaration that it was using the mark

4  CALCAR in connection with *all* of those goods and services.  (*Id.*)  And again, when

5  American Calcar, Inc. filed its renewal of the registration on April 2, 2007, it requested

6  deletion of the "weather reporting, messaging, and global positioning" goods in Class 9

7  and the "telecommunications connections" services in Class 38, but reiterated its

8  representation that it was using the mark in commerce in *all* of the remaining goods

9  registered in Class 9.  (*Id.*)

10       Discovery has shown that those sworn statements were false.  Calcar, Inc.'s use

11  of the mark in commerce is focused on automobiles – not the breadth of industries listed

12  above, such as telecommunications or weather reporting.  (*See, e.g.* Confidential Moore

13  Decl. Ex. 9: Karen O. Depo. at 54:22-55:6.)  In deposition, Plaintiffs' representatives

14  admitted that Plaintiffs have not sold any products for use in telecommunications or

15  database access or "global computer networks," or for website hardware or software,

16  and Plaintiffs' car manuals have never been for use in weather reporting, messaging, or

17  global positioning.  (*Id.* at Ex. 8: Yip Depo. at 141:16-145:9 (regarding ACI); Ex. 9:

18  Karen O. at Depo. 10:2-11:3 (describing Plaintiffs' automotive manuals); Moore Decl.

19  Ex. 40 at TCCI RFPD 90-92  (noting nothing meaningful to compel besides the Quick

20  Tips.)  Nor did Plaintiffs produce any evidence of use or sales of "computer hardware"

21  – much less CALCAR-branded hardware; their *sole* evidence of "sales" is of Quick Tips

22  and Start Up Tips manuals.  (Confidential Moore Decl. Ex. 2; Ex. 9: Karen O. Depo. at

23  27:18-29:19; Moore Decl. Ex. 39. at ROG 1l; Ex. 44 at TCCI RFPD 91.)

24       Plaintiffs' knowledge that its mark was not in use on all of the goods and services

25  listed in the application at the time it filed its 2000 Statement of Use *or* upon all of the

26  goods listed in the registration when it filed its 2007 renewal is all that is required to

27  establish intent to commit fraud in the procurement of a registration.  *Medinol, supra* at

28  1210; *see also Torres, supra* at 49.  Even a single false representation to the USPTO

-13-

EXHIBIT H
PAGE 20

1  during the course of its prosecution invalidates the entire registration; here, there are

2  multiple misrepresentations, and the Court should therefore cancel the registration as

3  invalid.  *See, id.*; and 15 U.S.C. § 1119 (granting courts power to invalidate registered

4  marks to rectify the register.)  Without its federal registration, Plaintiffs' claim for

5  infringement of a registered mark under 15 U.S.C. § 1114(1) necessarily fails, and

6  Plaintiffs lack any (rebuttable) presumption of validity or ownership of trademark rights

7  to the term "CALCAR."

8      **B.**    ***Plaintiffs Cannot Prove Their Trademark Infringement, False***

9          ***Designation or Unfair Competition Claims***

10         An element common to Plaintiffs' trademark infringement, false designation of

11  origin and unfair competition claims is likelihood of confusion.  *See Walter v. Mattel*,

12  210 F.3d 1108, 1111 (9th Cir. 2000). To prove this element, Plaintiffs must come

13  forward with evidence that a "reasonably prudent consumer" in the marketplace is likely

14  to be confused as to the origin of the goods or services bearing one of the marks.

15  *Dreamwerks Prod. Group. Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998).  To

16  put it another way, Plaintiffs must prove that confusion between TCCI's longstanding

17  use of "CalCars" for its non-profit organization's PHEV awareness efforts on the one

18  hand, and Plaintiffs' limited, cryptic use of "Calcar, Inc." on its manuals and website, on

19  the other hand, is probable – not just possible – among an appreciable number of

20  reasonably prudent consumers.  *See Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135,

21  1151 (9th Cir. 2002).  Analysis of the eight factors used to evaluate likelihood of

22  confusion, and the relative importance of each factor will be case-specific. *Brookfield*

23  *Communications, Inc. v. West Coast Ent. Corp.*, 174 F.3d 1036, 1054 (9th Cir. 1999).

24  The analysis of these factors decidedly favors TCCI.

25        **1.**    **Plaintiffs' "Calcar" Name is Weak**

26         The weaker the mark, conceptually and/or commercially, the lesser the protection

27  it is afforded.  *Glow Indus., Inc. v. Lopez*, 252 F. Supp. 2d 962, 987 (C.D. Cal. 2002).

28  In its tentative order denying Plaintiff Calcar, Inc.'s preliminary injunction motion, the

-14-

HOWREY LLP

1   Court noted that CALCAR is suggestive, but merits lesser protection as it does not

2   appear inherently distinctive in relation to Calcar, Inc.'s products. (Moore Decl. Ex. 1

3   at p.7.)  As explained above, Plaintiffs failed to produce any evidence of the commercial

4   strength of its mark "by extensive advertising, length of time in business, public

5   recognition and uniqueness." (*Id.* at Ex. 50 at RFPD 68-70); *Century 21 Real Estate*

6   *Corp. v. Sandlin*, 846 F.2d 1175, 1179 (9th Cir. 1988).  There is no evidence of

7   advertisements, promotional expenditures, sales revenue, surveys, consumer

8   recognition, website visits, or other indicia of strength or renown to suggest that auto

9   makers, let alone the consuming public, know of "Calcar." *See supra* Sections II.B, fn.

10  3, and III.A.1.  With no evidence of market recognition or goodwill (much less proper

11  trademark use), there is genuine issue as to any material fact regarding to the overall

12  weakness Plaintiffs' CALCAR "mark."

13              **2.       The Parties Provide Unrelated Products and Services to**

14                       **Different Groups of People and Plaintiffs Have no Evidence of**

15                       **Expansion Into TCCI's Field**

16          The standard for whether the parties' goods or services are "related" is whether

17  customers are "likely to associate" their products. *See Surfvivor*, 406 F.3d at 633.

18  Where "there is no material evidence in the record that customers are likely to associate

19  the two products or conclude that the products come from the same source" summary

20  judgment is appropriate. *Id.* Here, the parties' objectives, purpose, and nature are so

21  disparate, it is no wonder that there has been no evidence of confusion over six years of

22  co-existence.  TCCI is an advocacy group with a mission to reduce reliance on foreign

23  oil and lower emissions. (Kramer Decl. ¶ 5.)  TCCI does not use "CalCars" to sell any

24  automotive products, and has no plans to do so. (Kramer Decl. at ¶5, ¶12 and ¶13;

25  Moore Decl. Ex. 43: Kramer Depo at 210:16.)  TCCI does not have any "customers": it

26  primarily provides information to the public and in terms of "products," it provides

27  bumper stickers and t-shirts to its donors, volunteers and other supporters of its mission.

28  (Kramer Decl. at ¶17; Moore Decl. Ex. 44: Kramer II Depo. at 380:25-382:7.)

-15-

HOWREY LLP

1    Plaintiffs are for-profit companies, one (American Calcar, Inc.) which sells no

2  products and generates income by licensing its patents in settlement of infringement

3  lawsuits, and the other (Calcar, Inc.), which designs and sells niche automotive

4  demonstration manuals and DVDs to automotive companies – a field completely

5  unrelated to TCCI's advocacy efforts.  (Moore Decl. at Ex. 6; Ex. 48; Ex. 32 at ¶¶ 2, 4.)

6  The fact that Plaintiffs claim that they had not heard of TCCI until 2007 (five years after

7  TCCI began using "CalCars") and that Mr. Gremban, who has been involved in the

8  electric car industry for nearly forty years, as well as Mr. Kramer, had not heard of

9  Calcar, Inc. until the lawsuit was filed, is further evidence that the parties operate in

10  different spheres.  (*Id.* at Ex. 45: Gremban Depo. at 257:21-258:12; Confidential Moore

11  Decl. Ex. 5 at ROG 4.)

12    Although Plaintiffs' Complaint refers to an "intention" to expand into "hybrid

13  technology," they have conceded that they have no such intention. *See supra* Section

14  II.B. at pg. 8.  In its tentative order denying the motion for preliminary injunction, this

15  Court recognized that the fact that the parties operate in the automobile arena is not

16  enough to find that the goods and services are related.  (Moore Decl. Ex. 1 at p. 8.)

17  Plaintiffs' own perception of "competition" does not make the QuickTip products

18  related to TCCI's PHEV advocacy efforts.  *See Thane Int'l, Inc. v. Trek Bicycle Corp.*,

19  305 F.3d 894, 908-909 (9th Cir. 2002) (acknowledging consumer differences between

20  sporting goods market and bicycle enthusiast market.)  There is no genuine issue as to

21  any material fact regarding the differences in the parties' services.

22        **3.    The Parties' Respective Audiences are Sophisticated**

23    When consumers are sophisticated or exercise great care in purchasing goods, or

24  where the goods are expensive, there is not a high likelihood of confusion. *See*

25  *Accuride Int'l, Inc. v. Accuride Corp.*, 871 F.2d 1531, 1537 (9th Cir. 1989).  In its

26  tentative order denying Calcar, Inc.'s motion for preliminary injunction, the Court found

27  that consumers of Plaintiffs' and Defendants' goods and services would exercise a high

28  degree of care. (Moore Decl. Ex. 1 at p. 10.)  A year later, the evidence proves that it

HOWREY LLP

EXHIBIT H
PAGE 23

1    would be virtually impossible that those who interface with the parties would make a

2    hasty and mistaken assumption that they are related or affiliated.

3         Plaintiffs' potential "customers" are one or more of "approximately twenty"

4    major automobile manufacturers that are potential purchasers of their Quick Tip guides.

5    (*Id.* at Ex. 33, ¶¶ 11-12.)  Plaintiffs do not sell products directly to the public.  Plaintiffs

6    have refused to produce any pricing information regarding their products (including the

7    cost of its manuals), but it is indisputable that the bulk purchase of these products by

8    automobile manufacturers is not a casual decision.  (*Id.* at Ex. 1 at p. 10; Ex. 29 at pp.

9    501-503; Defendants Sep. Stat. of Undisputed Facts (SUF) ¶¶ 55-56; *see also* fn. 3

10   (regarding inconclusive shipping receipts that fail to identify contacts or fact of

11   distribution.))  Because the manuals specifically relate to a media or navigation system

12   of a car company's vehicle, there must be direct and involved contact between Plaintiffs

13   and the representative of the automobile manufacturer, who, necessarily, would need to

14   be familiar with the vehicle's navigational or electronics system and what Plaintiffs

15   have to offer.  (*See* Moore Decl. Exs. 2-3; Confidential Moore Decl. Ex. 2.)

16        Similarly, TCCI's audience (it has no customers *per se*) are driven, eco-friendly,

17   environmentally conscious individuals and organizations.  (Kramer Decl. at ¶14.)  They

18   volunteer, visit TCCI's website, and subscribe to TCCI's newsletter, knowing that they

19   *want* to be part of TCCI's efforts to promote PHEV development.  There is no evidence

20   that TCCI's audience has ever heard of "Calcar, Inc." or "American Calcar, Inc." and

21   little opportunity or reason for any of TCCI's audience to be confused between the

22   parties.  In these types of circumstances, courts rarely find likelihood of confusion. *See*

23   *Accuride*, 871 F.2d at 1537 ("purchasers of the parties' goods … would be expected to

24   exercise a high degree of care in making their purchase decisions.  This factor weighs

25   heavily against the finding a likelihood of confusion in the relevant purchasing

26   population"); *EA Eng'g, Sci. & Tech., Inc. v. Envtl. Audit, Inc.*, 703 F. Supp. 853, 858

27   (C.D. Cal. 1989).  In light of the care, sophistication, and nature of Plaintiffs'

28

-17-

EXHIBIT H
PAGE 24

1   transactions and their niche group of clients, and the nature of TCCI's organization and

2   audience, future name confusion is highly unlikely.

3          **4.        After Nearly *Six* Years, There Has Been No Actual Confusion**

4          Where significant time has passed with two names in the market, a relative lack

5   of actual confusion between them is persuasive evidence that confusion is not likely.

6   *Cohn*, 281 F.3d at 842-43 (several dozen inquiries over six years insufficient evidence).

7   There is no relevant evidence that anybody who supported or volunteered with TCCI

8   did so under the mistaken belief that it was associated with Calcar, Inc, especially when

9   Mr. Kramer and Mr. Gremban both testified that they had never heard of Plaintiffs until

10  the lawsuit. (Moore Decl. Ex. 44: Kramer II Depo. at 568:5-569:4; Ex. 45: Gremban

11  Depo. at 257:21-258:12; 208:20-209:19; *see also* Kramer Decl. ¶ 13.)  Nor is there any

12  evidence that any of Plaintiffs' automotive clients have been confused, even for a

13  moment. (Moore Decl. Ex. 41 at RFPD 59; Ex. 40 at RFPD 110; Ex. 53 at RFPD 43-

14  45; *see also* Ex. 46: Klein Depo at 181:21 – 182:4.)[5]  Nobody has ever approached

15  TCCI or Mr. Kramer to ask about an affiliation with Plaintiffs or "Calcar." (*Id.*; Moore

16  Decl. Ex. 43: Kramer Depo.106:8-13, 131:18-132:15; Ex. 44: Kramer II Depo. at 567:5-

17  568:4; Ex. 45: Gremban Depo. at  208:20-209:19; Ex. 42 at ¶¶ 6-7; Ex. 49 at ROG 12.)

18  Having failed to produce any relevant evidence that consumers confuse the parties'

19  identities, Plaintiffs cannot establish a "mental recognition in buyers' and potential

20  buyers' minds" between "CALCAR" and a single source.  *Japan Telecom, Inc. v. Japan*

21  *Telecom Amer., Inc.*, 287 F.3d 866, 873-75 (9th Cir. 2002).

22         In the absence of actual confusion over a six-year period, Plaintiffs should have

23  conducted a consumer confusion survey.  Their failure to do so is strong evidence that

24  _____

25  [5] Mr. and Mrs. Obradovich's personal beliefs about "confusion" are not evidence of
    confusion.  For example, Mr. Obradovich suggests that every time TCCI uses "CalCars"
26  and others repeat it as a reference to TCCI, that is somehow evidence of confusion.
    (Moore Decl. Ex. 47: Depo. at 73:2-76:19.)  He could not recall any specifics of any
27  consumer confusion.  (*Id.* at 76:9-19.)

28

-18-

HOWREY LLP

EXHIBIT H
PAGE 25

1  they cannot show any likelihood of confusion. *Cairns v. Franklin Mint, Co.*, 24 F. Supp.

2  1013, 1041 (C.D. Cal. 1998) ("a plaintiff's failure to conduct a consumer survey,

3  assuming it has the financial resources to do so, may lead to an inference that results of

4  such a survey would be unfavorable"); *Playboy Enters., Inc. v. Netscape Commc'n.*

5  *Corp.*, 55 F. Supp. 2d 1070, 1084 (C.D. Cal. 1999). There is no genuine issue as to any

6  material fact as to the *de minimus*, if any, consumer confusion over the last six years.

7           **5.**    **TCCI Adopted The Nickname "CalCars" In Good Faith**

8       The "intent" factor in the *Sleekcraft* analysis looks to evidence of bad faith in a

9  defendant's adoption of the accused mark. It is undisputed that Mr. Kramer adopted

10  "CalCars" without any knowledge of Plaintiffs or their alleged rights in the name

11  "Calcar." (Moore Decl. Ex. 37 at ROG 10; Kramer Decl. ¶ 18.) Indeed, he had never

12  heard of Plaintiffs before being contacted by their attorneys. (Kramer Decl. ¶ 18.)

13  There is no genuine issue as to any material fact regarding TCCI's good faith in

14  adopting the nickname "CalCars" and the website URL calcars.org. *See also* Section

15  II.A (discussing reasons for choosing name.)

16           **6.**    **The Parties' Marks and Marketing Are Dissimilar**

17       Similarity of marks is determined by the appearance, sound, and meaning of the

18  marks when considered in their entirety and as they appear in the marketplace. *See*

19  *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000). As they

20  appear in the marketplace, the parties' respective names and marks are neither identical,

21  nor confusingly similar, and have different meanings:

22
23   

24       When used in press articles, the name "CalCars" is typically preceded by the full

25  name that is abbreviates, "The California Cars Initiative," and often with the fact that the

26  company is a non-profit organization based in Northern California. (Moore Decl. Ex. 14;

27  Ex. 43: Kramer Depo at 98:4-9.) "CalCars" is a direct reference to the words "California

28  Cars" in TCCI's name. When an interested person visits TCCI's website, or reads an

HOWREY LLP

EXHIBIT H
PAGE 20

1  article about "The California Cars Initiative" or TCCI's CalCars News about efforts to

2  promote PHEVs, the context and source is very clear. In many instances, such as on its

3  home page (see screenshot on pg. 4), in PowerPoint presentations, and its promotional

4  bumper stickers and t-shirts, TCCI uses a distinctive font, coloring, and design. (Kramer

5  Decl. Exs. 1, 3-6, 8.)

6      In contrast, Plaintiffs use "Calcar" in conjunction with a horse logo. Plaintiffs

7  claim that "Calcar" means "spur." (Moore Decl. Ex. 33 at ¶3.) Plaintiffs use the name

8  on letterhead and business cards, but the name does not appear in the press or

9  advertisements. (*Id.* at Ex. 5 at CALCAR 0027; Confidential Moore Decl. Ex. 1.) As to

10  the "Quick Tip" guides, only people who know to look for "Calcar, Inc." or "Calcar" on

11  the copyright page at back of the manuals would notice it. *See supra* at Sections II.B.

12  and III.A.1. Because the parties' marks are accompanied by other slogans, designs, and

13  graphics, summary judgment is appropriate. *Surfvivor*, 406 F.3d at 633 (affirming

14  defense summary judgment, finding similarity of marks factor neutral as between

15  "Survivor" and "Surfvivor" and acknowledging marks' differences in graphics and

16  accompanying slogans).

17      Overall, the content, method, and purpose of the parties' marketing are distinct.

18  As the Court previously recognized, the fact that both parties have websites does not

19  create overlap (Moore Decl. Ex. 1 at p.9), and discovery has shown that Plaintiffs have

20  no evidence that anybody has visited their website, much less that those who are looking

21  for information from TCCI. TCCI's messaging is clear, and refers to "The California

22  Cars Initiative" and to its non-profit status, mission and message. (Kramer Decl. ¶¶ 2,

23  6, 9-12, 15-16; Exs. 1, 4-6.) TCCI "markets" through speaking at public forums, private

24  events, presentations to the media, word of mouth, its "CalCars-News" subscription

25  newsletter, unsolicited press, and news stories. (*Id.* at ¶ 6.) TCCI's communications

26  with representatives of automobile manufacturers are conducted through sophisticated

27  high-level media representatives, managers, and engineers who are sensitive to

28  environmental issues – not with those involved in purchasing decisions for what is

HOWREY LLP

EXHIBIT H
PAGE 27

1  included in a bundle of materials given to new car buyers.  (Moore Decl. Ex. 45:

2  Gremban Depo. at 145:3-146:18; Ex. 54.)  TCCI's contacts are typically involved in

3  high-level policy making decisions and are well-versed in TCCI's campaign for the

4  advancement of environmental automotive technology.  (Moore Decl. Ex. 43: Kramer

5  Depo. at 35:2-25; 239:7-16; Ex. 45: Gremban Depo at 145:3-146:8; 244:25-245:9; Ex.

6  54; Kramer Decl. Ex. 8.)

7       Among a pool of "twenty" total automobile manufacturers, several of whom

8  Plaintiffs have sued, Plaintiffs market to them via "cold" calls or personal letters or

9  work through Mr. and Mrs. Obradovich's personal contacts.  (*Id.* at Ex.47: Michael O.

10  Depo. at 13:14-15:17, 68:1-19; Ex. 38 at ROG 1; Ex. 42 at TCCI ROG 3; Ex. 48;

11  Confidential Moore Decl. at Ex. 9: Karen O. Depo. at 7:7-8:7; Ex. 1.)  *See supra*

12  Sections II.B. and III.A.1 (describing Plaintiffs' clients and limited use).  To put it

13  simply, there is no evidence of overlap.  Accordingly, there is no genuine issue as to any

14  material fact regarding the dissimilarity between the parties' marketing channels and

15  efforts.

16       **C.    *Plaintiffs Cannot Prove Their Dilution Claim***

17       To prove their trademark dilution claim (Count III), Plaintiffs must prove that

18  CALCAR is famous among the general consuming public and that it became famous

19  before TCCI's first use of "CalCars" in 2002.  *Perfumebay.com Inc. v. eBay Inc.*, 506

20  F.3d 1165, 1179-1180 and fn. 8 (9th Cir. 2007) (state dilution analysis same as federal

21  dilution.)  Plaintiffs have failed to produce any such evidence.  (SUF ¶¶ 35-37, 39-44,

22  48-49, 54.)

23       Plaintiffs have produced no evidence that more than a few people within a select

24  group of automobile makers, and those who American Calcar has sued, have ever heard

25  of a company named "Calcar," let alone a product branded under the CALCAR name.

26  Plaintiffs have produced no evidence that the CALCAR mark is "widely recognized

27  among general consuming public," 15 U.S.C. § 1125(c)(2), or a "household name."

28  *Thane*, 305 F.3d at 911.  Plaintiffs have produced no consumer survey, third party

-21-

EXHIBIT H
PAGE 28

1  testimony, proof of meaningful advertising, proof of any revenues or marketing

2  expenditures – nothing at all – to support the contention that CALCAR is famous, much

3  less that it was famous as of July 2002 (TCCI's first use.)  *Cf. id.* at 909 (finding

4  "TREK" was not famous despite 20-plus years use, $3-5 million a year in advertising in

5  publications of general interest, sponsorship with Lance Armstrong, and numerous

6  awards).  For these failures, this Court should grant summary judgment on Plaintiffs'

7  dilution claim.

8      **D.    *Plaintiffs Cannot Prove Their Damages Claim***

9          Plaintiffs sought in their Complaint's prayer "monetary damages, including an

10  award of Defendants' profits."  (Moore Decl. Ex. 30.)  In their answer to Defendants'

11  interrogatory seeking the basis for their damages claim, Plaintiffs allege that "Where

12  there is a likelihood of confusion, it is presumed that Plaintiffs will suffer irreparable

13  harm."  (Moore Decl. Ex. 38 at ROG 7, p.4:8-9.)  Even if Plaintiffs had earned this

14  presumption, it would establish only the fact of damage, not the amount.  But a

15  "plaintiff must prove both the fact and the amount of damage."  *Lindy Pen Co., Inc. v.*

16  *Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir. 1993).  Not only have Plaintiffs failed to

17  prove the amount of any damages they have suffered, they have disclaimed attempting

18  to do so.

19          Plaintiffs have since February of this year repeatedly rebuffed Defendants'

20  discovery requests on the ground that "Plaintiffs do not intend to seek damages."

21  (Moore Ex. 51 at ROG 1, p.3; ROG 8, p.8.).  Plaintiffs opposed Defendants' motion to

22  compel by repeatedly asserting that "this case is about injunctive relief and not

23  damages," (*Id.* at Ex. 41 at p.5:24-25), that "*Plaintiffs have dropped their claims for*

24  *damages from this lawsuit,*" *id.* at 26-27, 30, 33, 37, 40, 44, 49, 63 and 96 (emphasis in

25  original), and that "ACI has disclaimed any claim for damages," *id.* at 27, 30, 34, 37 and

26  50, while repeatedly criticizing Defendants for "irrationally denying that Plaintiffs have

27  dropped their damages claim from this case."  (*Id.* at 27, 31, 34, 38 and 50.)  Plaintiffs

28  then opposed Defendants motion for discovery sanctions by repeatedly asserting that

-22-

EXHIBIT H
PAGE 29

1  they "do not seek economic damages." (*Id.* at Ex. 52 at pp. 1, 2.)  At the hearing on

2  Defendants' motion to compel, Plaintiffs counsel argued "this is an injunction case

3  where we're not looking for damages." (Moore Ex. 29 at pp. 294-95 at 40:16-41:11.)

4  Plaintiffs have sought to overturn Magistrate Judge Johnson's discovery order by

5  reiterating that "This is an injunction case" and "Plaintiffs have dropped their claims for

6  damages from the lawsuit." (*Id.* at Ex. 35 at pp. 2:12; 3:16.)  Through these 28

7  unequivocal statements, Plaintiffs have waived their claims for damages.

8        Plaintiffs now try to limit that their abandonment of their damages claim to "past

9  economic damages," (*Id.* at Ex. 29 at p.306; Ex. 35 at p.7), seeking to retain a claim for

10  corrective advertising damages. (*Id.* Ex. 52 at p.2.)   Plaintiffs have never asserted such

11  a damages claim, however.  Plaintiffs have both waived the corrective advertising

12  damages claim by failing to allege it in their complaint or contention interrogatory

13  answer, and by failing to produce evidence necessary to support that claim. (Moore Ex.

14  38 at ROG 7.)  Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information . . . as

15  required by Rule 26(a) or (e), the party is not allowed to use that information . . . on

16  motion").  Plaintiffs have failed to produce any evidence of what they have spent, or

17  will spend, on corrective advertising. *See U-Haul Int'l, Inc. v. Jartran, Inc.*, 793 F.2d

18  1034 (9th Cir. 1986) (confirming award of plaintiff's actual corrective advertising

19  expenditures).  Plaintiffs have failed to identify how its corrective advertising expense

20  could be based on Defendants' advertising expenses, the amount of damage to its

21  CALCAR mark, or the relationship between Defendants' expenses and any such

22  damage. *See Adray v. Adry-Mart Inc.*, 76 F.3d 984, 988-89 (9th Cir. 1995).

23        Plaintiffs' damages claim also fails for lack of evidence. (*See* Moore Decl, Ex.

24  30: Complaint at ¶¶25, 30 and "Prayer for Relief.")  Plaintiffs produced nothing in

25  response to TCCI's discovery requests on the issue of actual damages, harm, or lost

26  sales.  After Magistrate Judge Johnson ordered Plaintiffs to produce their financial

27  documents or reach a stipulation formally abandoning their claims, Plaintiffs did

28  neither.  Instead, they produced a single-page summary of sales volumes, with no

HOWREY LLP

EXHIBIT H
PAGE 30

1  revenue or profit data.  Later, less than a week ago, they produced delivery receipts with

2  dollar values and delivery addresses redacted, and which failed to show that the Quick

3  Tip guides were actually distributed to any of Plaintiffs' customers.  *See supra* fn. 3

4  (discussing late produced evidence and Plaintiffs' refusal to make their 30(b)(6)

5  witnesses available for deposition on these documents).  Plaintiffs' failure to produce

6  sales revenue or profit numbers dooms their actual damages claim.  *See Lindy*, 982 F.2d

7  at 1408 (affirming denial of actual damages for plaintiff's failure to produce sales

8  revenue and profit data).

9         As Defendants have never made a profit, there are no profits to disgorge under 15

10 U.S.C. § 1117(a), nor has there been a showing of willfulness or intentional

11 infringement that courts consider a prerequisite to a disgorgement remedy.  *See id.* at

12 1406-08.  Because there is "no record that [Plaintiffs] suffered any damages as a result

13 of the asserted infringement," this Court should grant Defendants summary judgment as

14 to monetary damages.  *Surfvivor*, 406 F.3d at 634.

15 **IV.    CONCLUSION**

16        The Court should grant Defendants summary judgment on their affirmative

17 defense that the CALCAR registration is invalid (Fifth Affirmative Defense), Plaintiffs'

18 dilution and infringement claims (Courts I-IV), and Plaintiffs' lack of monetary

19 damages.

20 Dated:  June 30, 2008                    Respectfully submitted,

21

22                                         HOWREY LLP

23
                                           By: /s/ Bobby A. Ghajar
24                                             Bobby A. Ghajar
25                                             William C. Rooklidge
                                               Frank P. Coté
26
                                           Attorneys for Defendants
27                                         The California Cars Initiative
28                                         and Felix Kramer

HOWREY LLP

-24-

EXHIBIT H
PAGE 31

# EXHIBIT I

1    William C. Rooklidge (SBN 134483)
     Frank P. Coté (SBN 204529)
2    HOWREY LLP
     4 Park Plaza, Suite 1700
3    Irvine, CA 92614-2559
     Telephone: (949) 721-6900
4    Facsimile: (949) 721-6910
     E-mail: rooklidgew@howrey.com
5    E-mail: cotef@howrey.com

6    Bobby A. Ghajar (SBN 198719)
     Eric J. Moore (SBN 221995)
7    HOWREY LLP
     550 South Hope Street, Suite 1100
8    Los Angeles, California 90071
     Telephone: (213) 892-1800
9    Facsimile: (213) 892-2300
     E-mail: ghajarb@howrey.com
10   E-mail: mooree@howrey.com

11   Attorneys for Defendants
     The California Cars Initiative, Inc. and
12   Felix Kramer

13

14             **UNITED STATES DISTRICT COURT**

            **CENTRAL DISTRICT OF CALIFORNIA**
15
            **SOUTHERN DIVISION**
16

17
    CALCAR, INC., a California
18   Corporation; and AMERICAN CALCAR,
    INC., a Delaware corporation,
19

            Plaintiffs,
20

          vs.
21

22   THE CALIFORNIA CARS INITIATIVE,
    INC., an unknown business entity; and
    FELIX KRAMER, an individual,
23

            Defendants.
24

25

26

27

28

Case No. SACV07-723 AG (JWJx)

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Honorable Andrew J. Guilford

Date:      July 21, 2008
Time      10:00 a.m.
Ctrm:     10-D

HOWREY LLP

DM_US 23339461_2

EXHIBIT 1
PAGE 32

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ....................................................................................... 1

II.   THE COURT SHOULD GRANT DEFENDANTS' MOTION
      FOR SUMMARY JUDGMENT BECAUSE THERE IS AN
      ABSENCE OF EVIDENCE TO SUPPORT PLAINTIFFS'
      CLAIMS ................................................................................................... 2

      A.    Plaintiffs' Absence of Evidence ..................................................... 2

      B.    Plaintiffs Cannot Prove Their Trademark Infringement,
            False Designation of Origin, or Unfair Competition
            Claims ............................................................................................ 5

            1.    The Parties Continue to Provide Disparate
                  Products and Services ......................................................... 5

            2.    The Parties' Respective Audiences Are
                  Sophisticated Enough to Recognize the Difference
                  Between an Instructional Automotive Guide and a
                  Mission to Commercialize PHEVs ...................................... 7

            3.    After Six Years of Coexistence and Almost a Year
                  of Discovery Plaintiffs Confirm There is No
                  Relevant Actual Confusion ................................................. 9

            4.    The Lack of Recognition or Renown of CALCAR
                  Belies its Strength as a Source-Identifier of
                  Plaintiffs' Goods and Services .......................................... 11

            5.    Plaintiffs Admit They Have No Intention of
                  Expanding Into Hybrid Technology Per Se ....................... 13

            6.    There is an Insufficient Overlap of Marketing
                  Channels ............................................................................ 14

            7.    As They Appear in the Marketplace, the Marks are
                  Dissimilar .......................................................................... 15

            8.    TCCI's Good Faith Adoption of "CalCars" is
                  Questionable ...................................................................... 17

      C.    Plaintiffs Are Not Entitled to Any Presumptions
            Stemming from a Trademark Registration That Was
            Fraudulently Obtained, And is Otherwise Narrow in
            Scope ............................................................................................ 18

            1.    Plaintiffs' CALCAR Trademark Registration Is
                  Invalid Because It Was Obtained Through Fraud
                  on the USPTO .................................................................... 18

-i-

EXHIBIT 1
PAGE 33

1            2.    Whatever Trademark Rights Plaintiffs Have Are
                   Limited ........................................................................ 21
2
        D.    Plaintiffs' Varying Theories of Confusion Conflict With
3             Each Other and Are Unsupported by the Evidence ................... 21
4       E.    Defendants Should be Granted Summary Judgment on
              Plaintiffs' Damages Claim ......................................................... 23
5
III.    CONCLUSION ................................................................................ 25

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

HOWREY LLP

DM_US 213:9461_2

EXHIBIT 1
PAGE 34

1

# TABLE OF AUTHORITIES

2

Page

## CASES

3

4    *Accuride International, Inc. v. Accuride Corp.,*
     871 F.2d 1531 (9th Cir. 1989) ...................................................................8

5    *Adray v. Adry-Mart, Inc.,*
     76 F.3d 984 (9th Cir. 1995) ..........................................................24, 25

6

7    *Anderson v. Liberty Lobby,*
     477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ......................2

8    *Angel v. Seattle-First National Bank,*
     653 F.2d 1293 (9th Cir. 1981) ...............................................................2

9

10   *Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc.,*
     457 F.3d 1062 (9th Cir. 2006) ..............................................................23

11   *Blockbuster Videos v. City of Tempe,*
     141 F.3d 1295 (9th Cir. 1998) ..............................................................18

12

13   *Brookfield Comm'ns., Inc. v. West Coast Entertainment Corp.,*
     174 F.3d 1036 (9th Cir. 1999) ...........................9, 11, 12, 17, 20, 21

14   *Cairns v. Franklin Mint, Co.,*
     24 F. Supp. 2d 1013 (C.D. Cal. 1998) ...................................................10

15

16   *Entrepreneur Media, Inc. v. Smith,*
     279 F.3d 1135 (9th Cir. 2002) ................................................................5

17   *First Franklin Finance Corp. v. Franklin First Finance, Ltd.,*
     356 F. Supp. 2d 1048 (C.D. Cal. 2005) .................................................22

18

19   *Gillette Co. v. Wilkinson Sword, Inc.,*
     1992 U.S. Dist. LEXIS 1265 (S.D.N.Y. Jan. 31, 1992) ........................25

20   *Glow Industrial v. Lopez,*
     273 F. Supp. 2d 1095 (C.D. Cal. 2002) .................................................10

21

22   *GoTo.com, Inc. v. Walt Disney Co.,*
     202 F.3d 1199 (9th Cir. 2000) ..............................................................15

23   *Herbaceuticals, Inc. v. Xel Herbaceuticals, Inc.,*
     86 U.S.P.Q. 2d 1572 (TTAB March 7, 2008) ........................................19

24

25   *International Star Class Yacht Racing Association v. Tommy Hilfiger USA, Inc.,*
     80 F.3d 749 (2d Cir. 1996) ...................................................................18

26   *Interstellar Starship Services v. Epix, Inc.,*
     304 F.3d 936 (9th Cir. 2002) ................................................................22

27

28   *Karl Storz Endoscopy-America, Inc. v. Surgical Techs., Inc.,*
     285 F.3d 848 (9th Cir. 2002) .........................................................22-23

-iii-

EXHIBIT 1
PAGE 35

*M2 Software, Inc. v. Madacy Entertainment,*
    421 F.3d 1073 (9th Cir. 2005) ................................................................. 13

*Matrix Motor Co. v. Toyota Jidosha Kabushiki Kaisha,*
    290 F. Supp. 2d 1083 (C.D. Cal. 2003) ...................................................... 3

*Medinol Ltd. v. Neuro Vasx, Inc.,*
    67 U.S.P.Q. 2d (BNA) 1205 (T.T.A.B. 2003) ........................................... 19

*Mirage Resorts, Inc. v. Cybercom Products,*
    228 F. Supp. 2d 1141 (D. Nev. 2002) ........................................................ 23

*National Fire Prot. Association, Inc. v. International Code Council, Inc.,*
    2006 WL 839501 (D.Mass. 2006) .............................................................. 24

*New West Corp. v. NYM Co. of California, Inc.,*
    595 F.2d 1194 (9th Cir. 1979) .................................................................. 20

*Paladin Assocs., Inc. v. Montana Power Co*
    328 F.3d 1145 (9th Cir. 2003) .................................................................... 5

*Payless Shoesource, Inc. v. Reebok International Ltd.,*
    998 F.2d 985 (Fed. Cir. 1993) .............................................................. 22-23

*Perfumebay.com, Inc. v. eBay, Inc.,*
    506 F.3d 1165 (9th Cir. 2007) ............................................................. 8, 22

*Quicksilver Inc. v. Kymsta Corp.,*
    466 F.3d 749 (9th Cir. 2006) .................................................................. 21

*Surfvivor Media, Inc. v. Survivor Products,*
    406 F.3d 625 (9th Cir. 2005) ...................................................2, 3, 13, 17, 22

*Switchmusic.com, Inc. v. U.S. Music Corp.,*
    416 F. Supp. 2d 812 (C.D. Cal. 2006) ...................................................... 15

*Therma-Scan, Inc. v. Thermoscan, Inc.,*
    295 F.3d 623 (6th Cir. 2002) .................................................................. 11

*Walter v. Mattel,*
    210 F.3d 1108 (9th Cir. 2000) .................................................................... 5

*West Des Moines State Bank v. Hawkeye Bancorporation,*
    722 F.2d 411 (8th Cir. 1983) .................................................................. 24

*Zazu Designs v. L'Oreal, S.A.,*
    979 F.2d 499 (7th Cir. 1992) .................................................................. 25

**STATUTES**

15 U.S.C. § 1114(1) ............................................................................... 20

15 U.S.C. § 1115(b)(1) ........................................................................... 20

HOWREY LLP

DM_US:21339461_2

EXHIBIT 1
PAGE 36

1  15 U.S.C. § 1117 ................................................................................................. 23

2  15 U.S.C. § 1119 ................................................................................................. 20

3  Fed. R. Civ. P. 56(e) ........................................................................................... 2

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HOWREY LLP

DM_US 21339461_2

EXHIBIT I
PAGE 37

1  **I.    INTRODUCTION**

2           In a case where the strength of the CALCAR mark has been questioned since

3  Plaintiff Calcar, Inc.'s unsuccessful motion for preliminary injunction, Plaintiffs

4  dropped their fame-based dilution claim after compelling TCCI to incur the expense of

5  litigating the issue for a year.  Also, concurrent with their opposition filed on July 7,

6  2008, months after the close of discovery, almost a year after Defendants served their

7  discovery requests and in clear violation of Federal Rule of Civil Procedure 26,

8  Plaintiffs produced over 400 new documents and attached many of them to Mr.

9  Obradovich's latest declaration in an attempt to survive summary judgment by

10 burdening Defendants and this Court with off-topic and unsubstantiated evidence.

11 Despite this sandbagging and last-minute claim pruning, Plaintiffs have nothing to

12 support their remaining claims and damages prayer other than unsupported and

13 conclusory allegations, which are insufficient to create a triable issue of fact so as to

14 preclude summary judgment.

15          Instead of going beyond the pleadings and designating "specific facts" evidencing

16 a genuine issue of material fact for trial as required by Federal Rule of Civil Procedure

17 56(e), Plaintiffs attempt to cast The California Cars Initiative as a politically polarizing

18 organization, Mr. Kramer as a greedy opportunist, Defendants' counsel as vengeful

19 crusaders, Quick Tips as safety guides, Auto-Director as computer hardware, general

20 automotive technology as hybrid technology, and virtually everyone as the relevant

21 consuming public.  The legal analysis, however, remains the same as that laid out in

22 Defendants' opening brief:  there can be no likelihood of confusion where there is a

23 confirmed absence of objective evidence of (1) similar "products" or services "sold" by

24 the parties; (2) consumer recognition and commercial strength of "Calcar" as uniquely

25 associated with Plaintiffs' goods and services; (3) actual confusion among relevant

26 consumers; (4) credible evidence of expansion; or (5) relevant overlap in marketing.

27 This is especially true in light of Plaintiffs' failure to disprove (1) the high degree of

28

-1-

1  care exercised by the parties' respective audiences; (2) the dissimilarity of the marks as

2  they appear in the marketplace; (3) the unrelatedness between TCCI's advocacy efforts

3  and Plaintiffs' printed or electronic manuals; (4) TCCI's good-faith adoption of the

4  nickname "CalCars;" (5) Plaintiffs' use of "Calcar" predominantly as a trade name; and

5  (6) Plaintiffs' fraud on the USPTO at least with respect to computer hardware and

6  telecommunications connections. Plaintiffs' opposition confirms that they have failed

7  to carry their burden to prove a likelihood of confusion or damages.

8  **II.   THE COURT SHOULD GRANT DEFENDANTS' MOTION FOR**

9  **SUMMARY JUDGMENT BECAUSE THERE IS AN ABSENCE OF**

10  **EVIDENCE TO SUPPORT PLAINTIFFS' CLAIMS**

11  **A.   Plaintiffs' Absence of Evidence**

12        To defeat TCCI's motion, Plaintiffs' cannot "rely merely on allegations or

13  denials," rather, they must "must set out specific facts showing there is a genuine issue

14  for trial." Fed. R. Civ. P. 56(e). If the evidence is "merely colorable, or is not

15  significantly probative," or just raises "some metaphysical doubt as to the material fact,"

16  summary judgment may be granted. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249-50,

17  261, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Likewise, a motion for summary

18  judgment cannot be defeated by mere conclusory allegations unsupported by factual

19  data. *Angel v. Seattle-First Nat'l Bank*, 653 F.2d 1293, 1299 (9th Cir. 1981).

20        Plaintiffs cannot survive summary judgment through their speculation, innuendo,

21  and lack of evidence. They cite no case in which a court has denied a defense motion

22  for summary judgment based on a record as devoid of objective proof as what Plaintiffs

23  rely on here. By comparison, on objectively stronger plaintiff's facts, in *Surfvivor*

24  *Media, Inc. v. Survivor Products*, 406 F.3d 625, 633 (9th Cir. 2005), the Ninth Circuit

25  affirmed a grant of summary judgment in favor of defendants because no material issue

26  of fact was raised reflecting confusion between the marks. In that case, while the

27  suggestive marks differed by only one letter and sounded "nearly identical," the court

28

-2-

1    noted they were visually distinctive because of their typical use with other slogans or

2    graphics such that any similarity between "Surfvivor" and "Survivor" did not help the

3    plaintiff survive summary judgment. *Id.* The goods were not related, despite both

4    parties' incorporation of a general "outdoor theme," because there was a lack of record

5    evidence to show customers were likely to associate the products or associate them as

6    coming from the same source. *Id.* There was "scant evidence" of actual confusion (two

7    instances), despite some overlap in marketing channels. *Id.* at 633-34. Additionally, the

8    plaintiff expressed an interest in expansion, but had a "complete inability to adduce any

9    concrete evidence of expansion plans." *Id.* at 634. The Ninth Circuit also noted another

10   basis for granting summary judgment: the lack of evidence that the plaintiff suffered any

11   damages as a result of the asserted infringement. *Id.* at 634 n.4.[1] Plaintiffs' similar

12   failure here to raise a genuine issue of material fact as to likelihood of confusion and

13   damages confirms that Defendants' motion for summary judgment should be granted.

14           Defendants' opening brief highlighted the following lack of evidence:

15   •    no financial data relating to Plaintiffs' sales, revenue, marketing
          expenditures, pricing, profits, or product distribution;

16   •    no admissible or objective evidence of strength, fame, or scope of
          protectable use of CALCAR as a trademark;

17   •    no overlapping goods "sold" by non-profit TCCI to "customers;"

18   •    no consumer confusion survey or any other admissible evidence of
          likelihood of consumer confusion between the parties and their activities;

19   •    no third party testimony showing any likelihood of harm to Plaintiffs'
          because of any association with TCCI;

20   •    no proof of monetary damage; and

21   •    no proof of use of the CALCAR mark in commerce on goods such as
          computer hardware and telecommunications services.

22   Plaintiffs' Opposition confirms their lack of proof on these critical issues.

23

24   ─────────────────

25   [1] *See also Matrix Motor Co. v. Toyota Jidosha Kabushiki Kaisha*, 290 F. Supp. 2d 1083,
     1092 (C.D. Cal. 2003) (granting defense summary judgment where plaintiff sold race

26   car and parts, and defendant sold passenger cars, finding that "Plaintiff has shown no
     evidence of ill will when people buy Plaintiff's products, that any people have bought

27   one of Plaintiff's products believing it was a Toyota product (or vice versa), that it has
     lost or will lose any goodwill due to Defendants' use of the TOYOTA MATRIX mark"

28   and that Plaintiff presented no evidence of its own reputation.).

-3-

EXHIBIT I
PAGE 40

1      Plaintiffs rely on the same allegations as when the Court denied their motion for

2  preliminary injunction, namely that: (1) Calcar, Inc. distributes "millions" of Quick

3  Tips; (2) American Calcar, Inc. owns patents that could relate to hybrid technology; (3)

4  Plaintiffs are expanding into hybrid technology; (4) automobile manufacturers associate

5  CALCAR mark with high-quality goods and services, with Plaintiffs as the source; and

6  (5) Ms. Spiegel read a newspaper article about TCCI, allegedly called Plaintiffs, and

7  was therefore "confused." This Court did not find that evidence persuasive. (Moore

8  Decl. Ex. 1.)[2] To supplement this bare record, Plaintiffs have submitted more

9  speculative, self-serving, or otherwise inadmissible testimony of renown and confusion

10  from Plaintiffs' principal and his wife.

11      Plaintiffs continue to refuse to produce documents and information despite an

12  order compelling production. While simultaneously filing a motion to vacate that order,

13  an order they first chose to willfully violate, Plaintiffs produced over 1,000 pages of

14  heavily redacted shipping receipts for their Quick Tips guides two business days before

15  the motion cut-off. (Confidential Moore Decl. ¶ 10, Ex. 10.) As discussed in

16  Defendants' opening brief, even if admissible, those shipping receipts do not establish

17  proof of sales or distribution or trademark use of CALCAR.

18      Plaintiffs were aware of the discovery deadlines, and the special extension

19  stipulated to regarding the continued depositions of the parties' key witnesses, yet

20  refused to make the Obradoviches available. On July 7, 2008, Plaintiffs served their

21  opposition brief with a new-found focus on their Auto-Director software, and over 400

22  pages of additional documents, many attached to Mr. Obradovich's latest declaration.

23

----

24  [2] For the Court's reference, as in previous briefs, Defendants use the same naming
    convention for the supporting declarations cited herein. Aside from the Reply
25  Declaration of Eric Moore ("Moore Reply Decl."), the declarations cited herein refer to
    those filed on June 30 and July 7 (designated "Moore Decl." and "Moore Opp. Decl.")
26  with Defendants' opening brief and opposition to Plaintiffs' motion, respectively.
    Likewise, references to Plaintiffs' declarations are designated with similar abbreviations
27  to their motion for partial summary judgment and opposition (e.g. "Michael O. Decl.
    ISO PMSJ.")

28

HOWREY LLP

DM_US:21339461_2

EXHIBIT 1
PAGE 41

1  Yet, despite these belated attempts to selectively fill the self-created gaps in the record,

2  Plaintiffs are essentially left with the Declarations of Michael and Karen Obradovich

3  stating their beliefs that "Calcar" is well-known and that TCCI's use of "CalCars" is

4  confusing.  It is well established that "mere speculation is not evidence." *Surfvivor* at

5  634 (citing *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1161 (9th Cir.

6  2003).)  The Obradoviches' perception is not proof of *probable* confusion among an

7  appreciable number of reasonably prudent consumers.  *See Entrepreneur Media, Inc. v.*

8  *Smith*, 279 F.3d 1135, 1151 (9th Cir. 2002).

9       **B.    Plaintiffs Cannot Prove Their Trademark Infringement, False**

10            **Designation of Origin, or Unfair Competition Claims**

11            Plaintiffs' trademark infringement, false designation of origin and unfair

12  competitions claims hinge on whether they can prove a likelihood of confusion between

13  TCCI's longstanding use of "CalCars" for its non-profit organization's PHEV

14  awareness efforts on the one hand, and Plaintiffs' limited, cryptic use of "Calcar, Inc."

15  on its printed manuals, software demonstrations, and website.  *See Walter v. Mattel*, 210

16  F.3d 1108, 1111 (9th Cir. 2000).  Plaintiffs have not carried their burden of proof.

17       **1.    The Parties Continue to Provide Disparate Products and**

18            **Services**

19            Plaintiffs attempt to create "relatedness" where it does not exist.  For example,

20  Plaintiffs point to amorphous automotive patents "including those designed for or usable

21  with hybrid cars" (but not for plug-in hybrid electric technology)[3] and the Mazda

22  Tribute Hybrid Quick Tip (which is largely the same as the other instructional manuals)

23  (Opp. at 18), as if the link between the parties can be established through a mere

24

25  _____

26  [3] Asked about the scope of the patents, American Calcar's 30(b)(6) witness refused to
    testify based on privilege.  (Confidential Moore Opp. Decl. Ex. 2:Yip. Depo. at 171:7-
    172:12.)  Regardless, the fact that a patent application covers a product theoretically

27  "usable" with a hybrid car is irrelevant, and ownership of a patent application is not a
    "service" that confers trademark rights on its owner. (*See id.* at 169:4-171:7.)

28

HOWREY LLP

DM_US:21339461_2

EXHIBIT I
PAGE 42

1   compatibility of Plaintiffs' products with hybrid cars.  (Moore Reply Decl. ¶ 8, Ex. 7

2   (discussing Plaintiffs' patents and their unrelatedness to hybrid vehicles; *also compare*

3   Confidential Moore Decl. Ex. 4 with Moore Decl. Ex. 2.)

4        Through advocacy and demonstration of how PHEVs are viable, TCCI promotes

5   the successful commercialization of PHEVs by whoever is willing to answer the call.

6   (Defendants' Response to Plaintiffs' Genuine Issues of Material Fact ("SGI") ¶¶ 2, 6,

7   11, 13.)  Defendants explained and proved that TCCI is a non-profit advocacy

8   organization which does not sell any automotive "products," it is not a "commercial

9   venture," and it has no "customers" *per se.*  (Kramer Decl. ¶ 5; Kramer Opp Decl. ¶ 2.)

10  In opposition, Plaintiffs' mischaracterize Mr. Kramer's testimony to paint TCCI as Felix

11  Kramer's for-profit enterprise.  (Opp. at 17.)  These irrelevant, unfounded, and personal

12  attacks fail to identify what "products" TCCI sells to what customers, much less their

13  relatedness to the products Plaintiffs allegedly brand as "CALCAR."

14        Plaintiffs falsely assert that the parties both make "in-vehicle display systems."

15  (Opp. at 17.)  There is no such thing as a "CalCars' CAN-view display," and TCCI does

16  *not* make or market any screen displays.  (Kramer Decl. ¶ 25; Moore Opp. Decl. Ex. 1:

17  Kramer I Depo. at 240:2-15; Kramer II Depo. at 344:2-348:2; 563:20-564:10.)  The

18  CAN-view circuit board that works with Toyota Priuses or freestanding displays is

19  made by an unrelated third party.  (Kramer Decl. ¶ 25; Moore Decl., Ex 44: Kramer II

20  Depo. at 336:3-347:7, 563:3-10.)  TCCI only lists that provider on its website among a

21  list of 13 "Hybrid component" companies.  (Kramer Decl. at ¶24, Ex. 10.)  The list

22  does not identify any products (*id.*) and TCCI and Mr. Kramer do not receive revenue

23  from and do not have an ownership stake in that company's endeavors. (Kramer Opp.

24  Decl. ¶ 24.)  What Plaintiffs call the Auto-Director "in-vehicle electronic screen display

25  system" is beta computer *software* that Plaintiffs have yet to sell in the last *eleven* years.

26  (Moore Opp. Decl. Ex. 2: Michael O. Depo. at 44:3-17; Moore Decl. Ex. 41 at ROG 8,

27

28

HOWREY LLP

DM_US:21339461_2

EXHIBIT I
PAGE 45

1    18; Ex. 39 at ROG 1; Confidential Moore Opp. Decl. Ex. 1: Karen O. Depo. at 13:9-16;

2    *Id.* at Ex. 2: Yip Depo. at 152:17-153:6, 39:22-24; *Id.* at Ex. 2.)[4] *See infra* II.C.1.

3        Plaintiffs also allege that both parties "distribute printed instructional materials that

4    detail the operation and condition of a vehicle, including hybrid vehicles" (Opp. at 17-

5    18), but cite to no evidence to support TCCI's distribution of such materials, or how their

6    content could at all overlap.  In sum, Plaintiffs' goods and TCCI's advocacy and

7    development efforts are completely unrelated, such that auto makers, volunteers, or

8    donors are not likely to mistake the two, making this factor strongly favor Defendants.

9        **2.    The Parties' Respective Audiences Are Sophisticated Enough to**

10            **Recognize the Difference Between an Instructional Automotive**

11            **Guide and a Mission to Commercialize PHEVs**

12        Defendants' motion noted that Plaintiffs' originally asserted only "approximately

13   twenty" major automobile manufacturers as potential customers, (Moore Decl., Ex. 32:

14   Michael O. Decl. ISO PI ¶¶ 11-12), and that because Plaintiffs' products are automobile

15   brand-specific, those alleged customers must necessarily be familiar with the goods

16   such that the bulk purchase of those products is neither a casual decision, nor a likely

17   point of hypothetical confusion with TCCI's activities.  In response, Plaintiffs repeat the

18   argument from their preliminary injunction motion that the effect of the high degree of

19   care exercised by sophisticated customers is somehow irrelevant if the marks are

20   similar, and that "initial interest confusion" makes this factor irrelevant. (Moore Opp.

21   Decl., Ex. 9: Mot. for PI at pp. 9-10; Opp. at 21-22.)  This attempt to downplay a factor

22   that points squarely in Defendants' favor is not supported by Ninth Circuit law. *See*

23

24   ─────────────────────

25   [4] As to the flawed argument that the hardware display systems are similar in appearance,
     the console itself belongs to neither Hybrid Interfaces (CAN-view's provider) (much
     less TCCI), nor Plaintiffs: it comes with the car.  The display is also different: the CAN-

26   view (offered at www.hybridinterfaces.ca), for example, may show diagnostic tools
     *specific* to how a hybrid or PHEV functions between gas and electric power.  (Brookey

27   Decl. ISO PMSJ, Ex. L at p. 173.)  The cited Auto-Director screen shot shows how to
     set the date and time.  (Michael O. Decl. ISO PMSJ, Ex. C.)

28

-7-

EXHIBIT I
PAGE 46

1   *Perfumebay.com, Inc. v. eBay, Inc.*, 506 F.3d 1165, 1176 (9th Cir. 2007) (noting that the

2   relatedness of goods offered and the level of care exercised by the consumer may

3   largely determine initial interest confusion); *Accuride Int'l, Inc. v. Accuride Corp.*, 871

4   F.2d 1531, 1537 (9th Cir. 1989) (noting that the high degree of purchasing care factor

5   weighs heavily against a likelihood of confusion in the relevant purchasing population).

6   Plaintiffs' argument that "even a knowledgeable, careful consumer *could* assume that

7   the parties are affiliated" is an unsupported hypothetical – nothing more.  (Opp. at 21

8   (emphasis added).)

9        At other points in their opposition, Plaintiffs argue that the relevant consuming

10  public is larger than the original "twenty automakers" that Plaintiffs approach via cold

11  calls, mass mailings, and personal contacts.  But Plaintiffs' recent attempt to expand the

12  purchasing group to (undefined) "first-tier" suppliers of automobile parts and systems,

13  and "anyone who may have a use for licensing Calcar's [automotive] technology" is as

14  unsupported by the evidence as their unsubstantiated "contacts" with the original twenty

15  automakers.  (See Defendants' Response to Plaintiffs' SGI ¶ 42.)  Plaintiffs failed to

16  identify these groups, points of contact, what materials they were shown, when and how

17  many times those communications were received or responded to, and there is no

18  documentary evidence supporting sales to any of them.  (Conf. Moore Decl. Ex. 5 at

19  ROG 17) (asking for all points of contact with each of its clients in the auto industry

20  who have purchased, or have considered purchasing CALCAR products or services.)  In

21  response to an interrogatory asking for proof of sales of *each* "CALCAR" branded

22  product and service sold from 2000-2008, Plaintiffs produced a chart showing a total of

23  *eight* automakers (and only two clients in the last two years) that allegedly purchased

24  Quick Tips and Start-Up guides (and no other products or services) at an undisclosed

25  price.  (Confidential Moore Decl., Ex. 2.)  Also, Plaintiffs have only one current patent

26  licensee.  (Conf. Moore Opp. Decl., Ex. 2: Yip Depo. at 53:5-10.)  Plaintiffs cannot

27  retreat from their responses to avoid summary judgment.

28

-8-

1    Even assuming as true Plaintiffs' mischaracterization that TCCI "consumers" are

2    "anyone who is exposed to CalCars' print or electronic products or who hears CalCars'

3    political message" (Opp. at 16), if everyone "shopping" for information on PHEVs on

4    the internet or in the media is the relevant "consumer," where is the evidence of anyone

5    being confused?  Plaintiffs fail to explain how this expanded theory of the relevant

6    consuming public negates the degree of care exercised by either Plaintiffs' clients, or

7    TCCI's volunteers or donors.  This factor strongly favors Defendants.

8          **3.      After Six Years of Coexistence and Almost a Year of Discovery**

9                    **Plaintiffs Confirm There is No Relevant Actual Confusion**

10   The Ninth Circuit observed in *Brookfield Comm'ns., Inc. v. West Coast Entm't*

11   *Corp.*, 174 F.3d 1036, 1050, (9th Cir. 1999), that "[w]e cannot think of more persuasive

12   evidence that there is no *likelihood* of confusion between these two marks than the fact

13   that they have been simultaneously used for five years without causing any consumers

14   to be confused as to who makes what."  To avoid this damning conclusion, Plaintiffs

15   proclaim to have "persuasive proof" of future confusion in the form of: the instance of

16   an environmental consultant (Mrs. Speigel) allegedly leaving a message for TCCI on

17   Plaintiffs' voicemail over a year ago, inquiring about a demonstration of the converted

18   Toyota Prius; and the deposition testimony of BMW's 30(b)(6) representative

19   purportedly exhibiting confusion.  (Opp. at 19-20.)  First, the voice message is

20   inadmissible hearsay; unsubstantiated by a sworn statement from Ms. Speigel herself;

21   and is, at best, evidence that Ms. Spiegel dialed the wrong phone number.  (Defendants'

22   Evid. Objections (DKT 126) at p. 31-32.)  Even so, under the relaxed evidentiary

23   standards of a preliminary injunction proceeding, this Court already noted that the

24   voicemail was *de minimus* evidence of actual confusion.  (Moore Decl. Ex. 1 at p. 11 &

25   n.1.)  Second, there can be no actual marketplace confusion during a deposition when

26   the declarant has no knowledge of what the parties offer, much less a belief that one

27   parties' goods or services are those of another.  For context, Plaintiffs subpoenaed

28

-9-

HOWREY LLP

EXHIBIT 1
PAGE 46

1    BMW for the person most knowledgeable on the CALCAR mark with respect to

2    automotive goods and services; the reputation of the mark within the automotive

3    industry; communications with American Calcar, Inc.; Plaintiffs' patents; TCCI and Mr.

4    Kramer; hybrid technology with respect to BMW cars; and hybrid technology with

5    respect to TCCI and Mr. Kramer.  (Moore Reply Decl. Ex. 5.)  BMW's 30(b)(6) witness

6    had never heard of TCCI or Mr. Kramer before the deposition, and his only familiarity

7    with "Calcar" was as the name of the company that sued BMW for patent infringement.

8    (Moore Opp. Decl. Ex. 4: Klein Depo. at 48:2-51:19; also 23:19-26:22, 28:22-30:6;

9    22:14-24.)  Further, this purported evidence cannot be used as a "proxy for all the

10   members of the public who read [a] newspaper article and think the entity known as

11   CALCAR/CALCARS is hounding the automotive industry" or "compelling evidence of

12   future likelihood of confusion" by the very automakers who are not aware that they are

13   allegedly being hounded.  (Opp. at 20.)

14        Elsewhere in Plaintiffs' opposition regarding post-sale confusion, they assert that

15   there was a "sudden loss of interest" from Toyota and Maserati (two automakers which

16   have not been Plaintiffs' clients in the last eight years) (Confidential Moore Decl. Ex.

17   2), which Mrs. Obradovich believes is attributable to "confusion with CalCars' and

18   prejudice against CalCars' political message."  (Karen O. Decl. ISO PMSJ at ¶ 5.)  Like

19   all of the other statements used to support their claims, Plaintiffs rely on pure

20   speculation: "[t]his is my belief.  If I knew for a fact, believe me, I would be telling you

21   for a fact.  I don't know for a fact.  It's a belief I have."  (Confidential Moore Opp. Decl.

22   Ex. 1: Karen O. Depo. at 52:24-53:7.)

23        Additionally, Plaintiffs do not factually dispute that in six years, nobody has ever

24   approached TCCI in actual confusion with Plaintiffs.  (Defendants' Response to

25   Plaintiffs' SGI ¶ 54.)  And Plaintiffs do not explain why, in spite of the Court's tentative

26   ruling on their scant evidence in support of the preliminary injunction, they failed to

27   supplement their proof with a consumer confusion survey – the other extra-judicial type

28

HOWREY LLP

DM_US:21339461_2

EXHIBIT 1
PAGE 49

1  of evidence of confusion. *Glow Indus. v. Lopez*, 273 F. Supp. 2d 1095, 1125 (C.D. Cal.

2  2002) (citing *Cairns v. Franklin Mint, Co.*, 24 F. Supp. 2d 1013, 1040 (C.D. Cal.

3  1998).) There is no genuine issue that this factor strongly favors Defendants.

4       4.     **The Lack of Recognition or Renown of CALCAR Belies its**

5             **Strength as a Source-Identifier of Plaintiffs' Goods and Services**

6       Plaintiffs' opposition relies on three things to support the strength of the

7  CALCAR mark: (1) Michael and Karen Obradovich's statements that people in the

8  automotive industry react positively "to mention of the CALCAR mark;" (2) "the extent

9  of Calcar's marketing of printed products, electronic products, and patent technology;"

10  and (3) a purported "concession" by Mr. Kramer that the mark is arbitrary. (Opp. at 16-

11  17.)[5]

12       First, both Obradovich declarations are purely speculative and unsupported by

13  tangible or credible evidence. (*See* Defendants' Evidentiary Objections to the

14  Declarations of Michael and Karen O.) For example, Mrs. Obradovich states that

15  people at "industry functions" are familiar with "Calcar" products such as Quick Tips,

16  yet does not name a single "industry function," or type of person in attendance. (Karen

17  Decl. ¶ 2.) This generalization is unsupported by any evidence whatsoever that any auto

18  industry third parties recognized Plaintiffs or their "CALCAR" trademark. Plaintiffs

19  provide no objective evidence of marketplace recognition, advertising or promotional

20  expenditures, proof of advertising, promotional expenditures, sales revenue, surveys,

21  third party testimony, website visits, or other indicia of strength or renown that might

22  suggest that automakers, let alone the consuming public, know of "Calcar." *See*

23  *Brookfield,* 174 F.3d at 1058 (finding mark weak in spite of federal and state

24

25  ───────────────

26  [5] To the extent Plaintiffs rely on the incontestability of their fraudulently obtained
registration as evidence of strength, "even where a trademark is incontestable ... the
significance of its presumed strength will depend upon its recognition among members

27  of the public." *Therma-Scan, Inc. v. Thermoscan, Inc.,* 295 F.3d 623,632 (6th Cir.
2002). Here, there is none.

28

1    registrations and $100,000 in advertising because plaintiff failed to "come forth with

2    substantial evidence establishing the widespread recognition of its mark."); *see also*

3    Moore Decl., Ex. 50 at RFPD 68-70. Additionally, Plaintiffs' do not exclusively use

4    "Calcar" in the industry and ignore uses like calcarcover.com, Defendants' use of

5    CalCars and CalCars.org for six years, and a car dealership's use of calcar.com. (Moore

6    Opp. Decl., Ex. 5; Kramer Decl. at ¶ 13; Moore Decl., Ex. 11.)

7        Second, Plaintiffs have provided no proof of the extent of marketing of its

8    suddenly-growing list of purported products. As mentioned above, they produced no

9    accounting of marketing or advertising – either factual or financial. Their "printed

10   products," Quick Tips (which do not use "Calcar" as a trademark), are supported by a

11   one-page summary Plaintiffs ginned up long after the close of discovery. (Confidential

12   Moore Decl. Ex. 2.) Their "electronic products," Auto-Director, a sample of which was

13   not produced until June 11, 2008 and almost 300 screen shots of which were produced

14   as late as July 7, 2008, were not subject to any cross-examination, were never sold and

15   there is no record of *who* they were marketed to, or when – in the last eleven years since

16   the product was first developed –the software was demonstrated. (Defendants'

17   Response to Plaintiffs' SGI ¶ 33, 52-53.) Their "patent technology" has garnered them

18   some recognition from the automakers it has chosen to sue for patent infringement, and

19   only resulted in one license agreement. (Conf. Moore Opp. Decl., Ex. 2: Yip Depo. at

20   53:5-10.) Additionally, the handful of pages of "promotional" material produced, which

21   include business cards, are unsupported by any evidence of distribution and often

22   indicate outdated website and contact information. (*See, e.g.*, Moore Decl, Ex. 5,

23   CALCAR 18-27 pointing to www.calcar1.com, a now defunct website.) Third, Mr.

24   Kramer did not concede that the mark is strong or arbitrary. Strength of a mark is a

25   legal issue, and Mr. Kramer's lay opinion was based on the fact that the "Calcar" mark

26   had no specific meaning to him absent any context for the term. As they do throughout

27   their Opposition, Plaintiffs fail to recognize that context matters. (*See infra*, Section

28

-12-

1    II.C.1.)  Plaintiffs can have a product labeled front-to-cover with the CALCAR mark,

2    but if they cannot prove appreciable widespread recognition of the mark by the relevant

3    consuming public, they cannot prove that the mark is strong.  *See Brookfield,* 174 F.3d

4    at 1058

5          Accordingly, even if Plaintiffs used CALCAR as a trademark, and even if the

6    mark were conceptually strong, the record is devoid of evidence of strength or renown

7    that might suggest that automakers, let alone the consuming public, know of "Calcar."

8    As such, Plaintiffs' mark is weak.

9          **5.      Plaintiffs Admit They Have No Intention of Expanding Into**

10                  **Hybrid Technology Per Se**

11          Plaintiffs cite *Surfvivor,* 406 F.3d at 634, in order to redirect this Court's inquiry

12   on "whether existence of the allegedly infringing mark is hindering the plaintiff's

13   expansion plans," (Opp. at 23) but fail to address how TCCI's presence is doing this, or

14   that Plaintiffs have actual plans to expand.  Plaintiffs do not dispute that they admitted

15   in discovery that they "have no intention of expanding into hybrid technology per se but

16   that their products, Quick Tip guides, could be used in cars with internal combustion

17   engines or, theoretically, in hybrid cars as well."  (Defendants' Response to Plaintiffs'

18   SGI ¶ 47; Moore Decl. Ex. 41 at ROG 18, RFPD 54-55.)  With nothing but a

19   "theoretical" link between their products and TCCI's advocacy efforts, Plaintiffs focus

20   on the never-commercialized Auto-Director software in an attempt to bridge the gap

21   between the parties' unrelated "goods."  As with their reliance on certain patents (*see*

22   *supra* Section II.B.1 and fn. 3), whether Plaintiffs have products that "may be

23   applicable" to hybrid technology – for example, merely because all hybrid cars have

24   internal combustion engines – is not evidence of expansion.  By analogy, that "tires" are

25

26

27

28

HOWREY LLP

DM_US.21339461_2

EXHIBIT 1

PAGE 52

1 | used on hybrids does not mean tire companies are expanding into hybrid technology.[6]

2 | Regardless, there needs to be a "strong possibility of expansion into competing markets"

3 | in order to show a likelihood of confusion. *M2 Software, Inc. v. Madacy Entm't*, 421

4 | F.3d 1073, 1085 (9th Cir. 2005) (discrediting plaintiff's claim of expansion into general

5 | retail distribution of audio CDs because it had only sold 215 audio CDs in ten years).

6 | Here, Plaintiffs developed Auto-Director eleven years ago but have yet to sell a single

7 | copy, and have only obtained one license of its other technology. With no proof of

8 | expansion, this factor weighs in Defendants' favor.

9 | **6.   There is an Insufficient Overlap of Marketing Channels**

10 | As the Court previously recognized, the fact that both parties have websites does

11 | not create persuasive overlap of marketing channels (Moore Decl., Ex. 1 at p. 9), yet

12 | Plaintiffs again push that argument. (Opp. at 20.) Plaintiffs do not rebut the fact that

13 | they do not even track who has visited their website and that the username/password

14 | section of the website is inoperative and failed to point to any evidence that those

15 | visiting Plaintiffs' website are the same people who are searching for information on

16 | PHEVs. (Defendants' Response to Plaintiffs' SGI ¶¶ 37-38.) Their ownership of a

17 | website adds nothing to the analysis without proof of who uses it.

18 | Although Plaintiffs argue, without legal support, that this Court should ignore the

19 | purpose and content of the parties' marketing (and erroneously contend that the parties

20 | are "promoting and marketing very similar goods"), it is undisputed that when TCCI has

21 | communicated with representatives of automobile manufacturers, it is through

22 | sophisticated high-level media representatives, managers, and engineers who are

23 | sensitive to environmental issues – not with those involved in purchasing decisions for

24 | what is included in a bundle of materials given to new car buyers. (Moore Decl., Ex.

25 |

26 |
27 | [6] Although Mr. Obradovich's declaration, like his first a year ago, refers to Plaintiffs "recently hiring additional technical R&F staff to develop this technology," Plaintiffs refused to identify those alleged hires in discovery. (Moore Decl., Ex. 53 at RFPD 82.)

28 |

-14-

EXHIBIT 1
PAGE 51

1  45: Gremban Depo. at 145:3-146:18; Ex. 54.)

2       In opposition, Plaintiffs now argue that "both companies market directly to the

3  same automotive industry, including the same automaker companies and the same

4  technology departments within those manufacturers." (Opp. p. 20; Michael O. Opp.

5  Decl. ¶ 18.) But Plaintiffs do not support the statement that they target "the same

6  technology departments" and in fact, their only declared points of contact with

7  automakers consisted of two in-house counsel and a chief financial officer.

8  (Confidential Moore Decl. Ex. 5 at ROG 17.) Plaintiffs fail to address Defendants'

9  point that the automotive industry is large, as are the manufacturing companies within it,

10  such that the purpose of the parties' marketing would lead them to very different

11  contacts and minimize any potential marketing overlap. *See, e.g. Switchmusic.com, Inc.*

12  *v. U.S. Music Corp.*, 416 F. Supp. 2d 812, 824 (C.D. Cal. 2006) (no overlap in

13  marketing channels even though parties' guitars both appeared in the same buyer's

14  guide and both were listed as exhibitors at a trade show, noting "numerous

15  manufacturers' guitars are depicted in the buyer's guide" and the parties' guitars "never

16  appear on the same or neighboring pages.")

17         **7.**    **As They Appear in the Marketplace, the Marks are Dissimilar**

18       The parties agree that similarity is determined by appearance, sound, and meaning

19  when considered in the marks' entirety as they appear in the marketplace. *See*

20  *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000). Regarding

21  meaning, "CalCars" is a direct reference to the words "California Cars" in TCCI's name.

22  (Kramer Decl. ¶ 4.) Plaintiffs allege that "Calcar" is Latin for "spur," "intended to

23  convey the concept of rider spurring on a willing horse." (Moore Decl., Ex. 33 at ¶ 3.)

24  Other obscure English-language definitions for "calcar" include a definition in anatomy

25  as "spur," and in *The Transformers*," a toy characterized as "a near-unfeeling machine

26  with flawless memory for military history and tactics. And evil." (Moore Opp. Decl.,

27  Exs. 6-7.)

28

HOWREY LLP

DM_US 21339461_2

EXHIBIT I
PAGE 52

1    Plaintiffs allege that there are "many instances of the words CALCAR and

2  CALCARS being presented alone to represent the respective parties and their products or

3  activities," yet the total of five documents provided in support of this contention prove

4  TCCI's point: for example, the word "Calcar" is used as a reference to the company, e.g.

5  "Calcar's Quick Tips" or "Calcar Announces…" or "Quick Tips is a trademark of

6  Calcar." (Opp. at 19, citing Michael O. Opp. Decl. ¶ 17, Ex. J.) When Plaintiffs refer to

7  their company names alone, as already discussed, that is not trademark use. Regardless,

8  the following examples show that, as they appear in the marketplace, the parties'

9  respective names and marks are neither identical, nor confusingly similar:

10    **Parties' "Website Banners" (Michael O. Opp. Decl. Ex. I; Moore Decl. Ex. 13):**

11
12        

13
14    **Plaintiffs' "Products" (Moore Decl. Ex. 2; Michael O. Decl. ISO PMSJ Ex. C):**

15    *Back copyright page of Audi Quick Tips*          *Screen shot of beta*
                                                          *Auto-Director Software*
16
17                                                   
18
19
20
21
22
23    **Defendants' "Products" (Kramer Decl. ¶ 17):**

24
25              
26
27
28

-16-

1

"Promotional Materials" (Michael O. Opp. Decl. Ex. I; Kramer Decl. Ex. 4):





©Copyright 1998 Calcar, Inc. "Auto Director™" and "Quick Tips®" and the Calcar "Horse" are trademarks of Calcar, Inc. "Microsoft®" and "Windows®" are registered trademarks of Microsoft Corporation.

Additionally, in third-party articles, TCCI's name "CalCars" is typically preceded by the full name that it abbreviates, "The California Cars Initiative," and/or often with the fact that the company is a non-profit, along with its .org website. (Moore Decl. Ex. 43: Kramer Depo. at 98:4-9; Moore Reply Decl. Ex. 8; Kramer Decl. ¶ 17.)

When the Court considers the differences in how the names – including accompanying slogans, designs, and graphics—appear on the parties' materials, this factor weighs in Defendants' favor or at the very least, favors neither party. *Cf. Surfvivor*, 406 F.3d at 633.

**8.    TCCI's Good Faith Adoption of "CalCars" is Unquestionable**

*Sleekcraft's* "intent" factor looks to evidence of bad faith in a defendant's adoption of the accused mark – whether a defendant adopted a mark with the intent to capitalize on the goodwill or reputation of a plaintiff's trademark rights. *Brookfield*, 174 F.3d at 1059. Plaintiffs do not, and cannot, dispute that Mr. Kramer adopted "CalCars" without any knowledge of Plaintiffs or "Calcar." (Moore Decl., Ex. 37 at ROG 10; Kramer Decl. ¶ 18.) He adopted the nickname "CalCars" for reasons having

EXHIBIT I
PAGE 54

1    nothing to do with Plaintiffs. (*Id.* at ¶ 4; Moore Decl., Ex. 43: Kramer Depo. at 53:16-

2    54:2.)

3        Plaintiffs' "evidence" of bad faith consists of a character attack on Mr. Kramer,

4    and alleged constructive knowledge of the mark or failure to conduct a trademark

5    search. (Opp. pp. 22-23.)  First, there is no evidence that Mr. Kramer is using the

6    "CalCars" name to promote himself or to "sell" products, and the record is clear that

7    TCCI does not and will not offer products for sale.  Moreover, contrary to Plaintiffs'

8    argument (Opp. at 22), there is no affirmative duty for every trademark user to conduct

9    a trademark search, lest they be found a willful infringer. *Int'l Star Class Yacht Racing*

10   *Ass'n v. Tommy Hilfiger USA, Inc.*, 80 F.3d 749, 754 (2d Cir. 1996), is inapposite, as

11   that case involved a situation in which a company received attorney advice to conduct a

12   search and ignored that advice.  As the Court recognized in its tentative preliminary

13   injunction order (Moore Decl., Ex. 1 at p. 10), *even if* Mr. Kramer had known of

14   Plaintiffs' registration for CALCAR, nothing about that registration, which covered

15   goods such as "computer hardware" and "computer software for use in

16   telecommunications" would have suggested that TCCI's use of "CalCars" on TCCI's

17   distinct advocacy efforts would pose a problem.  (Kramer Opp. Decl., at ¶4);

18   *Blockbuster Videos v. City of Tempe*, 141 F.3d 1295, 1300 (9th Cir. 1998) (finding that

19   infringement is not willful if the defendant "might have reasonably thought that its

20   proposed usage was not barred by the statute.")  This factor weighs in TCCI's favor.

21    **C.    Plaintiffs Are Not Entitled to Any Presumptions Stemming from a**

22         **Trademark Registration That Was Fraudulently Obtained, And is**

23         **Otherwise Narrow in Scope**

24         **1.    Plaintiffs' CALCAR Trademark Registration Is Invalid Because**

25              **It Was Obtained Through Fraud on the USPTO**

26    Plaintiffs failed to disprove that their CALCAR trademark registration was

27   obtained through fraud on the USPTO regarding their trademark use on goods and

28

-18-

EXHIBIT I
PAGE 55

1  services such as computer hardware in class 9 and telecommunications services in class

2  38, and in fact conceded the point.[7]  (Moore Decl. Ex. 9; Defendants' Response to

3  Plaintiffs' SGI ¶¶ 52-53.)  Auto-Director is *not* computer hardware, even if Mrs.

4  Obradovich – who does not handle any of the technological sides of Plaintiffs' business

5  – thinks that it is.  (Confidential Moore Opp. Decl., Ex. 1: Karen O. Depo. at 13:19-23.)

6  Plaintiffs try to salvage the registration by arguing that Auto-Director may be "used

7  with computer hardware;" but that does not make it computer hardware.  Likewise, that

8  it may "utilize" or "relate to" telecommunications services does not make it a product

9  that offers such services.  (Michael O. Opp. Decl. ¶ 4.)  In discovery, Defendants asked

10  for proof of Plaintiffs' use of the CALCAR mark on each of the goods and services

11  listed in the registration.  (Moore Decl., Ex. 34: Kramer ROG 12, 1st RFPDs 21-24 and

12  90-93, 94.)  Plaintiffs never produced any "computer hardware" or any proof that it

13  offered telecommunications services to any customers (*i.e.* the Class 38 component of

14  its registration).  Plaintiffs' misrepresentations are undisputed.

15      Plaintiffs do not dispute the law cited in Defendants' opening brief relating to

16  fraud on the USPTO, or that it is a strict liability offense.  It is clear that one

17  misrepresented good is enough to cancel the entire registration, and innocence or

18  mistake is no defense.  *See, e.g. Medinol Ltd. v. Neuro Vasx, Inc.*, 67 U.S.P.Q.2d (BNA)

19  1205, 1209-10 (T.T.A.B. 2003) (rejecting lack of subjective intent argument and

20  cancelling entire registration because the applicant's statement of use claimed that the

21  mark was in use on catheters and stents, but the mark had never been used on stents);

22  *see also Herbaceuticals, Inc. v. Xel Herbaceuticals, Inc.*, 86 U.S.P.Q.2d 1572 (TTAB

23

24  _____

25  [7] Plaintiffs also fail to sufficiently address the other identified goods which Defendants
   believe have never been a part of Plaintiffs' products or used in commerce, such as
26  computer software for use in *weather reporting, messaging, global positioning,*
   *database access, imaging,* and pre-recorded software on CD-Rom relating to *global*
27  *computer networks,* and *telecommunications* in class 9, but because one
   misrepresentation is sufficient to constitute fraud, Defendants need not further
28  distinguish how Plaintiffs' goods do not relate to the above categories.

EXHIBIT 1
PAGE 58

1    March 7, 2008).  Given Plaintiffs' admitted misrepresentations set forth above, the

2    Court should cancel the registration as invalid.  *See, id.*; 15 U.S.C. § 1119 (granting

3    courts power to invalidate registered marks to rectify the register); 15 U.S.C. §

4    1115(b)(1) (Defendants' invalidity defense includes a registration fraudulently

5    obtained.)

6         Side-stepping the issue of their lack of use on "computer hardware" or

7    "telecommunications services," Plaintiffs argue that the Auto-Director embodies "all the

8    functionality" of the registration, and that an actual sale was not required.  That

9    argument is wrong as well.  Plaintiffs offer no objective evidence that the Auto-Director

10   product was marketed "in a way sufficiently public to identify or distinguish the marked

11   goods in an appropriate segment of the public mind as those of the adopter of the mark"

12   (Opp. at 7).  The Ninth Circuit's opinion in *New West Corp. v. NYM Co. of California,*

13   *Inc.*, 595 F.2d 1194 (9th Cir. 1979), provides guidance.  In *New West*, the court

14   determined that prior advertising of a mark for a new magazine was sufficient to

15   establish use of the mark when that advertising was followed by receipt of 13,500

16   subscriptions for that magazine.  *Id.* at 1200.  Thus, there was an offering for sale,

17   followed by an execution of sales. Here, while Plaintiffs claim that they marketed the

18   Auto-Director product (and that it bears the CALCAR mark) – without identifying who

19   received the marketing, or when it occurred – they admit that there has not been a single

20   sale or delivery of these products in the 11 years since its first development.  Any

21   development-stage demonstrations, even if substantiated with appropriate back-up

22   information, are insufficient to establish trademark use and trademark rights.  *See*

23   *Brookfield*, 174 F.3d at 1052.  Consequently, Plaintiffs' reliance on the Auto-Director

24   beta product to support its use of the mark CALCAR on "computer software" or other

25   goods and services alleged in its registration and later renewal necessarily fails.

26        Without its federal registration, Plaintiffs' claim for infringement of a registered

27   mark under 15 U.S.C. § 1114(1) necessarily fails, and they are left to their limited or

28

-20-

EXHIBIT 1
PAGE 59

1  non-existent common law rights in the term "CALCAR."

2  **2.    Whatever Trademark Rights Plaintiffs Have Are Limited**

3  Plaintiffs claim they use "Calcar" as a house mark in conjunction with their Quick

4  Tips, Start-Up Tips, and Auto-Director marks, and on their promotional materials and

5  website.  With the exception of the newly produced Auto-Director samples, Defendants

6  addressed each of these categories of "use" in their opening brief (Mot. at 9-11),

7  describing the non-trademark, miniscule text used to refer to the company "Calcar" in

8  each of these guides.  Plaintiffs' opposition does not address these arguments, and

9  merely concludes that "the CALCAR mark is inextricably linked" with Plaintiffs'

10  goods, without explaining or distinguishing its house mark theory.  Regardless,

11  Plaintiffs acknowledge that a house mark must serve to indicate the origin of the

12  product (Opp. p. 4 (citing *Quicksilver Inc. v. Kymsta Corp.*, 466 F.3d 749, 757 (9th Cir.

13  2006)) such that Plaintiffs must also prove its recognition among the relevant

14  consuming public.  Plaintiffs have not even tried to do so.

15  Plaintiffs point to no evidence that anybody outside of a select group of

16  individuals personally approached by the Obradoviches, among a finite set of major

17  automakers, has heard, or would have occasion to hear, of "Calcar."  (Confidential

18  Moore Decl. Ex. 9: Karen O. Depo. at 125:18-127:9; Ex. 1; Moore Decl. Ex. 33 at ¶¶

19  11-12.)  Nor do they point to non-speculative evidence that anyone recognizes

20  "CALCAR" as a trademark versus the name of a company.  Accordingly, Defendants

21  have sufficiently rebutted any presumption of validity Plaintiffs' fraudulent registration

22  could provide.

23  **D.    Plaintiffs' Varying Theories of Confusion Conflict With Each Other**

24  **and Are Unsupported by the Evidence**

25  Plaintiffs' Opposition inaccurately accuses Defendants of ignoring certain

26  meritless claims in Plaintiffs' opening brief.  First, Defendants have discussed, in detail,

27

28

-21-

1   the factors that are relevant to any analysis of "initial interest confusion" or "reverse

2   confusion" in the above discussion of the likelihood of confusion factors.

3       Plaintiffs make much of the "internet trinity" without acknowledging that this

4   record does not favor them in either a "troika" analysis, or in light of the totality of

5   likelihood of confusion factors favoring Defendants. *Perfumebay.com*, 506 F.3d at

6   1176 ("actionable initial interest confusion on the Internet is determined, in large part,

7   by the relatedness of the goods offered and the level of care exercised by the

8   consumer.") (quoting *Interstellar Starship Servs. v. Epix, Inc.*, 304 F.3d 936, 945 (9th

9   Cir. 2002).) Mere similarity in domain names is irrelevant to the likelihood of

10  confusion analysis. *First Franklin Fin. Corp. v. Franklin First Fin., Ltd.*, 356 F. Supp.

11  2d 1048, 1052 (C.D. Cal. 2005) (quoting Brookfield, 174 F.3d at 1055) ("Certainly, it is

12  true that anyone manually typing the URL www.Franklinfirstfinancial.com will find

13  defendant's website, but such persons would only do so, in all likelihood, in an attempt

14  to specifically locate defendant's website and would in no way be confused.") With no

15  evidence of an internet presence, or evidence that even their few clients search for, or

16  utilize, the calcar.net website, this theory is yet another, inapplicable hypothetical.

17      Second, Plaintiffs failed to plead the distinct claim of reverse confusion, which

18  requires that a junior user dominate the senior user in the relevant market, and they

19  waived this theory by insisting on pursuing their fame-based dilution cause of action

20  through the filing of dispositive motions, and by maintaining that they are renowned

21  among the automotive industry. *See Surfvivor,* 406 F.3d at 631 (declining to consider

22  forward confusion because plaintiff's claim focused on reverse confusion and forward

23  confusion was insufficiently pled in the complaint).

24      Similarly, Plaintiffs' "post sale confusion" argument fails for the sheer fact that

25  TCCI has no "products" that are redistributed post-sale.[8]  Finally, Defendants decline to

26

---

27  [8] Plaintiffs cite *Karl Storz Endoscopy-America, Inc. v. Surgical Techs., Inc.*, 285 F.3d
28  848 (9th Cir. 2002) and *Payless Shoesource, Inc. v. Reebok Int'l Ltd.*, 998 F.2d 985,
                                                          (Continued...)

HOWREY LLP
DM_US 21359461_2

EXHIBIT 1
PAGE 29

1   address Plaintiffs' bald assertion that there are special considerations raised by TCCI's

2   allegedly "political" message, as the law affords none and the evidence does not warrant

3   creating a new likelihood of confusion factor based on Plaintiffs' and counsel's

4   conjecture about perceptions of those in the automotive field.

5       **E.**     **Defendants Should be Granted Summary Judgment on Plaintiffs'**

6               **Damages Claim**

7       Plaintiffs argue that Defendants' motion on damages is "moot" because they have

8   abandoned their "claim for economic damages" even though they now seek corrective

9   advertising damages. (Opp. at 23.) At the same time, they argue that they did plead

10   corrective advertising damages because their Complaint's prayer sought "monetary

11   damages," for which prospective corrective advertising damages are a surrogate.[9] (*Id.* at

12   25 n.15.) Plaintiffs cannot have it both ways: if they plead it, they waived it. And

13   Plaintiffs' argument that their damages waiver is limited to past damages, (*id.* at 24), is

14   belied by at least the 28 contrary statements Defendants identified in the opening brief.

15       Defendants deny that they failed to produce evidence to support their damages

16   claim, but do not point to any supporting evidence. (*Id.* at 24.) In fact, neither

17   Plaintiffs' answer to Defendants' contention interrogatory on damages, nor Plaintiffs'

18   30(b)(6) witnesses on damages, ever mentioned prospective corrective advertising.

19   Moreover, Plaintiffs never submitted an expert report on damages. While prospective

20   corrective advertising damages may indeed be established by the amount of advertising

21   ———————————————

22   (...Continued)

23   989-90 (Fed. Cir. 1993), which recognize that post-sale confusion is actionable, but deal with highly-related, competing *products*. In *Au-Tomotive Gold, Inc. v. Volkswagen of*

24   *Am., Inc.*, 457 F.3d 1062, 1076-79 (9th Cir. 2006), the defendant intentionally and exactly copied Volkswagen and Audi marks and sold products bearing those marks; the

25   court noted that defendant's disclaimer on the packaging was not useful when removed post-sale. None of these cases are applicable to the instant facts.

26   [9] Prospective corrective advertising damages are "monetary damages," because the damages statute, 15 U.S.C. §1117 allows recovery of only "(1) defendant's profits, (2)

27   any damages sustained by the plaintiff, and (3) the costs of the action." Prospective corrective advertising damages are neither defendants' profits nor costs.

28

HOWREY LLP
DM_US 21339461 2

EXHIBIT 1
PAGE 60

1   expenditure necessary to restore an infringed mark to the value it enjoyed before the

2   infringement, Plaintiffs have never identified in pleadings, discovery or an expert report

3   the initial or post-infringement value of the Calcar mark, or the dollar amount of

4   advertising necessary to restore any lost value, and should be barred from doing so at

5   trial. *See Nat'l Fire Prot. Ass'n, Inc. v. Int'l. Code Council, Inc.*, 2006 WL 839501 at

6   *30 (D.Mass. 2006) (granting defendant summary judgment on plaintiff's corrective

7   advertising claim because plaintiff "never claimed in its discovery responses, its Rule

8   26(a) damage disclosures, or in its 30(b)(6) witness testimony that it has ever conducted

9   a corrective advertising campaign, or that it plans to do so" and estimated its cost of

10  corrective advertising for the first time after the close of discovery).

11         Plaintiffs rely on *Adray v. Adry-Mart, Inc.*, 76 F.3d 984, 988-89 (9th Cir. 1995)

12  (reversing refusal to instruct jury on corrective advertising damages), and *Mirage*

13  *Resorts, Inc. v. Cybercom Prods.*, 228 F. Supp. 2d 1141, 1142 (D. Nev. 2002) (granting

14  uncontested request for corrective advertising damages), for the unremarkable

15  proposition that Defendants bear the burden of showing that Plaintiffs' corrective

16  advertising figure based on 25% of Defendants' accused advertising expenses is

17  unreasonable. *See also West Des Moines State Bank v. Hawkeye Bancorporation*, 722

18  F.2d 411, 414 (8th Cir. 1983) (reversing and remanding for recalculation of defendants'

19  advertising expenses to remove sum spent on materials not exposed to the public). That

20  proposition is irrelevant here because Plaintiffs have never carried their burden of

21  coming forward with evidence to shift the burden to Defendants.[10]

22         Plaintiffs never identified in pleadings, discovery or expert report either the sum

23  requested for corrective advertising or the amount Defendants allegedly spent on the

24

25  _____

26  [10] Moreover, Plaintiffs should not be permitted to, on the one hand, shift such a burden
    onto Defendants, while, on the other hand, simultaneously depriving Defendants of the
    evidence it could use to meet that burden, *i.e.* improperly refusing to produce to
27  Defendants the financial information that would show that Defendants have in no way
    injured Plaintiffs' mark.

28

-24-

EXHIBIT 1
PAGE 61

1   infringing advertising.  Moreover, even though a prospective corrective damages claim

2   should "not exceed the damage to the value of [plaintiff's] mark," *Adray*, 76 F.3d at

3   989, Plaintiffs have never identified in pleadings, discovery or an expert report the

4   damage to the value of their mark. *Accord, Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499,

5   506 (7th Cir. 1992) ("To justify damages to pay for corrective advertising a plaintiff

6   must show that the confusion caused by the defendant's mark injured the plaintiff and

7   that 'repair' of the old trademark, rather than adoption of a new one, is the least

8   expensive way to proceed.").  Nor have Plaintiffs shown a factual basis for equating

9   cost of advertising with its damages.  *Cf Gillette Co. v. Wilkinson Sword, Inc.*, 1992

10  U.S. Dist. LEXIS 1265, *14-15 (S.D.N.Y. Jan. 31, 1992) (cost-of-advertising damages

11  permissible only if "it is reasonable to suppose that if a defendant spends x amount on

12  an advertising campaign, a competitor (plaintiff) is likely to lose x amount as a result of

13  that advertising campaign").  Because Plaintiffs never produced in discovery any

14  evidence or assertion on these factual bases for their prospective corrective advertising

15  damages claim, Defendants have nothing to rebut, and summary judgment should be

16  granted.

17  **III.    CONCLUSION**

18      For all of these reasons, the Court should grant Defendants summary judgment.

19

20  Dated:  July 14, 2008                Respectfully submitted,

21                                        HOWREY LLP

22                                        By: /s/ Bobby A. Ghajar

23                                            Bobby A. Ghajar
                                              William C. Rooklidge

24

25                                        Attorneys for Defendants
                                          The California Cars Initiative
26                                        and Felix Kramer

27

28

-25-

EXHIBIT I
PAGE 62

# EXHIBIT J

1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3                  SOUTHERN DIVISION    **CERTIFIED COPY**

4                      ---oOo---

5

6    CALCAR, INC., a California corporation,

7              Plaintiff,

8                                      Case No.

9       vs.                           SACV 07-00723

10                                     AG (JWJx)

11   THE CALIFORNIA CARS INITIATIVE, INC.,

12   an unknown business entity; and

13   FELIX KRAMER, an individual;

14              Defendants.

15   _____

16

17

18     VIDEOTAPED DEPOSITION OF LAWRENCE FELIX KRAMER

19             WEDNESDAY, JUNE 25, 2008

20                  VOLUME II

21

22

23

24

25   Pages 254 - 586

                                                          254

EXHIBIT J
PAGE 63

1    what I think is Google's business in knowing.

2        Q.  Well, I am asking.

3        A.  I said that we -- we simply told them how

4    we allocated our expenditures from the funds we

5    received in the way that they asked for it.          10:38:18AM

6        Q.  I understand.  But if you could just answer

7    my question, I'd appreciate it.

8        A.  I never thought it was a relevant fact

9    about how the funds that were described in bulk here,

10   the category allocations, how they were then          10:38:38AM

11   allocated by the individuals for the expense areas

12   they were allocated to.

13       Q.  Did you in fact use some of the grant money

14   to go on a cruise?

15       A.  Excuse me?                                     10:38:54AM

16       Q.  Did you in fact use some of the grant money

17   to go on a cruise?

18       A.  No.

19       Q.  Did you use any of it to go on vacation?

20       A.  No.                                            10:38:59AM

21       Q.  How did you use the money?

22       A.  I did not segregate these funds into a

23   personal checking account for Felix Kramer and spend

24   it on anything.  I put it into my personal checking

25   account.  So I did not allocate these funds to        10:39:12AM
                                                           303

EXHIBIT J
PAGE 64

1   anything.

2        Q.  So they were commingled with other funds

3   that went into your checking account, correct?

4        A.  These funds -- all the funds that Google

5   gave us were transferred to the International          10:39:31AM

6   Humanities Center.  I bill the International

7   Humanities Center, when we have the resources, for

8   consulting fees, monthly consulting fees.  There's no

9   connection between those consulting fees and any

10  funds -- any allocations from Google, other than the   10:39:51AM

11  fact that we told Google that $72,000 of those funds

12  went to Felix Kramer.

13       Q.  I'm a little confused by that.

14           Did the Google funds go to the

15  International Humanities Center or did they go to       10:40:09AM

16  you?

17       A.  All contributions to CalCars -- to

18  California Cars Initiative go to the International

19  Humanities Center.

20       Q.  And the International Humanities Center        10:40:20AM

21  then pays Felix Kramer?

22       A.  The California Cars Initiative bills IHC

23  for consulting or expenses.

24       Q.  And how were the consulting services

25  billed, are they on an hourly basis?                    10:40:42AM

                                                            304

EXHIBIT J
PAGE 65

1    back up.

2          If somebody is going onto the calcars.org

3    Web site and they are doing research, they can find

4    out about Hybrid Interfaces as somebody that is

5    providing product that they may be interested in,        11:28:15AM

6    correct?

7          A.   Indirectly they will -- they can find that

8    out.

9          Q.   All right.  And we've already seen that

10   they can go to Hybrid Interfaces and find out about     11:28:24AM

11   CalCars and go to the How To Get page, right?

12         A.   Yes.

13         Q.   So there is some symbiosis there, right?

14         A.   Yes.

15         Q.   Do you know whether these V3 and V4 systems   11:28:39AM

16   have actually been commercialized?

17         A.   When I described "commercialized," I talked

18   about -- I used commercial -- I reserve that for mass

19   production.

20         Q.   Do you know whether someone could go and      11:28:58AM

21   buy one of these systems right now?

22         A.   I don't know that.  I know that in the past

23   they have been able to.

24         Q.   And has CalCars received any money or has

25   International Humanities group received any money in     11:29:11AM

                                                                347

EXHIBIT J
PAGE 66

1          BY MR. BROOKEY:

2          Q.  Okay.  What do you mean then?

3          A.  You said that if I am required to divert

4     time and attention and resources to defending against

5     a lawsuit, that that has a greater environmental        12:02:35PM

6     impact than the -- than the environmental cost of

7     defending myself.

8          Q.  Again, just so I'm clear, we talked about

9     the environmental impact of defending yourself,

10    things like your lawyers filing thousand-page          12:03:09PM

11    motions, flying all over the country and driving to

12    court.  So that's kind of one environmental cost of

13    this litigation, right?

14         A.  Yes.

15         Q.  And in addition to that, you are saying the   12:03:20PM

16    distraction of you taking your time and resources

17    away from the mission of The California Cars

18    Initiative is another type of environmental harm,

19    correct?

20         A.  Yes.                                          12:03:29PM

21         Q.  So those are two areas in which continuing

22    the litigation, in your mind, would be kind of

23    hurting the planet, right?

24         A.  Yes.  And the first one is not simply our

25    lawyers flying around, it is all the lawyers flying    12:03:41PM

                                                                    369

EXHIBIT J
PAGE 67

1    around and all the lawyers printing paper.

2         Q.   But remember, we carpool in a hybrid when

3    we go to court.

4         So you've identified all these areas of

5    environmental harm.  How would the environment be          12:04:03PM

6    harmed if you simply were using your own name for the

7    organization instead of using plaintiff's name?

8         MR. ROOKLIDGE:  Objection.  Argumentative.

9    Assumes facts.  He is using his own name.

10        MR. BROOKEY:  Mr. Rooklidge, I am going to           12:04:20PM

11   get the magistrate on the phone if you don't stop the

12   speaking objections.

13        MR. ROOKLIDGE:  Your line of questioning is

14   abusive and it's based on doing nothing but twisting

15   the facts in the record.                                   12:04:30PM

16        MR. BROOKEY:  None of what you said is

17   true.  You need to stop the speaking objections.

18   They are prohibited by the federal rules, the local

19   rules and the civility and professional guidelines.

20   And if you won't stop them voluntarily, I'd be happy       12:04:43PM

21   to ask Magistrate Johnson to tell you to stop.

22        I don't think I've ever seen more flagrant

23   coaching than I've seen here and in Mr. Pistorino's

24   conduct at the Gremban deposition.

25        MR. ROOKLIDGE:  I don't think I've ever              12:04:59PM

                                                               370

EXHIBIT J
PAGE 16

1    seen more incompetent questions or questions that are

2    more intentionally misleading and distorting of the

3    record.

4          MR. BROOKEY:  That is the exact type of

5    ad hominem that I've asked you repeatedly to stop        12:05:09PM

6    doing.  Do not sit here and --

7          MR. ROOKLIDGE:  An ad hominem is an attack

8    on the person.  I am not attacking you and I have

9    never attacked you.  I am simply characterizing your

10   questions.                                              12:05:24PM

11         MR. BROOKEY:  So if I tell you that you did

12   an incompetent job in the BMW litigation, you

13   wouldn't consider that an ad hominem?

14         MR. ROOKLIDGE:  No.

15         MR. BROOKEY:  So you are not going to          12:05:33PM

16   withdraw that personal attack?

17         You attacked me on the record at the last

18   deposition.  It's very unprofessional.  It's very

19   disappointing.  And I would like to hope that it

20   would be disappointing to Mr. Kramer, who is out     12:05:44PM

21   there trying -- according to his testimony, trying to

22   kind of save the world.

23         Q.  So let's get back to the question,

24   Mr. Kramer.

25         A.  Would you repeat the question, please?      12:05:58PM

                                                                371

EXHIBIT J
PAGE 69


1   International Humanities, correct?

2       A.  Yes.

3       Q.  And if you wanted to get at that money for

4   the purposes of The California Cars Initiative, what

5   would you need to do?                                    02:06:22PM

6       A.  I would need to document what it was for

7   and send an approved invoice to IHC that would be

8   auditable and that could be put into IRS --

9   categories for IRS tax reports.

10      Q.  Who would approve the invoice?                   02:06:41PM

11      A.  I would approve the invoice.

12      Q.  So if you said, "I need a million dollars

13  because I want to buy a house," you could invoice

14  them for that?

15      A.  In that case, I would invoice it and IHC,        02:06:54PM

16  as the fiscally responsible party, would say, "That

17  is not an approved nonprofit activity or expenditure

18  for a 501(c)3 organization."

19      Q.  What if you say to your staff, "I'm going

20  to increase my daily consulting fee from $600 to       02:07:11PM

21  $6,000 a day," would that be acceptable?

22          MR. ROOKLIDGE:  Objection.  Incomplete

23  hypothetical.  Lack of foundation.  Calls for

24  speculation.

25          THE WITNESS:  Nothing like that has ever         02:07:24PM

                                                                      417

EXHIBIT J
PAGE 70

1    come up.

2            BY MR. BROOKEY:

3        Q.  I understand that, but would that be

4    something that you could do?

5            MR. ROOKLIDGE:  Objection.  Lack of          02:07:29PM

6    foundation.  Calls for speculation.  Incomplete

7    hypothetical.

8            THE WITNESS:  I have confidence that the

9    IHC, whom I selected carefully, is doing its job in

10   making sure that it can be confident that the        02:07:43PM

11   expenditures it approves are those that fall within

12   the guidelines that it has for valid nonprofit

13   activities.

14           BY MR. BROOKEY:

15       Q.  Have you seen those guidelines?             02:08:02PM

16       A.  IHC has a manual which they distributed to

17   us which is in the materials supplied to you.

18       Q.  Do you have to explain to IHC what you've

19   done with the money they give you?

20       A.  Yes.                                         02:08:17PM

21       Q.  How do you do that?

22       A.  I submit an invoice for consulting

23   services, that's one type of invoice.  Or an invoice

24   for expenses, that's a different form.

25       Q.  How did you decide on the $600-per-day       02:08:29PM
                                                          416

EXHIBIT J
PAGE 74

```
 1   consulting fee?

 2       A.  I don't recall.

 3       Q.  So -- but there isn't anything to stop you

 4   from saying, "You know what, now it's $6,000 a day,"

 5   right?                                        02:08:47PM

 6           MR. ROOKLIDGE:  Objection.  Misstates the

 7   testimony.

 8           THE WITNESS:  I don't know.

 9           BY MR. BROOKEY:

10       Q.  And you don't know if IHC would have any   02:08:56PM

11   reason to object if you invoiced them at $120,000 a

12   month instead of $12,000 a month, right?

13       A.  Only my common sense.

14       Q.  At the end of the day, money that is

15   donated to the supposed nonprofit is going to end up  02:09:17PM

16   in your personal bank account, right?

17           MR. ROOKLIDGE:  Objection.  Misstates the

18   testimony.  You are badgering the witness.

19           THE WITNESS:  I object to your calling us a

20   "supposed nonprofit."                         02:09:31PM

21           BY MR. BROOKEY:

22       Q.  If you can answer the question, though, I

23   would appreciate it.

24       A.  I don't know -- the answer is I object to

25   your phrasing.  That is not what we are.       02:09:40PM
                                                       419
```



EXHIBIT J
PAGE 72

1    International Humanities Center-CalCars.

2        Q.  And in terms of disbursements, the check

3    from International Humanities Center would go to

4    Felix Kramer?

5        A.  Would what?                                    02:11:01PM

6        Q.  Would go to Felix Kramer.

7            MR. ROOKLIDGE:  Objection.  Incomplete

8    hypothetical.  Vague and ambiguous.  Assumes facts.

9            THE WITNESS:  Disbursements from

10   International Humanities Center have gone to Felix    02:11:13PM

11   Kramer.

12           BY MR. BROOKEY:

13       Q.  And as long as you invoice International

14   Humanities Center, they are not going to question

15   what you are using the funds for, correct?           02:11:27PM

16       A.  No.

17       Q.  I'm sorry?

18           It's correct that they are not going to

19   question you, right?

20       A.  No.  If I neglect to specify what it is or    02:11:35PM

21   I don't sign the document, they are going to question

22   it and make sure I give them the information they

23   need.

24       Q.  If you were to tell them, "I don't want it

25   to be $600 a day for 20 days a month, I want it to be 02:11:50PM

                                                            421

EXHIBIT J
PAGE 73

1  $6,000 a day for 30 days a month," as long as you

2  invoiced that and filled out the paperwork correctly,

3  you'd get paid, right?

4        MR. ROOKLIDGE:  Objection.  Incomplete

5  hypothetical.  Lacks foundation.  Calls for            02:12:06PM

6  speculation.

7        THE WITNESS:  I have received reimbursement

8  for the invoices I've submitted to International

9  Humanities Center.

10        BY MR. BROOKEY:                                  02:12:17PM

11     Q.  Right.  But in terms of not questioning,

12  they are not going to cross-examine you and say did

13  you really do that work.  They are going to take your

14  word for it once the invoice is approved and

15  submitted.  That's all I'm asking.                     02:12:28PM

16     A.  They rely on my signed approval of

17  invoices.

18     Q.  Have you ever invoiced them for consulting

19  work you did not perform?

20     A.  No.                                             02:12:37PM

21     Q.  Do you keep track of how much consulting

22  work you do?

23     A.  No.

24     Q.  You said, I think, a few times that you

25  spend more than the 20 days a month consulting,       02:12:44PM

                                                          422

EXHIBIT J
PAGE 74

1    STATE OF CALIFORNIA      )

                              )   ss.

2    COUNTY OF SAN FRANCISCO)

3

4         I hereby certify that the witness in the

5    foregoing deposition, LAWRENCE FELIX KRAMER, was by

6    me duly sworn to testify to the truth, the whole

7    truth and nothing but the truth, in the

8    within-entitled cause; that said deposition was taken

9    at the time and place herein named; that the

10   deposition is a true record of the witness's

11   testimony as reported by me, a duly Certified

12   Shorthand Reporter and a disinterested person, and

13   was thereafter transcribed into typewriting by

14   computer.

15        I further certify that I am not interested in

16   the outcome of said action, nor connected with, nor

17   related to, any of the parties in said action, nor to

18   their respective counsel.

19        IN WITNESS WHEREOF, I have hereunto set my hand

20   and affixed my signature this 28th day of June 2008.

21

22

23

24   _____

25        DEBORAH LEE LUBIN, CSR No. 3234, RPR

579

EXHIBIT J
PAGE 75

**EXHIBIT K**

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | SACV 07-0723 AG (MLGx) | Date | July 17, 2008 |
| Title | CALCAR, INC. ET AL. V. THE CALIFORNIA CARS INITIATIVE, INC. ET AL. | | |

Present: The
Honorable          ANDREW J. GUILFORD

| Lisa Bredahl | None Present | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Not Present | Not Present |

**Proceedings:**    [IN CHAMBERS] ORDER CONTINUING TRIAL AND MOTIONS

Trial in this matter is currently scheduled for August 26, 2008. The Court has multiple other trials, including criminal trials, scheduled for that date. Accordingly, on the Court's own motion, the trial in this matter is continued to September 23, 2008, at 9:00 a.m. The Pretrial Conference is continued from August 11, 2008 to September 8, 2008 at 8:30 a.m. The motions scheduled for July 21, 2008, are continued August 18, 2008, at 10:00 a.m.

|  | : | 0 |
|---|---|---|
| Initials of Preparer | lmb | |

EXHIBIT K
PAGE 76

# EXHIBIT L



US006438465B2

(12) **United States Patent**
Obradovich et al.

(10) Patent No.: **US 6,438,465 B2**
(45) Date of Patent: **\*Aug. 20, 2002**

(54) **TECHNIQUE FOR EFFECTIVELY SEARCHING FOR INFORMATION IN A VEHICLE**

(75) Inventors: **Michael L. Obradovich**, San Clemente; **Michael L. Kent**, Garden Grove; **John G. Dinkel**, Irvine, all of CA (US)

(73) Assignee: **American Calcar, Inc.**, Wilmington, DE (US)

(\*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **09/792,351**

(22) Filed: **Feb. 23, 2001**

**Related U.S. Application Data**

(60) Continuation of application No. 09/401,038, filed on Sep. 21, 1999, now Pat. No. 6,233,506, which is a division of application No. 08/789,934, filed on Jan. 28, 1997, now Pat. No. 6,009,355.

(51) Int. Cl.[7] .............................. **G05D 1/00**; G06F 7/00
(52) U.S. Cl. ............................................... **701/1**; 701/36
(58) Field of Search ................................. 701/1, 29, 35, 701/36; 345/733, 810, 530, 803, 156, 763–765, 168, 685, 802, 700, 705, 714, 737, 745; 340/436, 459, 521, 417; 73/117.2

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,582,926 A | 6/1971 | Hassan | |
| 4,031,363 A | \* 6/1977 | Freeman et al. | ............... 73/114 |
| 4,291,749 A | 9/1981 | Ootsuka et al. | ............ 165/202 |
| 4,314,232 A | 2/1982 | Tsunoda | ................. 340/460 |
| 4,337,821 A | 7/1982 | Saito | ................. 165/200 |
| 4,401,848 A | 8/1983 | Tsunoda | ................. 704/274 |
| 4,407,564 A | 10/1983 | Ellis | ......................... 345/7 |

| | | | |
|---|---|---|---|
| 4,419,730 A | 12/1983 | Ito et al. | ................. 701/36 |
| 4,441,405 A | 4/1984 | Takeuchi | ................. 454/75 |
| 4,484,302 A | \* 11/1984 | Cason et al. | ........... 345/802 |
| 4,536,739 A | 8/1985 | Nobuta | ................. 340/323 R |
| 4,582,389 A | 4/1986 | Wood et al. | ............ 359/14 |
| 4,636,782 A | 1/1987 | Nakamura et al. | ........... 345/7 |
| 4,731,769 A | 3/1988 | Schaefer et al. | ........... 369/6 |
| 4,740,779 A | 4/1988 | Cleary et al. | ............. 345/7 |
| 4,740,780 A | 4/1988 | Brown et al. | .............. 345/7 |
| 4,752,824 A | 6/1988 | Moore | ......................... 345/7 |
| 4,795,223 A | 1/1989 | Moss | ......................... 345/7 |

(List continued on next page.)

OTHER PUBLICATIONS

M. Krebs, "Cares That Tell You Where to Go," *The New York Times*, Dec. 15, 1996, section 11, p. 1.
L. Kraar, "Knowledge Engineering," *Fortune*, Oct. 28, 1996, pp. 163–164.
S. Heuchert, "Eyes Forward: An ergonomic solution to driver information overload," *Society of Automobile Engineering*, Sep. 1996, pp. 27–31.
J. Braunstein, "Airbag Technology Takes Off," *Automotive & Transportation Interiors*, Aug. 1996, p. 16.
I. Adcock, "No Longer Square," *Automotive & Transporation Interiors*, Aug. 1996, pp. 38–40.

*Primary Examiner*—Jacques H. Louis-Jacques
(74) *Attorney, Agent, or Firm*—Kaye Scholer LLP

(57) **ABSTRACT**

In a multimedia information and control system for use in an automobile, at least one interface is employed which enables a user to access information concerning the automobile and control vehicle functions in an efficient manner. The user may select one of a plurality of displayed options on a screen of such an interface. Through audio, video and/or text media, the user is provided with information concerning the selected option and the vehicle function corresponding thereto. Having been so informed, the user may activate the selected option to control the corresponding vehicle function.

**16 Claims, 15 Drawing Sheets**



CALCAR 2307

EXHIBIT L
PAGE 77

**US 6,438,465 B2**

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,811,240 A * | 3/1989 | Ballou et al. | 345/763 |
| 4,818,048 A | 4/1989 | Moss | 345/7 |
| 4,827,520 A | 5/1989 | Zeinstra | 701/1 |
| 4,837,551 A | 6/1989 | Iino | 345/7 |
| 4,876,594 A | 10/1989 | Schiffman | 345/7 |
| 4,891,650 A | 1/1990 | Sheffer | 342/457 |
| 4,914,705 A | 4/1990 | Nigawara | 704/270 |
| 4,988,976 A | 1/1991 | Lu | 345/7 |
| 4,995,258 A | 2/1991 | Frank | 73/118.2 |
| 4,996,959 A | 3/1991 | Akimoto | 73/118.2 |
| 5,006,829 A | 4/1991 | Miyamoto et al. | 340/459 |
| 5,043,736 A | 8/1991 | Darnell et al. | 342/357.1 |
| 5,051,735 A | 9/1991 | Furukawa | 345/7 |
| 5,055,851 A | 10/1991 | Sheffer | 342/457 |
| 5,070,323 A | 12/1991 | Iino et al. | 345/7 |
| 5,119,504 A | 6/1992 | Durboraw, III | 455/572 |
| 5,198,797 A | 3/1993 | Daidoji | 345/7 |
| 5,203,499 A | 4/1993 | Knittel | 237/2 A |
| 5,208,756 A | 5/1993 | Song | 455/456 |
| 5,214,413 A | 5/1993 | Okabayashi et al. | 345/7 |
| 5,214,707 A | 5/1993 | Fujimoto et al. | 704/275 |
| 5,235,633 A | 8/1993 | Dennison et al. | 455/456 |
| 5,257,190 A | 10/1993 | Crane | 701/35 |
| 5,267,159 A * | 11/1993 | O'Neall | 701/35 |
| 5,274,560 A | 12/1993 | LaRue | 701/202 |
| 5,278,532 A | 1/1994 | Hegg et al. | 345/7 |
| 5,293,115 A | 3/1994 | Swanson | 324/110 |
| 5,299,132 A | 3/1994 | Wortham | 455/457 |
| 5,334,974 A | 8/1994 | Simms et al. | 340/990 |
| 5,335,276 A | 8/1994 | Thompson et al. | 380/21 |
| 5,335,743 A | 8/1994 | Gillbrand et al. | 180/178 |
| 5,345,817 A | 9/1994 | Grenn et al. | 73/117.3 |
| 5,351,041 A | 9/1994 | Ikata et al. | 340/825.24 |
| 5,361,165 A | 11/1994 | Stringfellow et al. | 359/631 |
| 5,371,510 A | 12/1994 | Miyauchi et al. | 345/7 |
| 5,400,045 A | 3/1995 | Aoki | 345/7 |
| 5,404,443 A | 4/1995 | Hirata | 345/327 |
| 5,414,439 A | 5/1995 | Groves et al. | 345/7 |
| 5,416,318 A | 5/1995 | Hegyi | 250/226 |
| 5,418,537 A | 5/1995 | Bird | 342/357.03 |
| 5,422,565 A | 6/1995 | Swanson | 324/110 |
| 5,432,904 A | 7/1995 | Wong | 705/4 |
| 5,440,428 A | 8/1995 | Hegg et al. | 359/630 |
| 5,442,553 A | 8/1995 | Parillo | 455/420 |
| 5,450,321 A | 9/1995 | Crane | 701/35 |
| 5,450,329 A | 9/1995 | Tanner | 701/213 |
| 5,450,613 A | 9/1995 | Takahara et al. | 455/517 |
| 5,475,399 A | 12/1995 | Borsuk | 345/130 |
| 5,479,482 A | 12/1995 | Grimes | 345/7 |
| 5,483,632 A | 1/1996 | Kuwamoto et al. | 345/338 |
| 5,486,840 A | 1/1996 | Borrego et al. | 345/7 |
| 5,493,658 A | 2/1996 | Chiang et al. | 345/336 |
| 5,497,149 A | 3/1996 | Fast | 340/988 |
| 5,497,271 A | 3/1996 | Mulvanny et al. | 345/7 |
| 5,497,339 A | 3/1996 | Bernard | 708/108 |
| 5,504,622 A | 4/1996 | Oikawa et al. | 359/630 |
| 5,506,595 A | 4/1996 | Fukano et al. | 345/7 |
| 5,511,724 A | 4/1996 | Freiberger et al. | 236/49.3 |
| 5,515,285 A | 5/1996 | Garrett, Sr. et al. | 701/350 |
| 5,515,419 A | 5/1996 | Sheffer | 455/456 |
| 5,519,403 A | 5/1996 | Bickley et al. | 342/352 |
| 5,519,410 A | 5/1996 | Smalanskas et al. | 342/352 |
| 5,523,559 A | 6/1996 | Swanson | 250/222.1 |
| 5,525,977 A | 6/1996 | Suman | 340/825.25 |
| 5,528,248 A | 6/1996 | Steiner et al. | 342/357.06 |
| 5,528,496 A | 6/1996 | Brauer et al. | 701/32 |
| 5,534,888 A | 7/1996 | Lebby et al. | 345/121 |
| 5,539,869 A | 7/1996 | Spoto et al. | 345/336 |
| 5,547,125 A | 8/1996 | Hennessee et al. | 236/49.3 |
| 5,550,551 A | 8/1996 | Alesio | 342/457 |
| 5,553,661 A | 9/1996 | Beyerlein et al. | 165/203 |
| 5,555,172 A | 9/1996 | Potter | 455/456 |
| 5,555,286 A | 9/1996 | Tendler | 455/404 |
| 5,555,502 A | 9/1996 | Opel | 701/36 |
| 5,559,520 A | 9/1996 | Barzegar et al. | 342/357.1 |
| 5,572,204 A | 11/1996 | Timm et al. | 340/988 |
| 5,576,724 A | 11/1996 | Fukatsu et al. | 345/7 |
| 5,579,535 A | 11/1996 | Orlen et al. | 345/7 |
| 5,587,715 A | 12/1996 | Lewis | 342/357.03 |
| 5,627,547 A | 5/1997 | Ramaswamy et al. | 342/357.08 |
| 5,631,642 A | 5/1997 | Brockelsby et al. | 340/993 |
| 5,638,305 A | 6/1997 | Kobayashi et al. | 364/528.15 |
| 5,648,769 A | 7/1997 | Sato et al. | 340/988 |
| 5,650,929 A | 7/1997 | Potter et al. | 455/456 |
| 5,653,386 A | 8/1997 | Hennessee et al. | 237/12.3 |
| 5,654,715 A | 8/1997 | Hayashikura et al. | 342/70 |
| 5,657,233 A * | 8/1997 | Cherrington et al. | 705/400 |
| 5,666,102 A | 9/1997 | Lahiff | 340/461 |
| 5,669,061 A | 9/1997 | Schipper | 455/429 |
| 5,670,953 A | 9/1997 | Satoh et al. | 340/903 |
| 5,673,305 A | 9/1997 | Ross | 455/517 |
| 5,689,252 A | 11/1997 | Ayanoglu et al. | 340/991 |
| 5,691,695 A | 11/1997 | Lahiff | 340/461 |
| 5,702,165 A | 12/1997 | Koibuchi | 303/146 |
| 5,712,640 A | 1/1998 | Andou et al. | 342/70 |
| 5,717,595 A * | 2/1998 | Cherrington et al. | 705/400 |
| 5,734,973 A | 3/1998 | Honda | 455/186.1 |
| 5,752,754 A | 5/1998 | Amitani et al. | 303/199 |
| 5,758,311 A | 5/1998 | Tsuji et al. | 701/111 |
| 5,767,788 A | 6/1998 | Ness | 340/825.49 |
| 5,777,394 A | 7/1998 | Arold | 307/10.1 |
| 5,777,580 A | 7/1998 | Janky et al. | 342/457 |
| 5,825,283 A | 10/1998 | Camhi | 340/438 |
| 5,874,889 A | 2/1999 | Higdon et al. | 340/426 |
| 5,898,391 A | 4/1999 | Jefferies et al. | 340/998 |
| 5,900,814 A | 5/1999 | Stern | 340/539 |
| 5,917,405 A | 6/1999 | Joao | 340/426 |
| 5,919,239 A | 7/1999 | Fraker et al. | 701/35 |
| 6,002,334 A | 12/1999 | Dvorak | 340/568.1 |
| 6,009,355 A * | 12/1999 | Obradovich et al. | 701/1 |
| 6,037,991 A | 3/2000 | Thro et al. | 725/116 |
| 6,011,505 A | 8/2000 | Wagener | 701/1 |

* cited by examiner

CALCAR 2308

EXHIBIT L
PAGE 78



FIG. 1

FIG. 2

CALCAR 2310

EXHIBIT
PAGE 80



FIG. 3A

CALCAR 2311

EXHIBIT L
PAGE 01



FIG. 3B



FIG. 3C

EXHIBIT L
PAGE 82

209



FIG. 4A

209



FIG. 4B

CALCAR 2314

EXHIBIT
PAGE



FIG. 5



FIG. 6

CALCAR 2315

EXHIBIT L
PAGE 85



FIG. 7

FIG. 8

EXHIBIT L
PAGE 86



FIG. 9



FIG. 10

CALCAR 2317

EXHIBIT L
PAGE 81



FIG. 11

EXHIBIT L
PAGE 88



FIG. 12

CALCAR 2319

EXHIBIT L
PAGE 81



**FIG. 13**



**FIG. 14**

EXHIBIT L
PAGE 90



FIG. 15



FIG. 16

EXHIBIT L
PAGE 91



FIG. 17



FIG. 18

FIG. 19

| 1901 | 1903 |
|---|---|
| AIR CONDITIONING | LINK TO CLIMATE CONTROL SCREEN OF FIG. 15 |
| ANTI-LOCK BRAKE SYSTEM INDICATOR | LINK TO WARNING LIGHT OPTION #4 ON FUEL/TEMP SCREEN (NOT SHOWN) |
| AUTOMATIC CLIMATE CONTROL | LINK TO CLIMATE CONTROL SCREEN OF FIG. 15 |
| · · · | · · · |
| CHARGING SYSTEM FAILURE INDICATOR | LINK TO CHARGING SYSTEM FAILURE OPTION 1309f (FIG. 13) |
| CLIMATE CONTROL SYSTEM | LINK TO CLIMATE CONTROL SCREEN OF FIG. 15 |
| COOLING | LINK TO CLIMATE CONTROL SCREEN OF FIG. 15 |
| CRUISE CONTROL INDICATOR | LINK TO WARNING LIGHT OPTION #2 ON SPEEDOMETER SCREEN (NOT SHOWN) |
| DEFOG/DEFROST | LINK TO CLIMATE CONTROL SCREEN OF FIG. 15 |
| DOOR AJAR INDICATOR | LINK TO WARNING LIGHT OPTION #7 ON FUEL/TEMP SCREEN (NOT SHOWN) |
| DIRECTIONAL SIGNALS INDICATOR | LINK TO TURN SIGNAL/HAZARD WARNING OPTION 1201b (FIG. 12) |

1905

CALCAR 2323

EXHIBIT L
PAGE 93

US 6,438,465 B2

**1**

## TECHNIQUE FOR EFFECTIVELY SEARCHING FOR INFORMATION IN A VEHICLE

This application is a continuation of application Ser. No. 09/401,038 filed on Sep. 21, 1999 now U.S. Pat. No. 6,233,506, which is a division of application Ser. No. 08/789,934 filed on Jan. 28, 1997, maturing into U.S. Pat. No. 6,009,355 issued on Dec. 28, 1999.

### FIELD OF THE INVENTION

The invention relates generally to information and control systems and, more particularly, to a system for use in an automobile which facilitates a user's retrieval and/or dissemination of information, and control of vehicle functions.

### BACKGROUND OF THE INVENTION

Information is vital to day-to-day activities. With no access to information, people cannot function efficiently in this society, and their lives and financial well-being are put in jeopardy. People want to be well-informed, so much so that when they are travelling in automobiles, they tune into local radio stations to listen to news, weather forecasts and traffic conditions. For that matter, some automobiles are equipped with audiovisual systems including television (TV) receivers. One such system is disclosed in U.S. Pat. No. 5,404,443 issued to Hirata. The Hirata system provides audiovisual information in a number of modes including a TV mode, which may be selected by control switches disposed on the periphery of a display.

Automobile users like to be continually updated with information affecting their travel plans such as weather and traffic conditions because of its fast changing nature. Automobile users who are traveling also like to continually keep in touch with their homes and offices, and to confirm appointments and hotel reservations so that they can adjust their itineraries accordingly. To that end, cellular mobile telephones were introduced to enable automobile users to conduct business and contact their families while they are traveling.

In addition, local map information is important to automobile travelers moving from one locale to another. As such, navigation systems were developed to help reach their destinations in an unfamiliar milieu. One such vehicle navigation system is disclosed in U.S. Pat. No. 5,274,560 issued to LaRue. The disclosed system is based on artificial intelligence and provides a driver with directions via a voice interface. The system is built upon an optical disk player which can be used for entertainment as well. Digitized maps, compressed voice records and computer programs are stored on an optical disk compatible with the disk player. After a destination point is identified, the disclosed system finds the best route from the digitized maps and guides the driver therethrough via the voice interface, taking into account the latest traffic conditions received by an FM receiver to avoid congestion.

Recently, navigation systems based on military global positioning system (GPS) technology have emerged. One such navigation system is commercially available as an option for the latest model of the ACURA 3.5 RL automobile. This ACURA navigation system receives signals from a constellation of satellites which is part of the GPS. In response to these signals, the navigation system pinpoints the automobile's location (in latitude and longitude). It also detects the automobile's speed and direction. With geographic information stored on a hard disk in an onboard

**2**

computer, the navigation system is capable of verbally and visually communicating to the user instructions for reaching the destination.

In addition to the above techniques for communications with automobile users, a technique for disseminating information regarding the automobiles themselves is disclosed in U.S. Pat. No. 5,442,553 issued to Parrillo. The disclosed system is a vehicle diagnostic and software upgrade system. In this system, sensors are provided in the vehicle to generate dynamic data relating to various mechanical controls and the engine of the vehicle, including engine R.P.M., fuel/air mixture, emissions and pollution content information. A microprocessor in the vehicle has access to selectable program parameters affecting the functioning of the mechanical controls. The microprocessor collects and transmits the dynamic data to a remote diagnostic station periodically or upon its request. In response, the remote station sends, to the vehicle, signals indicative of any changes in its software and/or program parameters. The microprocessor accordingly causes the changes to be made in the vehicle based on the received signals.

Besides the communication capabilities described above, an automobile has many accessories and user control elements such as lights, wipers, a clock, temperature control, cruise control, seat adjustment control, mirror adjustment control, and an anti-theft system. A technique for centralizing the command of the individual control elements is disclosed in U.S. Pat. No. 5,555,502 issued to Opel. The disclosed system includes a centralized control panel on a steering wheel which, together with a display, is utilized to control the electronic components of the automobile. The display is positioned in the area of the driver's sun visor. After the driver presses one of the buttons on the control panel corresponding to a desired electronic component, a menu is displayed so that the driver is able to select items from the menu to program the component. The selection is accomplished by pressing specified buttons on the panel.

In addition, a technique for controlling vehicle accessories via voice command is disclosed in U.S. Pat. No. 4,827,520 issued to Zeinstra. In accordance with this technique, control functions of each accessory are formatted in a summary page for display on a screen, which is scanned by infrared light to sense any touching thereon. By uttering any of the displayed functions on the summary page, preceded by either a specified keyword or an actuation of a push-to-talk switch on a steering wheel, a more detailed subpage of the selected function is displayed for further selection by voice. As an alternative to the voice command, the selection can also be accomplished by touching the displayed function on the screen.

Voice command and touch screen techniques are frequently mentioned in prior art references in controlling car accessories. In particular, U.S. Pat. No. 5,214,707 issued to Fujimoto et al. discloses a system for voice-controlling equipment inside a vehicle, including microphones capable of discriminating voice commands as to whether they are generated at the driver side or at the assistant side of the vehicle in a noisy environment.

### SUMMARY OF THE INVENTION

It is celebratory that technology advances at lightning speed. However, many people are left behind the technological frontier, and to some extent develop "technophobia". Some of them have even given up this technological race, which is confirmed by the blinking "12:00" display on the clocks of many video cassette recorders (VCRs) being used.

CALCAR 2324

EXHIBIT L
PAGE 94

US 6,438,465 B2

3

Similarly, it is fantastic that automobiles nowadays include many advanced accessories such as audiovisual systems, anti-theft systems, anti-lock brake systems, climate control, and cruise control which embrace the latest technologies. However, of all these accessories, many automobile users only know how to operate the headlights and windshield wipers, and regard the rest as nuisance. That is, the users pay for numerous accessories which they do not use, resulting in much consumer waste. We have recognized that such non-use is principally attributed to an inefficient distribution of operating knowledge of the automobile and, in particular, its accessories.

Specifically, when automobile users presently want to learn about certain aspects of an automobile, they need to consult an owner's manual which could have been lost or misplaced when they need it the most. In addition, the manual is unpopular because many users simply want to avoid reading any written material, and find it intimidating as it oftentimes is filled with incomprehensible technical jargon.

We have further recognized that even with the operating knowledge, many users are overwhelmed and confused with the large number of knobs, switches and buttons used to control the individual vehicle parts and accessories.

Accordingly, it is an object of the invention to design an information and control system for use inside an automobile with the user in mind. The user is afforded a centralized control which may be used in lieu of the knobs, switches and buttons to operate the vehicle parts and accessories. In accordance with the invention, the centralized control is intimately tied to an information system such that the user is able to efficiently access information about the functions and operations of such parts and accessories, and in a synergistic manner apply that information to operate same, using the centralized control.

It is another object of the invention that the access to the information is intuitive and direct so that the user can obtain the relevant information in a few self-explanatory steps. To that end, the invention embraces a multimedia approach where audio and video media are added to the traditional text media to convey information. The additional media increases the dimensions of both the user's comprehension of the information and the user's interaction with the automobile. Moreover, the information access is driven by a multilevel menu based on an intuitive model of taxonomy where information is organized in a minimal number of levels of subject matter from general to specific. The above integration of the multimedia approach with the multilevel menu approach presents an effective way of retrieving information in the automobile. Advantageously, with the invention, the user would not be distracted or overburdened by irrelevant information in the course of an information retrieval, which is conducive to a safe driving environment.

In the preferred embodiment, when the user wants to access information about a given part or accessory of the automobile, the user is presented with options on a display screen. Each option is associated with a respective one of different parts or accessories of the automobile. The user is able to select through the interface one of the options, associated with the given automobile part or accessory. The option, when selected, is highlighted in a first color, for example, yellow. A voice is then generated by the inventive system to explain the purpose or the content of the selected option before the user commits to it. Having been so informed, the user may then activate the selected option in retrieving the information of interest. The activated option is

4

highlighted in a second color, e.g., blue, to indicate its active status. The retrieved information is presented to the user both in text and i[008e] voice.

BRIEF DESCRIPTION OF THE DRAWING

Further objects, features and advantages of the invention will become apparent from the following detailed description taken in conjunction with the accompanying draw in g showing an illustrative embodiment of the invention, in which:

FIG. 1 is a block diagram of an automobile information and control system in accordance with the invention;

FIG. 2 illustrates a control panel and a display interface for a user to interact with the system of FIG. 1;

FIG. 3A illustrates a flow chart depicting the steps of an anti-car-theft routine used in the system of FIG. 1;

FIGS. 3B and 3C jointly illustrate a flow chart depicting the steps of a routine for presenting various screens to the user in the system interaction;

FIG. 4A illustrates a screen for eliciting a personal identification number (PIN) from the system user;

FIG. 4B illustrates a SELECT A FUNCTION screen including features thereof in accordance with the invention;

FIG. 5 illustrates an introduction screen including features thereof in accordance with the invention;

FIG. 6 illustrates a MANUFACTURER screen including features thereof in accordance with the invention;

FIG. 7 illustrates a SAFETY REMINDERS screen including features thereof in accordance with the invention;

FIG. 8 illustrates a THEFT PROTECTION FEATURES screen including features thereof in accordance with the invention;

FIG. 9 illustrates a QUICK TIP SET-UP screen including features thereof in accordance with the invention;

FIG. 10 illustrates a MAIN MENU screen including features thereof in accordance with the invention;

FIG. 11 illustrates a DRIVER'S VIEW screen including features thereof in accordance with the invention;

FIG. 12 illustrates an INSTRUMENT PANEL screen including features thereof in accordance with the invention;

FIG. 13 illustrates a TACHOMETER AND WARNING LIGHTS screen including features thereof in accordance with the invention;

FIG. 14 illustrates a segment of the screen of FIG. 13 providing the user with information regarding a particular function of the automobile;

FIG. 15 illustrates a CLIMATE CONTROL screen including features thereof in accordance with the invention;

FIG. 16 illustrates a SAVE screen for saving the user's preferences in accordance with the invention;

FIG. 17 illustrates a DATA ENTRY screen in accordance with the invention for looking up information regarding a specific item in the automobile;

FIG. 18 illustrates an INDEX screen with listed items for which information is available; and

FIG. 19 is a look-up table listing searchable items and the corresponding instructions for a processor in the system of FIG. 1 to provide information regarding such items.

Throughout this disclosure, unless otherwise stated, like elements, components and sections in the figures are denoted by the same numerals.

DETAILED DESCRIPTION

FIG. 1 illustrates information and control system 100 embodying the principles of the invention for use in an

CALCAR 2325

EXHIBIT L
PAGE 95

US 6,438,465 B2

5

automobile. System 100 is referred to as the "AUTO DIRECTOR" system. It is user-friendly and designed with the automobile user in mind. For example, with AUTO DIRECTOR display interface 102a to be described, information about the automobile is readily available literally at the fingertips of the user. This information includes operational instructions, maintenance procedures, safety measures, and information about virtually every capability of the automobile. In accordance with the invention, the user is able to efficiently access such information using multimedia means involving audio, text and video media. Also with interface 102a, or multifunction display interface 102b to be described, the user is afforded a centralized control whereby he/she can program or adjust different vehicle parts and accessories using the information thus obtained.

As shown in FIG. 1, central to system 100 is processor 105 connected to memory 115. Data bus 107 connects processor 105 to display interfaces 102, input interfaces 104, communications interfaces 106, output control interfaces 108, vehicle computer interfaces 110, vehicle control interfaces 112, self-test interface 114, preferences interface 116, and audio interface 118.

Display interfaces 102 include, inter alia, AUTO DIRECTOR display interface 102a, which is illustrated in FIG. 2, together with control panel 205 in FIG. 1. By way of example, but not limitation, the hardware of interface 102a and control panel 205 are derived from a prior art navigation system of the type of the ACURA navigation system. In fact, interface 102a and control panel 205 are used in this illustrative embodiment to realize not only AUTO DIRECTOR functions to be described, but also the well-known navigation function.

Interface 102a includes a conventional liquid crystal display screen 209, and LCD driver (not shown) for processor 105 to control the display on screen 209. Interface 102a also incorporates well-known touch-screen circuitry (not shown) connected to touch screen interface 104a in FIG. 1. With this circuitry, the user can interact with processor 105 by, say, touching a displayed option on screen 209. Through interface 104a, processor 105 receives from the touch screen circuitry a signal identifying the location on screen 209 where it has been touched. If such a location matches the predetermined location of one of the displayed options, processor 105 determines that that option has been selected. With such touch-screen and displayed option selection capabilities, through AUTO DIRECTOR interface 102a, the user is able to obtain information on and control selectable functions of the automobile such as the instrument panel, navigation function, mobile phone, radio/CD player, locks, mirrors, windows, driver's seat adjustment control, climate control, windshield wipers, cruise control, lights, security function, steering, ride control, engine and transmission.

Control panel 205 comprises CANCEL switch 205a, ENTER switch 205b, BRIGHTNESS switch 205c, PUSH TO SELECT knob 205d, MENU switch 205e, MAP/GUIDE switch 205f, SETUP switch 205g, ZOOM IN switch 205h and ZOOM OUT switch 205i. BRIGHTNESS switch 205c comprises a standard variable resistor such that when it is pushed one way, operating circuitry 121 responsively causes the display intensity to increase, and the other way to decrease. ZOOM IN switch 205h when pressed enables the automobile user to enlarge a particular visual area of interest on screen 209, affording better details. On the other hand, ZOOM OUT switch 205i. when pressed performs the inverse function to switch 205h. As an alternative to the touch-screen capability, switch 205d, similar to a standard

6

joystick is provided for the user to move from one displayed option to another on screen 209 in the same direction (e.g., up, down, left or right) as the switch is operated. A desired option may be selected by pressing ENTER switch 205b. The functions of the other switches are described hereinbelow as they are called out in the operation of system 100. In this illustrative embodiment, AUTO DIRECTOR display interface 102a and control panel 205 are mounted close to the center of the dashboard of the automobile next to the steering wheel.

Referring back to FIG. 1, display interfaces 102 also include multifunction display interface 102b, center console display interface 102c, rear console display interface 102d, and instrument panel display interface 102e.

Specifically, multifunction display interface 102b is installed on the dashboard close to interface 102a on the driver side. Like interface 102a, interface 102b provides the user with graphic display and control of selected functions using well-known touch screen technology. In fact, interface 102b duplicates certain control functions (e.g., navigation, phone, radio and climate control) of interface 102a so that the user can use interface 102b to control a selected function while interface 102a is engaged in another ongoing function. For example, while the user is relying on AUTO DIRECTOR interface 102a to provide navigation information to reach a given destination, the user may want to adjust the climate control of the automobile. It is inconvenient for the user to terminate the ongoing navigation mode of interface 102a, albeit temporarily, to access the climate control function through the interface, adjust the climate control and then resume the navigation mode. Thus, it is preferable to leave the navigation mode of interface 102a alone and use interface 102b to administer the climate control.

Center console interface 102c is installed close to interface 102a on the passenger side. Similar to interface 102b, interface 102c provides the front seat passenger with graphic display and control of functions which include: the front passenger seat adjustment, door lock, window, climate and TV controls. If enabled by the driver, control is also available for the radio/CD player and phone.

Rear console display interface 102d is installed on the back of a front seat. Similar to interface 102c, interface 102d provides rear seat passengers with graphic display and control of certain functions if enabled by driver or front seat passenger. These functions include: the rear seat climate, windows, door locks, radio/CD player and TV controls.

Instrument panel display interface 102e is installed on the dashboard in front of the driver seat.

This interface provides the driver with graphic display of the vehicle speed, engine RPM, outside and inside temperatures, oil pressure, fuel level, time, odometer reading, trip odometer reading and warning light indicators. Through AUTO DIRECTOR interface 102a, the system user may select the display of the information in either an analog or a digital form.

Input interfaces 104 comprise touch screen interface 104a and control panel 205 described before, and voice command interface 104d. The latter is connected to a microphone (not shown) and comprises standard voice command circuitry (not shown) for processing voice commands by the user through the microphone to control or modify selected functions of system 100.

Communications interfaces 106 include phone interface 106a, radio/CD interface 106b, television (TV) interface 106c, navigation interface 106d, and beacon interface 106e. Processor 105 interacts with and controls standard phone

CALCAR 2326

EXHIBIT L
PAGE 96

US 6,438,465 B2

7

equipment connected to phone interface 106a. Through processor 105, the user may operate the phone equipment via voice command, thereby realizing hands-free operation of the equipment. Alternatively, the user may operate the phone equipment using the touch screen capability provided by AUTO DIRECTOR display interface 102a or multifunction display interface 102b. The user may also operate the phone equipment via remote switches.

Similarly, processor 105 interacts with and controls one or more radio receivers and CD players in the automobile connected to radio/CD interface 106b. Through processor 105, the user may operate the radio receivers via voice command, remote switch and/or touch screen capability.

Processor 105 further interacts with and controls one or more TV receivers in the automobile connected to TV interface 106c. Again, the user may operate the TV receivers via voice command, remote switches and/or touch screen capability.

As further described hereinbelow, navigation interface 106d is connected to a standard inertial guidance system (not shown) capable of providing gyros information, and deriving the vehicle location based on GPS information. With the map information stored in memory 115, the inertial guidance system is capable of providing the user with navigational instructions via interface 102a or 102b. Besides the locational information, local and national emergency information may be derived from the GPS information using additional standard decoding circuitry in interface 106d.

Beacon interface 106e is used for connection to a standard beacon device for detecting a predetermined beacon radio signal to provide additional locational information.

Output control interfaces 108 include lock interface 108a, mirror interface 108b, window interface 108c, steering column interface 108d, seat interface 108e, climate control interface 108f, wiper interface 108g, cruise control interface 108h, light interface 108i and clock interface 108j.

Specifically, lock interface 108a comprises output control logic controllable by processor 105 to lock or unlock the car doors, glove box, console storage, trunk (or liftgate), fuel filler door, brakes and transmission, and enable or disable the child-proof door locks, fuel pump and ignition.

Mirror interface 108b comprises output control logic controllable by processor 105 to maneuver the positions of the outside mirrors and inside rear view mirror, and to fold or unfold the outside mirrors.

Window interface 108c comprises output control logic controllable by processor 105 to incrementally or completely open or close all windows, and to open, close or tilt any sunroof.

Steering column interface 108d comprises output control logic controllable by processor 105 to move the steering column in or out and up or down.

Seat interface 108e comprises output control logic controllable by processor 105 to (1) adjust the positions of the front seats forward or aft, and up or down; (2) tilt the front or rear of the seat cushion up or down; (3) adjust the seat back lumbar, width and angle forward or aft; (4) increase or decrease the cushion size and stiffness; (5) raise or lower the head restraint; and (6) raise or lower the seat belt height.

Climate control interface 108f comprises output control logic controllable by processor 105 to (1) turn the climate control system on or off; (2) select an air flow mode; (3) set fan speeds; (4) enable or disable seat heaters; (5) select fresh or recirculated air (for driver only); and (6) enable or disable front and rear defrosters, mirrors and steering wheel heaters (for driver only).

8

Windshield wiper interface 108g comprises output control logic controllable by processor 105 to (1) select a high, low, intermittent, single wipe or off mode; (2) set an intermittent delay; and (3) enable or disable front or rear washers. Interface 108g also includes control logic for controlling rain- and speed-sensitive wipers, and for activating an automatic wash in a single wide mode when the windshield is at a certain level of opacity.

Cruise control interface 108h comprises output control logic controllable by processor 105 to (1) turn the cruise control on or off, (2) set the vehicle speed, and (3) cancel or resume the set speed.

Light interface 108i comprises output control logic controllable by processor 105 to select an automatic on mode or off mode for parking lights, headlights and fog lights; and to turn on or off map or courtesy lights.

Clock interface 108j comprises output control logic controllable by processor 105 to set an initial date and time on a conventional clock (not shown) connected to interface 108j. System 100 relies on the current date and time kept by the clock to provide a time reference for the system functions.

Vehicle computer interfaces 110 include anti-lock brake computer interface 110a, engine computer interface 110b and supplemental restraint computer interface 110c for processor 105 to communicate with the computers controlling the anti-lock brakes, engine and supplemental restraints (e.g., back-up airbag deployers and seat belt tensioners), respectively. Interfaces 110 also include back-up interface 110d through which processor 105 receives and analyzes signals from the engine, anti-lock brake and supplemental restraint computers. These signals would indicate to processor 105 any failures of the computers. In response to a computer failure, processor 105 causes a corresponding back-up computer connected to interface 110d to provide a back-up function.

Vehicle control interfaces 112 include steering interface 112a, ride interface 112b, engine interface 112c, transmission interface 112d, traction control interface 112e, and security interface 112f.

Specifically, steering interface 112a comprises input monitoring and output control logic for processor 105 to lighten or tighten the steering effort ratio in response to changing road conditions. Through interface 102a, the user may opt for manual or automatic steering effort ratio control. Interface 112a is capable of adapting and storing data according to the driver's inputs. It also allows for steering of front and/or rear wheels for sporty or increased stability.

Ride interface 112b comprises input monitoring and output control logic for processor 105 to lighten or stiffen the ride control to front and/or rear of vehicle in response to changing road conditions. Through interface 102a, the user may also opt for manual or automatic ride control.

Engine interface 112c comprises input monitoring and output control logic allowing for shutting off a specified number of cylinders, and varying valve and cam timing to increase performance or fuel economy. This interface also allows for manual or automatic control of the engine components, and includes the capability of adapting and storing data according to the driver's inputs.

Transmission interface 112d comprises input monitoring and output control logic for selecting manual or automatic shifting of the transmission. In an automatic shifting mode, interface 112d is capable of adapting and storing data according to the driver's inputs. Interface 112d also allows for control of a variable differential ratio for fast acceleration and high economy cruise.

CALCAR 2327

EXHIBIT L
PAGE 97

US 6,438,465 B2

9

Traction control interface 112e comprises input monitoring and output control logic providing information on whether power is delivered to front and/or rear wheels of the vehicle and what proportion of the power is delivered to each wheel. This interface also allows for manual or automatic control, and such functions as yaw control in cooperation with the anti-lock brakes and an engine cylinder shutoff.

Security interface 112f comprises control logic for setting a security level, and enabling or disabling a number of security related functions such as the fuel supply cut-off, motion detector, brake locking, etc. Interface 112f also allows entry of a new or alteration of an existing personal identification number (PIN) for personalization of the vehicle functions, i.e., saving the vehicle functional preferences.

In accordance with an aspect of the invention, system 100 incorporates an anti-car-theft technique involving security interface 112f. In accordance with this inventive technique, security interface 112f further comprises a sensor for detection of a predetermined condition to trigger an anti-theft routine. It will be appreciated that a person skilled in the art will come up with many different triggering events causing the sensor to invoke the routine. For example, a passive way of triggering the anti-theft routine would be after the sensor detects that the engine is off and the user has opened, closed and locked the driver's door.

In any event, as soon as processor 105 receives from the sensor a signal requesting an invocation of the anti-theft routine, processor 105 retrieves from navigation interface 106d GPS information identifying the parking location of the automobile, as indicated at step 251 in FIG. 3A. Processor 105 then stores at step 253 the parking location GPS information in memory 115. At step 255, processor 105 determines whether the security measures remain on. By way of example, but not limitation, such determination is based on information from lock interface 108a indicating whether the driver's door is properly unlocked. If that door is properly unlocked, processor 105 determines that the security measures are called off, and the anti-theft routine comes to an end, as indicated at step 257.

Otherwise if processor 105 determines that the security measures remain on, processor 105 at step 259 retrieves from navigation interface 106d GPS information identifying the current location of the automobile.

Processor 105 then compares at step 261 the current location GPS information with the parking location GPS information previously stored. If processor 105 at step 262 determines that the current location matches the parking location based on the comparison, the anti-theft routine returns to step 255 after a predetermined period. Otherwise if processor 105 determines that the current location does not match the parking location, processor 105 assumes that the automobile has been removed without authorization, i.e., stolen. At this point, if a conventional alarm system is connected to security interface 112f, processor 105 would cause an alarm to come on, gas to be cut off, etc.

In this example, a conventional transmitter (not shown) is connected to security interface 112f and transmits a predetermined sequence of signals receivable by a law enforcement agency or a suitable alarm monitor company when it is activated. Continuing the example, processor 105 translates the GPS information identifying the current vehicle location into the corresponding street address based on the map information stored in memory 115, as indicated at step 263. Processor 105 at step 265 looks up one or more phone

10

numbers pre-stored in memory 115 for reporting to the law enforcement agency (or the alarm monitor company) about the stolen status. Alternatively, a list of phone numbers associated with law enforcement agencies (or branches of the alarm monitor company) in many different geographic locations is pre-stored, along with the GPS information identifying the locations of the respective law enforcement agencies (or alarm monitor company branches). This being so, processor 105 locates the closest law enforcement agency (or alarm monitor company branch) and its associated phone number(s) by comparing the current vehicle location GPS information with the respective agency (or branch) location GPS information.

In any event, processor 105 at step 267 initiates a call to a law enforcement agency (or an alarm monitor company branch) through phone interface 106a using the phone number just located. After the phone connection is established, processor 105 provides through the connection information about the current address of the vehicle using conventional voice synthesizer circuitry (not shown) in audio interface 118, and the pre-recorded information about the vehicle itself such as its vehicle identification number (VIN), model, year, color, license number, etc., as indicated at step 269. Through the same phone connection, processor 105 may also provide information about the vehicle's owner such as his/her name and contact number so that the law enforcement agency (or alarm monitor company branch) can notify the owner of the incident. Processor 105 at step 271 activates the aforementioned transmitter connected to security interface 112f to generate the predetermined sequence of signals in case the stolen vehicle is in transit. For that matter, processor 105 can also repeatedly check on the latest vehicle location and report any new address different from the one previously reported. Thus, by tracking the signals in the vicinity of the latest reported vehicle location, the law enforcement agency (or alarm monitor company) would recover the vehicle in an efficient manner.

Referring back to FIG. 1, self-test interface 114 comprises input/output (I/O) control logic for performing an active self-test of system 100 on power up or at the user's request. Specifically, interface 114 polls every other interface in system 100 for a self-test result. Each interface, when polled, performs an active self-test and reports the test results to interface 114, where such test results are gathered and caused to be displayed on interface 102a.

Preferences interface 116 monitors changes made by the user in selected functions after the user logs on system 100, and prompts the user to save such preferences. These preferences are stored in memory 115 in association with the user's PIN. Functions affording the user choices include auto locks, an easy entry, auto lamps, the seat position, steering column position, mirror position, radio, steering, ride, transmission shift, engine performance, climate, and security level.

Audio interface 118 comprises I/O control logic for receiving audio signals from a radio/CD, TV, compact disk (CD) player, or phone interface, processing the received audio signals, providing proper amplifications thereto, and routing the resulting sound to appropriate speakers and headphones (not shown) connected to interface 118. In this illustrative embodiment, AUTO DIRECTOR display interface 102a and multifunction display interface 102b share the same speakers. Interface 118 also provides center and rear console display interfaces 102c and 102d with separate audio channels, speakers and headphone outputs. The front and rear speakers may be muted by the user as a preference.

Interface 118 also processes requests from other interfaces for pre-recorded digital sounds stored in a SOUNDSGOOD

CALCAR 2328

EXHIBIT L
PAGE 98

US 6,438,465 B2

11

library in memory 115 and routes the requested sounds to the appropriate interfaces. In addition, interface 118 comprises the conventional voice synthesizer circuitry for providing voice messages to the appropriate interfaces.

FIGS. 3B and 3C jointly illustrate routine 300 for accessing, through AUTO DIRECTOR display interface 102a, a main menu to obtain operational instructions, maintenance procedures, safety measures, and other information about the automobile, collectively referred to as "Quick Tips". Routine 300 is stored in memory 115 and initiated when SETUP switch 205g in FIG. 2 is pressed. Instructed by routine 300, processor 105 at step 301 elicits a PIN from the user by displaying a screen of FIG. 4A through interface 102a. As shown in FIG. 4A, a video key-pad comprising numeral keys "1" through "9", and "★" and "#" keys are displayed on screen 209. In response, the user enters a sequence of numerals by touching the corresponding displayed keys, followed by the "#" key.

It should be pointed out that in accordance with another aspect of the invention, when a displayed key or option is touched on the screen of AUTO DIRECTOR display interface 102a or multifunction display interface 102b, a tone pre-selected by the user from the SOUNDSGOOD library is generated through audio interface 118, indicating that the key or option has been touched on the screen. Advantageously, relying on the audio tone confirmation, as opposed to a visual confirmation, the user while driving can continually watch the road.

The user may alternatively enter the above numeral sequence using control panel 205 in a manner to be described. In any event, processor 105 then verifies at step 303 the PIN entry by comparing it with the user's pre-selected PIN. The latter is stored in memory 115, along with the user's preferences. In a standard way, the user is given a few chances to enter a correct PIN. Verification of the PIN entry identifies the user as a legitimate user. Thus, if the PIN entry is not valid, routine 300 comes to an end, as indicated at step 304.

Otherwise if the PIN entry is valid, processor 105 at step 305 causes interface 102a to display on screen 209 a "SELECT A FUNCTION" screen, which is illustrated in FIG. 4B. As shown in FIG. 4B, two options, namely, "NAVIGATION" and "QUICK TIPS", are displayed on screen 209. By default, NAVIGATION option 401 is highlighted yellow when the screen of FIG. 4B appears.

It should be pointed out that in this illustrative embodiment, a yellow highlight on an option indicates that the option is selected but not yet activated. Once a yellow highlighted option is activated, it is highlighted blue. System 100 then performs according to the activated option.

Thus, in this instance, the user may activate the yellow highlighted NAVIGATION option by touching the option on screen 209 or by pressing ENTER switch 205b.

However, if QUICK TIPS option 403 is desired, the user may touch that option on screen 209, which would then be highlighted yellow. A second touch on the same option will change the highlight to blue, indicating the active status. As an alternative, the user may utilize knob 205d of FIG. 2 to select QUICK TIPS option 403 by first pushing the knob to the right. In response, processor 105 causes the yellow highlight to move from default NAVIGATION option 401 to QUICK TIPS option 403. The user can then select the QUICK TIPS option by pressing ENTER switch 205b. Upon selection, the yellow highlighted option will again turn blue.

Processor 105 at step 308 detects an activation of either NAVIGATION option 401 or QUICK TIPS option 403. If

12

NAVIGATION option 401 is activated, processor 105 at step 311 causes system 100 to enter into a navigation mode. In this mode, processor 105 causes navigational instructions to be displayed on screen 209 in a conventional manner. In providing the navigation instructions, the standard inertial guidance system connected to navigation interface 106d receives signals from a constellation of GPS satellites maintained and controlled by the U.S. Department of Defense. In response to these signals, the inertial guidance system identifies the location (in longitude and latitude) of the automobile. The system also detects the vehicle speed, and the direction in which the vehicle is headed. By accessing the map information stored in memory 115, the system is capable of visually and verbally providing the user with directions to a given destination through AUTO DIRECTOR display interface 102a and audio interface 118, respectively.

Otherwise if activation of QUICK TIPS option 403 is detected at step 308, processor 105 causes interface 102a to display an introduction screen on screen 209, as indicated at step 314. This introduction screen is illustrated in FIG. 5.

As shown in FIG. 5, system source identification, warning and instructional information appear on the introduction screen, along with two options, "MAIN MENU" and "READ ME". The default option in this instance is READ ME option 501 which is highlighted yellow. Processor 105 detects at step 317 whether MAIN MENU option 503 or READ ME option 501 is activated. If MAIN MENU option 503 is activated, routine 300 proceeds to step 340 to be described. Otherwise if READ ME option 501 is activated, routine 300 proceeds to step 320 where processor 105 causes a series of three screens to be displayed. The first screen of the series is a "MANUFACTURER" screen, which is illustrated in FIG. 6.

As shown in FIG. 6, a description of the QUICK TIPS system appears on the MANUFACTURER screen. If the text to be displayed exceeds one screen, which is the case here, scrolling options comprising scroll-up option 605 and scroll-down option 607 are provided. When option 605 is touched and activated on screen 209, additional text scrolls up one paragraph at a time. Option 607 performs an inverse function to option 605. Again, as an alternative, the user may maneuver PUSH TO SELECT knob 205d until the desired scroll option (or direction arrow) is highlighted yellow. The activation of the highlighted option is achieved by pressing ENTER switch 205b.

By default, displayed option 609 has the "AUTO VOICE" wording thereon and is highlighted blue as the MANUFAC-TURER screen comes on. Accordingly, a pre-recorded voice is activated by processor 105 through audio interface 118 to read the entire text associated with this screen without interruption, including the text which is not presently shown on screen 209 but otherwise shown upon scrolling. To alter the AUTO VOICE function, the user may touch option 609 on screen 209, or alternatively press ENTER switch 205b. By doing so, the "AUTO VOICE" wording on option 609 changes to "MANUAL VOICE", which is highlighted blue, indicating its active status.

In accordance with the MANUAL VOICE function, a pre-recorded voice reads the displayed text only, and stops reading until additional text is scrolled onto the screen. To silence the voice, the user may again touch option 609 on screen 209, or alternatively press ENTER switch 205b. By doing so, the "MANUAL VOICE" wording on option 609 changes to "VOICE OFF", and the voice is deactivated, with the option now highlighted yellow. The cycle of the AUTO VOICE, MANUAL VOICE and VOICE OFF functions can be repeated by successively touching option 609 or pressing switch 205b.

CALCAR 2329

EXHIBIT L
PAGE 91

US 6,438,465 B2

13

14

Other displayed options on the screen of FIG. 6 include PREVIOUS option 611 and NEXT option 613. As indicated at step 323, option 611 when selected causes routine 300 to return to step 314, where the introduction screen of FIG. 5 is again displayed. Otherwise, if option 613 is selected, routine 300 proceeds to step 326 in FIG. 3C where processor 105 causes a "SAFETY REMINDERS" screen to be displayed on screen 209. FIG. 7 illustrates such a screen.

As shown in FIG. 7, like the MANUFACTURER screen, the SAFETY REMINDERS screen includes option 609 displayed with the default wording "AUTO VOICE" thereon, PREVIOUS option 611, NEXT option 613, scroll-up option 605 and scroll-down option 607. This screen reminds the user of the safety features of the vehicle including, for example, air bags and seat belts. As indicated at step 329, option 611 when selected causes routine 300 to return to step 320 of FIG. 3B. Otherwise if option 613 is selected, routine 300 proceeds to step 332 where processor 105 causes a "THEFT PROTECTION FEATURES" screen to be displayed on LCD screen 209. FIG. 8 illustrates such a screen.

As shown in FIG. 8, the THEFT PROTECTION FEA-TURES screen similarly has thereon displayed options 605, 607, 609, 611 and 613. This screen describes to the user a theft-deterrent system including the anti-theft routine of FIG. 3A equipped in the vehicle. As indicated at step 335, option 611 when selected causes routine 300 to return to step 326. Otherwise if option 613 is selected, routine 300 proceeds to step 338 where processor 105 causes a "QUICK TIPS SET-UP" screen to be displayed on LCD screen 209. FIG. 9 illustrates such a screen.

As shown in FIG. 9, the QUICK TIPS SET-UP screen comprises two arrays of displayed options, denoted 901 and 903, respectively. Array 901 concerns the volume of the audio part of system 100. In this illustrative embodiment, the user may select the options in array 901 to respectively turn the volume off, to a "SOFT" level, to a medium level, and to a "LOUD" level. Array 903 concerns the display of LCD 119 of system 100. In this illustrative embodiment, the user may select the options in array 903 to respectively turn the display off, adjust it to a "DAY" setting, adjust it to a "NIGHT" setting, and have it automatically adjusted. When the QUICK TIPS SETUP screen comes on, by default, the volume is set to a medium level (i.e., the "MED" option in array 901 highlighted blue), and the display is set to be automatically adjusted (i.e., the "AUTO" option in array 903 highlighted blue).

Also shown in FIG. 9 is NEXT option 905. By selecting this option, routine 300 returns to step 340 of FIG. 3B where a "MAIN MENU" screen is displayed on LCD screen 209. After routine 300 is performed, the screen of FIG. 9 can be invoked at any time by pressing SETUP switch 205g to re-adjust the volume and the intensity of the LCD of system 100.

FIG. 10 illustrates the MAIN MENU screen. This screen comprises displayed options disposed in columns 1001, 1003, 1005, and 1007. For example, column 1001 includes DRIVER'S VIEW option 1001a, STEERING COLUMN CONTROLS option 1001b, LOCK option 1001c, DRIVING TIPS option 1001d, and INDEX option 1001e. It should also be noted that this screen can be invoked at any time by pressing MENU switch 205e.

When the MAIN MENU screen comes on, by default, DRIVER'S VIEW option 1001a is highlighted yellow, indi-cating that it is selected. However, the user may touch any other displayed option on screen 209 for re-selection. A

further touch on the yellow highlighted option changes its color to blue and activates same. Again, the user may alternatively maneuver PUSH TO SELECT knob 205d to re-select any other displayed option, followed by a depres-sion of ENTER switch 205b to activate the selected option. Since LCD screen 209 is compact, the display area for each option on the MAIN MENU screen is generally small. As a result, selection and activation of an option by touching the option on the screen is susceptible to errors, especially when the vehicle is in motion. Thus, in this situation it may be preferable to achieve the same result using knob 205d and switch 205b, instead.

In addition, because of the small display area allocated to each option on the MAIN MENU screen, the wording on the option is brief and thus tends to be cryptic.

In accordance with a feature of the invention, after a predetermined time (e.g., a few seconds) has elapsed from the option's being highlighted yellow, processor 105 causes a voice to be generated on speakers 127 to explain the purpose of the option before the user activates it. For example, after a predetermined delay from DRIVER'S VIEW option 1001a 's being highlighted yellow, a voice is activated, stating the option name, followed by an explana-tion of the purpose of the option such as "To provide location of dash mounted components." Thus, this inventive feature affords a preview of the option before the user commits to it, thereby avoiding unnecessary backtracking.

Continuing the example, after hearing the preview of option 1001a, the user decides to select that option. In response, processor 105 causes a "DRIVER'S VIEW" screen to be displayed on screen 209. Such a screen is illustrated in FIG. 11. When the DRIVER'S VIEW screen appears, VOICE option 1101 is highlighted blue, indicating that voice announcements are active. To disable the voice announcements, the user may touch VOICE option 1101 on screen 209, or alternatively press ENTER switch 205b. VOICE option 1101 would be highlighted yellow when disabled.

As also shown in FIG. 11, a view of the interior of the automobile from the driver's perspective is provided. Underneath that view, DASH-MOUNTED CONTROLS option 1103, INSTRUMENT PANEL option 1105, AUDIO SYSTEM option 1107, CLIMATE CONTROLS option 1109 and PREVIOUS option 1111 are displayed. By default, DASH-MOUNTED CONTROLS option is highlighted yel-low. However, the user in this example decides to select INSTRUMENT PANEL option 1105, instead. By touching option 1105 on screen 209, the option is highlighted yellow. If VOICE option is not disabled, after a predetermined delay, an announcement such as "To provide information on gauges, meters and warning lights" comes on to preview the purpose or content of option 1105. Options 1103, 1107, and 1109 are similarly programmed. In this instance, selecting PREVIOUS option 1111 enables the user to return to the MAIN MENU screen of FIG. 10.

Continuing the example, assuming that the user activates option 1105 after hearing the preview, in response processor 105 causes an "INSTRUMENT PANEL" screen to be dis-played on screen 209. Such a screen is illustrated in FIG. 12. As shown in FIG. 12, the previous screen format is generally maintained in that it provides a view of the object (the instrument panel of the automobile in this instance) pertinent to the option which has been selected, along with displayed options for further selection thereunder. Based on the dis-closure heretofore, the design and operation of these screens by now are apparent to a person skilled in the art, and become self-explanatory.

CALCAR 2330

EXHIBIT L
PAGE 100

US 6,438,465 B2

15

In accordance with another feature of the invention, individual elements on the instrument panel shown in FIG. 12 are labeled with numerals "1", "2", "3", "4" and "5" which correspond to option 1201*a* designated "1. TACHOMETER AND WARNING LIGHTS", option 1201*b* designated "2. TURN SIGNAL/HAZARD WARNING", option 1201*c* designated "3. SPEEDOMETER AND WARNING LIGHTS", option 1201*e* designated "4. ODOMETER & TRIP METERS/OUTSIDE TEMPERATURE", and option 1201*f* designated "5. FUEL/ TEMP GAUGE AND WARNING LIGHTS", respectively. As such, the function of the displayed options is two-fold. First, the wording on each displayed option informs the user of what the corresponding element(s) represents. Second, each displayed option is also for selection to obtain more information about the corresponding element(s). In addition, with the above voice preview feature, the user is further apprised of the purpose or content of the option before he/she commits to it. For example, TACHOMETER AND WARNING LIGHTS option 1201*a* corresponds to a voice preview such as "To provide information on tachometer, malfunction, maintenance required, low oil pressure and charging system failure indicators."

Assuming that the user in this instance activates option 1201*a*, in response processor 105 causes a "TACHOM-ETER AND WARNING LIGHTS" screen to be displayed on screen 209. Such a screen is illustrated in FIG. 13.

FIG. 13 shows VOICE option 1301 similar to option 1101 described before, TIP option 1303, a tachometer of the automobile denoted 1305, warning lights collectively denoted 1307, and options 1309*a* through 1309*f* in display segment 1311.

When TIP option 1303 appears on screen 209, it indicates that helpful hints or reminders are available upon selection thereof. In accordance with another feature of the invention, the appearance of TIP option 1303 is accompanied by the playing of a sound segment associated therewith. This sound segment may be pre-selected by the user from the SOUNDSGOOD library. After an adaptation period, the user would be able to rely on the familiar sound segment, without looking at the screen, to alert him/her of the availability of the TIP option.

Similarly, the user may pre-select another sound segment associated with warnings. Such a sound segment should connote urgency or even emergency as such warnings include, for example, engine overheating, an extremely low fuel level caution, GPS emergency information from navigation interface 106*d*, etc. Under control of processor 115, audio interface 118 preempts any on-going announcement and momentarily substitute therefor any such warning as soon as it occurs, which is preceded by the associated sound segment.

In any event, if option 1303 is selected in this instance, a voice comes on and utters a tip regarding tachometer 1305 such as "To prevent engine damage, do not drive with needle in red zone." This tip is also momentarily displayed on segment 1311 in lieu of options 1309*a* through 1309*f*.

Similar to the elements on the INSTRUMENT PANEL screen, tachometer 1305 and warning lights 1307 on this screen are individually labeled and correspond to options 1309*a*, 1309*b*, 1309*c*, 1309*e* and 1309*f*, respectively. Assuming in this example that MAINTENANCE REQUIRED option 1309*c* is activated, display segment 1311 would be replaced by new display segment 1411 illustrated in FIG. 14. As shown in FIG. 14, item 1401 indicates the subject selected, i.e., "MAINTENANCE

16

REQUIRED". Item 1403 explains what the MAINTE-NANCE REQUIRED warning light, when on, indicates. In this instance it states, "Maintenance required warning light comes on to indicate it is time for scheduled maintenance." PREVIOUS option 1405 enables the user to reactivate segment 1311 of FIG. 13.

Assuming further that at this point the user wants to learn about and also to program the air conditioning of the automobile, the user may access a "CLIMATE CONTROL" screen by successively pressing the PREVIOUS option to backtrack to the DRIVER'S VIEW screen of FIG. 11, where CLIMATE CONTROLS option 1109 is available. As a second alternative, the user may press MENU switch 205*e* to invoke the MAIN MENU screen of FIG. 10, where a "CLIMATE CONTROLS" option within column 1003 is available. A third alternative is provided in the event that the user cannot immediately relate "air conditioning" to the CLIMATE CONTROLS option. At the MAIN MENU screen of FIG. 10, the user may select Index option 1001*e* to be described. It suffices to know for now that this option allows the user to access the "CLIMATE CONTROL" screen using the term "air conditioning".

FIG. 15 illustrates the "CLIMATE CONTROL" screen. With the voice enabled, a first touch on any displayed option on screen 209 causes it to be highlighted yellow, indicating its selected status. A second touch causes it to be highlighted blue, indicating its active status. With the voice disabled, only one touch on any displayed option activates it.

As shown in FIG. 15, the MODE options include OFF option 1511, AUTO option 1513, A/C option 1515, HEAT option 1517, and SMART CLIMATE option 1519. It should be noted that only one of the MODE options can be active at a time. In this example, assuming that the voice is enabled, when OFF option 1151 is selected by a first touch, a voice explaining the option comes on, uttering "To disable climate control." A second touch on the same option would then shut the climate control off through climate control interface 108*f*.

When AUTO option 1513 is selected by a first touch, a voice comes on to explain the option, uttering "System automatically determines air-flow distribution and volume for optimum efficiency." A second touch on the same option enables the automatic control, followed by a voice utterance, "Set desired temperature." Temperature display 1535 then flashes with the current temperature setting, prompting the user to set a desired temperature in a manner to be described.

If the user neglects to set a temperature after a predeter-mined time, in accordance with another aspect of the invention, a temperature range is automatically maintained by processor 105 in response to the date and time informa-tion from clock interface 108*j*, and the GPS information from navigation interface 106*d*. Based on the date and time information, processor 105 knows what the current season (e.g., mid-winter versus mid-summer) and time of the day (e.g., night verse noon) are. Based on the GPS information, processor 105 knows the region (e.g, New England versus Southern California) where the vehicle is. Processor 105 looks up a table stored in memory 115 containing predeter-mined temperature ranges corresponding to different com-binations of the temporal and geographic parameters. It then prescribes an appropriate temperature range according to the table. This temperature range is updated by processor 105 periodically to reflect changes in the time of the day and the geographic location of the vehicle.

Similarly, A/C option 1515 and HEAT option 1517 respectively enable the user to activate air conditioning and heaters at a desired temperature or a default temperature range.

CALCAR 2331

EXHIBIT L
PAGE 101

US 6,438,465 B2

17

SMART CLIMATE option 1519 is designed to allow the user to program the climate control for the next ride before he/she leaves the vehicle. When SMART CLIMATE option 1519 is selected by a first touch, a voice comes on to explain the option, uttering "To enable pre-heating or pre-cooling of vehicle." A second touch on the option activates the function, followed by a voice utterance, "Set desired temperature. Set desired time using fan speed arrows." Temperature display 1535 then flashes the current temperature setting, prompting the user to set a desired temperature. Similarly, fan speed display 1541 then flashes the current date, followed by current time, prompting the user to set the date and time that the user plans to re-enter the vehicle. Through climate control interface 108f, processor 105 determines whether the current level of power from the car battery and any back-up power sources is sufficient. If it is insufficient, a message such as "Fail to pre-condition vehicle temperature" is issued through audio interface 118 to notify the user of the noncompliance. Otherwise, when it is close to the re-entry time, processor 105 determines the start-up time to effect the pre-conditioning, depending on the temperature difference between the inside and outside of the vehicle at that time. Processor 105 would then cause a combination of heaters and/or heat pumps (not shown) connected to interface 108f to pre-condition the vehicle temperature. In order to avoid substantially draining the power, in this illustrative embodiment, the requested temperature would be maintained up to an hour after the set re-entry time.

The Air options in FIG. 15 include FRESH option 1521 and RECIRCULATED option 1523. Only one of these two options can be active at a time. When FRESH option 1521 is selected by a first touch on the option, a voice comes on to explain the selected option, uttering "To select outside air to circulate in vehicle." A second touch on the option activates the selection to ventilate the vehicle with outside air. Similarly, RECIRCULATED option 1523 allows the user to select the inside air for recirculation in the vehicle.

The VENT options in FIG. 15 include FLOOR option 1525, FLOOR/DASH option 1527, DASH option 1529, DEFROST option 1531 and FLOOR/DEFROST option 1533. Only one of these five options can be active at a time. When FLOOR option 1525 is selected by a first touch on the option, a voice comes on explaining the option, uttering "Main air distribution to floor." A second touch on the option directs an air flow toward the vehicle floor.

Similarly, FLOOR/DASH option 1527 enables the user to bifurcate the air flow between the floor and the dashboard. DASH option 1529 enables the user to direct the air flow from the dashboard. DEFROST option 1531 enables the user to direct the air flow toward the windshield and select fresh air if not selected. FLOOR/DEFROST option 1533 enables the user to bifurcate the air flow between the floor and windshield.

Temperature display 1535 displays the temperature selected by the user. Touching on up-arrow 1537 increases the selected temperature while touching on down-arrow 1539 decreases same. Continued touching on either up-arrow 1537 or down-arrow 1539 causes the temperature setting to change rapidly.

Similarly, fan speed display 1541 displays the fan speed (high, medium or low) selected by the user. Touching on up-arrow 1543 increases the selected fan speed while touching down-arrow 1539 decreases same.

The HEATERS options in FIG. 15 include SEAT option 1547, MIRROR option 1549, REAR WINDOW option

18

1551, STEERING WHEEL option 1553, and ALL option 1554. One or more of these options can be active at the same time. When SEAT option 1547 is selected by a first touch on the option, a voice comes on to explain the option, uttering "To enable seat heaters." A second touch on the option activates the seat heaters connected to climate control interface 108f.

Similarly, MIRROR option 1549 enables the user to activate outside mirror heaters. REAR WINDOW option 1551 enables the user to activate a rear window defroster. STEERING WHEEL option 1553 enables the user to activate a steering wheel heater. Finally, ALL option 1554 enables the user to activate all of the heaters simultaneously.

In personalizing the vehicle, preference interface 116 monitors any user adjustments to certain vehicle functions by comparing their current settings with the corresponding stored preferences in memory 115. Thus, for example, if the user changes any of the settings relating to the climate control such as the mode, vent, air, temperature, fan speed, etc. from its previous preferred setting, preference interface 116 causes a SAVE screen to appear on screen 209. This SAVE screen is illustrated in FIG. 16. As shown in FIG. 16, the user is prompted to save the change in the setting that he/she has just made. The user at this point may activate SAVE option 1601 to change the previous preferred setting. The SAVE screen thereafter disappears in favor of the previous screen. Otherwise, he/she may activate CLOSE option 1603 to close the SAVE screen, without storing the latest setting, which is then treated as a temporary setting. In the latter case, for example, a restart of the automobile will obliterate such a temporary setting, and reinstate the stored preferred setting.

Climate control screens can similarly be invoked by the front passenger and rear passengers on display interfaces 102c and 102d, respectively. Such screens provide similar MODE options including OFF, AUTO, A/C and HEAT options; and VENT options including LOWER VENT, UPPER VENT and LOWER/UPPER vent options. They also provide for temperature and fan speed adjustments for the respective localized areas. However, no save screen is provided.

Using INDEX option 1001e of FIG. 10 to look up information on and/or to control various items in the automobile will now be described. After option 1001e is activated, a DATA ENTRY screen illustrated in FIG. 17 is exhibited on screen 209. As shown in FIG. 17, a message "Enter Letter Or Item Name" appears to prompt the user for an entry of the name of the item of interest or its beginning letter. For this purpose, entry options for letters A through Z arranged in a grid format are provided in section 1701 for selection. In addition, DONE option 1703, when activated, indicates to system 100 that the entry is completed. Subdisplay 1705 is used to echo the user's entry to ensure its correctness.

In this illustration, the user enters "AIR CONDITIONING" as exhibited on subdisplay 1705. In response, an INDEX screen shown in FIG. 18 appears on display screen 209, with the search item name "AIR CONDITIONING" highlighted yellow. It should be noted that other item names such as "Anti-lock Brake System Indicator" are also shown, and they are in alphabetical order following "AIR CONDITIONING". This stems from the design of system 100 whereby the user may conveniently enter the beginning letter of the search item name only. In that case, a list of item names in alphabetical order with the first item name having the same beginning letter highlighted yellow. For instance,

CALCAR 2332

EXHIBIT L
PAGE 102

US 6,438,465 B2

19

if the user had only entered "A" for "AIR CONDITIONING", a list of item names starting with "A" in alphabetical order would appear on screen 209 (although in this instance it would be the same list as shown in FIG. 18 as "AIR CONDITIONING" is the first item with a letter "A" in system 100). If the user cannot locate the name of the item of interest in the list, he/she may scroll the screen using scroll-up option 1801 or scroll-down option 1803 to review additional item names after or before the listed item names. Alternatively, the user may select PREVIOUS option 1805 to return to the screen of FIG. 17 to enter the complete item name.

In any event, after the user locates the item name on the INDEX screen, the user may then touch the item name to access information on that item. To that end, a look-up table is stored in memory 115. FIG. 19 illustrates such a look-up table, wherein left column 1901 lists each item name in alphabetical order in the index, and right column 1903 lists the corresponding instruction for processor 105 to carry out to access information on that item. For example, according to row 1905 of the table, the selection and activation of the item name "AIR CONDITIONING" causes processor 105 to connect the user to the CLIMATE CONTROL screen of FIG. 15 previously described.

The foregoing merely illustrates the principles of the invention. It will thus be appreciated that those skilled in the art will be able to devise numerous other systems which embody the principles of the invention and are thus within its spirit and scope.

For example, based on the disclosure heretofore, it is apparent that through system 100, the user can run diagnostics on selected parts of the automobile by voice command or touch-screen control.

In addition, in the disclosed embodiment, through system 100, the user is able to program the climate control for the next ride before he/she leaves the vehicle. It will be appreciated that the user will be able to achieve same remotely ahead of time via telecommunication means. For example, processor 105 may be programmed to accept climate control commands through phone interface 106a. In that instance, the user can call from anywhere to establish a phone connection with phone interface 106a using a predetermined phone number, through which the user communicates the commands to climate control interface 108f to program the climate control. Through the phone connection, the user may be provided with climate control options described above in a synthesized voice. The user may activate one or more of such options by pressing a predetermined touch-tone key on the telephone keypad corresponding to a "yes" or "no" response. Similarly, the user may achieve the relevant temperature and/or time settings by pressing the touch-tone keys corresponding to the numerals indicative thereof. Of course, telecommunication means other than the telephone including a radio frequency (RF) transmitter may also be used to communicate the climate control commands from a remote area.

In addition, in the disclosed embodiment, the user may access different screens provided by AUTO DIRECTOR display interface 102a to learn about and control certain vehicle functions. It will be appreciated that a person skilled in the art will develop a demonstration program wherein a series of such screens will be automatically presented to a user in a predetermined sequence. The presentation may include commentaries, and highlights on selected options displayed on each screen. Furthermore, the presentation may be coupled with the showing of actual vehicle functions. For

20

example, in demonstrating the climate control screen of FIG. 15, while the function of a highlighted VENT option (e.g., Floor, Floor/Dash, Dash, Defrost or Floor/Defrost) is explained, it is activated so that the user in the automobile can feel an actual air flow from the corresponding direction. The above demonstration program may be invoked using a PIN provided by the automobile manufacturer. The program may run continually while the automobile is shown in a showroom, or may be invoked by the user occasionally to obtain relevant information.

Further, in the disclosed embodiment, the MAINTENANCE REQUIRED warning light comes on when it is time for scheduled maintenance. In accordance with another aspect of the invention, the maintenance is scheduled by system 100 according to the cumulative time of the tachometer reading above a predetermined RPM value. Such cumulative time reflects the extent of the engine wear, and if it exceeds a predetermined length of time without maintenance, the engine performance would degrade substantially. In measuring the cumulative time in question, a conventional comparator (not shown) is employed in system 100 to compare the instantaneous tachometer reading (provided by engine control interface 112c) with the predetermined RPM value. Each time when the tachometer reading exceeds the predetermined value, processor 105 is interrupted to register the length of such an occurrence. The latter is added to a running sum to update the cumulative time in question. This cumulative time may be displayed on instrument panel display interface 102e, along with the tachometer reading and the MAINTENANCE REQUIRED warning indicator. A second conventional comparator (not shown) is employed in system 100 to compare the cumulative time with the above predetermined time length. As soon as the cumulative time exceeds the predetermined length, processor 105 is interrupted and causes the MAINTENANCE REQUIRED warning light to come on, indicating that it is time for maintenance.

Still further, system 100 as described is highly adaptable in adjusting to new system requirements, and capable of "learning" new automobile features to be introduced into the system. Such learning may involve a modification or an upgrade in the system software stored in memory 115.

Moreover, other features of system 100 may include capabilities of communications with a third party remote from the vehicle. For example, system 100 may be programmed to transmit signals representing data on the current speed of the vehicle and its VIN receivable by a radar system, thus enabling the third party to monitor its speed. Furthermore, system 100 may be programmed by the third party to disable and subsequently enable the vehicle upon successful verification of a PIN pre-assigned to the third party. To that end, system 100 is capable of receiving remote transmission of the PIN, followed by the disable or enable code. The transmission may be encrypted for security reasons. Furthermore, more than one PIN may be used for different purposes. For example, a PIN may be assigned to a law enforcement agency to disable the vehicle because of a suspension of a license, or to temporarily disable the vehicle when the driver is intoxicated. Another PIN may be assigned to an environmental protection agency to disable the vehicle for failing to meet the emission requirements. Yet another PIN may be assigned to the vehicle owner to disable the vehicle when parked, thereby reducing the risk of a car theft. The disabling of the vehicle involves cutting off its gas, putting on its anti-lock brakes, etc.

Further, system 100 is capable of receiving a low-frequency, low-power broadcast covering an area of a lim-

CALCAR 2333

EXHIBIT L
PAGE 108

US 6,438,465 B2

21

ited radius, referred to as a "Cell". The broadcast may provide electronic GPS map and Yellow Page type information pertaining to the cell. This information, when received, may be downloaded onto AUTO DIRECTOR display interface 102a or multifunction display interface 102b. Such information includes a local directory indicating locations of nearby gas stations, restaurants and other facilities on the GPS map, with respect to the current location of the automobile. The local directory may be formatted in the form of "web pages" featuring the local businesses, and include additional information such as business hours, telephone numbers, and information on products and services provided by such businesses.

The above broadcast may also provide local weather information sponsored by a civic group or commercial entity. In the case of civic group sponsorship, the local civic events may be posted alongside the weather information, and in the case of commercial sponsorship, advertisements may be posted instead. Of course, as the automobile moves from cell to cell, the contents of the broadcast change accordingly.

In addition, while the radio in the automobile is tuned to a particular radio station, system 100 is also capable of receiving any electronic files broadcast from that radio station, along with the radio program. These electronic files, which may be in the form of web pages, can be downloaded onto the system. The system user may then scroll the pages to learn such information as program listings and coming events sponsored by the radio station.

Moreover, in the disclosed embodiment, system 100 is illustratively used in an automobile. It will be appreciated that a person skilled in the art may also employ the inventive system in another type of vehicle such as a boat, an airplane, etc.

Finally, although information and control system 100, as disclosed, is embodied in the form of various discrete functional blocks, the system could equally well be embodied in an arrangement in which the functions of any one or more of those blocks or indeed, all of the functions thereof, are realized, for example, by one or more appropriately programmed processors or devices.

We claim:

1. A system for use in a vehicle comprising:

a memory for storing a plurality of displays having predetermined contents, the plurality of displays being associated with a plurality of aspects of the vehicle;

an interface for entering a query to conduct a search concerning an aspect of the vehicle;

an input device for selecting a result of the search;

a processor responsive to the selected result for identifying at least one of the plurality of displays which is associated with the aspect of the vehicle; and

22

a display element for showing thereon the at least one display.

2. The system of claim 1 wherein the result is selected from a list of search results satisfying the query.

3. The system of claim 1 wherein an association of the plurality of displays with the plurality of aspects of the vehicle is established in a table format.

4. The system of claim 1 wherein the query includes a term at least identifying partially the aspect of the vehicle.

5. The system of claim 1 wherein the input device includes a touch-screen capability.

6. The system of claim 1 wherein the at least one display includes an option selectable to access information concerning the aspect of the vehicle.

7. The system of claim 1 wherein the at least one display includes an option selectable to control the aspect of the vehicle.

8. The system of claim 7 wherein the aspect of the vehicle includes a climate control of the vehicle.

9. The system of claim 1 herein the interface includes the input device.

10. A method for use in a system in a vehicle comprising:

storing in a memory a plurality of displays having predetermined contents, the plurality of displays being associated with a plurality of aspects of the vehicle;

receiving an entry of a query to conduct a search concerning an aspect of the vehicle;

receiving from an input device a selection of a result of the search;

in response to the selected result, identifying at least one of the plurality of displays which is associated with the aspect of the vehicle; and

showing the at least one display.

11. The method of claim 10 wherein the result is selected from a list of search results satisfying the query.

12. The method of claim 10 wherein an association of the plurality of displays with the plurality of aspects of the vehicle is established in a table format.

13. The method of claim 10 wherein the query includes a term at least identifying partially the aspect of the vehicle.

14. The method of claim 10 wherein the at least one display includes an option selectable to access information concerning the aspect of the vehicle.

15. The method of claim 10 wherein the at least one display includes an option selectable to control the aspect of the vehicle.

16. The method of claim 15 wherein the aspect of the vehicle includes a climate control of the vehicle.

*  *  *  *  *

CALCAR 2334

EXHIBIT L
PAGE 104

# EXHIBIT M

US006330497B1

(12) **United States Patent**
Obradovich et al.

(10) Patent No.: **US 6,330,497 B1**
(45) Date of Patent: ***Dec. 11, 2001**

(54) **MULTIMEDIA TECHNIQUE FOR OPERATING DEVICES IN A VEHICLE**

(75) Inventors: **Michael L. Obradovich**, San Clemente; **Michael L. Kent**, Garden Grove; **John G. Dinkel**, Irvine, all of CA (US)

(73) Assignee: **American Calcar Inc.**, Wilmington, DE (US)

(*) Notice: This patent issued on a continued prosecution application filed under 37 CFR 1.53(d), and is subject to the twenty year patent term provisions of 35 U.S.C. 154(a)(2).

Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **09/717,538**

(22) Filed: **Nov. 21, 2000**

**Related U.S. Application Data**

(60) Continuation of application No. 09/401,039, filed on Sep. 21, 1999, now Pat. No. 6,175,782, which is a division of application No. 08/789,934, filed on Jan. 28, 1997, now Pat. No. 6,009,355.

(51) Int. Cl.[7] .................................................. G06F 7/70
(52) U.S. Cl. ......................... 701/1; 701/29; 340/336; 345/7
(58) Field of Search .................................... 701/29, 30, 31, 701/32, 36, 49; 340/461, 436, 438, 449, 459, 336; 307/10.1

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,582,926 | 6/1971 | Hassan | 340/449 |
| 4,291,749 | 9/1981 | Ootsuka et al. | 165/202 |
| 4,314,232 | 2/1982 | Tsunoda | 340/460 |
| 4,337,821 | 7/1982 | Saito | 165/202 |
| 4,401,848 | 8/1983 | Tsunoda | 704/274 |
| 4,407,564 | 10/1983 | Ellis | 345/7 |
| 4,419,730 | 12/1983 | Ito et al. | 701/36 |
| 4,441,405 | 4/1984 | Takeuchi | 454/75 |
| 4,536,739 | 8/1985 | Nobuta | 340/323 R |
| 4,582,389 | 4/1986 | Wood et al. | 359/14 |
| 4,636,782 | 1/1987 | Nakamura et al. | 345/7 |
| 4,731,769 | 3/1988 | Schaefer et al. | 369/6 |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 0 569 243 | 11/1993 | (EP) . |
| 0 675 341 | 10/1995 | (EP) . |

*Primary Examiner*—Jacques H. Louis-Jacques
(74) *Attorney, Agent, or Firm*—Kaye Scholer LLP

(57) **ABSTRACT**

In a multimedia information and control system for use in an automobile, at least one interface is employed which enables a user to access information concerning the automobile and control vehicle functions in an efficient manner. The user may select one of a plurality of displayed options on a screen of such an interface. Through audio, video and/or text media, the user is provided with information concerning the selected option and the vehicle function corresponding thereto. Having been so informed, the user may activate the selected option to control the corresponding vehicle function.

**56 Claims, 15 Drawing Sheets**



**US 6,330,497 B1**
Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,740,779 | 4/1988 | Cleary et al. | 345/7 |
| 4,740,780 | 4/1988 | Brown et al. | 345/7 |
| 4,752,824 | 6/1988 | Moore | 348/115 |
| 4,795,223 | 1/1989 | Moss | 345/7 |
| 4,818,048 | 4/1989 | Moss | 345/7 |
| 4,827,520 | 5/1989 | Zeinstra | 701/1 |
| 4,837,551 | 6/1989 | Iino | 345/7 |
| 4,876,594 | 10/1989 | Schiffman | 348/115 |
| 4,914,705 | 4/1990 | Nigawara | 704/270 |
| 4,988,976 | 1/1991 | Lu | 340/461 |
| 4,995,258 | 2/1991 | Frank | 73/118.2 |
| 4,996,959 | 3/1991 | Akimoto | 123/406.52 |
| 5,006,829 | 4/1991 | Miyamoto et al. | 340/459 |
| 5,043,736 | 8/1991 | Darnell et al. | 342/357.1 |
| 5,051,735 | 9/1991 | Furukawa | 345/7 |
| 5,070,323 | 12/1991 | Iino et al. | 345/7 |
| 5,119,504 | 6/1992 | Durboraw, III | 455/54.1 |
| 5,198,797 | 3/1993 | Daidoji | 340/425.5 |
| 5,203,499 | 4/1993 | Knittel | 237/2 A |
| 5,214,413 | 5/1993 | Okabayashi et al. | 345/7 |
| 5,214,707 | 5/1993 | Fujimoto et al. | 704/275 |
| 5,235,633 | 8/1993 | Dennison et al. | 379/60 |
| 5,257,190 | 10/1993 | Crane | 701/35 |
| 5,274,560 | 12/1993 | LaRue | 701/202 |
| 5,278,532 | 1/1994 | Hegg et al. | 345/7 |
| 5,293,115 | 3/1994 | Swanson | 324/110 |
| 5,299,132 | 3/1994 | Wortham | 455/457 |
| 5,334,974 | 8/1994 | Simms et al. | 340/990 |
| 5,335,276 | 8/1994 | Thompson et al. | 380/266 |
| 5,335,743 | 8/1994 | Gillbrand et al. | 180/178 |
| 5,345,817 | 9/1994 | Grenn et al. | 73/117.3 |
| 5,351,041 | 9/1994 | Ikata et al. | 340/825.24 |
| 5,361,165 | 11/1994 | Stringfellow et al. | 359/631 |
| 5,371,510 | 12/1994 | Miyauchi et al. | 345/7 |
| 5,400,045 | 3/1995 | Aoki | 345/7 |
| 5,404,443 | 4/1995 | Hirata | 725/75 |
| 5,414,439 | 5/1995 | Groves et al. | 345/7 |
| 5,416,318 | 5/1995 | Hegyi | 250/226 |
| 5,422,565 | 6/1995 | Swanson | 324/110 |
| 5,432,904 | 7/1995 | Wong | 705/4 |
| 5,440,428 | 8/1995 | Hegg et al. | 359/630 |
| 5,442,553 | 8/1995 | Parillo | 455/420 |
| 5,450,321 | 9/1995 | Crane | 701/35 |
| 5,450,329 | 9/1995 | Tanner | 701/213 |
| 5,450,613 | 9/1995 | Takahara et al. | 455/517 |
| 5,475,399 | 12/1995 | Borsuk | 345/130 |
| 5,479,482 | 12/1995 | Grimes | 455/556 |

| | | | |
|---|---|---|---|
| 5,483,632 | 1/1996 | Kuwamoto et al. | 345/338 |
| 5,486,840 | 1/1996 | Borrego et al. | 345/7 |
| 5,493,658 | 2/1996 | Chiang et al. | 345/336 |
| 5,497,271 | 3/1996 | Mulvanny et al. | 359/631 |
| 5,497,339 | 3/1996 | Bernard . | |
| 5,504,622 | 4/1996 | Oikawa et al. | 359/630 |
| 5,506,595 | 4/1996 | Fukano et al. | 345/7 |
| 5,511,724 | 4/1996 | Freiberger et al. | 236/49.3 |
| 5,519,403 | 5/1996 | Bickley et al. | 342/352 |
| 5,519,410 | 5/1996 | Smalanskas et al. | 345/7 |
| 5,523,559 | 6/1996 | Swanson | 250/222.1 |
| 5,525,977 | 6/1996 | Suman | 340/825.25 |
| 5,528,248 | 6/1996 | Steiner et al. | 342/357.06 |
| 5,528,496 | 6/1996 | Brauer et al. | 701/32 |
| 5,534,888 | 7/1996 | Lebby et al. | 345/121 |
| 5,539,869 | 7/1996 | Spoto et al. | 345/336 |
| 5,547,125 | 8/1996 | Hennessee et al. | 236/49.3 |
| 5,553,661 | 9/1996 | Beyerlein et al. | 165/203 |
| 5,555,172 | 9/1996 | Potter | 455/456 |
| 5,555,286 | 9/1996 | Tendler | 455/404 |
| 5,555,502 | 9/1996 | Opel | 701/36 |
| 5,559,520 | 9/1996 | Barzegar et al. | 342/357.1 |
| 5,572,204 | 11/1996 | Timm et al. | 340/998 |
| 5,576,724 | 11/1996 | Fukatsu et al. | 345/7 |
| 5,579,535 | 11/1996 | Orlen et al. | 455/421 |
| 5,627,547 | 5/1997 | Ramaswamy et al. | 342/357.08 |
| 5,639,305 | 6/1997 | Kobayashi et al. | 700/280 |
| 5,648,769 | 7/1997 | Sato et al. | 340/988 |
| 5,650,929 | 7/1997 | Potter et al. | 455/456 |
| 5,653,386 | 8/1997 | Hennessee et al. | 237/12.3 |
| 5,654,715 | 8/1997 | Hayashikura et al. | 342/70 |
| 5,666,102 | 9/1997 | Lahiff | 340/461 |
| 5,670,953 | 9/1997 | Satoh et al. | 340/903 |
| 5,689,252 | 11/1997 | Ayanoglu et al. | 340/991 |
| 5,691,695 | 11/1997 | Lahiff | 340/461 |
| 5,702,165 | 12/1997 | Koibuchi | 303/146 |
| 5,712,640 | 1/1998 | Andou et al. | 342/70 |
| 5,734,973 | 3/1998 | Honda | 455/186.1 |
| 5,752,754 | 5/1998 | Amitani et al. | 303/199 |
| 5,758,311 | 5/1998 | Tsuji et al. | 701/111 |
| 5,777,394 | 7/1998 | Arold | 307/10.1 |
| 5,919,239 | 7/1999 | Fraker et al. | 701/35 |
| 6,009,355 | * 12/1999 | Obradovich et al. | 701/1 |
| 6,131,060 | * 10/2000 | Obradovich et al. | 701/1 |
| 6,133,853 | * 10/2000 | Obradovich et al. | 701/117 |
| 6,148,261 | * 11/2000 | Obradovich et al. | 701/208 |
| 6,175,782 | * 1/2001 | Obradovich et al. | 701/1 |

* cited by examiner

CALCAR 2278

EXHIBIT M
PAGE 106



FIG. 1

FIG. 2

**U.S. Patent**        Dec. 11, 2001        Sheet 3 of 15        US 6,330,497 B1



251 — RETRIEVE PARKING
LOCATION GPS INFORMATION

253 — STORE GPS INFORMATION

255 — SECURITY
MEASURES ON
?
NO
257 — END

YES

259 — RETRIEVE CURRENT VEHICLE
LOCATION GPS INFORMATION

COMPARE CURRENT LOCATION
GPS INFORMATION WITH STORED
PARKING LOCATION GPS INFORMATION

261
262 — CURRENT
LOCATION MATCHES
PARKING LOCATION
?
YES

NO

263 — TRANSLATE CURRENT LOCATION
GPS INFORMATION INTO
CORRESPONDING STREET ADDRESS

265 — LOOK UP PHONE NUMBER(S)

267 — INITIATE PHONE CALL

269 — PROVIDE CURRENT ADDRESS
AND VEHICLE INFORMATION

271 — ACTIVATE TRANSMITTER

FIG. 3A

CALCAR 2281

EXHIBIT M
PAGE 109



FIG. 3B



FIG. 3C

Case 3:08-mc-80083-MHP    Document 46-7    Filed 07/23/2008    Page 9 of 31

209



FIG. 4A

209



FIG. 4B

CALCAR 2284

EXHIBIT M
PAGE 112

209



# Calcar, Inc

AUTO  DIRECTOR

WARNING: DO NOT USE WHILE DRIVING
Before using Quick Tips for the first time you must first read the information provided by the "READ ME" button.

©1996 Calcar, Quick Tips™ is a trademark of Calcar, made in USA

503 — MAIN MENU          READ ME — 501

FIG. 5

209



609 — AUTO VOICE

MANUFACTURER

WHAT'S IN THIS SYSTEM
This information has been prepared to help you get acquainted with your new car, and to provide a convenient reference source for common questions.

HOWEVER, IT IS NOT INTENDED AS A SUBSTITUTE FOR YOUR OWNER'S MANUAL.

611 — PREVIOUS          NEXT — 613

607    605

FIG. 6



FIG. 7

FIG. 8

EXHIBIT M
PAGE 114



FIG. 9



FIG. 10



FIG. 11

EXHIBIT M
PAGE 119



FIG. 12

EXHIBIT M
PAGE 117



FIG. 13



FIG. 14

CALCAR 2290

EXHIBIT M
PAGE 118

**U.S. Patent**　　Dec. 11, 2001　　Sheet 13 of 15　　US 6,330,497 B1



FIG. 15



FIG. 16

CALCAR 2291

EXHIBIT M
PAGE 119



FIG. 17



FIG. 18

FIG. 19

| | |
|---|---|
| AIR CONDITIONING | LINK TO CLIMATE CONTROL SCREEN OF FIG. 15 |
| ANTI-LOCK BRAKE SYSTEM INDICATOR | LINK TO WARNING LIGHT OPTION #4 ON FUEL/TEMP SCREEN (NOT SHOWN) |
| AUTOMATIC CLIMATE CONTROL | LINK TO CLIMATE CONTROL SCREEN OF FIG. 15 |
| CHARGING SYSTEM FAILURE INDICATOR | LINK TO CHARGING SYSTEM FAILURE OPTION 1309f (FIG. 13) |
| CLIMATE CONTROL SYSTEM | LINK TO CLIMATE CONTROL SCREEN OF FIG. 15 |
| COOLING | LINK TO CLIMATE CONTROL SCREEN OF FIG. 15 |
| CRUISE CONTROL INDICATOR | LINK TO WARNING LIGHT OPTION #2 ON SPEEDOMETER SCREEN (NOT SHOWN) |
| DEFOG/DEFROST | LINK TO CLIMATE CONTROL SCREEN OF FIG. 15 |
| DOOR AJAR INDICATOR | LINK TO WARNING LIGHT OPTION #7 ON FUEL/TEMP SCREEN (NOT SHOWN) |
| DIRECTIONAL SIGNALS INDICATOR | LINK TO TURN SIGNAL/HAZARD WARNING OPTION 1201b (FIG. 12) |

1901    1903    1905

EXHIBIT M
PAGE 127

US 6,330,497 B1

1

## MULTIMEDIA TECHNIQUE FOR OPERATING DEVICES IN A VEHICLE

This application is a continuation of application Ser. No. 09/401,039 filed on Sep. 21, 1999, now 6,178,782 which is a division of application Ser. No. 08/789,934 filed on Jan. 28, 1997, maturing into U.S. Pat. No. 6,009,355 issued on Dec. 28, 1999.

### FIELD OF THE INVENTION

The invention relates generally to information and control systems and, more particularly, to a system for use in an automobile which facilitates a user's retrieval and/or dissemination of information, and control of vehicle functions.

### BACKGROUND OF THE INVENTION

Information is vital to day-to-day activities. With no access to information, people cannot function efficiently in this society, and their lives and financial well-being are put in jeopardy. People want to be well-informed, so much so that when they are travelling in automobiles, they tune into local radio stations to listen to news, weather forecasts and traffic conditions. For that matter, some automobiles are equipped with audiovisual systems including television (TV) receivers. One such system is disclosed in U.S. Pat. No. 5,404,443 issued to Hirata. The Hirata system provides audiovisual information in a number of modes including a TV mode, which may be selected by control switches disposed on the periphery of a display.

Automobile users like to be continually updated with information affecting their travel plans such as weather and traffic conditions because of its fast changing nature. Automobile users who are traveling also like to continually keep in touch with their homes and offices, and to confirm appointments and hotel reservations so that they can adjust their itineraries accordingly. To that end, cellular mobile telephones were introduced to enable automobile users to conduct business and contact their families while they are traveling.

In addition, local map information is important to automobile travelers moving from one locale to another. As such, navigation systems were developed to help reach their destinations in an unfamiliar milieu. One such vehicle navigation system is disclosed in U.S. Pat. No. 5,274,560 issued to LaRue. The disclosed system is based on artificial intelligence and provides a driver with directions via a voice interface. The system is built upon an optical disk player which can be used for entertainment as well. Digitized maps, compressed voice records and computer programs are stored on an optical disk compatible with the disk player. After a destination point is identified, the disclosed system finds the best route from the digitized maps and guides the driver therethrough via the voice interface, taking into account the latest traffic conditions received by an FM receiver to avoid congestion.

Recently, navigation systems based on military global positioning system (GPS) technology have emerged. One such navigation system is commercially available as an option for the latest model of the ACURA 3.5 RL automobile. This ACURA navigation system receives signals from a constellation of satellites which is part of the GPS. In response to these signals, the navigation system pinpoints the automobile's location (in latitude and longitude). It also detects the automobile's speed and direction. With geographic information stored on a hard disk in an onboard computer, the navigation system is capable of verbally and

2

visually communicating to the user instructions for reaching the destination.

In addition to the above techniques for communications with automobile users, a technique for disseminating information regarding the automobiles themselves is disclosed in U.S. Pat. No. 5,442,553 issued to Parillo. The disclosed system is a vehicle diagnostic and software upgrade system. In this system, sensors are provided in the vehicle to generate dynamic data relating to various mechanical controls and the engine of the vehicle, including engine R.P.M., fuel/air mixture, emissions and pollution content information. A microprocessor in the vehicle has access to selectable program parameters affecting the functioning of the mechanical controls. The microprocessor collects and transmits the dynamic data to a remote diagnostic station periodically or upon its request. In response, the remote station sends, to the vehicle, signals indicative of any changes in its software and/or program parameters. The microprocessor accordingly causes the changes to be made in the vehicle based on the received signals.

Besides the communication capabilities described above, an automobile has many accessories and user control elements such as lights, wipers, a clock, temperature control, cruise control, seat adjustment control, mirror adjustment control, and an anti-theft system. A technique for centralizing the command of the individual control elements is disclosed in U.S. Pat. No. 5,555,502 issued to Opel. The disclosed system includes a centralized control panel on a steering wheel which, together with a display, is utilized to control the electronic components of the automobile. The display is positioned in the area of the driver's sun visor. After the driver presses one of the buttons on the control panel corresponding to a desired electronic component, a menu is displayed so that the driver is able to select items from the menu to program the component. The selection is accomplished by pressing specified buttons on the panel.

In addition, a technique for controlling vehicle accessories via voice command is disclosed in U.S. Pat. No. 4,827,520 issued to Zeinstra. In accordance with this technique, control functions of each accessory are formatted in a summary page for display on a screen, which is scanned by infrared light to sense any touching thereon. By uttering any of the displayed functions on the summary page, preceded by either a specified keyword or an actuation of a push-to-talk switch on a steering wheel, a more detailed subpage of the selected function is displayed for further selection by voice. As an alternative to the voice command, the selection can also be accomplished by touching the displayed function on the screen.

Voice command and touch screen techniques are frequently mentioned in prior art references in controlling car accessories. In particular, U.S. Pat. No. 5,214,707 issued to Fujimoto et al. discloses a system for voice-controlling equipment inside a vehicle, including microphones capable of discriminating voice commands as to whether they are generated at the driver side or at the assistant side of the vehicle in a noisy environment.

### SUMMARY OF THE INVENTION

It is celebratory that technology advances at lightning speed. However, many people are left behind the technological frontier, and to some extent develop "technophobia". Some of them have even given up this technological race, which is confirmed by the blinking "12:00" display on the clocks of many video cassette recorders (VCRs) being used.

Similarly, it is fantastic that automobiles nowadays include many advanced accessories such as audiovisual

CALCAR 2294

EXHIBIT M
PAGE 122

US 6,330,497 B1

3

systems, anti-theft systems, anti-lock brake systems, climate control, and cruise control which embrace the latest technologies. However, of all these accessories, many automobile users only know how to operate the headlights and windshield wipers, and regard the rest as nuisance. That is, the users pay for numerous accessories which they do not use, resulting in much consumer waste. We have recognized that such non-use is principally attributed to an inefficient distribution of operating knowledge of the automobile and, in particular, its accessories.

Specifically, when automobile users presently want to learn about certain aspects of an automobile, they need to consult an owner's manual which could have been lost or misplaced when they need it the most. In addition, the manual is unpopular because many users simply want to avoid reading any written material, and find it intimidating as it oftentimes is filled with incomprehensible technical jargon.

We have further recognized that even with the operating knowledge, many users are overwhelmed and confused with the large number of knobs, switches and buttons used to control the individual vehicle parts and accessories.

Accordingly, it is an object of the invention to design an information and control system for use inside an automobile with the user in mind. The user is afforded a centralized control which may be used in lieu of the knobs, switches and buttons to operate the vehicle parts and accessories. In accordance with the invention, the centralized control is intimately tied to an information system such that the user is able to efficiently access information about the functions and operations of such parts and accessories, and in a synergistic manner apply that information to operate same, using the centralized control.

It is another object of the invention that the access to the information is intuitive and direct so that the user can obtain the relevant information in a few self-explanatory steps. To that end, the invention embraces a multimedia approach where audio and video media are added to the traditional text media to convey information. The additional media increases the dimensions of both the user's comprehension of the information and the user's interaction with the automobile. Moreover, the information access is driven by a multilevel menu based on an intuitive model of taxonomy where information is organized in a minimal number of levels of subject matter from general to specific. The above integration of the multimedia approach with the multilevel menu approach presents an effective way of retrieving information in the automobile. Advantageously, with the invention, the user would not be distracted or overburdened by irrelevant information in the course of an information retrieval, which is conducive to a safe driving environment.

In the preferred embodiment, when the user wants to access information about a given part or accessory of the automobile, the user is presented with options on a display screen. Each option is associated with a respective one of different parts or accessories of the automobile. The user is able to scroll through the interface one of the options, associated with the given automobile part or accessory. The option, when selected, is highlighted in a first color, for example, yellow. A voice is then generated by the inventive system to explain the purpose or the content of the selected option before the user commits to it. Having been so informed, the user may then activate the selected option in retrieving the information of interest. The activated option is highlighted in a second color, e.g., blue, to indicate its active status. The retrieved information is presented to the user both in text and in voice.

4

BRIEF DESCRIPTION OF THE DRAWINGS

Further objects, features and advantages of the invention will become apparent from the following detailed description taken in conjunction with the accompanying drawing showing an illustrative embodiment of the invention, in which:

FIG. 1 is a block diagram of an automobile information and control system in accordance with the invention;

FIG. 2 illustrates a control panel and a display interface for a user to interact with the system of FIG. 1;

FIG. 3A illustrates a flow chart depicting the steps of an anti-car-theft routine used in the system of FIG. 1;

FIGS. 3B and 3C jointly illustrate a flow chart depicting the steps of a routine for presenting various screens to the user in the system interaction;

FIG. 4A illustrates a screen for eliciting a personal identification number (PIN) from the system user;

FIG. 4B illustrates a SELECT A FUNCTION screen including features thereof in accordance with the invention;

FIG. 5 illustrates an introduction screen including features thereof in accordance with the invention;

FIG. 6 illustrates a MANUFACTURER screen including features thereof in accordance with the invention;

FIG. 7 illustrates a SAFETY REMINDERS screen including features thereof in accordance with the invention;

FIG. 8 illustrates a THEFT PROTECTION FEATURES screen including features thereof in accordance with the invention;

FIG. 9 illustrates a QUICK TIP SET-UP screen including features thereof in accordance with the invention;

FIG. 10 illustrates a MAIN MENU screen including features thereof in accordance with the invention;

FIG. 11 illustrates a DRIVER'S VIEW screen including features thereof in accordance with the invention;

FIG. 12 illustrates an INSTRUMENT PANEL screen including features thereof in accordance with the invention;

FIG. 13 illustrates a TACHOMETER AND WARNING LIGHTS screen including features thereof in accordance with the invention;

FIG. 14 illustrates a segment of the screen of FIG. 13 providing the user with information regarding a particular function of the automobile;

FIG. 15 illustrates a CLIMATE CONTROL screen including features thereof in accordance with the invention;

FIG. 16 illustrates a SAVE screen for saving the user's preferences in accordance with the invention;

FIG. 17 illustrates a DATA ENTRY screen in accordance with the invention for looking up information regarding a specific item in the automobile;

FIG. 18 illustrates an INDEX screen with listed items for which information is available; and

FIG. 19 is a look-up table listing searchable items and the corresponding instructions for a processor in the system of FIG. 1 to provide information regarding such items.

Throughout this disclosure, unless otherwise stated, like elements, components and sections in the figures are denoted by the same numerals.

DETAILED DESCRIPTION

FIG. 1 illustrates information and control system 100 embodying the principles of the invention for use in an automobile. System 100 is referred to as the "AUTO

CALCAR 2295

EXHIBIT M
PAGE 123

US 6,330,497 B1

5

DIRECTOR" system. It is user-friendly and designed with the automobile user in mind. For example, with AUTO DIRECTOR display interface 102a to be described, information about the automobile is readily available literally at the fingertips of the user. This information includes operational instructions, maintenance procedures, safety measures, and information about virtually every capability of the automobile. In accordance with the invention, the user is able to efficiently access such information using multimedia means involving audio, text and video media. Also with interface 102a, or multifunction display interface 102b to be described, the user is afforded a centralized control whereby he/she can program or adjust different vehicle parts and accessories using the information thus obtained.

As shown in FIG. 1, central to system 100 is processor 105 connected to memory 115. Data bus 107 connects processor 105 to display interfaces 102, input interfaces 104, communications interfaces 106, output control interfaces 108, vehicle computer interfaces 110, vehicle interfaces 112, self-test interface 114, preferences interface 116, and audio interface 118.

Display interfaces 102 include, inter alia, AUTO DIRECTOR display interface 102a, which is illustrated in FIG. 2, together with control panel 205 in FIG. 1. By way of example, but not limitation, the hardware of interface 102a and control panel 205 are derived from a prior art navigation system of the type of the ACURA navigation system. In fact, interface 102a and control panel 205 are used in this illustrative embodiment to realize not only AUTO DIRECTOR functions to be described, but also the well-known navigation function.

Interface 102a includes a conventional liquid crystal display screen 209, and LCD driver (not shown) for processor 105 to control the display on screen 209. Interface 102a also incorporates well-known touch-screen circuitry (not shown) connected to touch screen interface 104a in FIG. 1. With this circuitry, the user can interact with processor 105 by, say, touching a displayed option on screen 209. Through interface 104a, processor 105 receives from the touch screen circuitry a signal identifying the location on screen 209 where it has been touched. If such a location matches the predetermined location of one of the displayed options, processor 105 determines that that option has been selected. With such touch-screen and displayed option selection capabilities, through AUTO DIRECTOR interface 102a, the user is able to obtain information on and control selectable functions of the automobile such as the instrument panel, navigation function, mobile phone, radio/CD player, locks, mirrors, windows, driver's seat adjustment control, climate control, windshield wipers, cruise control, lights, security function, steering, ride control, engine and transmission.

Control panel 205 comprises CANCEL switch 205a, ENTER switch 205b, BRIGHTNESS switch 205c, PUSH TO SELECT knob 205d, MENU switch 205e, MAP/GUIDE switch 205f, SETUP switch 205g, ZOOM IN switch 205h and ZOOM OUT switch 205i. BRIGHTNESS switch 205c comprises a standard variable resistor such that when it is pushed one way, operating circuitry 121 responsively causes the display intensity to increase, and the other way to decrease. ZOOM IN switch 205h when pressed enables the automobile user to enlarge a particular visual area of interest on screen 209, affording better details. On the other hand, ZOOM OUT switch 205i when pressed performs the inverse function to switch 205h. As an alternative to the touch-screen capability, switch 205d similar to a standard joystick is provided for the user to move from one displayed option

6

to another on screen 209 in the same direction (e.g., up, down, left or right) as the switch is operated. A desired option may be selected by pressing ENTER switch 205b. The functions of the other switches are described hereinbelow as they are called out in the operation of system 100. In this illustrative embodiment, AUTO DIRECTOR display interface 102a and control panel 205 are mounted close to the center of the dashboard of the automobile next to the steering wheel.

Referring back to FIG. 1, display interfaces 102 also include multifunction display interface 102b, center console display interface 102c, rear console display interface 102d, and instrument panel display interface 102e.

Specifically, multifunction display interface 102b is installed on the dashboard close to interface 102a on the driver side. Like interface 102a, interface 102b provides the user with graphic display and control of selected functions using well-known touch screen technology. In fact, interface 102b duplicates certain control functions (e.g., navigation, phone, radio and climate control) of interface 102a so that the user can use interface 102b to control a selected function while interface 102a is engaged in another ongoing function. For example, while the user is relying on AUTO DIRECTOR interface 102a to provide navigation information to reach a given destination, the user may want to adjust the climate control of the automobile. It is inconvenient for the user to terminate the ongoing navigation mode of interface 102a, albeit temporarily, to access the climate control function through the interface, adjust the climate control and then resume the navigation mode. Thus, it is preferable to leave the navigation mode of interface 102a alone and use interface 102b to administer the climate control.

Center console interface 102c is installed close to interface 102a on the passenger side. Similar to interface 102b, interface 102c provides the front seat passenger with graphic display and control of functions which include: the front passenger seat adjustment, door lock, window, climate and TV controls. If enabled by the driver, control is also available for the radio/CD player and phone.

Rear console display interface 102d is installed on the back of a front seat. Similar to interface 102c, interface 102d provides rear seat passengers with graphic display and control of certain functions if enabled by driver or front seat passenger. These functions include: the rear seat climate, windows, door locks, radio/CD player and TV controls.

Instrument panel display interface 102e is installed on the dashboard in front of the driver seat. This interface provides the driver with graphic display of the vehicle speed, engine RPM, outside and inside temperatures, oil pressure, fuel level, time, odometer reading, trip odometer reading and warning light indicators. Through AUTO DIRECTOR interface 102a, the system user may select the display of the information in either an analog or a digital form.

Input interfaces 104 comprise touch screen interface 104a and control panel 205 described before, and voice command interface 104b. The latter is connected to a microphone (not shown) and comprises standard voice command circuitry (not shown) for processing voice commands by the user through the microphone to control or modify selected functions of system 100.

Communications interfaces 106 include phone interface 106a, radio/CD interface 106b, television (TV) interface 106c, navigation interface 106d, and beacon interface 106e. Processor 105 interacts with and controls standard phone equipment connected to phone interface 106a. Through processor 105, the user may operate the phone equipment

CALCAR 2296

EXHIBIT M
PAGE 124

US 6,330,497 B1

7

via voice command, thereby realizing hands-free operation of the equipment. Alternatively, the user may operate the phone equipment using the touch screen capability provided by AUTO DIRECTOR display interface 102a or multifunction display interface 102b. The user may also operate the phone equipment via remote switches.

Similarly, processor 105 interacts with and controls one or more radio receivers and CD players in the automobile connected to radio/CD interface 106b. Through processor 105, the user may operate the radio receivers via voice command, remote switch and/or touch screen capability.

Processor 105 further interacts with and controls one or more TV receivers in the automobile connected to TV interface 106c. Again, the user may operate the TV receivers via voice command, remote switches and/or touch screen capability.

As further described hereinbelow, navigation interface 106d is connected to a standard inertial guidance system (not shown) capable of providing gyros information, and deriving the vehicle location based on GPS information. With the map information stored in memory 115, the inertial guidance system is capable of providing the user with navigational instructions via interface 102a or 102b. Besides the locational information, local and national emergency information may be derived from the GPS information using additional standard decoding circuitry in interface 106d.

Beacon interface 106e is used for connection to a standard beacon device for detecting a predetermined beacon radio signal to provide additional locational information.

Output control interfaces 108 include lock interface 108a, mirror interface 108b, window interface 108c, steering column interface 108d, seat interface 108e, climate control interface 108f, wiper interface 108g, cruise control interface 108h, light interface 108i and clock interface 108j.

Specifically, lock interface 108a comprises output control logic controllable by processor 105 to lock or unlock the car doors, glove box, console storage, trunk (or liftgate), fuel filler door, brakes and transmission, and enable or disable the child-proof door locks, fuel pump and ignition.

Mirror interface 108b comprises output control logic controllable by processor 105 to maneuver the positions of the outside mirrors and inside rear view mirror, and to fold or unfold the outside mirrors.

Window interface 108c comprises output control logic controllable by processor 105 to incrementally or completely open or close all windows, and to open, close or tilt any sunroof.

Steering column interface 108d comprises output control logic controllable by processor 105 to move the steering column in or out and up or down.

Seat interface 108e comprises output control logic controllable by processor 105 to (1) adjust the positions of the front seats forward or aft, and up or down; (2) tilt the front or rear of the seat cushion up or down; (3) adjust the seat back lumbar, width and angle forward or aft; (4) increase or decrease the cushion size and stiffness; (5) raise or lower the head restraint; and (6) raise or lower the seat belt height.

Climate control interface 108f comprises output control logic controllable by processor 105 to (1) turn the climate control system on or off; (2) select an air flow mode; (3) set fan speeds; (4) enable or disable seat heaters; (5) select fresh or recirculated air (for driver only); and (6) enable or disable front and rear defrosters, mirrors and steering wheel heaters (for driver only).

Windshield wiper interface 108g comprises output control logic controllable by processor 105 to (1) select a high, low,

8

intermittent, single wipe or off mode; (2) set an intermittent delay; and (3) enable or disable front or rear washers. Interface 108g also includes control logic for controlling rain- and speed-sensitive wipers, and for activating an automatic wash in a single wide mode when the windshield is at a certain level of opacity.

Cruise control interface 108h comprises output control logic controllable by processor 105 to (1) turn the cruise control on or off, (2) set the vehicle speed, and (3) cancel or resume the set speed.

Light interface 108i comprises output control logic controllable by processor 105 to select an automatic on mode or off mode for parking lights, headlights and fog lights; and to turn on or off map or courtesy lights.

Clock interface 108j comprises output control logic controllable by processor 105 to set an initial date and time on a conventional clock (not shown) connected to interface 108j. System 100 relies on the current date and time kept by the clock to provide a time reference for the system functions.

Vehicle computer interfaces 110 include anti-lock brake computer interface 110a, engine computer interface 110b and supplemental restraint computer interface 110c for processor 105 to communicate with the computers controlling the anti-lock brakes, engine and supplemental restraints (e.g., back-up airbag deployers and seat belt tensioners), respectively. Interfaces 110 also include back-up interface 110d through which processor 105 receives and analyzes signals from the engine, anti-lock brake and supplemental restraint computers. These signals would indicate to processor 105 any failures of the computers. In response to a computer failure, processor 105 causes a corresponding back-up computer connected to interface 110d to provide a back-up function.

Vehicle control interfaces 112 include steering interface 112a, ride interface 112b, engine interface 112c, transmission interface 112d, traction control interface 112e, and security interface 112f.

Specifically, steering interface 112a comprises input monitoring and output control logic for processor 105 to lighten or tighten the steering effort ratio in response to changing road conditions. Through interface 102a, the user may opt for manual or automatic steering effort ratio control. Interface 112a is capable of adapting and storing data according to the driver's inputs. It also allows for steering of front and/or rear wheels for sporty or increased stability.

Ride interface 112b comprises input monitoring and output control logic for processor 105 to lighten or stiffen the ride control to front and/or rear of vehicle in response to changing road conditions. Through interface 102a, the user may also opt for manual or automatic ride control.

Engine interface 112c comprises input monitoring and output control logic allowing for shutting off a specified number of cylinders, and varying valve and cam timing to increase performance or fuel economy. This interface also allows for manual or automatic control of the engine components, and includes the capability of adapting and storing data according to the driver's inputs.

Transmission interface 112d comprises input monitoring and output control logic for selecting manual or automatic shifting of the transmission. In an automatic shifting mode, interface 112d is capable of adapting and storing data according to the driver's inputs. Interface 112d also allows for control of a variable differential ratio for fast acceleration and high economy cruise.

Traction control interface 112e comprises input monitoring and output control logic providing information on

CALCAR 2297

EXHIBIT M
PAGE 128

US 6,330,497 B1

9

whether power is delivered to front and/or rear wheels of the vehicle and what proportion of the power is delivered to each wheel. This interface also allows for manual or automatic control, and such functions as yaw control in cooperation with the anti-lock brakes and an engine cylinder shutoff.

Security interface 112f comprises control logic for setting a security level, and enabling or disabling a number of security related functions such as the fuel supply cut-off, motion detector, brake locking, etc. Interface 112f also allows entry of a new or alteration of an existing personal identification number (PIN) for personalization of the vehicle functions, i.e., saving the vehicle functional preferences.

In accordance with an aspect of the invention, system 100 incorporates an anti-car-theft technique involving security interface 112f. In accordance with this inventive technique, security interface 112f further comprises a sensor for detection of a predetermined condition to trigger an anti-theft routine. It will be appreciated that a person skilled in the art will come up with many different triggering events causing the sensor to invoke the routine. For example, a passive way of triggering the anti-theft routine would be after the sensor detects that the engine is off and the user has opened, closed and locked the driver's door.

In any event, as soon as processor 105 receives from the sensor a signal requesting an invocation of the anti-theft routine, processor 105 retrieves from navigation interface 106d GPS information identifying the parking location of the automobile, as indicated at step 251 in FIG. 3A. Processor 105 then stores at step 253 the parking location GPS information in memory 115. At step 255, processor 105 determines whether the security measures remain on. By way of example, but not limitation, such determination is based on information from lock interface 108a indicating whether the driver's door is properly unlocked. If that door is properly unlocked, processor 105 determines that the security measures are called off, and the anti-theft routine comes to an end, as indicated at step 257.

Otherwise if processor 105 determines that the security measures remain on, processor 105 at step 259 retrieves from navigation interface 106d GPS information identifying the current location of the automobile. Processor 105 then compares at step 261 the current location GPS information with the parking location GPS information previously stored. If processor 105 at step 262 determines that the current location matches the parking location based on the comparison, the anti-theft routine returns to step 255 after a predetermined period. Otherwise if processor 105 determines that the current location does not match the parking location, processor 105 assumes that the automobile has been removed without authorization, i.e., stolen. At this point, if a conventional alarm system is connected to security interface 112f, processor 105 would cause an alarm to come on, gas to be cut off, etc.

In this example, a conventional transmitter (not shown) is connected to security interface 112f and transmits a predetermined sequence of signals receivable by a law enforcement agency or a suitable alarm monitor company when it is activated. Continuing the example, processor 105 translates the GPS information identifying the current vehicle location into the corresponding street address based on the map information stored in memory 115, as indicated at step 263. Processor 105 at step 265 looks up one or more phone numbers pre-stored in memory 115 for reporting to the law enforcement agency (or the alarm monitor company) about

10

the stolen status. Alternatively, a list of phone numbers associated with law enforcement agencies (or branches of the alarm monitor company) in many different geographic locations is pre-stored, along with the GPS information identifying the locations of the respective law enforcement agencies (or alarm monitor company branches). This being so, processor 105 locates the closest law enforcement agency (or alarm monitor company branch) and its associated phone number(s) by comparing the current vehicle location GPS information with the respective agency (or branch) location GPS information.

In any event, processor 105 at step 267 initiates a call to a law enforcement agency (or an alarm monitor company branch) through phone interface 106a using the phone number just located. After the phone connection is established, processor 105 provides through the connection information about the current address of the vehicle using conventional voice synthesizer circuitry (not shown) in audio interface 118, and the pre-recorded information about the vehicle itself such as its vehicle identification number (VIN), model, year, color, license number, etc., as indicated at step 269. Through the same phone connection, processor 105 may also provide information about the vehicle's owner such as his/her name and contact number so that the law enforcement agency (or alarm monitor company branch) can notify the owner of the incident. Processor 105 at step 271 activates the aforementioned transmitter connected to security interface 112f to generate the predetermined sequence of signals in case the stolen vehicle is in transit. For that matter, processor 105 can also repeatedly check on the latest vehicle location and report any new address different from the one previously reported. Thus, by tracking the signals in the vicinity of the latest reported vehicle location, the law enforcement agency (or alarm monitor company) would recover the vehicle in an efficient manner.

Referring back to FIG. 1, self-test interface 114 comprises input/output (I/O) control logic for performing an active self-test of system 100 on power up or at the user's request. Specifically, interface 114 polls every other interface in system 100 for a self-test result. Each interface, when polled, performs an active self-test and reports the test results to interface 114, where such test results are gathered and caused to be displayed on interface 102a.

Preferences interface 116 monitors changes made by the user in selected functions after the user logs on system 100, and prompts the user to save such preferences. These preferences are stored in memory 115 in association with the user's PIN. Functions affording the user choices include auto locks, an easy entry, auto lamps, the seat position, steering column position, mirror position, radio, steering, ride, transmission shift, engine performance, climate, and security level.

Audio interface 118 comprises I/O control logic for receiving audio signals from a radio/CD, TV, compact disk (CD) player, or phone interface, processing the received audio signals, providing proper amplifications thereto, and routing the resulting sound to appropriate speakers and headphones (not shown) connected to interface 118. In this illustrative embodiment, AUTO DIRECTOR display interface 102a and multifunction display interface 102b share the same speakers. Interface 118 also provides center and rear console display interfaces 102c and 102d with separate audio channels, speakers and headphone outputs. The front and rear speakers may be muted by the user as a preference.

Interface 118 also processes requests from other interfaces for pre-recorded digital sounds stored in a SOUNDSGOOD

CALCAR 2298

EXHIBIT M
PAGE 126

US 6,330,497 B1

11

library in memory 115 and routes the requested sounds to the appropriate interfaces. In addition, interface 118 comprises the conventional voice synthesizer circuitry for providing voice messages to the appropriate interfaces.

FIGS. 3B and 3C jointly illustrate routine 300 for accessing, through AUTO DIRECTOR display interface 102a, a main menu to obtain operational instructions, maintenance procedures, safety measures, and other information about the automobile, collectively referred to as "Quick Tips". Routine 300 is stored in memory 115 and initiated when SETUP switch 205g in FIG. 2 is pressed. Instructed by routine 300, processor 105 at step 301 elicits a PIN from the user by displaying a screen of FIG. 4A through interface 102a. As shown in FIG. 4A, a video key-pad comprising numeral keys "1" through "9", and "*" and "#" keys are displayed on screen 209. In response, the user enters a sequence of numerals by touching the corresponding displayed keys, followed by the "#" key.

It should be pointed out that in accordance with another aspect of the invention, when a displayed key or option is touched on the screen of AUTO DIRECTOR display interface 102a or multifunction display interface 102b, a tone pre-selected by the user from the SOUNDSGOOD library is generated through audio interface 118, indicating that the key or option has been touched on the screen. Advantageously, relying on the audio tone confirmation, as opposed to a visual confirmation, the user while driving can continually watch the road.

The user may alternatively enter the above numeral sequence using control panel 205 in a manner to be described. In any event, processor 105 then verifies at step 303 the PIN entry by comparing it with the user's pre-selected PIN. The latter is stored in memory 115, along with the user's preferences. In a standard way, the user is given a few chances to enter a correct PIN. Verification of the PIN entry identifies the user as a legitimate user. Thus, if the PIN entry is not valid, routine 300 comes to an end, as indicated at step 304.

Otherwise if the PIN entry is valid, processor 105 at step 305 causes interface 102a to display on screen 209 a "SELECT A FUNCTION" screen, which is illustrated in FIG. 4B. As shown in FIG. 4B, two options, namely, "NAVIGATION" and "QUICK TIPS", are displayed on screen 209. By default, NAVIGATION option 401 is highlighted yellow when the screen of FIG. 4B appears.

It should be pointed out that in this illustrative embodiment, a yellow highlight on an option indicates that the option is selected but not yet activated. Once a yellow highlighted option is activated, the option is highlighted blue. System 100 then performs according to the activated option.

Thus, in this instance, the user may activate the yellow highlighted NAVIGATION option by touching the option on screen 209 or by pressing ENTER switch 205b.

However, if QUICK TIPS option 403 is desired, the user may touch that option on screen 209, which would then be highlighted yellow. A second touch on the same option will change the highlight to blue, indicating the active status. As an alternative, the user may utilize knob 205d of FIG. 2 to select QUICK TIPS option 403 by first pushing the knob to the right. In response, processor 105 causes the yellow highlight to move from default NAVIGATION option 401 to QUICK TIPS option 403. The user can then select the QUICK TIPS option by pressing ENTER switch 205b. Upon selection, the yellow highlighted option will again turn blue.

Processor 105 at step 308 detects an activation of either NAVIGATION option 401 or QUICK TIPS option 403. If

12

NAVIGATION option 401 is activated, processor 105 at step 311 causes system 100 to enter into a navigation mode. In this mode, processor 105 causes navigational instructions to be displayed on screen 209 in a conventional manner. In providing the navigation instructions, the standard inertial guidance system connected to navigation interface 106d receives signals from a constellation of GPS satellites maintained and controlled by the U.S. Department of Defense. In response to these signals, the inertial guidance system identifies the location (in longitude and latitude) of the automobile. The system also detects the vehicle speed, and the direction in which the vehicle is headed. By accessing the map information stored in memory 115, the system is capable of visually and verbally providing the user with directions to a given destination through AUTO DIRECTOR display interface 102a and audio interface 118, respectively.

Otherwise if activation of QUICK TIPS option 403 is detected at step 308, processor 105 causes interface 102a to display an introduction screen on screen 209, as indicated at step 314. This introduction screen is illustrated in FIG. 5.

As shown in FIG. 5, system source identification, warning and instructional information appear on the introduction screen, along with two options, "MAIN MENU" and "READ ME". The default option in this instance is READ ME option 501 which is highlighted yellow. Processor 105 detects at step 317 whether MAIN MENU option 503 or READ ME option 501 is activated. If MAIN MENU option 503 is activated, routine 300 proceeds to step 340 to be described. Otherwise if READ ME option 501 is activated, routine 300 proceeds to step 320 where processor 105 causes a series of three screens to be displayed. The first screen of the series is a "MANUFACTURER" screen, which is illustrated in FIG. 6.

As shown in FIG. 6, a description of the QUICK TIPS system appears on the MANUFACTURER screen. If the text to be displayed exceeds one screen, which is the case here, scrolling options comprising scroll-up option 605 and scroll-down option 607 are provided. When option 605 is touched and activated on screen 209, additional text scrolls up one paragraph at a time. Option 607 performs an inverse function to option 605. Again, as an alternative, the user may maneuver PUSH TO SELECT knob 205d until the desired scroll option (or direction arrow) is highlighted yellow. The activation of the highlighted option is achieved by pressing ENTER switch 205b.

By default, displayed option 609 has the "AUTO VOICE" wording thereon and is highlighted blue as the MANUFACTURER screen comes on. Accordingly, a pre-recorded voice is activated by processor 105 through audio interface 118 to read the entire text associated with this screen without interruption, including the text which is not presently shown on screen 209 but otherwise shown upon scrolling. To alter the AUTO VOICE function, the user may touch option 609 on screen 209, or alternatively press ENTER switch 205b. By doing so, the "AUTO VOICE" wording on option 609 changes to "MANUAL VOICE", which is highlighted blue, indicating its active status.

In accordance with the MANUAL VOICE function, a pre-recorded voice reads the displayed text only, and stops reading until additional text is scrolled onto the screen. To silence the voice, the user may again touch option 609 on screen 209, or alternatively press ENTER switch 205b. By doing so, the "MANUAL VOICE" wording on option 609 changes to "VOICE OFF", and the voice is deactivated, with the option now highlighted yellow. The cycle of the AUTO VOICE, MANUAL VOICE and VOICE OFF functions can be repeated by successively touching option 609 or pressing switch 205b.

CALCAR 2299

US 6,330,497 B1

13

Other displayed options on the screen of FIG. 6 include PREVIOUS option 611 and NEXT option 613. As indicated at step 323, option 611 when selected causes routine 300 to return to step 314, where the introduction screen of FIG. 5 is again displayed. Otherwise, if option 613 is selected, routine 300 proceeds to step 326 in FIG. 3C where processor 105 causes a "SAFETY REMINDERS" screen to be displayed on screen 209. FIG. 7 illustrates such a screen.

As shown in FIG. 7, like the MANUFACTURER screen, the SAFETY REMINDERS screen includes option 609 displayed with the default wording "AUTO VOICE" thereon, PREVIOUS option 611, NEXT option 613, scroll-up option 605 and scroll-down option 607. This screen reminds the user of the safety features of the vehicle including, for example, air bags and seat belts. As indicated at step 329, option 611 when selected causes routine 300 to return to step 320 of FIG. 3B. Otherwise if option 613 is selected, routine 300 proceeds to step 332 where processor 105 causes a "THEFT PROTECTION FEATURES" screen to be displayed on LCD screen 209. FIG. 8 illustrates such a screen.

As shown in FIG. 8, the THEFT PROTECTION FEATURES screen similarly has thereon displayed options 605, 607, 609, 611 and 613. This screen describes to the user a theft-deterrent system including the anti-theft routine of FIG. 3A equipped in the vehicle. As indicated at step 335, option 611 when selected causes routine 300 to return to step 326. Otherwise if option 613 is selected, routine 300 proceeds to step 338 where processor 105 causes a "QUICK TIPS SET-UP" screen to be displayed on LCD screen 209. FIG. 9 illustrates such a screen.

As shown in FIG. 9, the QUICK TIPS SET-UP screen comprises two arrays of displayed options, denoted 901 and 903, respectively. Array 901 concerns the volume of the audio part of system 100. In this illustrative embodiment, the user may select the options in array 901 to respectively turn the volume off, to a "SOFT" level, to a medium level, and to a "LOUD" level. Array 903 concerns the display of LCD 119 of system 100. In this illustrative embodiment, the user may select the options in array 903 to respectively turn the display off, adjust it to a "DAY" setting, adjust it to a "NIGHT" setting, and have it automatically adjusted. When the QUICK TIPS SETUP screen comes on, by default, the volume is set to a medium level (i.e., the "MED" option in array 901 highlighted blue), and the display is set to be automatically adjusted (i.e., the "AUTO" option in array 903 highlighted blue).

Also shown in FIG. 9 is NEXT option 905. By selecting this option, routine 300 returns to step 340 of FIG. 3B where a "MAIN MENU" screen is displayed on LCD screen 209. After routine 300 is performed, the screen of FIG. 9 can be invoked at any time by pressing SETUP switch 205g to re-adjust the volume and the intensity of the LCD of system 100.

FIG. 10 illustrates the MAIN MENU screen. This screen comprises displayed options disposed in columns 1001, 1003, 1005, and 1007. For example, column 1001 includes DRIVER'S VIEW option 1001a, STEERING COLUMN CONTROLS option 1001b, LOCK option 1001c, DRIVING TIPS option 1001d, and INDEX option 1001e. It should also be noted that this screen can be invoked at any time by pressing MENU switch 205e.

When the MAIN MENU screen comes on, by default, DRIVER'S VIEW option 1001a is highlighted yellow, indicating that it is selected. However, the user may touch any other displayed option on screen 209 for re-selection. A

14

further touch on the yellow highlighted option changes its color to blue and activates same. Again, the user may alternatively maneuver PUSH TO SELECT knob 205d to re-select any other displayed option, followed by a depression of ENTER switch 205b to activate the selected option. Since LCD screen 209 is compact, the display area for each option on the MAIN MENU screen is generally small. As a result, selection and activation of an option by touching the option on the screen is susceptible to errors, especially when the vehicle is in motion. Thus, in this situation it may be preferable to achieve the same result using knob 205d and switch 205b, instead.

In addition, because of the small display area allocated to each option on the MAIN MENU screen, the wording on the option is brief and thus tends to be cryptic. In accordance with a feature of the invention, after a predetermined time (e.g., a few seconds) has elapsed from the option's being highlighted yellow, processor 105 causes a voice to be generated on speakers 127 to explain the purpose of the option before the user activates it. For example, after a predetermined delay from DRIVER'S VIEW option 1001a's being highlighted yellow, a voice is activated, stating the option name, followed by an explanation of the purpose of the option such as "To provide location of dash mounted components." Thus, this inventive feature affords a preview of the option before the user commits to it, thereby avoiding unnecessary backtracking.

Continuing the example, after hearing the preview of option 1001a, the user decides to select that option. In response, processor 105 causes a "DRIVER'S VIEW" screen to be displayed on screen 209. Such a screen is illustrated in FIG. 11. When the DRIVER'S VIEW screen appears, VOICE option 1101 is highlighted blue, indicating that voice announcements are active. To disable the voice announcements, the user may touch VOICE option 1101 on screen 209, or alternatively press ENTER switch 205b. VOICE option 1101 would be highlighted yellow when disabled.

As also shown in FIG. 11, a view of the interior of the automobile from the driver's perspective is provided. Underneath that view, DASH-MOUNTED CONTROLS option 1103, INSTRUMENT PANEL option 1105, AUDIO SYSTEM option 1107, CLIMATE CONTROLS option 1109 and PREVIOUS option 1111 are displayed. By default, DASH-MOUNTED CONTROLS option is highlighted yellow. However, the user in this example decides to select INSTRUMENT PANEL option 1105, instead. By touching option 1105 on screen 209, the option is highlighted yellow. If VOICE option is not disabled, after a predetermined delay, an announcement such as "To provide information on gauges, meters and warning lights" comes on to preview the purpose or content of option 1105. Options 1103, 1107, and 1109 are similarly programmed. In this instance, selecting PREVIOUS option 1111 enables the user to return to the MAIN MENU screen of FIG. 10.

Continuing the example, assuming that the user activates option 1105 after hearing the preview, in response processor 105 causes an "INSTRUMENT PANEL" screen to be displayed on screen 209. Such a screen is illustrated in FIG. 12. As shown in FIG. 12, the previous screen format is generally maintained in that it provides a view of the object (the instrument panel of the automobile in this instance) pertinent to the option which has been selected, along with displayed options for further selection thereunder. Based on the disclosure heretofore, the design and operation of these screens by now are apparent to a person skilled in the art, and become self-explanatory.

CALCAR 2300

EXHIBIT M
PAGE 128

US 6,330,497 B1

15

In accordance with another feature of the invention, individual elements on the instrument panel shown in FIG. 12 are labeled with numerals "1", "2", "3", "4" and "5" which correspond to option 1201a designated "1. TACHOMETER AND WARNING LIGHTS", option 1201b designated "2. TURN SIGNAL/HAZARD WARNING", option 1201c designated "3. SPEEDOMETER AND WARNING LIGHTS", option 1201e designated "4. ODOMETER & TRIP METERS/OUTSIDE TEMPERATURE", and option 1201f designated "5. FUEL/ TEMP GAUGE AND WARNING LIGHTS", respectively. As such, the function of the displayed options is two-fold. First, the wording on each displayed option informs the user of what the corresponding element(s) represents. Second, each displayed option is also for selection to obtain more information about the corresponding element(s). In addition, with the above voice preview feature, the user is further apprised of the purpose or content of the option before he/she commits to it. For example, TACHOMETER AND WARNING LIGHTS option 1201a corresponds to a voice preview such as "To provide information on tachometer, malfunction, maintenance required, low oil pressure and charging system failure indicators."

Assuming that the user in this instance activates option 1201a, in response processor 105 causes a "TACHOM-ETER AND WARNING LIGHTS" screen to be displayed on screen 209. Such a screen is illustrated in FIG. 13.

FIG. 13 shows VOICE option 1301 similar to option 1101 described before, TIP option 1303, a tachometer of the automobile denoted 1305, warning lights collectively denoted 1307, and options 1309a through 1309f in display segment 1311.

When TIP option 1303 appears on screen 209, it indicates that helpful hints or reminders are available upon selection thereof. In accordance with another feature of the invention, the appearance of TIP option 1303 is accompanied by the playing of a sound segment associated therewith. This sound segment may be pre-selected by the user from the SOUNDSGOOD library. After an adaptation period, the user would be able to rely on the familiar sound segment, without looking at the screen, to alert him/her of the availability of the TIP option.

Similarly, the user may pre-select another sound segment associated with warnings. Such a sound segment should connote urgency or even emergency as such warnings include, for example, engine overheating, an extremely low fuel level caution, GPS emergency information from navi-gation interface 106d, etc. Under control of processor 115, audio interface 118 preempts any on-going announcement and momentarily substitute therefor any such warning as soon as it occurs, which is preceded by the associated sound segment.

In any event, if option 1303 is selected in this instance, a voice comes on and utters a tip regarding tachometer 1305 such as "To prevent engine damage, do not drive with needle in red zone." This tip is also momentarily displayed on segment 1311 in lieu of options 1309a through 1309f.

Similarly, the user refers to the elements on the INSTRUMENT PANEL screen, tachometer 1305 and warning lights 1307 on this screen are individually labeled and correspond to options 1309a, 1309b, 1309c, 1309e and 1309f, respectively. Assuming in this example that MAINTENANCE REQUIRED option 1309c is activated, display segment 1311 would be replaced by new display segment 1411 illustrated in FIG. 14. As shown in FIG. 14, item 1401 indicates the subject selected, i.e., "MAINTENANCE

16

REQUIRED". Item 1403 explains what the MAINTE-NANCE REQUIRED warning light, when on, indicates. In this instance it states, "Maintenance required warning light comes on to indicate it is time for scheduled maintenance." PREVIOUS option 1405 enables the user to reactivate segment 1311 of FIG. 13.

Assuming further that at this point the user wants to learn about and also to program the air conditioning of the automobile, the user may access a "CLIMATE CONTROL" screen by successively pressing the PREVIOUS option to backtrack to the DRIVER'S VIEW screen of FIG. 11, where CLIMATE CONTROLS option 1109 is available. As a second alternative, the user may press MENU switch 205e to invoke the MAIN MENU screen of FIG. 10, where a "CLIMATE CONTROLS" option within column 1003 is available. A third alternative is provided in the event that the user cannot immediately relate "air conditioning" to the CLIMATE CONTROLS option. At the MAIN MENU screen of FIG. 10, the user may select Index option 1001e to be described. It suffices here to know for now that this option allows the user to access the "CLIMATE CONTROL" screen using the term "air conditioning".

FIG. 15 illustrates the "CLIMATE CONTROL" screen. With the voice enabled, a first touch on any displayed option on screen 209 causes it to be highlighted yellow, indicating its selected status. A second touch causes it to be highlighted blue, indicating its active status. With the voice disabled, only one touch on any displayed option activates it.

As shown in FIG. 15, the MODE options include OFF option 1511, AUTO option 1513, A/C option 1515, HEAT option 1517, and SMART CLIMATE option 1519.It should be noted that only one of the MODE options can be active at a time. In this example, assuming that the voice is enabled, when OFF option 1511 is selected by a first touch, a voice explaining the option comes on, uttering "To disable climate control." A second touch on the same option would then shut the climate control off through climate control interface 108f.

When AUTO option 1513 is selected by a first touch, a voice comes on to explain the option, uttering "System automatically determines air-flow distribution and volume for optimum efficiency." A second touch on the same option enables the automatic control, followed by a voice utterance, "Set desired temperature." Temperature display 1535 then flashes with the current temperature setting, prompting the user to set a desired temperature in a manner to be described.

If the user neglects to set a temperature after a predeter-mined time, in accordance with another aspect of the invention, a temperature range is automatically maintained by processor 105 in response to the date and time informa-tion from clock interface 108j, and the GPS information from navigation interface 106d. Based on the date and time information, processor 105 knows what the current season (e.g., mid-winter versus mid-summer) and time of the day (e.g., night verse noon) are. Based on the GPS information, processor 105 knows the region (e.g., New England versus Southern California) where the vehicle is. Processor 105 looks up a table stored in memory 115 containing predeter-mined temperature ranges corresponding to different com-binations of the temporal and geographic parameters. It then prescribes an appropriate temperature range according to the table. This temperature range is updated by processor 105 periodically to reflect changes in the time of the day and the geographic location of the vehicle.

Similarly, A/C option 1515 and HEAT option 1517 respectively enable the user to activate air conditioning and heaters at a desired temperature or a default temperature range.

CALCAR 2301

US 6,330,497 B1

17

SMART CLIMATE option 1519 is designed to allow the user to program the climate control for the next ride before he/she leaves the vehicle. When SMART CLIMATE option 1519 is selected by a first touch, a voice comes on to explain the option, uttering "To enable pre-heating or pre-cooling of vehicle." A second touch on the option activates the function, followed by a voice utterance, "Set desired temperature. Set desired time using fan speed arrows." Temperature display 1535 then flashes the current temperature setting, prompting the user to set a desired temperature. Similarly, fan speed display 1541 then flashes the current date, followed by current time, prompting the user to set the date and time that the user plans to re-enter the vehicle. Through climate control interface 108f, processor 105 determines whether the current level of power from the car battery and any back-up power sources is sufficient. If it is insufficient, a message such as "Fail to pre-condition vehicle temperature" is issued through audio interface 118 to notify the user of the noncompliance. Otherwise, when it is close to the re-entry time, processor 105 determines the start-up time to effect the pre-conditioning, depending on the temperature difference between the inside and outside of the vehicle at that time. Processor 105 would then cause a combination of heaters and/or heat pumps (not shown) connected to interface 108f to pre-condition the vehicle temperature. In order to avoid substantially draining the power, in this illustrative embodiment, the requested temperature would be maintained up to an hour after the set re-entry time.

The Air options in FIG. 15 include FRESH option 1521 and RECIRCULATED option 1523. Only one of these two options can be active at a time. When FRESH option 1521 is selected by a first touch on the option, a voice comes on to explain the selected option, uttering "To select outside air to circulate in vehicle." A second touch on the option activates the selection to ventilate the vehicle with outside air. Similarly, RECIRCULATED option 1523 allows the user to select the inside air for recirculation in the vehicle.

The VENT options in FIG. 15 include FLOOR option 1525, FLOOR/DASH option 1527, DASH option 1529, DEFROST option 1531 and FLOOR/DEFROST option 1533. Only one of these five options can be active at a time. When FLOOR option 1525 is selected by a first touch on the option, a voice comes on explaining the option, uttering "Main air distribution to floor." A second touch on the option directs an air flow toward the vehicle floor.

Similarly, FLOOR/DASH option 1527 enables the user to bifurcate the air flow between the floor and the dashboard. DASH option 1529 enables the user to direct the air flow from the dashboard. DEFROST option 1531 enables the user to direct the air flow toward the windshield and select fresh air if not selected. FLOOR/DEFROST option 1533 a enables the user to bifurcate the air flow between the floor and windshield.

Temperature display 1535 displays the temperature selected by the user. Touching on up-arrow 1537 increases the selected temperature while touching on down-arrow 1539 decreases same. Continued touching on either up-arrow 1537 or down-arrow 1539 causes the temperature setting to change rapidly.

Similarly, fan speed display 1541 displays the fan speed (high, medium or low) selected by the user. Touching on up-arrow 1543 increases the selected fan speed while touching down-arrow 1539 decreases same.

The HEATERS options in FIG. 15 include SEAT option 1547, MIRROR option 1549, REAR WINDOW option

18

1551, STEERING WHEEL option 1553, and ALL option 1554. One or more of these options can be active at the same time. When SEAT option 1547 is selected by a first touch on the option, a voice comes on to explain the option, uttering "To enable seat heaters." A second touch on the option activates the seat heaters connected to climate control interface 108f.

Similarly, MIRROR option 1549 enables the user to activate outside mirror heaters. REAR WINDOW option 1551 enables the user to activate a rear window defrostor. STEERING WHEEL option 1553 enables the user to activate a steering wheel heater. Finally, ALL option 1554 enables the user to activate all of the heaters simultaneously.

In personalizing the vehicle, preference interface 116 monitors any user adjustments to certain vehicle functions by comparing their current settings with the corresponding stored preferences in memory 115. Thus, for example, if the user changes any of the settings relating to the climate control such as the mode, vent, air, temperature, fan speed, etc. from its previous preferred setting, preference interface 116 causes a SAVE screen to appear on screen 209. This SAVE screen is illustrated in FIG. 16. As shown in FIG. 16, the user is prompted to save the change in the setting that he/she has just made. The user at this point may activate SAVE option 1601 to change the previous preferred setting. The SAVE screen thereafter disappears in favor of the previous screen. Otherwise, he/she may activate CLOSE option 1603 to close the SAVE screen, without storing the latest setting, which is then treated as a temporary setting. In the latter case, for example, a restart of the automobile will obliterate such a temporary setting, and reinstate the stored preferred setting.

Climate control screens can similarly be invoked by the front passenger and rear passengers on display interfaces 102c and 102d, respectively. Such screens provide similar MODE options including OFF, AUTO, A/C and HEAT options; and VENT options including LOWER VENT, UPPER VENT and LOWER/UPPER vent options. They also provide for temperature and fan speed adjustments for the respective localized areas. However, no save screen is provided.

Using INDEX option 1001e of FIG. 10 to look up information on and/or to control various items in the automobile will now be described. After option 1001e is activated, a DATA ENTRY screen illustrated in FIG. 17 is exhibited on screen 209. As shown in FIG. 17, a message "Enter Letter Or Item Name" appears to prompt the user for an entry of the name of the item of interest or its beginning letter. For this purpose, entry options for letters A through Z arranged in a grid format are provided in section 1701 for selection. In addition, DONE option 1703, when activated, indicates to system 100 that the entry is completed. Subdisplay 1705 is used to echo the user's entry to ensure its correctness.

In this illustration, the user enters "AIR CONDITIONING" as exhibited on subdisplay 1705. In response, an INDEX screen shown in FIG. 18 appears on display screen 209, with the search item name "AIR CONDITIONING" highlighted yellow. It should be noted that other item names such as "Anti-lock Brake System Indicator" are also shown, and they are in alphabetical order following "AIR CONDITIONING". This stems from the design of system 100 whereby the user may conveniently enter the beginning letter of the search item name only. In that case, a list of item names in alphabetical order with the first item name having the same beginning letter highlighted yellow. For instance,

CALCAR 2302

EXHIBIT M
PAGE 130

US 6,330,497 B1

19

if the user had only entered "A" for "AIR CONDITIONING", a list of item names starting with "A" in alphabetical order would appear on screen 209 (although in this instance it would be the same list as shown in FIG. 18 as "AIR CONDITIONING" is the first item with a letter "A" in system 100). If the user cannot locate the name of the item of interest in the list, he/she may scroll the screen using scroll-up option 1801 or scroll-down option 1803 to review additional item names after or before the listed item names. Alternatively, the user may select PREVIOUS option 1805 to return to the screen of FIG. 17 to enter the complete item name.

In any event, after the user locates the item name on the INDEX screen, the user may then touch the item name to access information on that item. To that end, a look-up table is stored in memory 115. FIG. 19 illustrates such a look-up table, wherein left column 1901 lists each item name in alphabetical order in the index, and right column 1903 lists the corresponding instruction for processor 105 to carry out to access information on that item. For example, according to row 1905 of the table, the selection and activation of the item name "AIR CONDITIONING" causes processor 105 to connect the user to the CLIMATE CONTROL screen of FIG. 15 previously described. ·

The foregoing merely illustrates the principles of the invention. It will thus be appreciated that those skilled in the art will be able to devise numerous other systems which embody the principles of the invention and are thus within its spirit and scope.

For example, based on the disclosure heretofore, it is apparent that through system 100, the user can run diagnostics on selected parts of the automobile by voice command or touch-screen control.

In addition, in the disclosed embodiment, through system 100, the user is able to program the climate control for the next ride before he/she leaves the vehicle. It will be appreciated that the user will be able to achieve same remotely ahead of time via telecommunication means. For example, processor 105 may be programmed to accept climate control commands through phone interface 106a. In that instance, the user can call from anywhere to establish a phone connection with phone interface 106a using a predetermined phone number, through which the user communicates the commands to climate control interface 108f to program the climate control. Through the phone connection, the user may be provided with climate control options described above in a synthesized voice. The user may activate one or more of such options by pressing a predetermined touch-tone key on the telephone keypad corresponding to a "yes" or "no" response. Similarly, the user may achieve the relevant temperature and/or time settings by pressing the touch-tone keys corresponding to the numerals indicative thereof. Of course, telecommunication means other than the telephone including a radio frequency (RF) transmitter may also be used to communicate the climate control commands from a remote area.

In addition, in the disclosed embodiment, the user may access different screens provided by AUTO DIRECTOR display interface 102a to learn about and control certain vehicle functions. It will be appreciated that a person skilled in the art will develop a demonstration program wherein a series of such screens will be automatically presented to a user in a predetermined sequence. The presentation may include commentaries, and highlights on selected options displayed on each screen. Furthermore, the presentation may be coupled with the showing of actual vehicle functions. For

20

example, in demonstrating the climate control screen of FIG. 15, while the function of a highlighted VENT option (e.g., Floor, Floor/Dash, Dash, Defrost or Floor/Defrost) is explained, it is activated so that the user in the automobile can feel an actual air flow from the corresponding direction. The above demonstration program may be invoked using a PIN provided by the automobile manufacturer. The program may run continually while the automobile is shown in a showroom, or may be invoked by the user occasionally to obtain relevant information.

Further, in the disclosed embodiment, the MAINTE-NANCE REQUIRED warning light comes on when it is time for scheduled maintenance. In accordance with another aspect of the invention, the maintenance is scheduled by system 100 according to the cumulative time of the tachometer reading above a predetermined RPM value. Such cumulative time reflects the extent of the engine wear, and if it exceeds a predetermined length of time without maintenance, the engine performance would degrade substantially. In measuring the cumulative time in question, a conventional comparator (not shown) is employed in system 100 to compare the instantaneous tachometer reading (provided by engine control interface 112c) with the predetermined RPM value. Each time when the tachometer reading exceeds the predetermined value, processor 105 is interrupted to register the length of such an occurrence. The latter is added to a running sum to update the cumulative time in question. This cumulative time may be displayed on instrument panel display interface 102e, along with the tachometer reading and the MAINTENANCE REQUIRED warning indicator. A second conventional comparator (not shown) is employed in system 100 to compare the cumulative time with the above predetermined time length. As soon as the cumulative time exceeds the predetermined length, processor 105 is interrupted and causes the MAINTE-NANCE REQUIRED warning light to come on, indicating that it is time for maintenance.

Still further, system 100 as described is highly adaptable in adjusting to new system requirements, and capable of "learning" new automobile features to be introduced into the system. Such learning may involve a modification or an upgrade in the system software stored in memory 115.

Moreover, other features of system 100 may include capabilities of communications with a third party remote from the vehicle. For example, system 100 may be programmed to transmit signals representing data on the current speed of the vehicle and its VIN receivable by a radar system, thus enabling the third party to monitor its speed. Furthermore, system 100 may be programmed by the third party to disable and subsequently enable the vehicle upon successful verification of a PIN pre-assigned to the third party. To that end, system 100 is capable of receiving remote transmission of the PIN, followed by the disable or enable code. The transmission may be encrypted for security reasons. Furthermore, more than one PIN may be used for different purposes. For example, a PIN may be assigned to a law enforcement agency to disable the vehicle because of a suspension of a license, or to temporarily disable the vehicle when the driver is intoxicated. Another PIN may be assigned to an environmental protection agency to disable the vehicle for failing to meet the emission requirements. Yet another PIN may be assigned to the vehicle owner to disable the vehicle when parked, thereby reducing the risk of a car theft. The disabling of the vehicle involves cutting off its gas, putting on its anti-lock brakes, etc.

Further, system 100 is capable of receiving a low-frequency, low-power broadcast covering an area of a lim-

CALCAR 2303

EXHIBIT M
PAGE 131

US 6,330,497 B1

21

ited radius, referred to as a "Cell". The broadcast may provide electronic GPS map and Yellow Page type information pertaining to the cell. This information, when received, may be downloaded onto AUTO DIRECTOR display interface 102*a* or multifunction display interface 102*b*. Such information includes a local directory indicating locations of nearby gas stations, restaurants and other facilities on the GPS map, with respect to the current location of the automobile. The local directory may be formatted in the form of "web pages" featuring the local businesses, and include additional information such as business hours, telephone numbers, and information on products and services provided by such businesses.

The above broadcast may also provide local weather information sponsored by a civic group or commercial entity. In the case of civic group sponsorship, the local civic events may be posted alongside the weather information, and in the case of commercial sponsorship, advertisements may be posted instead. Of course, as the automobile moves from cell to cell, the contents of the broadcast change accordingly.

In addition, while the radio in the automobile is tuned to a particular radio station, system 100 is also capable of receiving any electronic files broadcast from that radio station, along with the radio program. These electronic files, which may be in the form of web pages, can be downloaded onto the system. The system user may then scroll the pages to learn such information as program listings and coming events sponsored by the radio station.

Moreover, in the disclosed embodiment, system 100 is illustratively used in an automobile. It will be appreciated that a person skilled in the art may also employ the inventive system in another type of vehicle such as a boat, an airplane, etc.

Finally, although information and control system 100, as disclosed, is embodied in the form of various discrete functional blocks, the system could equally well be embodied in an arrangement in which the functions of any one or more of those blocks or indeed, all of the functions thereof, are realized, for example, by one or more appropriately programmed processors or devices.

We claim:

1. A system for operating a device to perform a function in a vehicle comprising:

a display element for displaying at least one option which is associated with the function of the vehicle, the at least one option indicating a first status;

a first interface for selecting the at least one option, the selected at least one option indicating a second status;

an output element for providing information concerning the selected at least one option;

a second interface for activating the selected at least one option, the activated option indicating a third status; and

a processor for causing the device to perform the function after the selected at least one option is activated.

2. The system of claim 1 wherein the function includes climate control.

3. The system of claim 1 wherein the first interface is the same as the second interface.

4. The system of claim 1 wherein the display element includes a liquid crystal display (LCD).

5. The system of claim 1 wherein the second status is indicated by a highlight on the selected at least one option in a first color.

6. The system of claim 5 wherein the third status is indicated by a highlight on the activated option in a second color.

22

7. The system of claim 1 wherein the selected at least one option is selected using a touch-screen technique.

8. The system of claim 1 wherein the information is provided via audio media.

9. The system of claim 1 wherein the information is provided textually.

10. The system of claim 1 wherein at least one of the first interface and the second interface includes a device for indicating the at least one option.

11. The system of claim 1 wherein at least one of the first interface and the second interface includes a control button.

12. The system of claim 1 wherein at least one of the first interface and the second interface includes a voice command capability.

13. The system of claim 1 wherein the function includes a radio function.

14. The system of claim 1 wherein the function includes a television function.

15. The system of claim 1 wherein the function includes a CD playing function.

16. The system of claim 1 wherein the function includes a navigation function.

17. The system of claim 1 wherein the function includes a telephonic function.

18. The system of claim 1 wherein the function includes a lock function.

19. The system of claim 1 wherein the function includes a mirror adjustment function.

20. The system of claim 1 wherein the function includes a window adjustment function.

21. The system of claim 1 wherein the function includes a seat adjustment function.

22. The system of claim 1 wherein the function includes a windshield wiper control function.

23. The system of claim 1 wherein the function includes a cruise control function.

24. The system of claim 1 wherein the function includes a light control function.

25. The system of claim 1 wherein the function includes a security function.

26. The system of claim 1 wherein the function includes a steering control function.

27. The system of claim 1 wherein the function includes a ride control function.

28. The system of claim 1 wherein the function includes an engine function.

29. The system of claim 1 wherein the function includes a transmission function.

30. A method for operating a device to perform a function in a vehicle comprising:

displaying at least one option which is associated with the function of the vehicle, the at least one option indicating a first status;

selecting the at least one option, the selected at least one option indicating a second status;

providing information concerning the selected at least one option;

activating the selected at least one option, the activated option indicating a third status; and

causing the device to perform the function after the selected at least one option is activated.

31. The method of claim 20 wherein the function includes climate control.

32. The method of claim 20 wherein the second status is indicated by a highlight on the selected at least one option in a first color.

**CALCAR 2304**

EXHIBIT M
PAGE 132

US 6,330,497 B1

23

**33.** The method of claim **32** wherein the third status is indicated by a highlight on the activated option in a second color.

**34.** The method of claim **20** wherein the selected at least one option is selected using a touch-screen technique.

**35.** The method of claim **10** wherein the content is provided via audio media.

**36.** The method of claim **10** wherein the content is provided textually.

**37.** The method of claim **30** wherein the at least one option is selected using an indicator device.

**38.** The method of claim **30** wherein the at least one option is selected using a control button.

**39.** The method of claim **30** wherein the at least one option is selected via voice command.

**40.** The method of claim **30** wherein the function includes a radio function.

**41.** The method of claim **30** wherein the function includes a television function.

**42.** The method of claim **30** wherein the function includes a CD playing function.

**43.** The method of claim **30** wherein the function includes a navigation function.

**44.** The method of claim **30** wherein the function includes a telephonic function.

24

**45.** The method of claim **30** wherein the function includes a lock function.

**46.** The method of claim **30** wherein the function includes a mirror adjustment function.

**47.** The method of claim **30** wherein the function includes a window adjustment function.

**48.** The method of claim **30** wherein the function includes a seat adjustment function.

**49.** The method of claim **30** wherein the function includes a windshield wiper control function.

**50.** The method of claim **30** wherein the function includes a cruise control function.

**51.** The method of claim **30** wherein the function includes a light control function.

**52.** The method of claim **30** wherein the function includes a security function.

**53.** The method of claim **30** wherein the function includes a steering control function.

**54.** The method of claim **30** wherein the function includes a ride control function.

**55.** The method of claim **30** wherein the function includes an engine function.

**56.** The method of claim **30** wherein the function includes a transmission function.

* * * * *

CALCAR 2305

EXHIBIT M
PAGE 133

## UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.    : 6,330,497 B1                                    Page 1 of  1
DATED           : December 11, 2001
INVENTOR(S)   : Michael L. Obradovich et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is
hereby corrected as shown below:

<u>Column 22,</u>
Lines 63 and 65, after "claim", "20" should read -- 30 --.

<u>Column 23,</u>
Line 4 , after "claim", "20" should read -- 30 --.
Lines 6 and 8, after "claim", "10" should read -- 30 --.

Signed and Sealed this

Fourteenth Day of May, 2002

*Attest:*

JAMES E. ROGAN
*Director of the United States Patent and Trademark Office*

*Attesting Officer*

**CALCAR 2306**

EXHIBIT M
PAGE 134

# EXHIBIT N

US006587759B2

(12) **United States Patent**
Obradovich et al.

(10) Patent No.: **US 6,587,759 B2**
(45) Date of Patent: *Jul. 1, 2003

(54) **TECHNIQUE FOR EFFECTIVELY PROVIDING INFORMATION RESPONSIVE TO A NOTABLE CONDITION IN A VEHICLE**

(75) Inventors: **Michael L. Obradovich**, San Clemente, CA (US); **Michael L. Kent**, Garden Grove, CA (US); **John G. Dinkel**, Irvine, CA (US)

(73) Assignee: **American Calcar Inc.**, Wilmington, DE (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **10/209,107**

(22) Filed: **Jul. 30, 2002**

(65) **Prior Publication Data**

US 2002/0198635 A1 Dec. 26, 2002

**Related U.S. Application Data**

(60) Continuation of application No. 09/717,943, filed on Nov. 21, 2000, now Pat. No. 6,459,961, which is a continuation of application No. 09/401,039, filed on Sep. 21, 1999, now Pat. No. 6,175,782, which is a division of application No. 08/789,934, filed on Jan. 28, 1999, now Pat. No. 6,009,355.

(51) Int. Cl.[7] ............................. **G05D 1/00; B60Q 1/00**
(52) U.S. Cl. ............................. **701/1;** 701/29; 701/31; 340/438; 340/459; 340/461
(58) Field of Search ............................... 701/1, 36, 48, 701/29, 30, 31, 33; 340/459, 460, 461, 436, 439, 438

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,582,926 A    6/1971    Hassan ........................ 340/443

| | | | |
|---|---|---|---|
| 4,291,749 A | 9/1981 | Ootsuka et al. | 165/202 |
| 4,314,232 A | 2/1982 | Tsunoda | 340/460 |
| 4,337,821 A | 7/1982 | Saito | 165/202 |
| 4,401,848 A | 8/1983 | Tsunoda | 704/274 |
| 4,407,564 A | 10/1983 | Ellis | 345/7 |
| 4,419,730 A | 12/1983 | Ito et al. | 701/36 |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| DE | 4431070 | 3/1996 |
|---|---|---|
| JP | 58026652 A | 2/1983 |

OTHER PUBLICATIONS

M. Krebs, "Cars That Tell You Where To Go," The New York Times, Dec. 15, 1996, section 11, p. 1.
L. Kraar, "Knowledge Engineering," Fortune, Oct. 28, 1996, pp. 163–164.
S. Heuchert, "Eyes Forward: An ergonomic solution to driver information overload," Society of Automobile Engineering, Sep. 1996, pp. 27–31.
J. Braunstein, "Airbag Technology Take Off," Automotive & Transportation Interiors, Aug. 1996, p. 16.
I. Adcock, "No Longer Square," Automotive & Transportation Interiors, Aug. 1996, pp. 38–40.

*Primary Examiner*—Jacques H. Louis-Jacques
(74) *Attorney, Agent, or Firm*—Kaye Scholer LLP

(57)    **ABSTRACT**

In a multimedia information and control system for use in an automobile, at least one interface is employed which enables a user to access information concerning the automobile and control vehicle functions in an efficient manner. The user may select one of a plurality of displayed options on a screen of such an interface. Through audio, video and/or text media, the user is provided with information concerning the selected option and the vehicle function corresponding thereto. Having been so informed, the user may activate the selected option to control the corresponding vehicle function.

**28 Claims, 15 Drawing Sheets**



CALCAR 2713

US 6,587,759 B2
Page 2

## U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,426,691 A | * | 1/1984 | Kawasaki | 369/21 |
| 4,441,405 A | | 4/1984 | Takeuchi | 454/75 |
| 4,450,613 A | | 5/1984 | Ryan et al. | 701/35 |
| 4,521,885 A | | 6/1985 | Melocik et al. | 714/46 |
| 4,536,739 A | | 8/1985 | Nobuta | 340/323 R |
| 4,582,389 A | | 4/1986 | Wood et al. | 359/14 |
| 4,636,782 A | | 1/1987 | Nakamura et al. | 345/7 |
| 4,653,003 A | | 3/1987 | Kirstein | 701/29 |
| 4,731,769 A | | 3/1988 | Schaefer et al. | 369/6 |
| 4,740,779 A | | 4/1988 | Cleary et al. | 345/7 |
| 4,740,780 A | | 4/1988 | Brown et al. | 345/7 |
| 4,752,824 A | | 6/1988 | Moore | 348/115 |
| 4,787,039 A | | 11/1988 | Murata | 701/1 |
| 4,795,233 A | | 1/1989 | Chong | 345/7 |
| 4,818,048 A | | 4/1989 | Moss | 345/7 |
| 4,827,520 A | | 5/1989 | Zeinstra | 701/1 |
| 4,837,551 A | | 6/1989 | Iino | 345/7 |
| 4,876,594 A | | 10/1989 | Schiffman | 348/45 |
| 4,914,705 A | | 4/1990 | Nigawara | 704/270 |
| 4,988,976 A | | 1/1991 | Lu | 340/461 |
| 4,989,146 A | * | 1/1991 | Imajo | 701/35 |
| 4,995,258 A | | 2/1991 | Frank | 73/118.2 |
| 4,996,959 A | | 3/1991 | Akimoto | 123/406.52 |
| 5,006,829 A | | 4/1991 | Miyamoto et al. | 340/459 |
| 5,043,736 A | | 8/1991 | Darnell et al. | 342/357.1 |
| 5,051,735 A | | 9/1991 | Furukawa | 345/7 |
| 5,070,323 A | | 12/1991 | Iino et al. | 345/7 |
| 5,119,504 A | | 6/1992 | Durboraw, III | 455/575 |
| 5,198,797 A | | 3/1993 | Daidoji | 340/25.5 |
| 5,203,499 A | | 4/1993 | Knittel | 237/2 A |
| 5,214,413 A | | 5/1993 | Okabayashi et al. | 345/7 |
| 5,214,707 A | | 5/1993 | Fujimoto et al. | 704/275 |
| 5,235,633 A | | 8/1993 | Dennison et al. | 455/456 |
| 5,257,190 A | | 10/1993 | Crane | 701/35 |
| 5,274,560 A | | 12/1993 | LaRue | 701/202 |
| 5,278,532 A | | 1/1994 | Hegg et al. | 345/7 |
| 5,293,115 A | | 3/1994 | Swanson | 324/110 |
| 5,299,132 A | | 3/1994 | Wortham | 455/457 |
| 5,303,163 A | * | 4/1994 | Ebaugh et al. | 700/274 |
| 5,334,974 A | | 8/1994 | Simms et al. | 340/990 |
| 5,335,276 A | | 8/1994 | Thompson et al. | 380/266 |
| 5,335,743 A | | 8/1994 | Gillbrand et al. | 180/178 |
| 5,345,817 A | | 9/1994 | Grenn et al. | 73/117.3 |
| 5,351,041 A | | 9/1994 | Ikata et al. | 340/825.24 |
| 5,361,165 A | | 11/1994 | Stringfellow et al. | 359/631 |
| 5,371,510 A | | 12/1994 | Miyauchi et al. | 345/7 |
| 5,400,045 A | | 3/1995 | Aoki | 345/7 |
| 5,404,443 A | | 4/1995 | Hirata | 725/75 |
| 5,414,439 A | | 5/1995 | Groves et al. | 345/7 |
| 5,416,318 A | | 5/1995 | Hegyi | 250/226 |
| 5,422,565 A | | 6/1995 | Swanson | 324/110 |
| 5,430,432 A | * | 7/1995 | Camhi et al. | 340/438 |
| 5,432,904 A | | 7/1995 | Wong | 705/4 |
| 5,440,428 A | | 8/1995 | Hegg et al. | 359/630 |
| 5,442,553 A | | 8/1995 | Parillo | 455/420 |
| 5,450,321 A | | 9/1995 | Crane | 455/517 |
| 5,450,329 A | | 9/1995 | Tanner | 701/213 |
| 5,475,399 A | | 12/1995 | Borsuk | 345/472 |
| 5,479,482 A | | 12/1995 | Grimes | 455/556 |
| 5,483,632 A | | 1/1996 | Kuwamoto et al. | 345/708 |
| 5,486,840 A | | 1/1996 | Borrego et al. | 345/7 |
| 5,493,658 A | | 2/1996 | Chiang et al. | 345/709 |
| 5,497,271 A | | 3/1996 | Mulvanny et al. | 359/631 |
| 5,497,339 A | | 3/1996 | Bernard | 708/109 |
| 5,504,622 A | | 4/1996 | Oikawa et al. | 359/630 |
| 5,506,595 A | | 4/1996 | Fukano et al. | 345/7 |
| 5,511,724 A | | 4/1996 | Freiberger et al. | 236/49.3 |
| 5,519,403 A | | 5/1996 | Bickley et al. | 342/352 |
| 5,519,410 A | | 5/1996 | Smalanskas et al. | 345/7 |
| 5,523,559 A | | 6/1996 | Swanson | 250/222.1 |
| 5,525,977 A | | 6/1996 | Suman | 340/825.25 |
| 5,528,248 A | | 6/1996 | Steiner et al. | 342/357.06 |
| 5,528,496 A | | 6/1996 | Brauer et al. | 701/32 |
| 5,534,888 A | | 7/1996 | Lebby et al. | 345/672 |
| 5,539,869 A | | 7/1996 | Spoto et al. | 707/500.1 |
| 5,547,125 A | | 8/1996 | Hennessee et al. | 236/49.3 |
| 5,553,661 A | | 9/1996 | Beyerlein et al. | 165/203 |
| 5,555,172 A | | 9/1996 | Potter | 455/456 |
| 5,555,286 A | | 9/1996 | Tendler | 455/404 |
| 5,555,502 A | | 9/1996 | Opel | 701/36 |
| 5,559,520 A | | 9/1996 | Barzegar et al. | 342/357.1 |
| 5,572,201 A | * | 11/1996 | Graham et al. | 340/902 |
| 5,572,204 A | | 11/1996 | Timm et al. | 340/988 |
| 5,576,724 A | | 11/1996 | Fukatsu et al. | 345/7 |
| 5,579,535 A | | 11/1996 | Orlen et al. | 455/421 |
| 5,627,547 A | | 5/1997 | Ramaswamy et al. | 342/357.08 |
| 5,638,305 A | | 6/1997 | Kobayashi et al. | 700/280 |
| 5,648,769 A | | 7/1997 | Sato et al. | 455/456 |
| 5,650,929 A | | 7/1997 | Potter et al. | 455/456 |
| 5,653,386 A | | 8/1997 | Hennessee et al. | 237/12.3 B |
| 5,654,715 A | | 8/1997 | Hayashikura et al. | 342/70 |
| 5,666,101 A | | 9/1997 | Cazzani et al. | 340/461 |
| 5,670,953 A | | 9/1997 | Satoh et al. | 340/903 |
| 5,689,252 A | | 11/1997 | Ayanoglu et al. | 340/991 |
| 5,691,695 A | | 11/1997 | Lahiff | 340/461 |
| 5,702,165 A | | 12/1997 | Koibuchi | 303/146 |
| 5,712,640 A | | 1/1998 | Andou et al. | 342/70 |
| 5,732,368 A | | 3/1998 | Knoll et al. | 701/1 |
| 5,734,973 A | | 3/1998 | Honda | 455/186.1 |
| 5,752,754 A | | 5/1998 | Amitani et al. | 303/199 |
| 5,757,268 A | | 5/1998 | Toffolo et al. | 340/461 |
| 5,758,311 A | | 5/1998 | Tsuji et al. | 701/111 |
| 5,777,394 A | | 7/1998 | Arold | 307/10.1 |
| 5,781,872 A | | 7/1998 | Konishi et al. | 701/36 |
| 5,919,239 A | | 7/1999 | Fraker et al. | 701/35 |
| 6,002,326 A | | 12/1999 | Turner | 340/426 |

* cited by examiner

CALCAR 2714

EXHIBIT N
PAGE 136



FIG. 1

CALCAR 2715

EXHIBIT N
PAGE 144

FIG. 2

EXHIBIT N
PAGE 145



FIG. 3A



FIG. 3B

CALCAR 2718

EXHIBIT N
PAGE 140



FIG. 3C

CALCAR 2719

209



FIG. 4A

209



FIG. 4B

EXHIBIT N
PAGE 19?

209



FIG. 5



FIG. 6

**CALCAR 2721**

EXHIBIT N
PAGE 143



FIG. 7



FIG. 8

CALCAR 2722

EXHIBIT N
PAGE 144



FIG. 9



FIG. 10

CALCAR 2723

EXHIBIT N
PAGE 145



FIG. 11

CALCAR 2724

EXHIBIT N
PAGE 146



FIG. 12



FIG. 13



FIG. 14

CALCAR 2726

EXHIBIT N
PAGE 148

13/15



FIG. 15



FIG. 16

CALCAR 2727





FIG. 17



FIG. 18

EXHIBIT N
PAGE 150

| 1901 | 1903 |
|------|------|
| AIR CONDITIONING | LINK TO CLIMATE CONTROL SCREEN OF FIG. 15 |
| ANTI-LOCK BRAKE SYSTEM INDICATOR | LINK TO WARNING LIGHT OPTION #4 ON FUEL/TEMP SCREEN (NOT SHOWN) |
| AUTOMATIC CLIMATE CONTROL | LINK TO CLIMATE CONTROL SCREEN OF FIG. 15 |
| • • • | • • • |
| CHARGING SYSTEM FAILURE INDICATOR | LINK TO CHARGING SYSTEM FAILURE OPTION 1309f (FIG. 13) |
| CLIMATE CONTROL SYSTEM | LINK TO CLIMATE CONTROL SCREEN OF FIG. 15 |
| COOLING | LINK TO CLIMATE CONTROL SCREEN OF FIG. 15 |
| CRUISE CONTROL INDICATOR | LINK TO WARNING LIGHT OPTION #2 ON SPEEDOMETER SCREEN (NOT SHOWN) |
| DEFOG/DEFROST | LINK TO CLIMATE CONTROL SCREEN OF FIG. 15 |
| DOOR AJAR INDICATOR | LINK TO WARNING LIGHT OPTION #7 ON FUEL/TEMP SCREEN (NOT SHOWN) |
| DIRECTIONAL SIGNALS INDICATOR | LINK TO TURN SIGNAL/HAZARD WARNING OPTION 1201b (FIG. 12) |
| • • • | • • • |

1905

FIG. 19

EXHIBIT N
PAGE 151

US 6,587,759 B2

1

## TECHNIQUE FOR EFFECTIVELY PROVIDING INFORMATION RESPONSIVE TO A NOTABLE CONDITION IN A VEHICLE

This application is a continuation of application Ser. No. 09/717,943 filed on Nov. 21, 2000, which is a continuation of application Ser. No. 09/401,039 filed on Sep. 21, 1999, now U.S. Pat. No. 6,175,782, which is a division of application Ser. No. 08/789,934 filed on Jan. 28, 1997, now U.S. Pat. No. 6,009,355.

### FIELD OF THE INVENTION

The invention relates generally to information and control systems and, more particularly, to a system for use in an automobile which facilitates a user's retrieval and/or dissemination of information, and control of vehicle functions.

### BACKGROUND OF THE INVENTION

Information is vital to day-to-day activities. With no access to information, people cannot function efficiently in this society, and their lives and financial well-being are put in jeopardy. People want to be well-informed, so much so that when they are travelling in automobiles, they tune into local radio stations to listen to news, weather forecasts and traffic conditions. For that matter, some automobiles are equipped with audiovisual systems including television (TV) receivers. One such system is disclosed in U.S. Pat. No. 5,404,443 issued to Hirata. The Hirata system provides audiovisual information in a number of modes including a TV mode, which may be selected by control switches disposed on the periphery of a display.

Automobile users like to be continually updated with information affecting their travel plans such as weather and traffic conditions because of its fast changing nature. Automobile users who are traveling also like to continually keep in touch with their homes and offices, and to confirm appointments and hotel reservations so that they can adjust their itineraries accordingly. To that end, cellular mobile telephones were introduced to enable automobile users to conduct business and contact their families while they are traveling.

In addition, local map information is important to automobile travelers moving from one locale to another. As such, navigation systems were developed to help reach their destinations in an unfamiliar milieu. One such vehicle navigation system is disclosed in U.S. Pat. No. 5,274,560 issued to LaRue. The disclosed system is based on artificial intelligence and provides a driver with directions via a voice interface. The system is built upon an optical disk player which can be used for entertainment as well. Digitized maps, compressed voice records and computer programs are stored on an optical disk compatible with the disk player. After a destination point is identified, the disclosed system finds the best route from the digitized maps and guides the driver therethrough via the voice interface, taking into account the latest traffic conditions received by an FM receiver to avoid congestion.

Recently, navigation systems based on military global positioning system (GPS) technology have emerged. One such navigation system is commercially available as an option for the latest model of the ACURA 3.5 RL automobile. This ACURA navigation system receives signals from a constellation of satellites which is part of the GPS. In response to these signals, the navigation system pinpoints the automobile's location (in latitude and longitude). It also detects the automobile's speed and direction. With geo-

2

graphic information stored on a hard disk in an onboard computer, the navigation system is capable of verbally and visually communicating to the user instructions for reaching the destination.

In addition to the above techniques for communications with automobile users, a technique for disseminating information regarding the automobiles themselves is disclosed in U.S. Pat. No. 5,442,553 issued to Parillo. The disclosed system is a vehicle diagnostic and software upgrade system. In this system, sensors are provided in the vehicle to generate dynamic data relating to various mechanical controls and the engine of the vehicle, including engine R.P.M., fuel/air mixture, emissions and pollution content information. A microprocessor in the vehicle has access to selectable program parameters affecting the functioning of the mechanical controls. The microprocessor collects and transmits the dynamic data to a remote diagnostic station periodically or upon its request. In response, the remote station sends, to the vehicle, signals indicative of any changes in its software and/or program parameters. The microprocessor accordingly causes the changes to be made in the vehicle based on the received signals.

Besides the communication capabilities described above, an automobile has many accessories and user control elements such as lights, wipers, a clock, temperature control, cruise control, seat adjustment control, mirror adjustment control, and an anti-theft system. A technique for centralizing the command of the individual control elements is disclosed in U.S. Pat. No. 5,555,502 issued to Opel. The disclosed system includes a centralized control panel on a steering wheel which, together with a display, is utilized to control the electronic components of the automobile. The display is positioned in the area of the driver's sun visor. After the driver presses one of the buttons on the control panel corresponding to a desired electronic component, a menu is displayed so that the driver is able to select items from the menu to program the component. The selection is accomplished by pressing specified buttons on the panel.

In addition, a technique for controlling vehicle accessories via voice command is disclosed in U.S. Pat. No. 4,827,520 issued to Zeinstra. In accordance with this technique, control functions of each accessory are formatted in a summary page for display on a screen, which is scanned by infrared light to sense any touching thereon. By uttering any of the displayed functions on the summary page, preceded by either a specified keyword or an actuation of a push-to-talk switch on a steering wheel, a more detailed subpage of the selected function is displayed for further selection by voice. As an alternative to the voice command, the selection can also be accomplished by touching the displayed function on the screen.

Voice command and touch screen techniques are frequently mentioned in prior art references in controlling car accessories. In particular, U.S. Pat. No. 5,214,707 issued to Fujimoto et al. discloses a system for voice-controlling equipment inside a vehicle, including microphones capable of discriminating voice commands as to whether they are generated at the driver side or at the assistant side of the vehicle in a noisy environment.

### SUMMARY OF THE INVENTION

It is celebratory that technology advances at lightning speed. However, many people are left behind the technological frontier, and to some extent develop "technophobia". Some of them have even given up this technological race, which is confirmed by the blinking "12:00" display on the clocks of many video cassette recorders (VCRs) being used.

CALCAR 2730

US 6,587,759 B2

3

Similarly, it is fantastic that automobiles nowadays include many advanced accessories such as audiovisual systems, anti-theft systems, anti-lock brake systems, climate control, and cruise control which embrace the latest technologies. However, of all these accessories, many automobile users only know how to operate the headlights and windshield wipers, and regard the rest as nuisance. That is, the users pay for numerous accessories which they do not use, resulting in much consumer waste. We have recognized that such non-use is principally attributed to an inefficient distribution of operating knowledge of the automobile and, in particular, its accessories.

Specifically, when automobile users presently want to learn about certain aspects of an automobile, they need to consult an owner's manual which could have been lost or misplaced when they need it the most. In addition, the manual is unpopular because many users simply want to avoid reading any written material, and find it intimidating as it oftentimes is filled with incomprehensible technical jargon.

We have further recognized that even with the operating knowledge, many users are overwhelmed and confused with the large number of knobs, switches and buttons used to control the individual vehicle parts and accessories.

Accordingly, it is an object of the invention to design an information and control system for use inside an automobile with the user in mind. The user is afforded a centralized control which may be used in lieu of the knobs, switches and buttons to operate the vehicle parts and accessories. In accordance with the invention, the centralized control is intimately tied to an information system such that the user is able to efficiently access information about the functions and operations of such parts and accessories, and in a synergistic manner apply that information to operate same, using the centralized control.

It is another object of the invention that the access to the information is intuitive and direct so that the user can obtain the relevant information in a few self-explanatory steps. To that end, the invention embraces a multimedia approach where audio and video media are added to the traditional text media to convey information. The additional media increases the dimensions of both the user's comprehension of the information and the user's interaction with the automobile. Moreover, the information access is driven by a multilevel menu based on an intuitive model of taxonomy where information is organized in a minimal number of levels of subject matter from general to specific. The above integration of the multimedia approach with the multilevel menu approach presents an effective way of retrieving information in the automobile. Advantageously, with the invention, the user would not be distracted or overburdened by irrelevant information in the course of an information retrieval, which is conducive to a safe driving environment.

In the preferred embodiment, when the user wants to access information about a given part or accessory of the automobile, the user is presented with options on a display screen. Each option is associated with a respective one of different parts or accessories of the automobile. The user is able to select through the interface one of the options, associated with the given automobile part or accessory. The option, when selected, is highlighted in a first color, for example, yellow. A voice is then generated by the inventive system to explain the purpose or the content of the selected option before the user commits to it. Having been so informed, the user may then activate the selected option in retrieving the information of interest. The activated option is

4

highlighted in a second color, e.g., blue, to indicate its active status. The retrieved information is presented to the user both in text and in voice.

BRIEF DESCRIPTION OF THE DRAWING

Further objects, features and advantages of the invention will become apparent from the following detailed description taken in conjunction with the accompanying drawing showing an illustrative embodiment of the invention, in which:

FIG. 1 is a block diagram of an automobile information and control system in accordance with the invention;

FIG. 2 illustrates a control panel and a display interface for a user to interact with the system of FIG. 1;

FIG. 3A illustrates a flow chart depicting the steps of an anti-car-theft routine used in the system of FIG. 1;

FIGS. 3B and 3C jointly illustrate a flow chart depicting the steps of a routine for presenting various screens to the user in the system interaction;

FIG. 4A illustrates a screen for eliciting a personal identification number (PIN) from the system user;

FIG. 4B illustrates a SELECT A FUNCTION screen including features thereof in accordance with the invention;

FIG. 5 illustrates an introduction screen including features thereof in accordance with the invention;

FIG. 6 illustrates a MANUFACTURER screen including features thereof in accordance with the invention;

FIG. 7 illustrates a SAFETY REMINDERS screen including features thereof in accordance with the invention;

FIG. 8 illustrates a THEFT PROTECTION FEATURES screen including features thereof in accordance with the invention;

FIG. 9 illustrates a QUICK TIP SET-UP screen including features thereof in accordance with the invention;

FIG. 10 illustrates a MAIN MENU screen including features thereof in accordance with invention;

FIG. 11 illustrates a DRIVER'S VIEW screen including features thereof in accordance with the invention;

FIG. 12 illustrates an INSTRUMENT PANEL screen including features thereof in accordance with the invention;

FIG. 13 illustrates a TACHOMETER AND WARNING LIGHTS screen including features thereof in accordance with the invention;

FIG. 14 illustrates a segment of the screen of FIG. 13 providing the user with information regarding a particular function of the automobile;

FIG. 15 illustrates a CLIMATE CONTROL screen including features thereof in accordance with the invention;

FIG. 16 illustrates a SAVE screen for saving the user's preferences in accordance with the invention;

FIG. 17 illustrates a DATA ENTRY screen in accordance with the invention for looking up information regarding a specific item in the automobile;

FIG. 18 illustrates an INDEX screen with listed items for which information is available; and

FIG. 19 is a look-up table listing searchable items and the corresponding instructions for a processor in the system of FIG. 1 to provide information regarding such items.

Throughout this disclosure, unless otherwise stated, like elements, components and sections in the figures are denoted by the same numerals.

DETAILED DESCRIPTION

FIG. 1 illustrates information and control system 100 embodying the principles of the invention for use in an

CALCAR 2731

US 6,587,759 B2

5

automobile. System 100 is referred to as the "AUTO DIRECTOR" system. It is user-friendly and designed with the automobile user in mind. For example, with AUTO DIRECTOR display interface 102*a* to be described, information about the automobile is readily available literally at the fingertips of the user. This information includes operational instructions, maintenance procedures, safety measures, and information about virtually every capability of the automobile. In accordance with the invention, the user is able to efficiently access such information using multimedia means involving audio, text and video media. Also with interface 102*a*, or multifunction display interface 102*b* to be described, the user is afforded a centralized control whereby he/she can program or adjust different vehicle parts and accessories using the information thus obtained.

As shown in FIG. 1, central to system 100 is processor 105 connected to memory 115. Data bus 107 connects processor 105 to display interfaces 102, input interfaces 104, communications interfaces 106, output control interfaces 108, vehicle computer interfaces 110, vehicle control interfaces 112, self-test interface 114, preferences interface 116, and audio interface 118.

Display interfaces 102 include, inter alia, AUTO DIRECTOR display interface 102*a*, which is illustrated in FIG. 2, together with control panel 205 in FIG. 1. By way of example, but not limitation, the hardware of interface 102*a* and control panel 205 are derived from a prior art navigation system of the type of the ACURA navigation system. In fact, interface 102*a* and control panel 205 are used in this illustrative embodiment to realize not only AUTO DIRECTOR functions to be described, but also the well-known navigation function.

Interface 102*a* includes a conventional liquid crystal display screen 209, and LCD driver (not shown) for processor 105 to control the display on screen 209. Interface 102*a* also incorporates well-known touch-screen circuitry (not shown) connected to touch screen interface 104*a* in FIG. 1. With this circuitry, the user can interact with processor 105 by, say, touching a displayed option on screen 209. Through interface 104*a*, processor 105 receives from the touch screen circuitry a signal identifying the location on screen 209 where it has been touched. If such a location matches the predetermined location of one of the displayed options, processor 105 determines that that option has been selected. With such touch-screen and displayed option selection capabilities, through AUTO DIRECTOR interface 102*a*, the user is able to obtain information on and control selectable functions of the automobile such as the instrument panel, navigation function, mobile phone, radio/CD player, locks, mirrors, windows, driver's seat adjustment control, climate control, windshield wipers, cruise control, lights, security function, steering, ride control, engine and transmission.

Control panel 205 comprises CANCEL switch 205*a*, ENTER switch 205*b*, BRIGHTNESS switch 205*c*, PUSH TO SELECT knob 205*d*, MENU switch 205*e*, MAP/GUIDE switch 205*f*, SETUP switch 205*g*, ZOOM IN switch 205*h* and ZOOM OUT switch 205*i*. BRIGHTNESS switch 205*c* comprises a standard variable resistor such that when it is pushed one way, operating circuitry 121 responsively causes the display intensity to increase, and the other way to decrease. ZOOM IN switch 205*h* when pressed enables the automobile user to enlarge a particular visual area of interest on screen 209, affording better details. On the other hand, ZOOM OUT switch 205*i* when pressed performs the inverse function to switch 205*h*. As an alternative to the touch-screen capability, switch 205*d* similar to a standard joystick

6

is provided for the user to move from one displayed option to another on screen 209 in the same direction (e.g., up, down, left or right) as the switch is operated. A desired option may be selected by pressing ENTER switch 205*b*. The functions of the other switches are described hereinbelow as they are called out in the operation of system 100. In this illustrative embodiment, AUTO DIRECTOR display interface 102*a* and control panel 205 are mounted close to the center of the dashboard of the automobile next to the steering wheel.

Referring back to FIG. 1, display interfaces 102 also include multifunction display interface 102*b*, center console display interface 102*c*, rear console display interface 102*d*, and instrument panel display interface 102*e*.

Specifically, multifunction display interface 102*b* is installed on the dashboard close to interface 102*a* on the driver side. Like interface 102*a*, interface 102*b* provides the user with graphic display and control of selected functions using well-known touch screen technology. In fact, interface 102*b* duplicates certain control functions (e.g., navigation, phone, radio and climate control) of interface 102*a* so that the user can use interface 102*b* to control a selected function while interface 102*a* is engaged in another ongoing function. For example, while the user is relying on AUTO DIRECTOR interface 102*a* to provide navigation information to reach a given destination, the user may want to adjust the climate control of the automobile. It is inconvenient for the user to terminate the ongoing navigation mode of interface 102*a*, albeit temporarily, to access the climate control function through the interface, adjust the climate control and then resume the navigation mode. Thus, it is preferable to leave the navigation mode of interface 102*a* alone and use interface 102*b* to administer the climate control.

Center console interface 102*c* is installed close to interface 102*a* on the passenger side. Similar to interface 102*b*, interface 102*c* provides the front seat passenger with graphic display and control of functions which include: the front passenger seat adjustment, door lock, window, climate and TV controls. If enabled by the driver, control is also available for the radio/CD player and phone.

Rear console display interface 102*d* is installed on the back of front seat. Similar to interface 102*c*, interface 102*d* provides rear seat passengers with graphic display and control of certain functions if enabled by driver or front seat passenger. These functions include: the rear seat climate, windows, door locks, radio/CD player and TV controls.

Instrument panel display interface 102*e* is installed on the dashboard in front of the driver seat. This interface provides the driver with graphic display of the vehicle speed, engine RPM, outside and inside temperatures, oil pressure, fuel level, time, odometer reading, trip odometer reading and warning light indicators. Through AUTO DIRECTOR interface 102*a*, the system user may select the display of the information in either an analog or a digital form.

Input interfaces 104 comprise touch screen interface 104*a* and control panel 205 described before, and voice command interface 104*b*. The latter is connected to a microphone (not shown) and comprises standard voice command circuitry (not shown) for processing voice commands by the user through the microphone to control or modify selected functions of system 100.

Communications interfaces 106 include phone interface 106*a*, radio/CD interface 106*b*, television (TV) interface 106*c*, navigation interface 106*d*, and beacon interface 106*e*. Processor 105 interacts with and controls standard phone equipment connected to phone interface 106*a*. Through

CALCAR 2732

EXHIBIT N
PAGE 154

US 6,587,759 B2

7

processor **105**, the user may operate the phone equipment via voice command, thereby realizing hands-free operation of the equipment. Alternatively, the user may operate the phone equipment using the touch screen capability provided by AUTO DIRECTOR display interface 102*a* or multifunction display interface 102*b*. The user may also operate the phone equipment via remote switches.

Similarly, processor **105** interacts with and controls one or more radio receivers and CD players in the automobile connected to CD interface 106*b*. Through processor **105**, the user may operate the radio receivers via voice command, remote switch and/or touch screen capability.

Processor **105** further interacts with and controls one or more TV receivers in the automobile connected to TV interface 106*c*. Again, the user may operate the TV receivers via voice command, remote switches and/or touch screen capability.

As further described hereinbelow, navigation interface 106*d* is connected to a standard inertial guidance system (not shown) capable of providing gyros information, and deriving the vehicle location based on GPS information. With the map information stored in memory **115**, the inertial guidance system is capable of providing the user with navigational instructions via interface 102*a* or 102*b*. Besides the locational information, local and national emergency information may be derived from the GPS information using additional standard decoding circuitry in interface 106*d*.

Beacon interface 106*e* is used for connection to a standard beacon device for detecting a predetermined beacon radio signal to provide additional locational information.

Output control interfaces **108** include lock interface 108*a*, mirror interface 108*b*, window interface 108*c*, steering column interface 108*d*, seat interface 108*e*, climate control interface 108*f*, wiper interface 108*g*, cruise control interface 108*h*, light interface 108*i* and clock interface 108*j*.

Specifically, lock interface 108*a* comprises output control logic controllable by processor **105** to lock or unlock the car doors, glove box, console storage, trunk (or liftgate), fuel filler door, brakes and transmission, and enable or disable the child-proof door locks, fuel pump and ignition.

Mirror interface 108*b* comprises output control logic controllable by processor **105** to maneuver the positions of the outside mirrors and inside rear view mirror, and to fold or unfold the outside mirrors.

Window interface 108*c* comprises output control logic controllable by processor **105** to incrementally or completely open or close all windows, and to open, close or tilt any sunroof.

Steering column interface 108*d* comprises output control logic controllable by processor **105** to move the steering column in or out and up or down.

Seat interface 108*e* comprises output control logic controllable by processor **105** to (1) adjust the positions of the front seats forward or aft, and up or down; (2) tilt the front or rear of the seat cushion up or down; (3) adjust the seat back lumbar, width and angle forward or aft; (4) increase or decrease the cushion size and stiffness; (5) raise or lower the head restraint; and (6) raise or lower the seat belt height.

Climate control interface 108*f* comprises output control logic controllable by processor **105** to (1) turn the climate control system on or off; (2) select an air flow mode; (3) set fan speeds; (4) enable or disable seat heaters; (5) select fresh or recirculated air (for driver only); and (6) enable or disable front and rear defrosters, mirrors and steering wheel heaters (for driver only).

8

Windshield wiper interface 108*g* comprises output control logic controllable by processor **105** to (1) select a high, low, intermittent, single wipe or off mode; (2) set an intermittent delay; and (3) enable or disable front or rear washers. Interface 108*g* also includes control logic for controlling rain- and speed-sensitive wipers, and for activating an automatic wash in a single wide mode when the windshield is at a certain level of opacity.

Cruise control interface 108*h* comprises output control logic controllable by processor **105** to (1) turn the cruise control on or off, (2) set the vehicle speed, and (3) cancel or resume the set speed. Light interface 108*i* comprises output control logic controllable by processor **105** to select an automatic mode or off mode for parking lights, headlights and fog lights; and to turn on or off map or courtesy lights.

Clock interface 108*j* comprises output control logic controllable by processor **105** to set an initial date and time on a conventional clock (not shown) connected to interface 108*j*. System **100** relies on the current date and time kept by the clock to provide a time reference for the system functions.

Vehicle computer interfaces **110** include anti-lock brake computer interface 110*a*, engine computer interface 110*b* and supplemental restraint computer interface 110*c* for processor **105** to communicate with the computers controlling the anti-lock brakes, engine and supplemental restraints (e.g., back-up airbag deployers and seat belt tensioners), respectively. Interfaces **110** also include back-up interface 110*d* through which processor **105** receives and analyzes signals from the engine, anti-lock brake and supplemental restraint computers. These signals would indicate to processor **105** any failures of the computers. In response to a computer failure, processor **105** causes a corresponding back-up computer connected to interface 110*d* to provide a back-up function.

Vehicle control interfaces **112** include steering interface 112*a*, ride interface 112*b*, engine interface 112*c*, transmission interface 112*d*, traction control interface 112*e*, and security interface 112*f*.

Specifically, steering interface 112*a* comprises input monitoring and output control logic for processor **105** to lighten or tighten the steering effort ratio in response to changing road conditions. Through interface 102*a*, the user may opt for manual or automatic steering effort ratio control. Interface 112*a* is capable of adapting and storing data according to the driver's inputs. It also allows for steering of front and/or rear wheels for sporty or increased stability.

Ride interface 112*b* comprises input monitoring and output control logic for processor **105** to lighten or stiffen the ride control to front and/or rear of vehicle in response to changing road conditions. Through interface 102*a*, the user may also opt for manual or automatic ride control.

Engine interface 112*c* comprises input monitoring and output control logic allowing for shutting off a specified number of cylinders, and varying valve and cam timing to increase performance or fuel economy. This interface also allows for manual or automatic control of the engine components, and includes the capability of adapting and storing data according to the driver's inputs.

Transmission interface 112*d* comprises input monitoring and output control logic for selecting manual or automatic shifting of the transmission. In an automatic shifting mode, interface 112*d* is capable of adapting and storing data according to the driver's inputs. Interface 112*d* also allows for control of a variable differential ratio for fast acceleration and high economy cruise.

**CALCAR 2733**

EXHIBIT N
PAGE 155

US 6,587,759 B2

9

Traction control interface 112e comprises input monitoring and output control logic providing information on whether power is delivered to front and/or rear wheels of the vehicle and what proportion of the power is delivered to each wheel. This interface also allows for manual or automatic control, and such functions as yaw control in cooperation with the anti-lock brakes and an engine cylinder shutoff.

Security interface 112f comprises control logic for setting a security level, and enabling or disabling a number of security related functions such as the fuel supply cut-off, motion detector, brake locking, etc. Interface 112f also allows entry of a new or alteration of an existing personal identification number (PIN) for personalization of the vehicle functions, i.e., saving the vehicle functional preferences.

In accordance with an aspect of the invention, system 100 incorporates an anti-car-theft technique involving security interface 112f. In accordance with this inventive technique, security interface 112f further comprises a sensor for detection of a predetermined condition to trigger an anti-theft routine. It will be appreciated that a person skilled in the art will come up with many different triggering events causing the sensor to invoke the routine. For example, a passive way of triggering the anti-theft routine would be after the sensor detects that the engine is off and the user has opened, closed and locked the driver's door.

In any event, as soon as processor 105 receives from the sensor a signal requesting an invocation of the anti-theft routine, processor 105 retrieves from navigation interface 106d GPS information identifying the parking location of the automobile, as indicated at step 251 in FIG. 3A. Processor 105 then stores at step 253 the parking location GPS information in memory 115. At step 255, processor 105 determines whether the security measures remain on. By way of example, but not limitation, such determination is based on information from lock interface 108a indicating whether the driver's door is properly unlocked. If that door is properly unlocked, processor 105 determines that the security measures are called off, and the anti-theft routine comes to an end, as indicated at step 257.

Otherwise if processor 105 determines that the security measures remain on, processor 105 at step 259 retrieves from navigation interface 106d GPS information identifying the current location of the automobile. Processor 105 then compares at step 261 the current location GPS information with the parking location GPS information previously stored. If processor 105 at step 262 determines that the current location matches the parking location based on the comparison, the anti-theft routine returns to step 255 after a predetermined period. Otherwise if processor 105 determines that the current location does not match the parking location, processor 105 assumes that the automobile has been removed without authorization, i.e., stolen. At this point, if a conventional alarm system is connected to security interface 112f, processor 105 would cause an alarm to come on, gas to be cut off, etc.

In this example, a conventional transmitter (not shown) is connected to security interface 112f and transmits a predetermined sequence of signals receivable by a law enforcement agency or a suitable alarm monitor company when it is activated. Continuing the example, processor 105 translates the GPS information identifying the current vehicle location into the corresponding street address based on the map information stored in memory 115, as indicated at step 263. Processor 105 at step 265 looks up one or more phone

10

numbers pre-stored in memory 115 for reporting to the law enforcement agency (or the alarm monitor company) about the stolen status. Alternatively, a list of phone numbers associated with law enforcement agencies (or branches of the alarm monitor company) in many different geographic locations is pre-stored, along with the GPS information identifying the locations of the respective law enforcement agencies (or alarm monitor company branches). This being so, processor 105 locates the closest law enforcement agency (or alarm monitor company branch) and its associated phone number(s) by comparing the current vehicle location GPS information with the respective agency (or branch) location GPS information.

In any event, processor 105 at step 267 initiates a call to a law enforcement agency (or an alarm monitor company branch) through phone interface 106a using the phone number just located. After the phone connection is established, processor 105 provides through the connection information about the current address of the vehicle using conventional voice synthesizer circuitry (not shown) in audio interface 118, and the pre-recorded information about the vehicle itself such as its vehicle identification number (VIN), model, year, color, license number, etc., as indicated at step 269. Through the same phone connection, processor 105 may also provide information about the vehicle's owner such as his/her name and contact number so that the law enforcement agency (or alarm monitor company branch) can notify the owner of the incident. Processor 105 at step 271 activates the aforementioned transmitter connected to security interface 112f to generate the predetermined sequence of signals in case the stolen vehicle is in transit. For that matter, processor 105 can also repeatedly check on the latest vehicle location and report any new address different from the one previously reported. Thus, by tracking the signals in the vicinity of the latest reported vehicle location, the law enforcement agency (or alarm monitor company) would recover the vehicle in an efficient manner.

Referring back to FIG. 1, self-test interface 114 comprises input/output (I/O) control logic for performing an active self-test of system 100 on power up or at the user's request. Specifically, interface 114 polls every other interface in system 100 for a self-test result. Each interface, when polled, performs an active self-test and reports the test results to interface 114, where such test results are gathered and caused to be displayed on interface 102a.

Preferences interface 116 monitors changes made by the user in selected functions after the user logs on system 100, and prompts the user to save such preferences. These preferences are stored in memory 115 in association with the user's PIN. Functions affording the user choices include auto locks, an easy entry, auto lamps, the seat position, steering column position, mirror position, radio, steering, ride, transmission shift, engine performance, climate, and security level.

Audio interface 118 comprises I/O control logic for receiving audio signals from a radio/CD, TV, compact disk (CD) player, or phone interface, processing the received audio signals, providing proper amplifications thereto, and routing the resulting sound to appropriate speakers and headphones (not shown) connected to interface 118. In this illustrative embodiment, AUTO DIRECTOR display interface 102a and multifunction display interface 102b share the same speakers. Interface 118 also provides center and rear console display interfaces 102c and 102d with separate audio channels, speakers and headphone outputs. The front and rear speakers may be muted by the user as a preference.

Interface 118 also processes requests from other interfaces for pre-recorded digital sounds stored in a SOUNDSGOOD

CALCAR 2734

US 6,587,759 B2

11

library in memory 115 and routes the requested sounds to the appropriate interfaces. In addition, interface 118 comprises the conventional voice synthesizer circuitry for providing voice messages to the appropriate interfaces.

FIGS. 3B and 3C jointly illustrate routine 300 for accessing, through AUTO DIRECTOR display interface 102a, a main menu to obtain operational instructions, maintenance procedures, safety measures, and other information about the automobile, collectively referred to as "Quick Tips". Routine 300 is stored in memory 115 and initiated when SETUP switch 205g in FIG. 2 is pressed. Instructed by routine 300, processor 105 at step 301 elicits a PIN from the user by displaying a screen of FIG. 4A through interface 102a. As shown in FIG. 4A, a video key-pad comprising numeral keys "1" through "9", and "*" and "#" keys are displayed on screen 209. In response, the user enters a sequence of numerals by touching the corresponding displayed keys, followed by the "190 " key.

It should be pointed out that in accordance with another aspect of the invention, when a displayed key or option is touched on the screen of AUTO DIRECTOR display interface 102a or multifunction display interface 102b, a tone pre-selected by the user from the SOUNDSGOOD library is generated through audio interface 118, indicating that the key or option has been touched on the screen. Advantageously, relying on the audio tone confirmation, as opposed to a visual confirmation, the user while driving can continually watch the road.

The user may alternatively enter the above numeral sequence using control panel 205 in a manner to be described. In any event, processor 105 then verifies at step 303 the PIN entry by comparing it with the user's pre-selected PIN. The latter is stored in memory 115, along with the user's preferences. In a standard way, the user is given a few chances to enter a correct PIN. Verification of the PIN entry identifies the user as a legitimate user. Thus, if the PIN entry is not valid, routine 300 comes to an end, as indicated at step 304.

Otherwise if the PIN entry is valid, processor 105 at step 305 causes interface 102a to display on screen 209 a "SELECT A FUNCTION" screen, which is illustrated in FIG. 4B. As shown in FIG. 4B, two options, namely, "NAVIGATION" and "QUICK TIPS", are displayed on screen 209. By default, NAVIGATION option 401 is highlighted yellow when the screen of FIG. 4B appears.

It should be pointed out that in this illustrative embodiment, a yellow highlight on an option indicates that the option is selected but not yet activated. Once a yellow highlighted option is activated, the option is highlighted blue. System 100 then performs according to the activated option.

Thus, in this instance, the user may activate the yellow highlighted NAVIGATION option by touching the option on screen 209 or by pressing ENTER switch 205b.

However, if QUICK TIPS option 403 is desired, the user may touch that option on screen 209, which would then be highlighted yellow. A second touch on the same option will change the highlight to blue, indicating the active status. As an alternative, the user may utilize knob 205d of FIG. 2 to select QUICK TIPS option 403 by first pushing the knob to the right. In response, processor 105 causes the yellow highlight to move from default NAVIGATION option 401 to QUICK TIPS option 403. The user can then select the QUICK TIPS option by pressing ENTER switch 205b. Upon selection, the yellow highlighted option will again turn blue.

Processor 105 at step 308 detects an activation of either NAVIGATION option 401 or QUICK TIPS option 403. If

12

NAVIGATION option 401 is activated, processor 105 at step 311 causes system 100 to enter into a navigation mode. In this mode, processor 105 causes navigational instructions to be displayed on screen 209 in a conventional manner. In providing the navigation instructions, the standard inertial guidance system connected to navigation interface 106d receives signals from a constellation of GPS satellites maintained and controlled by the U.S. Department of Defense. In response to these signals, the inertial guidance system identifies the location (in longitude and latitude) of the automobile. The system also detects the vehicle speed, and the direction in which the vehicle is headed. By accessing the map information stored in memory 115, the system is capable of visually and verbally providing the user with directions to a given destination through AUTO DIRECTOR display interface 102a and audio interface 118, respectively.

Otherwise if activation of QUICK TIPS option 403 is detected at step 308, processor 105 causes interface 102a to display an introduction screen on screen 209, as indicated at step 314. This introduction screen is illustrated in FIG. 5.

As shown in FIG. 5, system source identification, warning and instructional information appear on the introduction screen, along with two options, "MAIN MENU" and "READ ME". The default option in this instance is READ ME option 501 which is highlighted yellow. Processor 105 detects at step 317 whether MAIN MENU option 503 or READ ME option 501 is activated. If MAIN MENU option 503 is activated, routine 300 proceeds to step 340 to be described. Otherwise if READ ME option 501 is activated, routine 300 proceeds to step 320 where processor 105 causes a series of three screens to be displayed. The first screen of the series is a "MANUFACTURER" screen, which is illustrated in FIG. 6.

As shown in FIG. 6, a description of the QUICK TIPS system appears on the MANUFACTURER screen. If the text to be displayed exceeds one screen, which is the case here, scrolling options comprising scroll-up option 605 and scroll-down option 607 are provided. When option 605 is touched and activated on screen 209, additional text scrolls up one paragraph at a time. Option 607 performs an inverse function to option 605. Again, as an alternative, the user may maneuver PUSH TO SELECT knob 205d until the desired scroll option (or direction arrow) is highlighted yellow. The activation of the highlighted option is achieved by pressing ENTER switch 205b.

By default, displayed option 609 has the "AUTO VOICE" wording thereon and is highlighted blue as the MANUFAC-TURER screen comes on. Accordingly, a pre-recorded voice is activated by processor 105 through audio interface 118 to read the entire text associated with this screen without interruption, including the text which is not presently shown on screen 209 but otherwise shown upon scrolling. To alter the AUTO VOICE function, the user may touch option 609 on screen 209, or alternatively press ENTER switch 205b. By doing so, the "AUTO VOICE" wording on option 609 changes to "MANUAL VOICE", which is highlighted blue, indicating its active status.

In accordance with the MANUAL VOICE function, a pre-recorded voice reads the displayed text only, and stops reading until additional text is scrolled onto the screen. To silence the voice, the user may again touch option 609 on screen 209, or alternatively press ENTER switch 205b. By doing so, the "MANUAL VOICE" wording on option 609 changes to "VOICE OFF", and the voice is deactivated, with the option now highlighted yellow. The cycle of the AUTO VOICE, MANUAL VOICE and VOICE OFF functions can be repeated by successively touching option 609 or pressing switch 205b.

CALCAR 2735

US 6,587,759 B2

13

Other displayed options on the screen of FIG. 6 include PREVIOUS option 611 and NEXT option 613. As indicated at step 323, option 611 when selected causes routine 300 to return to step 314, where the introduction screen of FIG. 5 is again displayed. Otherwise, if option 613 is selected, routine 300 proceeds to step 326 in FIG. 3C where processor 105 causes a "SAFETY REMINDERS" screen to be displayed on screen 209. FIG. 7 illustrates such a screen.

As shown in FIG. 7, like the MANUFACTURER screen, the SAFETY REMINDERS screen includes option 609 displayed with the default wording "AUTO VOICE" thereon, PREVIOUS option 611, NEXT option 613, scroll-up option 605 and scroll-down option 607. This screen reminds the user of the safety features of the vehicle including, for example, air bags and seat belts. As indicated at step 329, option 611 when selected causes routine 300 to return to step 320 of FIG. 3B. Otherwise if option 613 is selected, routine 300 proceeds to step 332 where processor 105 causes a "THEFT PROTECTION FEATURES" screen to be displayed on LCD screen 209. FIG. 8 illustrates such a screen.

As shown in FIG. 8, the THEFT PROTECTION FEATURES screen similarly has thereon displayed options 605, 607, 609, 611 and 613. This screen describes to the user a theft-deterrent system including the anti-theft routine of FIG. 3A equipped in the vehicle. As indicated at step 335, option 611 when selected causes routine 300 to return to step 326. Otherwise if option 613 is selected, routine 300 proceeds to step 338 where processor 105 causes a "QUICK TIPS SET-UP" screen to be displayed on LCD screen 209. FIG. 9 illustrates such a screen.

As shown in FIG. 9, the QUICK TIPS SET-UP screen comprises two arrays of displayed options, denoted 901 and 903, respectively. Array 901 concerns the volume of the audio part of system 100. In this illustrative embodiment, the user may select the options in array 901 to respectively turn the volume off, to a "SOFT" level, to a medium level, and to a "LOUD" level. Array 903 concerns the display of LCD 119 of system 100. In this illustrative embodiment, the user may select the options in array 903 to respectively turn the display off, adjust it to a "DAY" setting, adjust it to a "NIGHT" setting, and have it automatically adjusted. When the QUICK TIPS SETUP screen comes on, by default, the volume is set to a medium level (i.e., the "MED" option in array 901 highlighted blue), and the display is set to be automatically adjusted (i.e., the "AUTO" option in array 903 highlighted blue).

Also shown in FIG. 9 is NEXT option 905. By selecting this option, routine 300 returns to step 340 of FIG. 3B where a "MAIN MENU" screen is displayed on LCD screen 209. After routine 300 is performed, the screen of FIG. 9 can be invoked at any time by pressing SETUP switch 205g to re-adjust the volume and the intensity of the LCD of system 100.

FIG. 10 illustrates the MAIN MENU screen. This screen comprises displayed options disposed in columns 1001, 1003, 1005, and 1007. For example, column 1001 includes DRIVER'S VIEW option 1001a, STEERING COLUMN CONTROLS option 1001b, LOCK option 1001c, DRIVING TIPS option 1001d, and INDEX option 1001e. It should also be noted that this screen can be invoked at any time by pressing MENU switch 205e.

When the MAIN MENU screen comes on, by default, DRIVER'S VIEW option 1001a is highlighted yellow, indicating that it is selected. However, the user may touch any other displayed option on screen 209 for re-selection. A

14

further touch on the yellow highlighted option changes its color to blue and activates same. Again, the user may alternatively maneuver PUSH TO SELECT knob 205d to re-select any other displayed option, followed by a depression of ENTER switch 205b to activate the selected option. Since LCD screen 209 is compact, the display area for each option on the MAIN MENU screen is generally small. As a result, selection and activation of an option by touching the option on the screen is susceptible to errors, especially when the vehicle is in motion. Thus, in this situation it may be preferable to achieve the same result using knob 205d and switch 205b, instead.

In addition, because of the small display area allocated to each option on the MAIN MENU screen, the wording on the option is brief and thus tends to be cryptic. In accordance with a feature of the invention, after a predetermined time (e.g., a few seconds) has elapsed from the option's being highlighted yellow, processor 105 causes a voice to be generated on speakers 127 to explain the purpose of the option before the user activates it. For example, after a predetermined delay from DRIVER'S VIEW option 1001a's being highlighted yellow, a voice is activated, stating the option name, followed by an explanation of the purpose of the option such as "To provide location of dash mounted components." Thus, this inventive feature affords a preview of the option before the user commits to it, thereby avoiding unnecessary backtracking.

Continuing the example, after hearing the preview of option 1001a, the user decides to select that option. In response, processor 105 causes a "DRIVER'S VIEW" screen to be displayed on screen 209. Such a screen is illustrated in FIG. 11. When the DRIVER'S VIEW screen appears, VOICE option 1101 is highlighted blue, indicating that voice announcements are active. To disable the voice announcements, the user may touch VOICE option 1101 on screen 209, or alternatively press ENTER switch 205b. VOICE option 1101 would be highlighted yellow when disabled.

As also shown in FIG. 11, a view of the interior of the automobile from the driver's perspective is provided. Underneath that view, DASH-MOUNTED CONTROLS option 1103, INSTRUMENT PANEL option 1105, AUDIO SYSTEM option 1107, CLIMATE CONTROLS option 1109 and PREVIOUS option 1111 are displayed. By default, DASH-MOUNTED CONTROLS option is highlighted yellow. However, the user in this example decides to select INSTRUMENT PANEL option 1105, instead. By touching option 1105 on screen 209, the option is highlighted yellow. If VOICE option is not disabled, after a predetermined delay, an announcement such as "To provide information on gauges, meters and warning lights" comes on to preview the purpose or content of option 1105. Options 1103, 1107, and 1109 are similarly programmed. In this instance, selecting PREVIOUS option 1111 enables the user to return to the MAIN MENU screen of FIG. 10.

Continuing the example, assuming that the user activates option 1105 after hearing the preview, in response processor 105 causes an "INSTRUMENT PANEL" screen to be displayed on screen 209. Such a screen is illustrated in FIG. 12. As shown in FIG. 12, the previous screen format is generally maintained in that it provides a view of the object (the instrument panel of the automobile in this instance) pertinent to the option which has been selected, along with displayed options for further selection thereunder. Based on the disclosure heretofore, the design and operation of these screens by now are apparent to a person skilled in the art, and become self-explanatory.

CALCAR 2736

EXHIBIT N
PAGE 150

US 6,587,759 B2

15

In accordance with another feature of the invention, individual elements on the instrument panel shown in FIG. 12 are labeled with numerals "1", "2", "3", "4" and "5" which correspond to option 1201a designated "1. TACHOMETER AND WARNING LIGHTS", option 1201b designated "2. TURN SIGNAL/HAZARD WARNING", option 1201c designated "3. SPEEDOMETER AND WARNING LIGHTS", option 1201e designated "4. ODOMETER & TRIP METERS/OUTSIDE TEMPERATURE", and option 1201f designated "5. FUEL/ TEMP GAUGE AND WARNING LIGHTS", respectively. As such, the function of the displayed options is two-fold. First, the wording on each displayed option informs the user of what the corresponding element(s) represents. Second, each displayed option is also for selection to obtain more information about the corresponding element(s). In addition, with the above voice preview feature, the user is further apprised of the purpose or content of the option before he/she commits to it. For example, TACHOMETER AND WARNING LIGHTS option 1201a corresponds to a voice preview such as "To provide information on tachometer and malfunction, maintenance required, low oil pressure and charging system failure indicators."

Assuming that the user in this instance activates option 1201a, in response processor 105 causes a "TACHOM-ETER AND WARNING LIGHTS" screen to be displayed on screen 209. Such a screen is illustrated in FIG. 13.

FIG. 13 shows VOICE option 1301 similar to option 1101 described before, TIP option 1303, a tachometer of the automobile denoted 1305, warning lights collectively denoted 1307, and options 1309a through 1309f in display segment 1311.

When TIP option 1303 appears on screen 209, it indicates that helpful hints or reminders are available upon selection thereof. In accordance with another feature of the invention, the appearance of TIP option 1303 is accompanied by the playing of a sound segment associated therewith. This sound segment may be pre-selected by the user from the SOUNDSGOOD library. After an adaptation period, the user would be able to rely on the familiar sound segment, without looking at the screen, to alert him/her of the availability of the TIP option.

Similarly, the user may pre-select another sound segment associated with warnings. Such a sound segment should connote urgency or even emergency as such warnings include, for example, engine overheating, an extremely low fuel level caution, GPS emergency information from navigation interface 106d, etc. Under control of processor 115, audio interface 118 preempts any on-going announcement and momentarily substitute therefor any such warning as soon as it occurs, which is preceded by the associated sound segment.

In any event, if option 1303 is selected in this instance, a voice comes on and utters a tip regarding tachometer 1305 such as "To prevent engine damage, do not drive with needle in red zone." This tip is also momentarily displayed on segment 1311 in lieu of options 1309a through 1309f.

Similar to the elements on the INSTRUMENT PANEL screen, tachometer 1305 and warning lights 1307 on this screen are individually labeled and correspond to options 1309a, 1309b, 1309c, 1309e and 1309f, respectively. Assuming in this example that MAINTENANCE REQUIRED option 1309c is activated, display segment 1311 would be replaced by new display segment 1411 illustrated in FIG. 14. As shown in FIG. 14, item 1401 indicates the subject selected, i.e., "MAINTENANCE

16

REQUIRED". Item 1403 explains what the MAINTE-NANCE REQUIRED warning light, when on, indicates. In this instance it states, "Maintenance required warning light comes on to indicate it is time for scheduled maintenance." PREVIOUS option 1405 enables the user to reactivate segment 1311 of FIG. 13.

Assuming further that at this point the user wants to learn about and also to program the air conditioning of the automobile, the user may access a "CLIMATE CONTROL" screen by successively pressing the PREVIOUS option to backtrack to the DRIVER'S VIEW screen of FIG. 11, where CLIMATE CONTROLS option 1109 is available. As a second alternative, the user may press MENU switch 205e to invoke the MAIN MENU screen of FIG. 10, where a "CLIMATE CONTROLS" option within column 1003 is available. A third alternative is provided in the event that the user cannot immediately relate "air conditioning" to the CLIMATE CONTROLS option. At the MAIN MENU screen of FIG. 10, the user may select Index option 1001e to be described. It suffices to know for now that this option allows the user to access the "CLIMATE CONTROL" screen using the term "air conditioning".

FIG. 15 illustrates the "CLIMATE CONTROL" screen. With the voice enabled, a first touch on any displayed option on screen 209 causes it to be highlighted yellow, indicating its selected status. A second touch causes it to be highlighted blue, indicating its active status. With the voice disabled, only one touch on any displayed option activates it.

As shown in FIG. 15, the MODE options include OFF option 1511, AUTO option 1513, A/C option 1515, HEAT option 1517, and SMART CLIMATE option 1519. It should be noted that only one of the MODE options can be active at a time. In this example, assuming that the voice is enabled, when OFF option 1151 is selected by a first touch, a voice explaining the option comes on, uttering "To disable climate control." A second touch on the same option would then shut the climate control off through climate control interface 108f.

When AUTO option 1513 is selected by a first touch, a voice comes on to explain the option, uttering "System automatically determines air-flow distribution and volume for optimum efficiency." A second touch on the same option enables the automatic control, followed by a voice utterance, "Set desired temperature." Temperature display 1535 then flashes with the current temperature setting, prompting the user to set a desired temperature in a manner to be described.

If the user neglects to set a temperature after a predeter-mined time, in accordance with another aspect of the invention, a temperature range is automatically maintained by processor 105 in response to the date and time informa-tion from clock interface 108j, and the GPS information from navigation interface 106d. Based on the date and time information, processor 105 knows what the current season (e.g., mid-winter versus mid-summer) and time of the day (e.g., night verse noon) are. Based on the GPS information, processor 105 knows the region (e.g., New England versus Southern California) where the vehicle is. Processor 105 looks up a table stored in memory 115 containing predeter-mined temperature ranges corresponding to different com-binations of the temporal and geographic parameters. It then prescribes an appropriate temperature range according to the table. This temperature range is updated by processor 105 periodically to reflect changes in the time of the day and the geographic location of the vehicle.

Similarly, A/C option 1515 and HEAT option 1517 respectively enable the user to activate air conditioning and heaters at a desired temperature or a default temperature range.

US 6,587,759 B2

17

SMART CLIMATE option 1519 is designed to allow the user to program the climate control for the next ride before he/she leaves the vehicle. When SMART CLIMATE option 1519 is selected by a first touch, a voice comes on to explain the option, uttering "To enable pre-heating or pre-cooling of vehicle." A second touch on the option activates the function, followed by a voice utterance, "Set desired temperature. Set desired time using fan speed arrows." Temperature display 1535 then flashes the current temperature setting, prompting the user to set a desired temperature. Similarly, fan speed display 1541 then flashes the current date, followed by current time, prompting the user to set the date and time that the user plans to re-enter the vehicle. Through climate control interface 108f, processor 105 determines whether the current level of power from the car battery and any back-up power sources is sufficient. If it is insufficient, a message such as "Fail to pre-condition vehicle temperature" is issued through audio interface 118 to notify the user of the noncompliance. Otherwise, when it is close to the re-entry time, processor 105 determines the start-up time to effect the pre-conditioning, depending on the temperature difference between the inside and outside of the vehicle at that time. Processor 105 would then cause a combination of heaters and/or heat pumps (not shown) connected to interface 108f to pre-condition the vehicle temperature. In order to avoid substantially draining the power, in this illustrative embodiment, the requested temperature would be maintained up to an hour after the set re-entry time.

The Air options in FIG. 15 include FRESH option 1521 and RECIRCULATED option 1523. Only one of these two options can be active at a time. When FRESH option 1521 is selected by a first touch on the option, a voice comes on to explain the selected option, uttering "To select outside air to circulate in vehicle." A second touch on the option activates the selection to ventilate the vehicle with outside air. Similarly, RECIRCULATED option 1523 allows the user to select the inside air for recirculation in the vehicle.

The VENT options in FIG. 15 include FLOOR option 1525, FLOOR/DASH option 1527, DASH option 1529, DEFROST option 1531 and FLOOR/DEFROST option 1533. Only one of these five options can be active at a time. When FLOOR option 1525 is selected by a first touch on the option, a voice comes on explaining the option, uttering "Main air distribution to floor." A second touch on the option directs an air flow toward the vehicle floor.

Similarly, FLOOR/DASH option 1527 enables the user to bifurcate the air flow between the floor and the dashboard. DASH option 1529 enables the user to direct the air flow from the dashboard. DEFROST option 1531 enables the user to direct the air flow toward the windshield and select fresh air if not selected. FLOOR/DEFROST option 1533 enables the user to bifurcate the air flow between the floor and windshield.

Temperature display 1535 displays the temperature selected by the user. Touching on up-arrow 1537 increases the selected temperature while touching on down-arrow 1539 decreases same. Continued touching on either up-arrow 1537 or down-arrow 1539 causes the temperature setting to change rapidly.

Similarly, fan speed display 1541 displays the fan speed (high, medium or low) selected by the user. Touching on up-arrow 1543 increases the selected fan speed while touching down-arrow 1539 decreases same.

The HEATERS options in FIG. 15 include SEAT option 1547, MIRROR option 1549, REAR WINDOW option

18

1551, STEERING WHEEL option 1553, and ALL option 1554. One or more of these options can be active at the same time. When SEAT option 1547 is selected by a first touch on the option, a voice comes on to explain the option, uttering "To enable seat heaters." A second touch on the option activates the seat heaters connected to climate control interface 108f.

Similarly, MIRROR option 1549 enables the user to activate outside mirror heaters. REAR WINDOW option 1551 enables the user to activate a rear window defroster. STEERING WHEEL option 1553 enables the user to activate a steering wheel heater. Finally, ALL option 1554 enables the user to activate all of the heaters simultaneously.

In personalizing the vehicle, preference interface 116 monitors any user adjustments to certain vehicle functions by comparing their current settings with the corresponding stored preferences in memory 115. Thus, for example, if the user changes any of the settings relating to the climate control such as the mode, vent, air, temperature, fan speed, etc. from its previous preferred setting, preference interface 116 causes a SAVE screen to appear on screen 209. This SAVE screen is illustrated in FIG. 16. As shown in FIG. 16, the user is prompted to save the change in the setting that he/she has just made. The user at this point may activate SAVE option 1601 to change the previous preferred setting. The SAVE screen thereafter disappears in favor of the previous screen. Otherwise, he/she may activate CLOSE option 1603 to close the SAVE screen, without storing the latest setting, which is then treated as a temporary setting. In the latter case, for example, a restart of the automobile will obliterate such a temporary setting, and reinstate the stored preferred setting.

Climate control screens can similarly be invoked by the front passenger and rear passengers on display interfaces 102c and 102d, respectively. Such screens provide similar MODE options including OFF, AUTO, A/C and HEAT options; and VENT options including LOWER VENT, UPPER VENT and LOWER/UPPER vent options. They also provide for temperature and fan speed adjustments for the respective localized areas. However, no save screen is provided.

Using INDEX option 1001e of FIG. 10 to look up information on and/or to control various items in the automobile will now be described. After option 1001e is activated, a DATA ENTRY screen illustrated in FIG. 17 is exhibited on screen 209. As shown in FIG. 17, a message "Enter Letter Or Item Name" appears to prompt the user for an entry of the name of the item of interest or its beginning letter. For this purpose, entry options for letters A through Z arranged in a grid format are provided in section 1701 for selection. In addition, DONE option 1703, when activated, indicates to system 100 that the entry is completed. Subdisplay 1705 is used to echo the user's entry to ensure its correctness.

In this illustration, the user enters "AIR CONDITIONING" as exhibited on subdisplay 1705. In response, an INDEX screen shown in FIG. 18 appears on display screen 209, with the search item name "AIR CONDITIONING" highlighted yellow. It should be noted that other item names such as "Anti-lock Brake System Indicator" are also shown, and they are in alphabetical order following "AIR CONDITIONING". This stems from the design of system 100 whereby the user may conveniently enter the beginning letter of the search item name only. In that case, a list of item names in alphabetical order with the first item name having the same beginning letter highlighted yellow. For instance,

CALCAR 2738

EXHIBIT N
PAGE 160

US 6,587,759 B2

**19**

if the user had only entered "A" for "AIR CONDITIONING", a list of item names starting with "A" in alphabetical order would appear on screen 209 (although in this instance it would be the same list as shown in FIG. 18 as "AIR CONDITIONING" is the first item with a letter "A" in system 100). If the user cannot locate the name of the item of interest in the list, he/she may scroll the screen using scroll-up option 1801 or scroll-down option 1803 to review additional item names after or before the listed item names. Alternatively, the user may select PREVIOUS option 1805 to return to the screen of FIG. 17 to enter the complete item name.

In any event, after the user locates the item name on the INDEX screen, the user may then touch the item name to access information on that item. To that end, a look-up table is stored in memory 115. FIG. 19 illustrates such a look-up table, wherein left column 1901 lists each item name in alphabetical order in the index, and right column 1903 lists the corresponding instruction for processor 105 to carry out to access information on that item. For example, according to row 1905 of the table, the selection and activation of the item name "AIR CONDITIONING" causes processor 105 to connect the user to the CLIMATE CONTROL screen of FIG. 15 previously described.

The foregoing merely illustrates the principles of the invention. It will thus be appreciated that those skilled in the art will be able to devise numerous other systems which embody the principles of the invention and are thus within its spirit and scope.

For example, based on the disclosure heretofore, it is apparent that through system 100, the user can run diagnostics on selected parts of the automobile by voice command or touch-screen control.

In addition, in the disclosed embodiment, through system 100, the user is able to program the climate control for the next ride before he/she leaves the vehicle. It will be appreciated that the user will be able to achieve same remotely ahead of time via telecommunication means. For example, processor 105 may be programmed to accept climate control commands through phone interface 106a. In that instance, the user can call from anywhere to establish a phone connection with phone interface 106a using a predetermined phone number, through which the user communicates the commands to climate control interface 108f to program the climate control. Through the phone connection, the user may be provided with climate control options described above in a synthesized voice. The user may activate one or more of such options by pressing a predetermined touch-tone key on the telephone keypad corresponding to a "yes" or "no" response. Similarly, the user may achieve the relevant temperature and/or time settings by pressing the touch-tone keys corresponding to the numerals indicative thereof. Of course, telecommunication means other than the telephone including a radio frequency (RF) transmitter may also be used to communicate the climate control commands from a remote area.

In addition, in the disclosed embodiment, the user may access different screens provided by AUTO DIRECTOR display interface 102a to learn about and control certain vehicle functions. It will be appreciated that a person skilled in the art will develop a demonstration program wherein a series of such screens will be automatically presented to a user in a predetermined sequence. The presentation may include commentaries, and highlights on selected options displayed on each screen. Furthermore, the presentation may be coupled with the showing of actual vehicle functions. For

**20**

example, in demonstrating the climate control screen of FIG. 15, while the function of a highlighted VENT option (e.g., Floor, Floor/Dash, Dash, Defrost or Floor/Defrost) is explained, it is activated so that the user in the automobile can feel an actual air flow from the corresponding direction. The above demonstration program may be invoked using a PIN provided by the automobile manufacturer. The program may run continually while the automobile is shown in a showroom, or may be invoked by the user occasionally to obtain relevant information.

Further, in the disclosed embodiment, the MAINTENANCE REQUIRED warning light comes on when it is time for scheduled maintenance. In accordance with another aspect of the invention, the maintenance is scheduled by system 100 according to the cumulative time of the tachometer reading above a predetermined RPM value. Such cumulative time reflects the extent of the engine wear, and if it exceeds a predetermined length of time without maintenance, the engine performance would degrade substantially. In measuring the cumulative time in question, a conventional comparator (not shown) is employed in system 100 to compare the instantaneous tachometer reading (provided by engine control interface 112c) with the predetermined RPM value. Each time when the tachometer reading exceeds the predetermined value, processor 105 is interrupted to register the length of such an occurrence. The latter is added to a running sum to update the cumulative time in question. This cumulative time may be displayed on instrument panel display interface 102e, along with the tachometer reading and the MAINTENANCE REQUIRED warning indicator. A second conventional comparator (not shown) is employed in system 100 to compare the cumulative time with the above predetermined time length. As soon as the cumulative time exceeds the predetermined length, processor 105 is interrupted and causes the MAINTENANCE REQUIRED warning light to come on, indicating that it is time for maintenance.

Still further, system 100 as described is highly adaptable in adjusting to new system requirements, and capable of "learning" new automobile features to be introduced into the system. Such learning may involve a modification or an upgrade in the system software stored in memory 115.

Moreover, other features of system 100 may include capabilities of communications with a third party remote from the vehicle. For example, system 100 may be programmed to transmit signals representing data on the current speed of the vehicle and its VIN receivable by a radar system, thus enabling the third party to monitor its speed. Furthermore, system 100 may be programmed by the third party to disable and subsequently enable the vehicle upon successful verification of a PIN pre-assigned to the third party. To that end, system 100 is capable of receiving remote transmission of the PIN, followed by the disable or enable code. The transmission may be encrypted for security reasons. Furthermore, more than one PIN may be used for different purposes. For example, a PIN may be assigned to a law enforcement agency to disable the vehicle because of a suspension of a license, or to temporarily disable the vehicle when the driver is intoxicated. Another PIN may be assigned to an environmental protection agency to disable the vehicle for failing to meet the emission requirements. Yet another PIN may be assigned to the vehicle owner to disable the vehicle when parked, thereby reducing the risk of a car theft. The disabling of the vehicle involves cutting off its gas, putting on its anti-lock brakes, etc.

Further, system 100 is capable of receiving a low-frequency, low-power broadcast covering an area of a lim-

CALCAR 2739

EXHIBIT N
PAGE 101

US 6,587,759 B2

21

ited radius, referred to as a "Cell". The broadcast may provide electronic GPS map and Yellow Page type information pertaining to the cell. This information, when received, may be downloaded onto AUTO DIRECTOR display interface 102a or multifunction display interface 102b. Such information includes a local directory indicating locations of nearby gas stations, restaurants and other facilities on the GPS map, with respect to the current location of the automobile. The local directory may be formatted in the form of "web pages" featuring the local businesses, and include additional information such as business hours, telephone numbers, and information on products and services provided by such businesses.

The above broadcast may also provide local weather information sponsored by a civic group or commercial entity. In the case of civic group sponsorship, the local civic events may be posted alongside the weather information, and in the case of commercial sponsorship, advertisements may be posted instead. Of course, as the automobile moves from cell to cell, the contents of the broadcast change accordingly.

In addition, while the radio in the automobile is tuned to a particular radio station, system 100 is also capable of receiving any electronic files broadcast from that radio station, along with the radio program. These electronic files, which may be in the form of web pages, can be downloaded onto the system. The system user may then scroll the pages to learn such information as program listings and coming events sponsored by the radio station.

Moreover, in the disclosed embodiment, system 100 is illustratively used in an automobile. It will be appreciated that a person skilled in the art may also employ the inventive system in another type of vehicle such as a boat, an airplane, etc.

Finally, although information and control system 100, as disclosed, is embodied in the form of various discrete functional blocks, the system could equally well be embodied in an arrangement in which the functions of any one or more of those blocks or indeed, all of the functions thereof, are realized, for example, by one or more appropriately programmed processors or devices.

We claim:

1. A system for use in a vehicle comprising:
a display element;
an output element for providing information concerning at least one device in the vehicle;
a processor for identifying a notable condition of the vehicle;
a mechanism for providing an alert indicating the notable condition, a provision of the information concerning the at least one device being interrupted by the alert; and
an interface for selecting an option, which is provided on the display element in response to the notable condition, thereby prompting a user to select the option to obtain selected information to cope with the notable condition.

2. The system claim 1 wherein the alert is provided via audio media.

3. The system of claim 2 wherein the alert comprises a preselected audio signal.

4. The system of claim 1 wherein the at least one device includes a fuel gauge.

5. The system of claim 1 wherein the at least one device includes a speedometer.

6. The system of claim 1 wherein the at least one device includes an odometer.

22

7. The system of claim 1 wherein the at least one device includes a tachometer.

8. The system of claim 1 wherein the at least one device includes a temperature gauge.

9. The system of claim 1 wherein the at least one device includes a climate control.

10. The system of claim 1 wherein the notable condition concerns engine overheating in the vehicle.

11. The system of claim 1 wherein the notable condition concerns a low fuel level in the vehicle.

12. The system of claim 1 wherein the selected information is provided to the user via audio media.

13. The system of claim 1 wherein the selected information is provided to the user textually.

14. The system of claim 1 wherein the output element includes the display element.

15. A method for use in a system in a vehicle, the system including a display element, the method comprising:
providing information concerning at least one device in the vehicle;
identifying a notable condition of the vehicle;
providing an alert indicating the notable condition, a provision of the information concerning the at least one device being interrupted by the alert; and
providing an option on the display element in response to the notable condition, thereby prompting a user to select the option to obtain information to cope with the notable condition.

16. The method claim 15 therein the alert is provided via audio media.

17. The method of claim 16 wherein the alert comprises a preselected audio signal.

18. The method of claim 15 wherein the at least one device includes a fuel gauge.

19. The method of claim 15 wherein the at least one device includes a speedometer.

20. The method of claim 15 wherein the at least one device includes an odometer.

21. The method of claim 15 wherein the at least one device includes a tachometer.

22. The method of claim 15 the at least one device includes a temperature gauge.

23. The method of claim 15 wherein the at least one device includes a climate control.

24. The method of claim 15 wherein the notable condition concerns engine overheating in the vehicle.

25. The method of claim 15 wherein the notable condition concerns a low fuel level in vehicle.

26. The method of claim 15 wherein the selected information is provided to the user via audio media.

27. The method of claim 15 wherein the selected information is provided to the user textually.

28. Software including machine readable instructions stored in a tangible medium for performing a process, the process comprising:
providing information concerning at least one device in the vehicle;
identifying a notable condition of the vehicle;
providing an alert indicating the notable condition, a provision of the information concerning the at least one device being interrupted by the alert; and
providing an option on the display element in response to the notable condition, thereby prompting a user to select the option to obtain information to cope with the notable condition.

*  *  *  *  *

CALCAR 2740

EXHIBIT N
PAGE 102

**EXHIBIT O**

US006542795B2

(12) **United States Patent**
Obradovich et al.

(10) Patent No.: **US 6,542,795 B2**
(45) Date of Patent: **\*Apr. 1, 2003**

(54) **TECHNIQUE FOR PROVIDING INFORMATION AND CONTROL RESPONSIVE TO A REQUEST IN A VEHICLE**

(75) Inventors: **Michael L. Obradovich**, San Clemente, CA (US); **Michael L. Kent**, Garden Grove, CA (US); **John G. Dinkel**, Irvine, CA (US)

(73) Assignee: **American Calcar Inc.**, Wilmington, DE (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **10/176,444**

(22) Filed: **Jun. 20, 2002**

(65) **Prior Publication Data**

US 2002/0156555 A1 Oct. 24, 2002

**Related U.S. Application Data**

(60) Continuation of application No. 09/792,351, filed on Feb. 23, 2001, now Pat. No. 6,438,465, which is a continuation of application No. 09/401,038, filed on Sep. 21, 1999, now Pat. No. 6,233,506, which is a division of application No. 08/789,934, filed on Jan. 28, 1997, now Pat. No. 6,009,355.

(51) Int. Cl.[7] .......................... G05D 1/00; G06D 7/00
(52) U.S. Cl. .......................... 701/1; 701/29; 701/35
(58) Field of Search ................................ 701/1, 36, 37, 701/29, 35; 345/839, 810, 530, 803; 340/436, 459, 521, 410

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,582,926 A    6/1971  Hassan
4,031,363 A    6/1977  Freeman et al. .............. 73/114

4,291,749 A    9/1981  Ootsuka et al. .............. 165/202
4,314,232 A    2/1982  Tsunoda ...................... 340/460
4,337,821 A    7/1982  Saito ......................... 165/200
4,401,848 A    8/1983  Tsunoda ...................... 704/274
4,407,564 A   10/1983  Ellis ............................ 345/7
4,419,730 A   12/1983  Ito et al. ...................... 701/36
4,441,405 A    4/1984  Takeuchi ...................... 454/75
4,484,302 A   11/1984  Cason et al. ................. 345/802
4,536,739 A    8/1985  Nobuta ..................... 340/323 R
4,582,389 A    4/1986  Wood et al. ................. 359/14
4,636,782 A    1/1987  Nakamura et al. ............. 345/7
4,731,769 A    3/1988  Schaefer et al. ............... 369/6
4,740,779 A    4/1988  Cleary et al. .................. 345/7
4,740,780 A    4/1988  Brown et al. .................. 345/7
4,752,824 A    6/1988  Moore ......................... 345/7
4,795,223 A    1/1989  Moss .......................... 345/7
4,811,240 A    3/1989  Ballou et al. ............... 345/763
4,818,048 A    4/1989  Moss .......................... 345/7
4,827,520 A    5/1989  Zeinstra ...................... 701/1
4,837,551 A    6/1989  Iino ........................... 345/7

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

DE        4431070      3/1996

OTHER PUBLICATIONS

M. Krebs, "Cars That Tell You Where to Go," *The New York Times*, Dec. 15, 1996, section 11, p. 1.

(List continued on next page.)

*Primary Examiner*—Jacques H. Louis-Jacques
(74) *Attorney, Agent, or Firm*—Kaye Scholer LLP

(57) **ABSTRACT**

In a multimedia information and control system for use in an automobile, at least one interface is employed which enables a user to access information concerning the automobile and control vehicle functions in an efficient manner. The user may select one of a plurality of displayed options on a screen of such an interface. Through audio, video and/or text media, the user is provided with information concerning the selected option and the vehicle function corresponding thereto. Having been so informed, the user may activate the selected option to control the corresponding vehicle function.

**20 Claims, 15 Drawing Sheets**



CALCAR 2605

EXHIBIT 2
PAGE 163

US 6,542,795 B2

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,876,594 A | 10/1989 | Schiffman | 345/7 |
| 4,891,650 A | 1/1990 | Sheffer | 342/457 |
| 4,914,705 A | 4/1990 | Nigawara | 704/270 |
| 4,988,976 A | 1/1991 | Lu | 345/7 |
| 4,995,258 A | 2/1991 | Frank | 73/118.2 |
| 4,996,959 A | 3/1991 | Akimoto | 73/118.2 |
| 5,006,829 A | 4/1991 | Miyamoto et al. | 340/459 |
| 5,043,736 A | 8/1991 | Darnell et al. | 342/357.1 |
| 5,051,735 A | 9/1991 | Furukawa | 345/7 |
| 5,055,851 A | 10/1991 | Sheffer | 342/457 |
| 5,070,323 A | 12/1991 | Iino et al. | 345/7 |
| 5,119,504 A | 6/1992 | Durboraw, III | 455/572 |
| 5,198,797 A | 3/1993 | Daidoji | 345/7 |
| 5,203,499 A | 4/1993 | Knittel | 237/2 A |
| 5,208,756 A | 5/1993 | Song | 455/456 |
| 5,214,413 A | 5/1993 | Okabayashi et al. | 345/7 |
| 5,214,707 A | 5/1993 | Fujimoto et al. | 704/275 |
| 5,235,633 A | 8/1993 | Dennison et al. | 455/456 |
| 5,257,190 A | 10/1993 | Crane | 701/35 |
| 5,267,159 A | 11/1993 | O'Neall | 701/35 |
| 5,274,560 A | 12/1993 | LaRue | 701/202 |
| 5,278,532 A | 1/1994 | Hegg, et al. | 345/7 |
| 5,293,115 A | 3/1994 | Swanson | 324/110 |
| 5,299,132 A | 3/1994 | Wortham | 455/457 |
| 5,334,974 A | 8/1994 | Simms et al. | 340/990 |
| 5,335,276 A | 8/1994 | Thompson et al. | 380/21 |
| 5,335,743 A | 8/1994 | Gillbrand et al. | 180/178 |
| 5,345,817 A | 9/1994 | Grenn et al. | 73/117.3 |
| 5,351,041 A | 9/1994 | Ikata et al. | 340/825.24 |
| 5,361,165 A | 11/1994 | Stringfellow et al. | 359/631 |
| 5,371,510 A | 12/1994 | Miyauchi et al. | 345/7 |
| 5,400,045 A | 3/1995 | Aoki | 345/7 |
| 5,404,443 A | 4/1995 | Hirata | 340/327 |
| 5,414,439 A | 5/1995 | Groves et al. | 345/7 |
| 5,416,318 A | 5/1995 | Hegyi | 250/226 |
| 5,418,537 A | 5/1995 | Bird | 342/357.03 |
| 5,422,565 A | 6/1995 | Swanson | 324/110 |
| 5,432,904 A | 7/1995 | Wong | 705/4 |
| 5,440,428 A | 8/1995 | Hegg et al. | 359/630 |
| 5,442,553 A | 8/1995 | Parillo | 455/420 |
| 5,450,321 A | 9/1995 | Crane | 701/35 |
| 5,450,329 A | 9/1995 | Tanner | 701/213 |
| 5,450,613 A | 9/1995 | Takahara et al. | 455/517 |
| 5,475,399 A | 12/1995 | Borsuk | 345/130 |
| 5,479,482 A | 12/1995 | Grimes | 345/7 |
| 5,483,632 A | 1/1996 | Kuwamoto et al. | 345/338 |
| 5,486,840 A | 1/1996 | Borrego et al. | 345/7 |
| 5,493,658 A | 2/1996 | Chiang et al. | 345/336 |
| 5,497,149 A | 3/1996 | Fast | 340/988 |
| 5,497,271 A | 3/1996 | Mulvanny et al. | 345/7 |
| 5,497,339 A | 3/1996 | Bernard | 708/300 |
| 5,504,622 A | 4/1996 | Oikawa et al. | 359/630 |
| 5,506,595 A | 4/1996 | Fukano et al. | 345/7 |
| 5,511,724 A | 4/1996 | Freiberger et al. | 236/49.3 |
| 5,515,285 A | 5/1996 | Garrett, Sr. et al. | 701/35 |
| 5,515,419 A | 5/1996 | Sheffer | 455/456 |
| 5,519,403 A | 5/1996 | Bickley et al. | 342/352 |
| 5,519,410 A | 5/1996 | Smalanskas et al. | 342/352 |
| 5,523,559 A | 6/1996 | Swanson | 250/222.1 |
| 5,525,977 A | 6/1996 | Suman | 340/825.25 |
| 5,528,248 A | 6/1996 | Steiner et al. | 342/357.06 |
| 5,528,496 A | 6/1996 | Brauer et al. | 701/32 |
| 5,534,888 A | 7/1996 | Lebby et al. | 345/121 |
| 5,539,869 A | 7/1996 | Spoto et al. | 345/336 |
| 5,547,125 A | 8/1996 | Hennessee et al. | 236/49.3 |
| 5,550,551 A | 8/1996 | Alesio | 342/457 |
| 5,553,661 A | 9/1996 | Beyerlein et al. | 165/203 |
| 5,555,172 A | 9/1996 | Potter | 455/456 |
| 5,555,286 A | 9/1996 | Tendler | 455/404 |
| 5,555,502 A | 9/1996 | Opel | 701/36 |
| 5,559,520 A | 9/1996 | Barzegar et al. | 342/357.1 |
| 5,572,204 A | 11/1996 | Timm et al. | 340/988 |
| 5,576,724 A | 11/1996 | Fukatsu et al. | 345/7 |
| 5,579,535 A | 11/1996 | Orlen et al. | 345/7 |
| 5,587,715 A | 12/1996 | Lewis | 342/357.03 |
| 5,627,547 A | 5/1997 | Ramaswamy et al. | 342/357.08 |
| 5,631,642 A | 5/1997 | Brockelsby et al. | 340/993 |
| 5,638,305 A | 6/1997 | Kobayashi et al. | 364/528.15 |
| 5,648,769 A | 7/1997 | Sato et al. | 340/988 |
| 5,650,929 A | 7/1997 | Potter et al. | 455/456 |
| 5,653,386 A | 8/1997 | Hennessee et al. | 237/12.3 |
| 5,654,715 A | 8/1997 | Hayashikura et al. | 342/70 |
| 5,657,233 A | 8/1997 | Cherrington et al. | 705/400 |
| 5,666,102 A | 9/1997 | Lahiff | 340/461 |
| 5,669,061 A | 9/1997 | Schipper | 455/429 |
| 5,670,953 A | 9/1997 | Satoh et al. | 340/901 |
| 5,673,305 A | 9/1997 | Ross | 455/517 |
| 5,689,252 A | 11/1997 | Ayanoglu et al. | 340/991 |
| 5,691,695 A | 11/1997 | Lahiff | 340/461 |
| 5,702,165 A | 12/1997 | Koibuchi | 303/146 |
| 5,712,640 A | 1/1998 | Andou et al. | 342/70 |
| 5,717,595 A | 2/1998 | Cherrington et al. | 705/400 |
| 5,734,973 A | 3/1998 | Honda | 455/186.1 |
| 5,752,754 A | 5/1998 | Amitani et al. | 303/199 |
| 5,758,311 A | 5/1998 | Tsuji et al. | 701/111 |
| 5,767,788 A | 6/1998 | Ness | 340/825.49 |
| 5,777,394 A | 7/1998 | Arold | 307/10.1 |
| 5,777,580 A | 7/1998 | Janky et al. | 342/457 |
| 5,803,043 A * | 9/1998 | Bayron et al. | 123/335 |
| 5,825,283 A | 10/1998 | Camhi | 340/438 |
| 5,874,889 A | 2/1999 | Higdon et al. | 340/426 |
| 5,898,391 A | 4/1999 | Jefferies et al. | 340/988 |
| 5,900,814 A | 5/1999 | Stern | 340/539 |
| 5,917,405 A | 6/1999 | Joao | 340/426 |
| 5,919,239 A | 7/1999 | Fraker et al. | 701/35 |
| 6,002,334 A | 12/1999 | Dvorak | 340/568.1 |
| 6,037,991 A | 3/2000 | Thro et al. | 725/116 |
| 6,011,505 A | 8/2000 | Wagener | 701/1 |

## OTHER PUBLICATIONS

L. Kraar, "Knowledge Engineering," *Fortune*, Oct. 28, 1996, pp. 163–164.

S. Heuchert, "Eyes Forward: An ergonomic solution to driver information overload," *Society of Automobile Engineering*, Sep. 1996, pp. 27–31.

J. Braunstein, "Airbag Technology Takes Off," *Automotive & Transportation Interiors*, Aug. 1996, p. 16.

I. Adcock, "No Longer Square," *Automotive & Transportation Interiors*, Aug. 1996, pp. 38–40.

* cited by examiner

CALCAR 2606

EXHIBIT O
PAGE 104



FIG. 1

CALCAR 2607

EXHIBIT O
PAGE 173



FIG. 2



FIG. 3A

CALCAR 2609

EXHIBIT D
PAGE 164



FIG. 3B



FIG. 3C

EXHIBIT O
PAGE 161

209



FIG. 4A

209



FIG. 4B

CALCAR 2612

EXHIBIT O
PAGE 170

**U.S. Patent**     Apr. 1, 2003     Sheet 7 of 15     US 6,542,795 B2



FIG. 5



FIG. 6

CALCAR 2613

EXHIBIT O
PAGE 171



FIG. 7

FIG. 8

EXHIBIT O
PAGE 172



FIG. 9



FIG. 10



FIG. 11

EXHIBIT O
PAGE 174



FIG. 12

EXHIBIT O
PAGE 173



FIG. 13



FIG. 14

EXHIBIT O
PAGE 176



FIG. 15



FIG. 16

CALCAR 2619

EXHIBIT O
PAGE 177



FIG. 17



FIG. 18

CALCAR 2620

EXHIBIT O
PAGE 186

| 1901 | 1903 |
|---|---|
| AIR CONDITIONING | LINK TO CLIMATE CONTROL SCREEN OF FIG. 15 |
| ANTI-LOCK BRAKE SYSTEM INDICATOR | LINK TO WARNING LIGHT OPTION #4 ON FUEL/TEMP SCREEN (NOT SHOWN) |
| AUTOMATIC CLIMATE CONTROL | LINK TO CLIMATE CONTROL SCREEN OF FIG. 15 |
| • • • | • • • |
| CHARGING SYSTEM FAILURE INDICATOR | LINK TO CHARGING SYSTEM FAILURE OPTION 1309f (FIG. 13) |
| CLIMATE CONTROL SYSTEM | LINK TO CLIMATE CONTROL SCREEN OF FIG. 15 |
| COOLING | LINK TO CLIMATE CONTROL SCREEN OF FIG. 15 |
| CRUISE CONTROL INDICATOR | LINK TO WARNING LIGHT OPTION #2 ON SPEEDOMETER SCREEN (NOT SHOWN) |
| DEFOG/DEFROST | LINK TO CLIMATE CONTROL SCREEN OF FIG. 15 |
| DOOR AJAR INDICATOR | LINK TO WARNING LIGHT OPTION #7 ON FUEL/TEMP SCREEN (NOT SHOWN) |
| DIRECTIONAL SIGNALS INDICATOR | LINK TO TURN SIGNAL/HAZARD WARNING OPTION 1201b (FIG. 12) |
| • • • | • • • |

1905

FIG. 19

EXHIBIT 0
PAGE 179

US 6,542,795 B2

## 1

## TECHNIQUE FOR PROVIDING INFORMATION AND CONTROL RESPONSIVE TO A REQUEST IN A VEHICLE

This application is a continuation of application Ser. No. 09/792,351 filed on Feb. 23, 2001, now U.S. Pat. No. 6,438,465, which is a continuation of application Ser. No. 09/401,038 filed on Sep. 21, 1999 now U.S. Pat. No. 6,233,506, which is a division of application Ser. No. 08/789,934 filed on Jan. 28, 1997, now U.S. Pat. No. 6,009,355.

### FIELD OF THE INVENTION

The invention relates generally to information and control systems and, more particularly, to a system for use in an automobile which facilitates a user's retrieval and/or dissemination of information, and control of vehicle functions.

### BACKGROUND OF THE INVENTION

Information is vital to day-to-day activities. With no access to information, people cannot function efficiently in this society, and their lives and financial well-being are put in jeopardy. People want to be well-informed, so much so that when they are travelling in automobiles, they tune into local radio stations to listen to news, weather forecasts and traffic conditions. For that matter, some automobiles are equipped with audiovisual systems including television (TV) receivers. One such system is disclosed in U.S. Pat. No. 5,404,443 issued to Hirata. The Hirata system provides audiovisual information in a number of modes including a TV mode, which may be selected by control switches disposed on the periphery of a display.

Automobile users like to be continually updated with information affecting their travel plans such as weather and traffic conditions because of its fast changing nature. Automobile users who are traveling also like to continually keep in touch with their homes and offices, and to confirm appointments and hotel reservations so that they can adjust their itineraries accordingly. To that end, cellular mobile telephones were introduced to enable automobile users to conduct business and contact their families while they are traveling.

In addition, local map information is important to automobile travelers moving from one locale to another. As such, navigation systems were developed to help reach their destinations in an unfamiliar milieu. One such vehicle navigation system is disclosed in U.S. Pat. No. 5,274,560 issued to LaRue. The disclosed system is based on artificial intelligence and provides a driver with directions via a voice interface. The system is built upon an optical disk player which can be used for entertainment as well. Digitized maps, compressed voice records and computer programs are stored on an optical disk compatible with the disk player. After a destination point is identified, the disclosed system finds the best route from the digitized maps and guides the driver therethrough via the voice interface, taking into account the latest traffic conditions received by an FM receiver to avoid congestion.

Recently, navigation systems based on military global positioning system (GPS) technology have emerged. One such navigation system is commercially available as an option for the latest model of the ACURA 3.5 RL automobile. This ACURA navigation system receives signals from a constellation of satellites which is part of the GPS. In response to these signals, the navigation system pinpoints the automobile's location (in latitude and longitude). It also detects the automobile's speed and direction. With geographic information stored on a hard disk in an onboard computer, the navigation system is capable of verbally and visually communicating to the user instructions for reaching the destination.

In addition to the above techniques for communications with automobile users, a technique for disseminating information regarding the automobiles themselves is disclosed in U.S. Pat. No. 5,442,553 issued to Parillo. The disclosed system is a vehicle diagnostic and software upgrade system. In this system, sensors are provided in the vehicle to generate dynamic data relating to various mechanical controls and the engine of the vehicle, including engine R.P.M., fuel/air mixture, emissions and pollution content information. A microprocessor in the vehicle has access to selectable program parameters affecting the functioning of the mechanical controls. The microprocessor collects and transmits the dynamic data to a remote diagnostic station periodically or upon its request. In response, the remote station sends, to the vehicle, signals indicative of any changes in its software and/or program parameters. The microprocessor accordingly causes the changes to be made in the vehicle based on the received signals.

Besides the communication capabilities described above, an automobile has many accessories and user control elements such as lights, wipers, a clock, temperature control, cruise control, seat adjustment control, mirror adjustment control, and an anti-theft system. A technique for centralizing the command of the individual control elements is disclosed in U.S. Pat. No. 5,555,502 issued to Opel. The disclosed system includes a centralized control panel on a steering wheel which, together with a display, is utilized to control the electronic components of the automobile. The display is positioned in the area of the driver's sun visor. After the driver presses one of the buttons on the control panel corresponding to a desired electronic component, a menu is displayed so that the driver is able to select items from the menu to program the component. The selection is accomplished by pressing specified buttons on the panel.

In addition, a technique for controlling vehicle accessories via voice command is disclosed in U.S. Pat. No. 4,827,520 issued to Zeinstra. In accordance with this technique, control functions of each accessory are formatted in a summary page for display on a screen, which is scanned by infrared light to sense any touching thereon. By uttering any of the displayed functions on the summary page, preceded by either a specified keyword or an actuation of a push-to-talk switch on a steering wheel, a more detailed subpage of the selected function is displayed for further selection by voice. As an alternative to the voice command, the selection can also be accomplished by touching the displayed function on the screen.

Voice command and touch screen techniques are frequently mentioned in prior art references in controlling car accessories. In particular, U.S. Pat. No. 5,214,707 issued to Fujimoto et al. discloses a system for voice-controlling equipment inside a vehicle, including microphones capable of discriminating voice commands as to whether they are generated at the driver side or at the assistant side of the vehicle in a noisy environment.

### SUMMARY OF THE INVENTION

It is celebratory that technology advances at lightning speed. However, many people are left behind the technological frontier, and to some extent develop "technophobia".

CALCAR 2622

EXHIBIT O
PAGE 100

US 6,542,795 B2

3

Some of them have even given up this technological race, which is confirmed by the blinking "12:00" display on the clocks of many video cassette recorders (VCRs) being used.

Similarly, it is fantastic that automobiles nowadays include many advanced accessories such as audiovisual systems, anti-theft systems, anti-lock brake systems, climate control, and cruise control which embrace the latest technologies. However, of all these accessories, many automobile users only know how to operate the headlights and windshield wipers, and regard the rest as nuisance. That is, the users pay for numerous accessories which they do not use, resulting in much consumer waste. We have recognized that such non-use is principally attributed to an inefficient distribution of operating knowledge of the automobile and, in particular, its accessories.

Specifically, when automobile users presently want to learn about certain aspects of an automobile, they need to consult an owner's manual which could have been lost or misplaced when they need it the most. In addition, the manual is unpopular because many users simply want to avoid reading any written material, and find it intimidating as it oftentimes is filled with incomprehensible technical jargon.

We have further recognized that even with the operating knowledge, many users are overwhelmed and confused with the large number of knobs, switches and buttons used to control the individual vehicle parts and accessories.

Accordingly, it is an object of the invention to design an information and control system for use inside an automobile with the user in mind. The user is afforded a centralized control which may be used in lieu of the knobs, switches and buttons to operate the vehicle parts and accessories. In accordance with the invention, the centralized control is intimately tied to an information system such that the user is able to efficiently access information about the functions and operations of such parts and accessories, and in a synergistic manner apply that information to operate same, using the centralized control.

It is another object of the invention that the access to the information is intuitive and direct so that the user can obtain the relevant information in a few self-explanatory steps. To that end, the invention embraces a multimedia approach where audio and video media are added to the traditional text media to convey information. The additional media increases the dimensions of both the user's comprehension of the information and the user's interaction with the automobile. Moreover, the information access is driven by a multilevel menu based on an intuitive model of taxonomy where information is organized in a minimal number of levels of subject matter from general to specific. The above integration of the multimedia approach with the multilevel menu approach presents an effective way of retrieving information in the automobile. Advantageously, with the invention, the user would not be distracted or overburdened by irrelevant information in the course of an information retrieval, which is conducive to a safe driving environment.

In the preferred embodiment, when the user wants to access information about a given part or accessory of the automobile, the user is presented with options on a display screen. Each option is associated with a respective one of different parts or accessories of the automobile. The user is able to select through the interface one of the options, associated with the given automobile part or accessory. The option, when selected, is highlighted in a first color, for example, yellow. A voice is then generated by the inventive system to explain the purpose or the content of the selected

4

option before the user commits to it. Having been so informed, the user may then activate the selected option in retrieving the information of interest. The activated option is highlighted in a second color, e.g., blue, to indicate its active status. The retrieved information is presented to the user both in text and in voice.

BRIEF DESCRIPTION OF THE DRAWING

Further objects, features and advantages of the invention will become apparent from the following detailed description taken in conjunction with the accompanying drawing showing an illustrative embodiment of the invention, in which:

FIG. 1 is a block diagram of an automobile information and control system in accordance with the invention;

FIG. 2 illustrates a control panel and a display interface for a user to interact with the system of FIG. 1;

FIG. 3A illustrates a flow chart depicting the steps of an anti-car-theft routine used in the system of FIG. 1;

FIGS. 3B and 3C jointly illustrate a flow chart depicting the steps of a routine for presenting various screens to the user in the system interaction;

FIG. 4A illustrates a screen for eliciting a personal identification number (PIN) from the system user;

FIG. 4B illustrates a SELECT A FUNCTION screen including features thereof in accordance with the invention;

FIG. 5 illustrates an introduction screen including features thereof in accordance with the invention;

FIG. 6 illustrates a MANUFACTURER screen including features thereof in accordance with the invention;

FIG. 7 illustrates a SAFETY REMINDERS screen including features thereof in accordance with the invention;

FIG. 8 illustrates a THEFT PROTECTION FEATURES screen including features thereof in accordance with the invention;

FIG. 9 illustrates a QUICK TIP SET-UP screen including features thereof in accordance with the invention;

FIG. 10 illustrates a MAIN MENU screen including features thereof in accordance with invention;

FIG. 11 illustrates a DRIVER'S VIEW screen including features thereof in accordance with the invention;

FIG. 12 illustrates an INSTRUMENT PANEL screen including features thereof in accordance with the invention;

FIG. 13 illustrates a TACHOMETER AND WARNING LIGHTS screen including features thereof in accordance with the invention;

FIG. 14 illustrates a segment of the screen of FIG. 13 providing the user with information regarding a particular function of the automobile;

FIG. 15 illustrates a CLIMATE CONTROL screen including features thereof in accordance with the invention;

FIG. 16 illustrates a SAVE screen for saving the user's preferences in accordance with the invention;

FIG. 17 illustrates a DATA ENTRY screen in accordance with the invention for looking up information regarding a specific item in the automobile;

FIG. 18 illustrates an INDEX screen with listed items for which information is available; and

FIG. 19 is a look-up table listing searchable items and the corresponding instructions for a processor in the system of FIG. 1 to provide information regarding such items.

Throughout this disclosure, unless otherwise stated, like elements, components and sections in the figures are denoted by the same numerals.

CALCAR 2623

EXHIBIT O
PAGE 191

US 6,542,795 B2

5

## DETAILED DESCRIPTION

FIG. 1 illustrates information and control system 100 embodying the principles of the invention for use in an automobile. System 100 is referred to as the "AUTO DIRECTOR" system. It is user-friendly and designed with the automobile user in mind. For example, with AUTO DIRECTOR display interface 102a to be described, information about the automobile is readily available literally at the fingertips of the user. This information includes operational instructions, maintenance procedures, safety measures, and information about virtually every capability of the automobile. In accordance with the invention, the user is able to efficiently access such information using multimedia means involving audio, text and video media. Also with interface 102a, or multifunction display interface 102b to be described, the user is afforded a centralized control whereby he/she can program or adjust different vehicle parts and accessories using the information thus obtained.

As shown in FIG. 1, central to system 100 is processor 105 connected to memory 115. Data bus 107 connects processor 105 to display interfaces 102, input interfaces 104, communications interfaces 106, output control interfaces 108, vehicle computer interfaces 110, vehicle control interfaces 112, self-test interface 114, preferences interface 116, and audio interface 118.

Display interfaces 102 include, inter alia, AUTO DIRECTOR display interface 102a, which is illustrated in FIG. 2, together with control panel 205 in FIG. 1. By way of example, but not limitation, the hardware of interface 102a and control panel 205 are derived from a prior art navigation system of the type of the ACURA navigation system. In fact, interface 102a and control panel 205 are used in this illustrative embodiment to realize not only AUTO DIRECTOR functions to be described, but also the well-known navigation function.

Interface 102a includes a conventional liquid crystal display screen 209, and LCD driver (not shown) for processor 105 to control the display on screen 209. Interface 102a also incorporates well-known touch-screen circuitry (not shown) connected to touch screen interface 104a in FIG. 1. With this circuitry, the user can interact with processor 105 by, say, touching a displayed option on screen 209. Through interface 104a, processor 105 receives from the touch screen circuitry a signal identifying the location on screen 209 where it has been touched. If such a location matches the predetermined location of one of the displayed options, processor 105 determines that that option has been selected. With such touch-screen and displayed option selection capabilities, through AUTO DIRECTOR interface 102a, the user is able to obtain information on and control selectable functions of the automobile such as the instrument panel, navigation function, mobile phone, radio/CD player, locks, mirrors, windows, driver's seat adjustment control, climate control, windshield wipers, cruise control, lights, security function, steering, ride control, engine and transmission.

Control panel 205 comprises CANCEL switch 205a, ENTER switch 205b, BRIGHTNESS switch 205c, PUSH TO SELECT knob 205d, MENU switch 205e, MAP/GUIDE switch 205f, SETUP switch 205g, ZOOM IN switch 205h and ZOOM OUT switch 205i. BRIGHTNESS switch 205c comprises a standard variable resistor such that when it is pushed one way, operating circuitry 121 responsively causes the display intensity to increase, and the other way to decrease. ZOOM IN switch 205h when pressed enables the automobile user to enlarge a particular visual area of interest

6

on screen 209, affording better details. On the other hand, ZOOM OUT switch 205i when pressed performs the inverse function to switch 205h. As an alternative to the touch-screen capability, switch 205d similar to a standard joystick is provided for the user to move from one displayed option to another on screen 209 in the same direction (e.g., up, down, left or right) as the switch is operated. A desired option may be selected by pressing ENTER switch 205b. The functions of the other switches are described hereinbelow as they are called out in the operation of system 100. In this illustrative embodiment, AUTO DIRECTOR display interface 102a and control panel 205 are mounted close to the center of the dashboard of the automobile next to the steering wheel.

Referring back to FIG. 1, display interfaces 102 also include multifunction display interface 102b, center console display interface 102c, rear console display interface 102d, and instrument panel display interface 102e.

Specifically, multifunction display interface 102b is installed on the dashboard close to interface 102a on the driver side. Like interface 102a, interface 102b provides the user with graphic display and control of selected functions using well-known touch screen technology. In fact, interface 102b duplicates certain control functions (e.g., navigation, phone, radio and climate control) of interface 102a so that the user can use interface 102b to control a selected function while interface 102a is engaged in another ongoing function. For example, while the user is relying on AUTO DIRECTOR interface 102a to provide navigation information to reach a given destination, the user may want to adjust the climate control of the automobile. It is inconvenient for the user to terminate the ongoing navigation mode of interface 102a, albeit temporarily, to access the climate control function through the interface, adjust the climate control and then resume the navigation mode. Thus, it is preferable to leave the navigation mode of interface 102a alone and use interface 102b to administer the climate control.

Center console interface 102c is installed close to interface 102a on the passenger side. Similar to interface 102b, interface 102c provides the front seat passenger with graphic display and control of functions which include: the front passenger seat adjustment, door lock, window, climate and TV controls. If enabled by the driver, control is also available for the radio/CD player and phone.

Rear console display interface 102d is installed on the back of a front seat. Similar to interface 102c, interface 102d provides rear seat passengers with graphic display and control of certain functions if enabled by driver or front seat passenger. These functions include: the rear seat climate, windows, door locks, radio/CD player and TV controls.

Instrument panel display interface 102e is installed on the dashboard in front of the driver seat. This interface provides the driver with graphic display of the vehicle speed, engine RPM, outside and inside temperatures, oil pressure, fuel level, time, odometer reading, trip odometer reading and warning light indicators. Through AUTO DIRECTOR interface 102a, the system user may select the display of the information in either an analog or a digital form.

Input interfaces 104 comprise touch screen interface 104a and control panel 205 described before, and voice command interface 104b. The latter is connected to a microphone (not shown) and comprises standard voice command circuitry (not shown) for processing voice commands by the user through the microphone to control or modify selected functions of system 100.

Communications interfaces 106 include phone interface 106a, radio/CD interface 106b, television (TV) interface

CALCAR 2624

EXHIBIT O
PAGE 192

US 6,542,795 B2

7

106c, navigation interface 106d, and beacon interface 106e. Processor 105 interacts with and controls standard phone equipment connected to phone interface 106a. Through processor 105, the user may operate the phone equipment via voice command, thereby realizing hands-free operation of the equipment. Alternatively, the user may operate the phone equipment using the touch screen capability provided by AUTO DIRECTOR display interface 102a or multifunction display interface 102b. The user may also operate the phone equipment via remote switches.

Similarly, processor 105 interacts with and controls one or more radio receivers and CD players in the automobile connected to radio/CD interface 106b. Through processor 105, the user may operate the radio receivers via voice command, remote switch and/or touch screen capability.

Processor 105 further interacts with and controls one or more TV receivers in the automobile connected to TV interface 106c. Again, the user may operate the TV receivers via voice command, remote switches and/or touch screen capability.

As further described hereinbelow, navigation interface 106d is connected to a standard inertial guidance system (not shown) capable of providing gyros information, and deriving the vehicle location based on GPS information. With the map information stored in memory 115, the inertial guidance system is capable of providing the user with navigational instructions via interface 102a or 102b. Besides the locational information, local and national emergency information may be derived from the GPS information using additional standard decoding circuitry in interface 106d.

Beacon interface 106e is used for connection to a standard beacon device for detecting a predetermined beacon radio signal to provide additional locational information.

Output control interfaces 108 include lock interface 108a, mirror interface 108b, window interface 108c, steering column interface 108d, seat interface 108e, climate control interface 108f, wiper interface 108g, cruise control interface 108h, light interface 108i and clock interface 108j.

Specifically, lock interface 108a comprises output control logic controllable by processor 105 to lock or unlock the car doors, glove box, console storage, trunk (or liftgate), fuel filler door, brakes and transmission, and enable or disable the child-proof door locks, fuel pump and ignition.

Mirror interface 108b comprises output control logic controllable by processor 105 to maneuver the positions of the outside mirrors and inside rear view mirror, and to fold or unfold the outside mirrors.

Window interface 108c comprises output control logic controllable by processor 105 to incrementally or completely open or close all windows, and to open, close or tilt any sunroof.

Steering column interface 108d comprises output control logic controllable by processor 105 to move the steering column in or out and up or down.

Seat interface 108e comprises output control logic controllable by processor 105 to (1) adjust the positions of the front seats forward or aft, and up or down; (2) tilt the front or rear of the seat cushion up or down; (3) adjust the seat back lumbar, width and angle forward or aft; (4) increase or decrease the cushion size and stiffness; (5) raise or lower the head restraint; and (6) raise or lower the seat belt height.

Climate control interface 108f comprises output control logic controllable by processor 105 to (1) turn the climate control system on or off; (2) select an air flow mode; (3) set fan speeds; (4) enable or disable seat heaters; (5) select fresh

8

or recirculated air (for driver only); and (6) enable or disable front and rear defrosters, mirrors and steering wheel heaters (for driver only).

Windshield wiper interface 108g comprises output control logic controllable by processor 105 to (1) select a high, low, intermittent, single wipe or off mode; (2) set an intermittent delay; and (3) enable or disable front or rear washers. Interface 108g also includes control logic for controlling rain- and speed-sensitive wipers, and for activating an automatic wash in a single wide mode when the windshield is at a certain level of opacity.

Cruise control interface 108h comprises output control logic controllable by processor 105 to (1) turn the cruise control on or off, (2) set the vehicle speed, and (3) cancel or resume the set speed.

Light interface 108i comprises output control logic controllable by processor 105 to select an automatic on mode or off mode for parking lights, headlights and fog lights; and to turn on or off map or courtesy lights.

Clock interface 108j comprises output control logic controllable by processor 105 to set an initial date and time on a conventional clock (not shown) connected to interface 108j. System 100 relies on the current date and time kept by the clock to provide a time reference for the system functions.

Vehicle computer interfaces 110 include anti-lock brake computer interface 110a, engine computer interface 110b and supplemental restraint computer interface 110c for processor 105 to communicate with the computers controlling the anti-lock brakes, engine and supplemental restraints (e.g., back-up airbag deployers and seat belt tensioners), respectively. Interfaces 110 also include back-up interface 110d through which processor 105 receives and analyzes signals from the engine, anti-lock brake and supplemental restraint computers. These signals would indicate to processor 105 any failures of the computers. In response to a computer failure, processor 105 causes a corresponding back-up computer connected to interface 110d to provide a back-up function.

Vehicle control interfaces 112 include steering interface 112a, ride interface 112b, engine interface 112c, transmission interface 112d, traction control interface 112e, and security interface 112f.

Specifically, steering interface 112a comprises input monitoring and output control logic for processor 105 to lighten or tighten the steering effort ratio in response to changing road conditions. Through interface 102a, the user may opt for manual or automatic steering effort ratio control. Interface 112a is capable of adapting and storing data according to the driver's inputs. It also allows for steering of front and/or rear wheels for sporty or increased stability.

Ride interface 112b comprises input monitoring and output control logic for processor 105 to lighten or stiffen the ride control to front and/or rear of vehicle in response to changing road conditions. Through interface 102a, the user may also opt for manual or automatic ride control.

Engine interface 112c comprises input monitoring and output control logic allowing for shutting off a specified number of cylinders, and varying valve and cam timing to increase performance or fuel economy. This interface also allows for manual or automatic control of the engine components, and includes the capability of adapting and storing data according to the driver's inputs.

Transmission interface 112d comprises input monitoring and output control logic for selecting manual or automatic

CALCAR 2625

EXHIBIT 9
PAGE 195

US 6,542,795 B2

9
10

shifting of the transmission. In an automatic shifting mode, interface 112d is capable of adapting and storing data according to the driver's inputs. Interface 112d also allows for control of a variable differential ratio for fast acceleration and high economy cruise.

Traction control interface 112e comprises input monitoring and output control logic providing information on whether power is delivered to front and/or rear wheels of the vehicle and what proportion of the power is delivered to each wheel. This interface also allows for manual or automatic control, and such functions as yaw control in cooperation with the anti-lock brakes and an engine cylinder shutoff.

Security interface 112f comprises control logic for setting a security level, and enabling or disabling a number of security related functions such as the fuel supply cut-off, motion detector, brake locking, etc. Interface 112f also allows entry of a new or alteration of an existing personal identification number (PIN) for personalization of the vehicle functions, i.e., saving the vehicle functional preferences.

In accordance with an aspect of the invention, system 100 incorporates an anti-car-theft technique involving security interface 112f. In accordance with this inventive technique, security interface 112f further comprises a sensor for detection of a predetermined condition to trigger an anti-theft routine. It will be appreciated that a person skilled in the art will come up with many different triggering events causing the sensor to invoke the routine. For example, a passive way of triggering the anti-theft routine would be after the sensor detects that the engine is off and the user has opened, closed and locked the driver's door.

In any event, as soon as processor 105 receives from the sensor a signal requesting an invocation of the anti-theft routine, processor 105 retrieves from navigation interface 106d GPS information identifying the parking location of the automobile, as indicated at step 251 in FIG. 3A. Processor 105 then stores at step 253 the parking location GPS information in memory 115. At step 255, processor 105 determines whether the security measures remain on. By way of example, but not limitation, such determination is based on information from lock interface 108a indicating whether the driver's door is properly unlocked. If that door is properly unlocked, processor 105 determines that the security measures are called off, and the anti-theft routine comes to an end, as indicated at step 257.

Otherwise if processor 105 determines that the security measures remain on, processor 105 at step 259 retrieves from navigation interface 106d GPS information identifying the current location of the automobile. Processor 105 then compares at step 261 the current location GPS information with the parking location GPS information previously stored. If processor 105 at step 262 determines that the current location matches the parking location based on the comparison, the anti-theft routine returns to step 255 after a predetermined period. Otherwise if processor 105 determines that the current location does not match the parking location, processor 105 assumes that the automobile has been removed without authorization, i.e., stolen. At this point, if a conventional alarm system is connected to security interface 112f, processor 105 would cause an alarm to come on, gas to be cut off, etc.

In this example, a conventional transmitter (not shown) is connected to security interface 112f and transmits a predetermined sequence of signals receivable by a law enforcement agency or a suitable alarm monitor company when it is activated. Continuing the example, processor 105 translates the GPS information identifying the current vehicle location into the corresponding street address based on the map information stored in memory 115, as indicated at step 263. Processor 105 at step 265 looks up one or more phone numbers pre-stored in memory 115 for reporting to the law enforcement agency (or the alarm monitor company) about the stolen status. Alternatively, a list of phone numbers associated with law enforcement agencies (or branches of the alarm monitor company) in many different geographic locations is pre-stored, along with the GPS information identifying the locations of the respective law enforcement agencies (or alarm monitor company branches). This being so, processor 105 locates the closest law enforcement agency (or alarm monitor company branch) and its associated phone number(s) by comparing the current vehicle location GPS information with the respective agency (or branch) location GPS information.

In any event, processor 105 at step 267 initiates a call to a law enforcement agency (or an alarm monitor company branch) through phone interface 106a using the phone number just located. After the phone connection is established, processor 105 provides through the connection information about the current address of the vehicle using conventional voice synthesizer circuitry (not shown) in audio interface 118, and the pre-recorded information about the vehicle itself such as its vehicle identification number (VIN), model, year, color, license number, etc., as indicated at step 269. Through the same phone connection, processor 105 may also provide information about the vehicle's owner such as his/her name and contact number so that the law enforcement agency (or alarm monitor company branch) can notify the owner of the incident. Processor 105 at step 271 activates the aforementioned transmitter connected to security interface 112f to generate the predetermined sequence of signals in case the stolen vehicle is in transit. For that matter, processor 105 can also repeatedly check on the latest vehicle location and report any new address different from the one previously reported. Thus, by tracking the signals in the vicinity of the latest reported vehicle location, the law enforcement agency (or alarm monitor company) would recover the vehicle in an efficient manner.

Referring back to FIG. 1, self-test interface 114 comprises input/output (I/O) control logic for performing an active self-test of system 100 on power up or at the user's request. Specifically, interface 114 polls every other interface in system 100 for a self-test result. Each interface, when polled, performs an active self-test and reports the test results to interface 114, where such test results are gathered and caused to be displayed on interface 102a.

Preferences interface 116 monitors changes made by the user in selected functions after the user logs on system 100, and prompts the user to save such preferences. These preferences are stored in memory 115 in association with the user's PIN. Functions affording the user choices include auto locks, an easy entry, auto lamps, the seat position, steering column position, mirror position, radio, steering, ride, transmission shift, engine performance, climate, and security level.

Audio interface 118 comprises I/O control logic for receiving audio signals from a radio/CD, TV, compact disk (CD) player, or phone interface, processing the received audio signals, providing proper amplifications thereto, and routing the resulting sound to appropriate speakers and headphones (not shown) connected to interface 118. In this illustrative embodiment, AUTO DIRECTOR display interface 102a and multifunction display interface 102b share the

CALCAR 2626

EXHIBIT O
PAGE 18A

US 6,542,795 B2

11

same speakers. Interface 118 also provides center and rear console display interfaces 102c and 102d with separate audio channels, speakers and headphone outputs. The front and rear speakers may be muted by the user as a preference.

Interface 118 also processes requests from other interfaces for pre-recorded digital sounds stored in a SOUNDSGOOD library in memory 115 and routes the requested sounds to the appropriate interfaces. In addition, interface 118 comprises the conventional voice synthesizer circuitry for providing voice messages to the appropriate interfaces.

FIGS. 3B and 3C jointly illustrate routine 300 for accessing, through AUTO DIRECTOR display interface 102a, a main menu to obtain operational instructions, maintenance procedures, safety measures, and other information about the automobile, collectively referred to as "Quick Tips". Routine 300 is stored in memory 115 and initiated when SETUP switch 205g in FIG. 2 is pressed. Instructed by routine 300, processor 105 at step 301 elicits a PIN from the user by displaying a screen of FIG. 4A through interface 102a. As shown in FIG. 4A, a video key-pad comprising numeral keys "1" through "9", and "*" and "#" keys are displayed on screen 209. In response, the user enters a sequence of numerals by touching the corresponding displayed keys, followed by the "#" key.

It should be pointed out that in accordance with another aspect of the invention, when a displayed key or option is touched on the screen of AUTO DIRECTOR display interface 102a or multifunction display interface 102b, a tone pre-selected by the user from the SOUNDSGOOD library is generated through audio interface 118, indicating that the key or option has been touched on the screen. Advantageously, instead of a visual confirmation, as opposed to a visual confirmation, the user while driving can continually watch the road.

The user may alternatively enter the above numeral sequence using control panel 205 in a manner to be described. In any event, processor 105 then verifies at step 303 the PIN entry by comparing it with the user's pre-selected PIN. The latter is stored in memory 115, along with the user's preferences. In a standard way, the user is given a few chances to enter a correct PIN. Verification of the PIN entry identifies the user as a legitimate user. Thus, if the PIN entry is not valid, routine 300 comes to an end, as indicated at step 304.

Otherwise if the PIN entry is valid, processor 105 at step 305 causes interface 102a to display on screen 209 a "SELECT A FUNCTION" screen, which is illustrated in FIG. 4B. As shown in FIG. 4B, two options, namely, "NAVIGATION" and "QUICK TIPS", are displayed on screen 209. By default, NAVIGATION option 401 is highlighted yellow when the screen of FIG. 4B appears.

It should be pointed out that in this illustrative embodiment, a yellow highlight on an option indicates that the option is selected but not yet activated. Once a yellow highlighted option is activated, the option is highlighted blue. System 100 then performs according to the activated option.

Thus, in this instance, the user may activate the yellow highlighted NAVIGATION option by touching the option on screen 209 or by pressing ENTER switch 205b.

However, if QUICK TIPS option 403 is desired, the user may touch that option on screen 209, which would then be highlighted yellow. A second touch on the same option will change the highlight to blue, indicating the active status. As an alternative, the user may utilize knob 205d of FIG. 2 to select QUICK TIPS option 403 by first pushing the knob to

12

the right. In response, processor 105 causes the yellow highlight to move from default NAVIGATION option 401 to QUICK TIPS option 403. The user can then select the QUICK TIPS option by pressing ENTER switch 205b. Upon selection, the yellow highlighted option will again turn blue.

Processor 105 at step 308 detects an activation of either NAVIGATION option 401 or QUICK TIPS option 403. If NAVIGATION option 401 is activated, processor 105 at step 311 causes system 100 to enter into a navigation mode. In this mode, processor 105 causes navigational instructions to be displayed on screen 209 in a conventional manner. In providing the navigation instructions, the standard inertial guidance system connected to navigation interface 106d receives signals from a constellation of GPS satellites maintained and controlled by the U.S. Department of Defense. In response to these signals, the inertial guidance system identifies the location (in longitude and latitude) of the automobile. The system also detects the vehicle speed, and the direction in which the vehicle is headed. By accessing the map information stored in memory 115, the system is capable of visually and verbally providing the user with directions to a given destination through AUTO DIRECTOR display interface 102a and audio interface 118, respectively.

Otherwise if activation of QUICK TIPS option 403 is detected at step 308, processor 105 causes interface 102a to display an introduction screen on screen 209, as indicated at step 314. This introduction screen is illustrated in FIG. 5.

As shown in FIG. 5, system source identification, warning and instructional information appear on the introduction screen, along with two options, "MAIN MENU" and "READ ME". The default option in this instance is READ ME option 501 which is highlighted yellow. Processor 105 detects at step 317 whether MAIN MENU option 503 or READ ME option 501 is activated. If MAIN MENU option 503 is activated, routine 300 proceeds to step 340 to be described. Otherwise if READ ME option 501 is activated, routine 300 proceeds to step 320 where processor 105 causes a series of three screens to be displayed. The first screen of the series is a "MANUFACTURER" screen, which is illustrated in FIG. 6.

As shown in FIG. 6, a description of the QUICK TIPS system appears on the MANUFACTURER screen. If the text to be displayed exceeds one screen, which is the case here, scrolling options comprising scroll-up option 605 and scroll-down option 607 are provided. When option 605 is touched and activated on screen 209, additional text scrolls up one paragraph at a time. Option 607 performs an inverse function to option 605. Again, as an alternative, the user may maneuver PUSH TO SELECT knob 205d until the desired scroll option (or direction arrow) is highlighted yellow. The activation of the highlighted option is achieved by pressing ENTER switch 205b.

By default, displayed option 609 has the "AUTO VOICE" wording thereon and is highlighted blue as the MANUFACTURER screen comes on. Accordingly, a pre-recorded voice is activated by processor 105 through audio interface 118 to read the entire text associated with this screen without interruption, including the text which is not presently shown on screen 209 but otherwise shown upon scrolling. To alter the AUTO VOICE function, the user may touch option 609 on screen 209, or alternatively press ENTER switch 205b. By doing so, the "AUTO VOICE" wording on option 609 changes to "MANUAL VOICE", which is highlighted blue, indicating its active status.

In accordance with the MANUAL VOICE function, a pre-recorded voice reads the displayed text only, and stops

CALCAR 2627

US 6,542,795 B2

13

reading until additional text is scrolled onto the screen. To silence the voice, the user may again touch option 609 on screen 209, or alternatively press ENTER switch 205b. By doing so, the "MANUAL VOICE" wording on option 609 changes to "VOICE OFF", and the voice is deactivated, with the option now highlighted yellow. The cycle of the AUTO VOICE, MANUAL VOICE and VOICE OFF functions can be repeated by successively touching option 609 or pressing switch 205b.

Other displayed options on the screen of FIG. 6 include PREVIOUS option 611 and NEXT option 613. As indicated at step 323, option 611 when selected causes routine 300 to return to step 314, where the introduction screen of FIG. 5 is again displayed. Otherwise, if option 613 is selected, routine 300 proceeds to step 326 in FIG. 3C where processor 105 causes a "SAFETY REMINDERS" screen to be displayed on screen 209. FIG. 7 illustrates such a screen.

As shown in FIG. 7, like the MANUFACTURER screen, the SAFETY REMINDERS screen includes option 609 displayed with the default wording "AUTO VOICE" thereon, PREVIOUS option 611, NEXT option 613, scroll-up option 605 and scroll-down option 607. This screen reminds the user of the safety features of the vehicle including, for example, air bags and seat belts. As indicated at step 329, option 611 when selected causes routine 300 to return to step 320 of FIG. 3B. Otherwise if option 613 is selected, routine 300 proceeds to step 332 where processor 105 causes a "THEFT PROTECTION FEATURES" screen to be displayed on LCD screen 209. FIG. 8 illustrates such a screen.

As shown in FIG. 8, the THEFT PROTECTION FEATURES screen similarly has thereon displayed options 605, 607, 609, 611 and 613. This screen describes to the user a theft-deterrent system including the anti-theft routine of FIG. 3A equipped in the vehicle. As indicated at step 335, option 611 when selected causes routine 300 to return to step 326. Otherwise if option 613 is selected, routine 300 proceeds to step 338 where processor 105 causes a "QUICK TIPS SET-UP" screen to be displayed on LCD screen 209. FIG. 9 illustrates such a screen.

As shown in FIG. 9, the QUICK TIPS SET-UP screen comprises two arrays of displayed options, denoted 901 and 903, respectively. Array 901 concerns the volume of the audio part of system 100. In this illustrative embodiment, the user may select the options in array 901 to respectively turn the volume off, to a "SOFT" level, to a medium level, and to a "LOUD" level. Array 903 concerns the display of LCD 119 of system 100. In this illustrative embodiment, the user may select the options in array 903 to respectively turn the display off, to a "DAY" setting, adjust it to a "NIGHT" setting, and have it automatically adjusted. When the QUICK TIPS SETUP screen comes on, by default, the volume is set to a medium level (i.e., the "MED" option in array 901 highlighted blue), and the display is set to be automatically adjusted (i.e., the "AUTO" option in array 903 highlighted blue).

Also shown in FIG. 9 is NEXT option 905. By selecting this option, routine 300 returns to step 340 of FIG. 3B where a "MAIN MENU" screen is displayed on LCD screen 209. After routine 300 is performed, the screen of FIG. 9 can be invoked at any time by pressing SETUP switch 205g to re-adjust the volume and the intensity of the LCD of system 100.

FIG. 10 illustrates the MAIN MENU screen. This screen comprises displayed options disposed in columns 1001, 1003, 1005, and 1007. For example, column 1001 includes

14

DRIVER'S VIEW option 1001a, STEERING COLUMN CONTROLS option 1001b, LOCK option 1001c, DRIVING TIPS option 1001d, and INDEX option 1001e. It should also be noted that this screen can be invoked at any time by pressing MENU switch 205e.

When the MAIN MENU screen comes on, by default, DRIVER'S VIEW option 1001a is highlighted yellow, indicating that it is selected. However, the user may touch any other displayed option on screen 209 for re-selection. A further touch on the yellow highlighted option changes its color to blue and activates same. Again, the user may alternatively maneuver PUSH TO SELECT knob 205d to re-select any other displayed option, followed by a depression of ENTER switch 205b to activate the selected option. Since LCD screen 209 is compact, the display area for each option on the MAIN MENU screen is generally small. As a result, selection and activation of an option by touching the option on the screen is susceptible to errors, especially when the vehicle is in motion. Thus, in this situation it may be preferable to achieve the same result using knob 205d and switch 205b, instead.

In addition, because of the small display area allocated to each option on the MAIN MENU screen, the wording on the option is brief and thus tends to be cryptic. In accordance with a feature of the invention, after a predetermined time (e.g., a few seconds) has elapsed from the option's being highlighted yellow, processor 105 causes a voice to be generated on speakers 127 to explain the purpose of the option before the user activates it. For example, after a predetermined delay from DRIVER'S VIEW option 1001a's being highlighted yellow, a voice is activated, stating the option name, followed by an explanation of the purpose of the option such as "To provide location of dash mounted components." Thus, this inventive feature affords a preview of the option before the user commits to it, thereby avoiding unnecessary backtracking.

Continuing the example, after hearing the preview of option 1001a, the user decides to select that option. In response, processor 105 causes a "DRIVER'S VIEW" screen to be displayed on screen 209. Such a screen is illustrated in FIG. 11. When the DRIVER'S VIEW screen appears, VOICE option 1101 is highlighted blue, indicating that voice announcements are active. To disable the voice announcements, the user may touch VOICE option 1101 on screen 209, or alternatively press ENTER switch 205b. VOICE option 1101 would be highlighted yellow when disabled.

As also shown in FIG. 11, a view of the interior of the automobile from the driver's perspective is provided. Underneath that view, DASH-MOUNTED CONTROLS option 1103, INSTRUMENT PANEL option 1105, AUDIO SYSTEM option 1107, CLIMATE CONTROLS option 1109 and PREVIOUS option 1111 are displayed. By default, DASH-MOUNTED CONTROLS option is highlighted yellow. However, the user in this example decides to select INSTRUMENT PANEL option 1105, instead. By touching option 1105 on screen 209, the option is highlighted yellow. If VOICE option is not disabled, after a predetermined delay, an announcement such as "To provide information on gauges, meters and warning lights" comes on to preview the purpose or content of option 1105. Options 1103, 1107, and 1109 are similarly programmed. In this instance, selecting PREVIOUS option 1111 enables the user to return to the MAIN MENU screen of FIG. 10.

Continuing the example, assuming that the user activates option 1105 after hearing the preview, in response processor

CALCAR 2628

EXHIBIT O
PAGE 199

US 6,542,795 B2

15

105 causes an "INSTRUMENT PANEL" screen to be displayed on screen 209. Such a screen is illustrated in FIG. 12. As shown in FIG. 12, the previous screen format is generally maintained in that it provides a view of the object (the instrument panel of the automobile in this instance) pertinent to the option which has been selected, along with highlighted options for further selection thereunder. Based on the disclosure heretofore, the design and operation of these screens by now are apparent to a person skilled in the art, and become self-explanatory.

In accordance with another feature of the invention, individual elements on the instrument panel shown in FIG. 12 are labeled with numerals "1", "2", "3", "4" and "5" which correspond to option 1201a designated "1. TACHOMETER AND WARNING LIGHTS", option 1201b designated "2. TURN SIGNAL/HAZARD WARNING", option 1201c designated "3. SPEEDOMETER AND WARNING LIGHTS", option 1201e designated "4. ODOMETER & TRIP METERS/OUTSIDE TEMPERATURE", and option 1201f designated "5. FUEL/ TEMP GAUGE AND WARNING LIGHTS", respectively. As such, the function of the displayed options is two-fold. First, the wording on each displayed option informs the user of what the corresponding element(s) represents. Second, each displayed option is also for selection to obtain more information about the corresponding element(s). In addition, with the above voice preview feature, the user is further apprised of the purpose or content of the option before he/she commits to it. For example, TACHOMETER AND WARNING LIGHTS option 1201a corresponds to a voice preview such as "To provide information on tachometer and malfunction, maintenance required, low oil pressure and charging system failure indicators."

Assuming that the user in this instance activates option 1201a, in response processor 105 causes a "TACHOM-ETER AND WARNING LIGHTS" screen to be displayed on screen 209. Such a screen is illustrated in FIG. 13.

FIG. 13 shows VOICE option 1301 similar to option 1101 described before, TIP option 1303, a tachometer of the automobile denoted 1305, warning lights collectively denoted 1307, and options 1309a through 1309f in display segment 1311.

When TIP option 1303 appears on screen 209, it indicates that helpful hints or reminders are available upon selection thereof. In accordance with another feature of the invention, the appearance of TIP option 1303 is accompanied by the playing of a sound segment associated therewith. This sound segment may be pre-selected by the user from the SOUNDSGOOD library. After an adaptation period, the user would be able to rely on the familiar sound segment, without looking at the screen, to alert him/her of the availability of the TIP option.

Similarly, the user may pre-select another sound segment associated with warnings. Such a sound segment should connote urgency or even emergency as such warnings include, for example, engine overheating, an extremely low fuel level caution, GPS emergency information from navigation interface 106d, etc. Under control of processor 115, audio interface 118 preempts any on-going announcement and momentarily substitute therefor any such warning as soon as it occurs, which is preceded by the associated sound segment.

In any event, if option 1303 is selected in this instance, a voice comes on and utters a tip regarding tachometer 1305 such as "To prevent engine damage, do not drive with needle in red zone." This tip is also momentarily displayed on segment 1311 in lieu of options 1309a through 1309f.

16

Similar to the elements on the INSTRUMENT PANEL screen, tachometer 1305 and warning lights 1307 on this screen are individually labeled and correspond to options 1309a, 1309b, 1309c, 1309e and 1309f, respectively. Assuming in this example that MAINTENANCE REQUIRED option 1309c is selected, display segment 1311 would be replaced by new display segment 1411 illustrated in FIG. 14. As shown in FIG. 14, item 1401 indicates the subject selected, i.e., "MAINTENANCE REQUIRED". Item 1403 explains what the MAINTE-NANCE REQUIRED warning light, when on, indicates. In this instance it states, "Maintenance required warning light comes on to indicate it is time for scheduled maintenance." PREVIOUS option 1405 enables the user to reactivate segment 1311 of FIG. 13.

Assuming further that at this point the user wants to learn about and also to program the air conditioning of the automobile, the user may access a "CLIMATE CONTROL" screen by successively pressing the PREVIOUS option to backtrack to the DRIVER'S VIEW screen of FIG. 11, where CLIMATE CONTROLS option 1109 is available. As a second alternative, the user may press MENU switch 205e to invoke the MAIN MENU screen of FIG. 10, where a "CLIMATE CONTROLS" option within column 1003 is available. A third alternative is provided in the event that the user cannot immediately relate "air conditioning" to the CLIMATE CONTROLS option. At the MAIN MENU screen of FIG. 10, the user may select index option 1001e to be described. It suffices to know for now that this option allows the user to access the "CLIMATE CONTROL" screen using the term "air conditioning".

FIG. 15 illustrates the "CLIMATE CONTROL" screen. With the voice enabled, a first touch on any displayed option on screen 209 causes it to be highlighted yellow, indicating its selected status. A second touch causes it to be highlighted blue, indicating its active status. With the voice disabled, only one touch on any displayed option activates it.

As shown in FIG. 15, the MODE options include OFF option 1511, AUTO option 1513, A/C option 1515, HEAT option 1517, and SMART CLIMATE option 1519. It should be noted that only one of the MODE options can be active at a time. In this example, assuming that the voice is enabled, when OFF option 1151 is selected by a first touch, a voice explaining the option comes on, uttering "To disable climate control." A second touch on the same option would then shut the climate control off through climate control interface 108f.

When AUTO option 1513 is selected by a first touch, a voice comes on to explain the option, uttering "System automatically determines air-flow distribution and volume for optimum efficiency." A second touch on the same option enables the automatic control, followed by a voice utterance, "Set desired temperature." Temperature display 1535 then flashes with the current temperature setting, prompting the user to set a desired temperature in a manner to be described.

If the user neglects to set a temperature after a predetermined time, in accordance with another aspect of the invention, a temperature range is automatically maintained by processor 105 in response to the date and time information from clock interface 108j, and the GPS information from navigation interface 106d. Based on the date and time information, processor 105 knows what the current season (e.g., mid-winter versus mid-summer) and time of the day (e.g., night verse noon) are. Based on the GPS information, processor 105 knows the region (e.g, New England versus Southern California) where the vehicle is. Processor 105

CALCAR 2629

US 6,542,795 B2

17

looks up a table stored in memory 115 containing predetermined temperature ranges corresponding to different combinations of the temporal and geographic parameters. It then prescribes an appropriate temperature range according to the table. This temperature range is updated by processor 105 periodically to reflect changes in the time of the day and the geographic location of the vehicle.

Similarly, A/C option 1515 and HEAT option 1517 respectively enable the user to activate air conditioning and heaters at a desired temperature or a default temperature range.

SMART CLIMATE option 1519 is designed to allow the user to program the climate control for the next ride before he/she leaves the vehicle. When SMART CLIMATE option 1519 is selected by a first touch, a voice comes on to explain the option, uttering "To enable pre-heating or pre-cooling of vehicle." A second touch on the option activates the function, followed by a voice utterance, "Set desired temperature. Set desired time using fan speed arrows." Temperature display 1535 then flashes the current temperature setting, prompting the user to set a desired temperature. Similarly, fan speed display 1541 then flashes the current date, followed by current time, prompting the user to set the date and time that the user plans to reenter the vehicle. Through climate control interface 108f, processor 105 determines whether the current level of power from the car battery and any back-up power sources is sufficient. If it is insufficient, a message such as "Fail to pre-condition vehicle temperature" is issued through audio interface 118 to notify the user of the noncompliance. Otherwise, when it is close to the re-entry time, processor 105 determines the start-up time to effect the pre-conditioning, depending on the temperature difference between the inside and outside of the vehicle at that time. Processor 105 would then cause a combination of heaters and/or heat pumps (not shown) connected to interface 108f to pre-condition the vehicle temperature. In order to avoid substantially draining the power, in this illustrative embodiment, the requested temperature would be maintained up to an hour after the set re-entry time.

The Air options in FIG. 15 include FRESH option 1521 and RECIRCULATED option 1523. Only one of these two options can be active at a time. When FRESH option 1521 is selected by a first touch on the option, a voice comes on to explain the selected option, uttering "To select outside air to circulate in vehicle." A second touch on the option activates the selection to ventilate the vehicle with outside air. Similarly, RECIRCULATED option 1523 allows the user to select the inside air for recirculation in the vehicle.

The VENT options in FIG. 15 include FLOOR option 1525, FLOOR/DASH option 1527, DASH option 1529, DEFROST option 1531 and FLOOR/DEFROST option 1533. Only one of these five options can be active at a time. When FLOOR option 1525 is selected by a first touch on the option, a voice comes on explaining the option, uttering "Main air distribution to floor." A second touch on the option directs an air flow toward the vehicle floor.

Similarly, FLOOR/DASH option 1527 enables the user to bifurcate the air flow between the floor and the dashboard. DASH option 1529 enables the user to direct the air flow from the dashboard. DEFROST option 1531 enables the user to direct the air flow toward the windshield and select fresh air if not selected. FLOOR/DEFROST option 1533 enables the user to bifurcate the air flow between the floor and windshield.

Temperature display 1535 displays the temperature selected by the user. Touching on up-arrow 1537 increases

18

the selected temperature while touching on down-arrow 1539 decreases same. Continued touching on either up-arrow 1537 or down-arrow 1539 causes the temperature setting to change rapidly.

Similarly, fan speed display 1541 displays the fan speed (high, medium or low) selected by the user. Touching on up-arrow 1543 increases the selected fan speed while touching down-arrow 1539 decreases same.

The HEATERS options in FIG. 15 include SEAT option 1547, MIRROR option 1549, REAR WINDOW option 1551, STEERING WHEEL option 1553, and ALL option 1554. One or more of these options can be active at the same time. When SEAT option 1547 is selected by a first touch on the option, a voice comes on to explain the option, uttering "To enable seat heaters." A second touch on the option activates the seat heaters connected to climate control interface 108f.

Similarly, MIRROR option 1549 enables the user to activate outside mirror heaters. REAR WINDOW option 1551 enables the user to activate a rear window defroster. STEERING WHEEL option 1553 enables the user to activate a steering wheel heater. Finally, ALL option 1554 enables the user to activate all of the heaters simultaneously.

In personalizing the vehicle, preference interface 116 monitors any user adjustments to certain vehicle functions by comparing their current settings with the corresponding stored preferences in memory 115. Thus, for example, if the user changes any of the settings relating to the climate control such as the mode, vent, air, temperature, fan speed, etc. from its previous preferred setting, preference interface 116 causes a SAVE screen to appear on screen 209. This SAVE screen is illustrated in FIG. 16. As shown in FIG. 16, the user is prompted to save the change in the setting that he/she has just made. The user at this point may activate SAVE option 1601 to change the previous preferred setting. The SAVE screen thereafter disappears in favor of the previous screen. Otherwise, he/she may activate CLOSE option 1603 to close the SAVE screen, without storing the latest setting, which is then treated as a temporary setting. In the latter case, for example, a restart of the automobile will obliterate such a temporary setting, and reinstate the stored preferred setting.

Climate control screens can similarly be invoked by the front passenger and rear passengers on display interfaces 102c and 102d, respectively. Such screens provide similar MODE options including OFF, AUTO, A/C and HEAT options; and VENT options including LOWER VENT, UPPER VENT and LOWER/UPPER vent options. They also provide for temperature and fan speed adjustments for the respective localized areas. However, no save screen is provided.

Using INDEX option 1001e of FIG. 10 to look up information on and/or to control various items in the automobile will now be described. After option 1001e is activated, a DATA ENTRY screen illustrated in FIG. 17 is exhibited on screen 209. As shown in FIG. 17, a message "Enter Letter Or Item Name" appears to prompt the user for an entry of the name of the item of interest or its beginning letter. For this purpose, entry options for letters A through Z arranged in a grid format are provided in section 1701 for selection. In addition, DONE option 1703, when activated, indicates to system 100 that the entry is completed. Subdisplay 1705 is used to echo the user's entry to ensure its correctness.

In this illustration, the user enters "AIR CONDITIONING" as exhibited on subdisplay 1705. In response, an

CALCAR 2630

US 6,542,795 B2

19

INDEX screen shown in FIG. 18 appears on display screen 209, with the search item name "AIR CONDITIONING" highlighted yellow. It should be noted that other item names such as "Anti-lock Brake System Indicator" are also shown, and they are in alphabetical order following "AIR CONDI-TIONING". This stems from the design of system 100 whereby the user may conveniently enter the beginning letter of the search item name only. In that case, a list of item names in alphabetical order with the first item name having the same beginning letter highlighted yellow. For instance, if the user had only entered "A" for "AIR CONDITIONING", a list of item names starting with "A" in alphabetical order would appear on screen 209 (although in this instance it would be the same list as shown in FIG. 18 as "AIR CONDITIONING" is the first item with a letter "A" in system 100). If the user cannot locate the name of the item of interest in the list, he/she may scroll the screen using scroll-up option 1801 or scroll-down option 1803 to review additional item names after or before the listed item names. Alternatively, the user may select PREVIOUS option 1805 to return to the screen of FIG. 17 to enter the complete item name.

In any event, after the user locates the item name on the INDEX screen, the user may then touch the item name to access information on that item. To that end, a look-up table is stored in memory 115. FIG. 19 illustrates such a look-up table, wherein left column 1901 lists each item name in alphabetical order in the index, and right column 1903 lists the corresponding instruction for processor 105 to carry out to access information on that item. For example, according to row 1905 of the table, the selection and activation of the item name "AIR CONDITIONING" causes processor 105 to connect the user to the CLIMATE CONTROL screen of FIG. 15 previously described.

The foregoing merely illustrates the principles of the invention. It will thus be appreciated that those skilled in the art will be able to devise numerous other systems which embody the principles of the invention and are thus within its spirit and scope.

For example, based on the disclosure heretofore, it is apparent that through system 100, the user can run diagnostics on selected parts of the automobile by voice command or touch-screen control.

In addition, in the disclosed embodiment, through system 100, the user is able to program the climate control for the next ride before he/she leaves the vehicle. It will be appreciated that the user will be able to achieve same remotely ahead of time via telecommunication means. For example, processor 105 may be programmed to accept climate control commands through phone interface 106a. In that instance, the user can call from anywhere to establish a phone connection with phone interface 106a using a predetermined phone number, through which the user communicates the commands to climate control interface 108f to program the climate control. Through the phone connection, the user may be provided with climate control options described above in a synthesized voice. The user may activate one or more of such options by pressing a predetermined touch-tone key on the telephone keypad corresponding to a "yes" or "no" response. Similarly, the user may achieve the relevant temperature and/or time settings by pressing the touch-tone keys corresponding to the numerals indicative thereof. Of course, telecommunication means other than the telephone including a radio frequency (RF) transmitter may also be used to communicate the climate control commands from a remote area.

In addition, in the disclosed embodiment, the user may access different screens provided by AUTO DIRECTOR

20

display interface 102a to learn about and control certain vehicle functions. It will be appreciated that a person skilled in the art will develop a demonstration program wherein a series of such screens will be automatically presented to a user in a predetermined sequence. The presentation may include commentaries, and highlights on selected options displayed on each screen. Furthermore, the presentation may be coupled with the showing of actual vehicle functions. For example, in demonstrating the climate control screen of FIG. 15, while the function of a highlighted VENT option (e.g., Floor, Floor/Dash, Dash, Defrost or Floor/Defrost) is explained, it is activated so that the user in the automobile can feel an actual air flow from the corresponding direction. The above demonstration program may be invoked using a PIN provided by the automobile manufacturer. The program may run continually while the automobile is shown in a showroom, or may be invoked by the user occasionally to obtain relevant information.

Further, in the disclosed embodiment, the MAINTE-NANCE REQUIRED warning light comes on when it is time for scheduled maintenance. In accordance with another aspect of the invention, the maintenance is scheduled by system 100 according to the cumulative time of the tachometer reading above a predetermined RPM value. Such cumulative time reflects the extent of the engine wear, and if it exceeds a predetermined length of time without maintenance, the engine performance would degrade substantially. In measuring the cumulative time in question, a conventional comparator (not shown) is employed in system 100 to compare the instantaneous tachometer reading (provided by engine control interface 112c) with the predetermined RPM value. Each time when the tachometer reading exceeds the predetermined value, processor 105 is interrupted to register the length of such an occurrence. The latter is added to a running sum to update the cumulative time in question. This cumulative time may be displayed on instrument panel display interface 102e, along with the tachometer reading and the MAINTENANCE REQUIRED warning indicator. A second conventional comparator (not shown) is employed in system 100 to compare the cumulative time with the above predetermined time length. As soon as the cumulative time exceeds the predetermined length, processor 105 is interrupted and causes the MAINTE-NANCE REQUIRED warning light to come on, indicating that it is time for maintenance.

Still further, system 100 as described is highly adaptable in adjusting to new system requirements, and capable of "learning" new automobile features to be introduced into the system. Such learning may involve a modification or an upgrade in the system software stored in memory 115.

Moreover, other features of system 100 may include capabilities of communications with a third party remote from the vehicle. For example, system 100 may be programmed to transmit signals representing data on the current speed of the vehicle and its VIN receivable by a radar system, thus enabling the third party to monitor its speed. Furthermore, system 100 may be programmed by the third party to disable and subsequently enable the vehicle upon successful verification of a PIN pre-assigned to the third party. To that end, system 100 is capable of receiving remote transmission of the PIN, followed by the disable or enable code. The transmission may be encrypted for security reasons. Furthermore, more than one PIN may be used for different purposes. For example, a PIN may be assigned to a law enforcement agency to disable the vehicle because of a suspension of a license, or to temporarily disable the vehicle when the driver is intoxicated. Another PIN may be

CALCAR 2631

US 6,542,795 B2

21

assigned to an environmental protection agency to disable the vehicle for failing to meet the emission requirements. Yet another PIN may be assigned to the vehicle owner to disable the vehicle when parked, thereby reducing the risk of a car theft. The disabling of the vehicle involves cutting off its gas, putting on its anti-lock brakes, etc.

Further, system **100** is capable of receiving a low-frequency, low-power broadcast covering an area of a limited radius, referred to as a "Cell". The broadcast may provide electronic GPS map and Yellow Page type information pertaining to the cell. This information, when received, may be downloaded onto AUTO DIRECTOR display interface **102a** or multifunction display interface **102b**. Such information includes a local directory indicating locations of nearby gas stations, restaurants and other facilities on the GPS map, with respect to the current location of the automobile. The local directory may be formatted in the form of "web pages" featuring the local businesses, and include additional information such as business hours, telephone numbers, and information on products and services provided by such businesses.

The above broadcast may also provide local weather information sponsored by a civic group or commercial entity. In the case of civic group sponsorship, the local civic events may be posted alongside the weather information, and in the case of commercial sponsorship, advertisements may be posted instead. Of course, as the automobile moves from cell to cell, the contents of the broadcast change accordingly.

In addition, while the radio in the automobile is tuned to a particular radio station, system **100** is also capable of receiving any electronic files broadcast from that radio station, along with the radio program. These electronic files, which may be in the form of web pages, can be downloaded onto the system. The system user may then scroll the pages to learn such information as program listings and coming events sponsored by the radio station.

Moreover, in the disclosed embodiment, system **100** is illustratively used in an automobile. It will be appreciated that a person skilled in the art may also employ the inventive system in another type of vehicle such as a boat, an airplane, etc.

Finally, although information and control system **100**, as disclosed, is embodied in the form of various discrete functional blocks, the system could equally well be embodied in an arrangement in which the functions of any one or more of those blocks or indeed, all of the functions thereof, are realized, for example, by one or more appropriately programmed processors or devices.

We claim:

1. A system for use in a vehicle comprising:

an interface for entering a request concerning an aspect of the vehicle, the request including a user description of the aspect of the vehicle;

a processor for selecting, based on the user description, a display which contains at least one option for selection, the at least one option pertaining to the aspect of the vehicle;

a display element for showing thereon the selected display; and

an input device for selecting the at least one option on the selected display.

2. The system of claim 1 wherein the user description includes a term at least identifying partially the aspect of the vehicle.

22

3. The system of claim 2 wherein the term includes one or more words.

4. The system of claim 1 wherein the at least one option is selected to access information about the aspect of the vehicle.

5. The system of claim 1 wherein the at least one option is selected to control the aspect of the vehicle.

6. The system of claim 5 wherein the aspect of the vehicle includes a climate control of the vehicle.

7. The system of claim 1 wherein the interface includes a touch-screen capability.

8. The system of claim 1 wherein the interface includes a voice input.

9. The system of claim 1 wherein the interface includes the input device.

10. The system of claim 1 wherein the selected display includes a second option for selection which pertains to a second aspect of the vehicle having a description similar to the user description.

11. The system of claim 10 wherein the description of the second aspect of the vehicle is similar to the user description in spelling.

12. A method for use in a system in a vehicle comprising:

receiving a request concerning an aspect of the vehicle, the request including a user description of the aspect of the vehicle;

selecting, based on the user description, a display which contains at least one option for selection, the at least one option pertaining to the aspect of the vehicle;

showing the selected display; and

allowing a selection of the at least one option on the selected display.

13. The method of claim 12 wherein the user description includes a term at least identifying partially the aspect of the vehicle.

14. The method of claim 13 wherein the term includes one or more words.

15. The method of claim 12 wherein the at least one option is selected to access information about the aspect of the vehicle.

16. The method of claim 12 wherein the at least one option is selected to control the aspect of the vehicle.

17. The method of claim 16 wherein the aspect of the vehicle includes a climate control of the vehicle.

18. The method of claim 12 wherein the selected display includes a second option for selection which pertains to a second aspect of the vehicle having a description similar to the user description.

19. The method of claim 18 wherein the description of the second aspect of the vehicle is similar to the user description in spelling.

20. Software including machine readable instructions stored in a tangible medium for performing a process comprising:

receiving a request concerning an aspect of the vehicle, the request including a user description of the aspect of the vehicle;

selecting, based on the user description, a display which contains at least one option for selection, the at least one option pertaining to the aspect of the vehicle;

showing the selected display; and

allowing a selection of the at least one option on the selected display.

* * * * *

CALCAR 2632

EXHIBIT O
PAGE 190

**EXHIBIT P**

US006459961B1

(12) **United States Patent**
Obradovich et al.

(10) Patent No.:    **US 6,459,961 B1**
(45) Date of Patent:    **\*Oct. 1, 2002**

(54) **TECHNIQUE FOR PROVIDING INFORMATION UPON A NOTABLE CONDITION IN A VEHICLE**

(75) Inventors: **Michael L. Obradovich**, San Clemente; **Michael L. Kent**, Garden Grove; **John G. Dinkel**, Irvine, all of CA (US)

(73) Assignee: **American Calcar, Inc.**, Wilmington, DE (US)

(\*) Notice: This patent issued on a continued prosecution application filed under 37 CFR 1.53(d), and is subject to the twenty year patent term provisions of 35 U.S.C. 154(a)(2).

Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/717,943**

(22) Filed: **Nov. 21, 2000**

**Related U.S. Application Data**

(60) Continuation of application No. 09/401,039, filed on Sep. 21, 1999, now Pat. No. 6,175,782, which is a division of application No. 08/789,934, filed on Jan. 28, 1997, now Pat. No. 6,009,355.

(51) Int. Cl.[7] .................................................. G06F 7/00
(52) U.S. Cl. .............................. 701/1; 701/29; 701/30; 340/438; 340/459; 340/461
(58) Field of Search .............................. 701/1, 36, 48, 701/49, 29, 34; 340/459, 459, 527, 521, 438, 439, 457, 457.4, 462; 345/522, 835, 967

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,582,926 A | 6/1971 | Hassan | 340/449 |
| 4,291,749 A | 9/1981 | Ootsuka et al. | 165/202 |
| 4,314,232 A | 2/1982 | Tsunoda | 340/460 |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| DE | 4431070 | 3/1996 | |
| EP | 0 569 243 A1 | 11/1993 | |
| EP | 0 675 341 A1 | 10/1995 | |
| JP | 58026652 A | \* 2/1983 | ........... B60Q/9/00 |

OTHER PUBLICATIONS

M. Krebs, "Cars That Tell You Where to Go," *The New York Times*, Dec. 15, 1996, section 11, p. 1.

L. Kraar, "Knowledge Engineering," *Fortune*, Oct. 18, 1996, pp. 163–164.

S. Heuchert, "Eyes Forward: An ergonomic solution to driver information overload," *Society of Automobile Engineering*, Sep. 1996, pp. 27–31.

J. Braunstein, "Airbag Technology Takes Off," *Automotive & Transportation Interiors*, Aug. 1996, p. 16.

I. Adcock, "No Longer Square," *Automotive & Transportation Interiors*, Aug. 1996, pp. 38–40.

*Primary Examiner*—Jacques H. Louis-Jacques
(74) *Attorney, Agent, or Firm*—Kaye Scholer LLP

(57) **ABSTRACT**

In a multimedia information and control system for use in an automobile, at least one interface is employed which enables a user to access information concerning the automobile and control vehicle functions in an efficient manner. The user may select one of a plurality of displayed options on a screen of such an interface. Through audio, video and/or text media, the user is provided with information concerning the selected option and the vehicle function corresponding thereto. Having been so informed, the user may activate the selected option to control the corresponding vehicle function.

**23 Claims, 15 Drawing Sheets**



CALCAR 2363

EXHIBIT P
PAGE 191

**US 6,459,961 B1**

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,337,821 A | 7/1982 | Saito | 165/202 |
| 4,401,848 A | 8/1983 | Tsunoda | 701/29 |
| 4,407,564 A | 10/1983 | Ellis | 345/7 |
| 4,419,730 A | 12/1983 | Ito et al. | 701/36 |
| 4,441,405 A | 4/1984 | Takeuchi | 454/75 |
| 4,521,885 A * | 6/1985 | Melocik et al. | 701/29 |
| 4,536,739 A | 8/1985 | Nobuta | 340/323 R |
| 4,582,389 A | 4/1986 | Wood et al. | 345/7 |
| 4,636,782 A | 1/1987 | Nakamura et al. | 345/7 |
| 4,653,003 A * | 3/1987 | Kirstein | 701/29 |
| 4,731,769 A | 3/1988 | Schaefer et al. | 701/36 |
| 4,740,779 A | 4/1988 | Cleary et al. | 345/7 |
| 4,740,780 A | 4/1988 | Brown et al. | 345/7 |
| 4,752,824 A | 6/1988 | Moore | 345/7 |
| 4,787,039 A * | 11/1988 | Murata | 701/1 |
| 4,795,223 A | 1/1989 | Moss | 345/7 |
| 4,818,048 A | 4/1989 | Moss | 345/7 |
| 4,827,520 A | 5/1989 | Zeinstra | 701/1 |
| 4,837,551 A | 6/1989 | Iino | 345/7 |
| 4,876,594 A | 10/1989 | Schiffman | 345/7 |
| 4,914,705 A | 4/1990 | Nigawara | 340/825.51 |
| 4,988,976 A | 1/1991 | Lu | 345/7 |
| 4,995,258 A | 2/1991 | Frank | 73/118.2 |
| 4,996,959 A | 3/1991 | Akimoto | 73/118.2 |
| 5,006,829 A | 4/1991 | Miyamoto et al. | 340/359 |
| 5,043,736 A | 8/1991 | Darnell et al. | 342/357.1 |
| 5,051,735 A | 9/1991 | Furukawa | 345/7 |
| 5,070,323 A | 12/1991 | Iino et al. | 345/7 |
| 5,119,504 A | 6/1992 | Durboraw, III | 340/991 |
| 5,198,797 A | 3/1993 | Daidoji | 345/7 |
| 5,203,499 A | 4/1993 | Knittel | 237/2 A |
| 5,214,413 A | 5/1993 | Okabayashi et al. | 345/7 |
| 5,214,707 A | 5/1993 | Fujimoto et al. | 381/92 |
| 5,235,633 A | 8/1993 | Dennison et al. | 455/456 |
| 5,257,190 A | 10/1993 | Crane | 701/35 |
| 5,274,560 A | 12/1993 | LaRue | 701/202 |
| 5,278,532 A | 1/1994 | Hegg et al. | 345/7 |
| 5,293,115 A | 3/1994 | Swanson | 324/110 |
| 5,299,132 A | 3/1994 | Wortham | 701/207 |
| 5,334,974 A | 8/1994 | Simms et al. | 340/990 |
| 5,335,276 A | 8/1994 | Thompson et al. | 380/266 |
| 5,335,743 A | 8/1994 | Gillbrand et al. | 180/178 |
| 5,345,817 A | 9/1994 | Green et al. | 701/110 |
| 5,351,041 A | 9/1994 | Ikata et al. | 340/825.24 |
| 5,361,165 A | 11/1994 | Stringfellow et al. | 345/9 |
| 5,371,510 A | 12/1994 | Miyauchi et al. | 345/7 |
| 5,400,045 A | 3/1995 | Aoki | 345/7 |
| 5,404,443 A | 4/1995 | Hirata | 701/36 |
| 5,414,439 A | 5/1995 | Groves et al. | 345/7 |
| 5,416,318 A | 5/1995 | Hegyi | 250/226 |
| 5,422,565 A | 6/1995 | Swanson | 324/110 |
| 5,432,904 A | 7/1995 | Wong | 701/29 |
| 5,440,428 A | 8/1995 | Hegg et al. | 345/7 |
| 5,442,553 A | 8/1995 | Parillo | 702/122 |
| 5,450,321 A | 9/1995 | Crane | 701/35 |
| 5,450,329 A | 9/1995 | Tanner | 701/213 |
| 5,450,613 A | 9/1995 | Takahara et al. | 340/825.4 |
| 5,475,399 A | 12/1995 | Borsuk | 345/901 |
| 5,479,482 A | 12/1995 | Grimes | 455/456 |
| 5,483,632 A | 1/1996 | Kuwamoto et al. | 345/708 |
| 5,486,840 A | 1/1996 | Borrego et al. | 345/7 |
| 5,493,658 A | 2/1996 | Chaing et al. | 345/709 |
| 5,497,271 A | 3/1996 | Mulvanny et al. | 345/7 |
| 5,497,339 A | 3/1996 | Bernard | 703/25 |
| 5,504,622 A | 4/1996 | Oikawa et al. | 345/7 |
| 5,506,595 A | 4/1996 | Fukano et al. | 345/7 |
| 5,511,724 A | 4/1996 | Freiberger et al. | 236/49.3 |
| 5,519,403 A | 5/1996 | Bickley et al. | 342/352 |
| 5,519,410 A | 5/1996 | Smallanskas et al. | 345/7 |
| 5,523,559 A | 6/1996 | Swanson | 324/110 |
| 5,525,977 A | 6/1996 | Suman | 340/825.24 |
| 5,528,248 A | 6/1996 | Steiner et al. | 342/357.06 |
| 5,528,496 A | 6/1996 | Brauer et al. | 701/32 |
| 5,534,888 A | 7/1996 | Lebby et al. | 345/901 |
| 5,539,869 A | 7/1996 | Spoto et al. | 701/29 |
| 5,547,125 A | 8/1996 | Hennessee et al. | 237/12.3 |
| 5,553,661 A | 9/1996 | Beyerlein et al. | 165/203 |
| 5,555,172 A | 9/1996 | Potter | 455/456 |
| 5,555,286 A | 9/1996 | Tendler | 455/404 |
| 5,555,502 A | 9/1996 | Opel | 701/36 |
| 5,559,520 A | 9/1996 | Barzegar et al. | 701/213 |
| 5,572,204 A | 11/1996 | Timm et al. | 340/988 |
| 5,576,724 A | 11/1996 | Fukatsu et al. | 345/7 |
| 5,579,535 A | 11/1996 | Orlen et al. | 340/905 |
| 5,627,547 A | 5/1997 | Ramaswamy et al. | 701/201 |
| 5,638,305 A | 6/1997 | Kobayashi et al. | 700/280 |
| 5,648,769 A | 7/1997 | Sato et al. | 701/200 |
| 5,650,929 A | 7/1997 | Potter et al. | 340/438 |
| 5,653,386 A | 8/1997 | Hennessee et al. | 237/12.313 |
| 5,654,715 A | 8/1997 | Hayashikura et al. | 342/70 |
| 5,666,102 A | 9/1997 | Lahiff | 340/461 |
| 5,670,953 A | 9/1997 | Satoh et al. | 701/301 |
| 5,689,252 A | 11/1997 | Ayanoglu et al. | 340/991 |
| 5,691,695 A | 11/1997 | Lahiff | 340/461 |
| 5,702,165 A | 12/1997 | Koibuchi | 701/71 |
| 5,712,640 A | 1/1998 | Andou et al. | 342/70 |
| 5,732,368 A * | 3/1998 | Knoll et al. | 701/1 |
| 5,734,973 A | 3/1998 | Honda | 455/186.1 |
| 5,752,754 A | 5/1998 | Amitani et al. | 303/199 |
| 5,757,268 A * | 5/1998 | Toffolo et al. | 340/459 |
| 5,758,311 A | 5/1998 | Tsuji et al. | 701/111 |
| 5,777,394 A | 7/1998 | Arold | 307/10.1 |
| 5,781,872 A * | 7/1998 | Konishi et al. | 701/36 |
| 5,919,239 A | 7/1999 | Fraker et al. | 701/35 |
| 6,002,326 A * | 12/1999 | Turner | 340/426 |

* cited by examiner

CALCAR 2364

EXHIBIT P
PAGE 192



FIG. 1

CALCAR 2365

EXHIBIT P
PAGE 193

FIG. 2

EXHIBIT P
PAGE 194



FIG. 3A



FIG. 3B



FIG. 3C



FIG. 4A



FIG. 4B

EXHIBIT P
PAGE 198



FIG. 5



FIG. 6

CALCAR 2371

EXHIBIT P
PAGE 199



FIG. 7



FIG. 8

CALCAR 2372

EXHIBIT P
PAGE 200



FIG. 9



FIG. 10

CALCAR 2373

EXHIBIT P
PAGE 201



FIG. 11

CALCAR 2374

EXHIBIT
PAGE 502



FIG. 12



FIG. 13



FIG. 14

CALCAR 2376

EXHIBIT P
PAGE 204



FIG. 15



FIG. 16



FIG. 17



FIG. 18

| 1901 | 1903 |
|---|---|
| AIR CONDITIONING | LINK TO CLIMATE CONTROL SCREEN OF FIG. 15 |
| ANTI-LOCK BRAKE SYSTEM INDICATOR | LINK TO WARNING LIGHT OPTION #4 ON FUEL/TEMP SCREEN (NOT SHOWN) |
| AUTOMATIC CLIMATE CONTROL | LINK TO CLIMATE CONTROL SCREEN OF FIG. 15 |
| • • • | • • • |
| CHARGING SYSTEM FAILURE INDICATOR | LINK TO CHARGING SYSTEM FAILURE OPTION 1309f (FIG. 13) |
| CLIMATE CONTROL SYSTEM | LINK TO CLIMATE CONTROL SCREEN OF FIG. 15 |
| COOLING | LINK TO CLIMATE CONTROL SCREEN OF FIG. 15 |
| CRUISE CONTROL INDICATOR | LINK TO WARNING LIGHT OPTION #2 ON SPEEDOMETER SCREEN (NOT SHOWN) |
| DEFOG/DEFROST | LINK TO CLIMATE CONTROL SCREEN OF FIG. 15 |
| DOOR AJAR INDICATOR | LINK TO WARNING LIGHT OPTION #7 ON FUEL/TEMP SCREEN (NOT SHOWN) |
| DIRECTIONAL SIGNALS INDICATOR | LINK TO TURN SIGNAL/HAZARD WARNING OPTION 1201b (FIG. 12) |
| • • • | • • • |

1905

**FIG. 19**

EXHIBIT P
PAGE 207

US 6,459,961 B1

**1**

### TECHNIQUE FOR PROVIDING INFORMATION UPON A NOTABLE CONDITION IN A VEHICLE

This application is a continuation of application Ser. No. 09/401,039 filed on Sep. 21, 1999, now U.S. Pat. No. 6,175,782 which is a division of application Ser. No. 08/789, 934 filed on Jan. 28, 1997, maturing into U.S. Pat. No. 6,009,355 issued on Dec. 28, 1999.

### FIELD OF THE INVENTION

The invention relates generally to information and control systems and, more particularly, to a system for use in an automobile which facilitates a user's retrieval and/or dissemination of information, and control of vehicle functions.

### BACKGROUND OF THE INVENTION

Information is vital to day-to-day activities. With no access to information, people cannot function efficiently in this society, and their lives and financial well-being are put in jeopardy. People want to be well-informed, so much so that when they are travelling in automobiles, they tune into local radio stations to listen to news, weather forecasts and traffic conditions. For that matter, some automobiles are equipped with audiovisual systems including television (TV) receivers. One such system is disclosed in U.S. Pat. No. 5,404,443 issued to Hirata. The Hirata system provides audiovisual information in a number of modes including a TV mode, which may be selected by control switches disposed on the periphery of a display.

Automobile users like to be continually updated with information affecting their travel plans such as weather and traffic conditions because of its fast changing nature. Automobile users who are traveling also like to continually keep in touch with their homes and offices, and to confirm appointments and hotel reservations so that they can adjust their itineraries accordingly. To that end, cellular mobile telephones were introduced to enable automobile users to conduct business and contact their families while they are traveling.

In addition, local map information is important to automobile travelers moving from one locale to another. As such, navigation systems were developed to help reach their destinations in an unfamiliar milieu. One such vehicle navigation system is disclosed in U.S. Pat. No. 5,274,560 issued to LaRue. The disclosed system is based on artificial intelligence and provides a driver with directions via a voice interface. The system is built upon an optical disk player which can be used for entertainment as well. Digitized maps, compressed voice records and computer programs are stored on an optical disk compatible with the disk player. After a destination point is identified, the disclosed system finds the best route from the digitized maps and guides the driver therethrough via the voice interface, taking into account the latest traffic conditions received by an FM receiver to avoid congestion.

Recently, navigation systems based on military global positioning system (GPS) technology have emerged. One such navigation system is commercially available as an option for the latest model of the ACURA 3.5 RL automobile. This ACURA navigation system receives signals from a constellation of satellites which is part of the GPS. In response to these signals, the navigation system pinpoints the automobile's location (in latitude and longitude). It also detects the automobile's speed and direction. With geographic information stored on a hard disk in an onboard

**2**

computer, the navigation system is capable of verbally and visually communicating to the user instructions for reaching the destination.

In addition to the above techniques for communications with automobile users, a technique for disseminating information regarding the automobiles themselves is disclosed in U.S. Pat. No. 5,442,553 issued to Parillo. The disclosed system is a vehicle diagnostic and software upgrade system. In this system, sensors are provided in the vehicle to generate dynamic data relating to various mechanical controls and the engine of the vehicle, including engine R.P.M., fuel/air mixture, emissions and pollution content information. A microprocessor in the vehicle has access to selectable program parameters affecting the functioning of the mechanical controls. The microprocessor collects and transmits the dynamic data to a remote diagnostic station periodically or upon its request. In response, the remote station sends, to the vehicle, signals indicative of any changes in its software and/or program parameters. The microprocessor accordingly causes the changes to be made in the vehicle based on the received signals.

Besides the communication capabilities described above, an automobile has many accessories and user control elements such as lights, wipers, a clock, temperature control, cruise control, seat adjustment control, mirror adjustment control, and an anti-theft system. A technique for centralizing the command of the individual control elements is disclosed in U.S. Pat. No. 5,555,502 issued to Opel. The disclosed system includes a centralized control panel on a steering wheel which, together with a display, is utilized to control the electronic components of the automobile. The display is positioned in the area of the driver's sun visor. After the driver presses one of the buttons on the control panel corresponding to a desired electronic component, a menu is displayed so that the driver is able to select items from the menu to program the component. The selection is accomplished by pressing specified buttons on the panel.

In addition, a technique for controlling vehicle accessories via voice command is disclosed in U.S. Pat. No. 4,827,520 issued to Zeinstra. In accordance with this technique, control functions of each accessory are formatted in a summary page for display on a screen, which is scanned by infrared light to sense any touching thereon. By uttering any of the displayed functions on the summary page, preceded by either a specified keyword or an actuation of a push-to-talk switch on a steering wheel, a more detailed subpage of the selected function is displayed for further selection by voice. As an alternative to the voice command, the selection can also be accomplished by touching the displayed function on the screen.

Voice command and touch screen techniques are frequently mentioned in prior art references in controlling car accessories. In particular, U.S. Pat. No. 5,214,707 issued to Fujimoto et al. discloses a system for voice-controlling equipment inside a vehicle, including microphones capable of discriminating voice commands as to whether they are generated at the driver side or at the assistant side of the vehicle in a noisy environment.

### SUMMARY OF THE INVENTION

It is celebratory that technology advances at lightning speed. However, many people are left behind the technological frontier, and to some extent develop "technophobia". Some of them have been given up this technological race, which is confirmed by the blinking "12:00" display on the clocks of many video cassette recorders (VCRs) being used.

CALCAR 2380

EXHIBIT P
PAGE 209

US 6,459,961 B1

3

Similarly, it is fantastic that automobiles nowadays include many advanced accessories such as audiovisual systems, anti-theft systems, anti-lock brake systems, climate control, and cruise control which embrace the latest technologies. However, of all these accessories, many automobile users only know how to operate the headlights and windshield wipers, and regard the rest as nuisance. That is, the users pay for numerous accessories which they do not use, resulting in much consumer waste. We have recognized that such non-use is principally attributed to an inefficient distribution of operating knowledge of the automobile and, in particular, its accessories.

Specifically, when automobile users presently want to learn about certain aspects of an automobile, they need to consult an owner's manual which could have been lost or misplaced when they need it the most. In addition, the manual is unpopular because many users simply want to avoid reading any written material, and find it intimidating as it oftentimes is filled with incomprehensible technical jargon.

We have further recognized that even with the operating knowledge, many users are overwhelmed and confused with the large number of knobs, switches and buttons used to control the individual vehicle parts and accessories.

Accordingly, it is an object of the invention to design an information and control system for use inside an automobile with the user in mind. The user is afforded a centralized control which may be used in lieu of the knobs, switches and buttons to operate the vehicle parts and accessories. In accordance with the invention, the centralized control is intimately tied to an information system such that the user is able to efficiently access information about the functions and operations of such parts and accessories, and in a synergistic manner apply that information to operate same, using the centralized control.

It is another object of the invention that the access to the information is intuitive and direct so that the user can obtain the relevant information in a few self-explanatory steps. To that end, the invention embraces a multimedia approach where audio and video media are added to the traditional text media to convey information. The additional media increases the dimensions of both the user's comprehension of the information and the user's interaction with the automobile. Moreover, the information access is driven by a multilevel menu based on an intuitive model of taxonomy where information is organized in a minimal number of levels of subject matter from general to specific. The above integration of the multimedia approach with the multilevel menu approach presents an effective way of retrieving information in the automobile. Advantageously, with the invention, the user would not be distracted or overburdened by irrelevant information in the course of an information retrieval, which is conducive to a safe driving environment.

In the preferred embodiment, when the user wants to access information about a given part or accessory of the automobile, the user is presented with options on a display screen. Each option is associated with a respective one of different parts or accessories of the automobile. The user is able to select through the interface one of the options, associated with the given automobile part or accessory. The option, when selected, is highlighted in a first color, for example, yellow. A voice is then generated by the inventive system to explain the purpose or the content of the selected option before the user commits to it. Having been so informed, the user may then activate the selected option in retrieving the information of interest. The activated option is

4

highlighted in a second color, e.g., blue, to indicate its active status. The retrieved information is presented to the user both in text and in voice.

## BRIEF DESCRIPTION OF THE DRAWING

Further objects, features and advantages of the invention will become apparent from the following detailed description taken in conjunction with the accompanying drawing showing an illustrative embodiment of the invention, in which:

FIG. 1 is a block diagram of an automobile information and control system in accordance with the invention;

FIG. 2 illustrates a control panel and a display interface for a user to interact with the system of FIG. 1;

FIG. 3A illustrates a flow chart depicting the steps of an anti-car-theft routine used in the system of FIG. 1;

FIGS. 3B and 3C jointly illustrate a flow chart depicting the steps of a routine for presenting various screens to the user in the system interaction;

FIG. 4A illustrates a screen for eliciting a personal identification number (PIN) from the system user;

FIG. 4B illustrates a SELECT A FUNCTION screen including features thereof in accordance with the invention;

FIG. 5 illustrates an introduction screen including features thereof in accordance with the invention;

FIG. 6 illustrates a MANUFACTURER screen including features thereof in accordance with the invention;

FIG. 7 illustrates a SAFETY REMINDERS screen including features thereof in accordance with the invention;

FIG. 8 illustrates a THEFT PROTECTION FEATURES screen including features thereof in accordance with the invention;

FIG. 9 illustrates a QUICK TIP SET-UP screen including features thereof in accordance with the invention;

FIG. 10 illustrates a MAIN MENU screen including features thereof in accordance with invention;

FIG. 11 illustrates a DRIVER'S VIEW screen including features thereof in accordance with the invention;

FIG. 12 illustrates an INSTRUMENT PANEL screen including features thereof in accordance with the invention;

FIG. 13 illustrates a TACHOMETER AND WARNING LIGHTS screen including features thereof in accordance with the invention;

FIG. 14 illustrates a segment of the screen of FIG. 13 providing the user with information regarding a particular function of the automobile;

FIG. 15 illustrates a CLIMATE CONTROL screen including features thereof in accordance with the invention;

FIG. 16 illustrates a SAVE screen for saving the user's preferences in accordance with the invention;

FIG. 17 illustrates a DATA ENTRY screen in accordance with the invention for looking up information regarding a specific item in the automobile;

FIG. 18 illustrates an INDEX screen with listed items for which information is available; and

FIG. 19 is a look-up table listing searchable items and the corresponding instructions for a processor in the system of FIG. 1 to provide information regarding such items.

Throughout this disclosure, unless otherwise stated, like elements, components and sections in the figures are denoted by the same numerals.

## DETAILED DESCRIPTION

FIG. 1 illustrates information and control system 100 embodying the principles of the invention for use in an

CALCAR 2381

EXHIBIT P
PAGE 209

US 6,459,961 B1

| 5 | 6 |

automobile. System 100 is referred to as the "AUTO DIRECTOR" system. It is user-friendly and designed with the automobile user in mind. For example, with AUTO DIRECTOR display interface 102a to be described, information about the automobile is readily available literally at the fingertips of the user. This information includes operational instructions, maintenance procedures, safety measures, and information about virtually every capability of the automobile. In accordance with the invention, the user is able to efficiently access such information using multimedia means involving audio, text and video media. Also with interface 102a, or multifunction display interface 102b to be described, the user is afforded a centralized control whereby he/she can program or adjust different vehicle parts and accessories using the information thus obtained.

As shown in FIG. 1, central to system 100 is processor 105 connected to memory 115. Data bus 107 connects processor 105 to display interfaces 102, input interfaces 104, communications interfaces 106, output control interfaces 108, vehicle computer interfaces 110, vehicle control interfaces 112, self-test interface 114, preferences interface 116, and audio interface 118.

Display interfaces 102 include, inter alia, AUTO DIRECTOR display interface 102a, which is illustrated in FIG. 2, together with control panel 205 in FIG. 1. By way of example, but not limitation, the hardware of interface 102a and control panel 205 are derived from a prior art navigation system of the type of the ACURA navigation system. In fact, interface 102a and control panel 205 are used in this illustrative embodiment to realize not only AUTO DIRECTOR functions to be described, but also the well-known navigation function.

Interface 102a includes a conventional liquid crystal display screen 209, and LCD driver (not shown) for processor 105 to control the display on screen 209. Interface 102a also incorporates well-known touch-screen circuitry (not shown) connected to touch screen interface 104a in FIG. 1. With this circuitry, the user can interact with processor 105 by, say, touching a displayed option on screen 209. Through interface 104a, processor 105 receives from the touch screen circuitry a signal identifying the location on screen 209 where it has been touched. If such a location matches the predetermined location of one of the displayed options, processor 105 determines that option has been selected. With such touch-screen and displayed option selection capabilities, through AUTO DIRECTOR interface 102a, the user is able to obtain information on and control selectable functions of the automobile such as the instrument panel, navigation function, mobile phone, radio/CD player, locks, mirrors, windows, driver's seat adjustment control, climate control, windshield wipers, cruise control, lights, security function, steering, ride control, engine and transmission.

Control panel 205 comprises CANCEL switch 205a, ENTER switch 205b, BRIGHTNESS switch 205c, PUSH TO SELECT knob 205d, MENU switch 205e, MAP/GUIDE switch 205f, SETUP switch 205g, ZOOM IN switch 205h and ZOOM OUT switch 205i. BRIGHTNESS switch 205c comprises a standard variable resistor such that when it is pushed one way, operating circuitry 121 responsively causes the display intensity to increase, and the other way to decrease. ZOOM IN switch 205h when pressed enables the automobile user to enlarge a particular visual area of interest on screen 209, affording better details. On the other hand, ZOOM OUT switch 205i when pressed performs the inverse function to switch 205h. As an alternative to the touch-screen capability, switch 205d similar to a standard joystick

is provided for the user to move from one displayed option to another on screen 209 in the same direction (e.g., up, down, left or right) as the switch is operated. A desired option may be selected by pressing ENTER switch 205b. The functions of the other switches are described hereinbelow as they are called out in the description of system 100. In this illustrative embodiment, AUTO DIRECTOR display interface 102a and control panel 205 are mounted close to the center of the dashboard of the automobile next to the steering wheel.

Referring back to FIG. 1, display interfaces 102 also include multifunction display interface 102b, center console display interface 102c, rear console display interface 102d, and instrument panel display interface 102e.

Specifically, multifunction display interface 102b is installed on the dashboard close to interface 102a on the driver side. Like interface 102a, interface 102b provides the user with graphic display and control of selected functions using well-known touch screen technology. In fact, interface 102b duplicates certain control functions (e.g., navigation, phone, radio and climate control) of interface 102a so that the user can use interface 102b to control a selected function while interface 102a is engaged in another ongoing function. For example, while the user is relying on AUTO DIRECTOR interface 102a to provide navigation information to reach a given destination, the user may want to adjust the climate control of the automobile. It is inconvenient for the user to terminate the ongoing navigation mode of interface 102a, albeit temporarily, to access the climate control function through the interface, adjust the climate control and then resume the navigation mode. Thus, it is preferable to leave the navigation mode of interface 102a alone and use interface 102b to administer the climate control.

Center console interface 102c is installed close to interface 102a on the passenger side. Similar to interface 102b, interface 102c provides the front seat passenger with graphic display and control of functions which include: the front passenger seat adjustment, door lock, window, climate and TV controls. If enabled by the driver, control is also available for the radio/CD player and phone.

Rear console display interface 102d is installed on the back of a front seat. Similar to interface 102c, interface 102d provides rear seat passengers with graphic display and control of certain functions if enabled by driver or front seat passenger. These functions include: the rear seat climate, windows, door locks, radio/CD player and TV controls.

Instrument panel display interface 102e is installed on the dashboard in front of the driver seat. This interface provides the driver with graphic display of the vehicle speed, engine RPM, outside and inside temperatures, oil pressure, fuel level, time, odometer reading, trip odometer reading and warning light indicators. Through AUTO DIRECTOR interface 102a, the system user may select the display of the information in either an analog or a digital form.

Input interfaces 104 comprise touch screen interface 104a and control panel 205 described before, and voice command interface 104b. The latter is connected to a microphone (not shown) and comprises standard voice command circuitry (not shown) for processing voice commands by the user through the microphone to control or modify selected functions of system 100.

Communications interfaces 106 include phone interface 106a, radio/CD interface 106b, television (TV) interface 106c, navigation interface 106d, and beacon interface 106e. Processor 105 interacts with and controls standard phone equipment connected to phone interface 106a. Through

CALCAR 2382

EXHIBIT P
PAGE 210

US 6,459,961 B1

7

processor 105, the user may operate the phone equipment via voice command, thereby realizing hands-free operation of the equipment. Alternatively, the user may operate the phone equipment using the touch screen capability provided by AUTO DIRECTOR display interface 102a or multifunction display interface 102b. The user may also operate the phone equipment via remote switches.

Similarly, processor 105 interacts with and controls one or more radio receivers and CD players in the automobile connected to radio/CD interface 106b. Through processor 105, the user may operate the radio receivers via voice command, remote switch and/or touch screen capability.

Processor 105 further interacts with and controls one or more TV receivers in the automobile connected to TV interface 106c. Again, the user may operate the TV receivers via voice command, remote switches and/or touch screen capability.

As further described hereinbelow, navigation interface 106d is connected to a standard inertial guidance system (not shown) capable of providing gyros information, and deriving the vehicle location based on GPS information. With the map information stored in memory 115, the inertial guidance system is capable of providing the user with navigational instructions via interface 102a or 102b. Besides the locational information, local and national emergency information may be derived from the GPS information using additional standard decoding circuitry in interface 106d.

Beacon interface 106e is used for connection to a standard beacon device for detecting a predetermined beacon radio signal to provide additional locational information.

Output control interfaces 108 include lock interface 108a, mirror interface 108b, window interface 108c, steering column interface 108d, seat interface 108e, climate control interface 108f, wiper interface 108g, cruise control interface 108h, light interface 108i and clock interface 108j.

Specifically, lock interface 108a comprises output control logic controllable by processor 105 to lock or unlock the car doors, glove box, console storage, trunk (or liftgate), fuel filler door, brakes and transmission, and enable or disable the child-proof door locks, fuel pump and ignition.

Mirror interface 108b comprises output control logic controllable by processor 105 to maneuver the positions of the outside mirrors and inside rear view mirror, and to fold or unfold the outside mirrors.

Window interface 108c comprises output control logic controllable by processor 105 to incrementally or completely open or close all windows, and to open, close or tilt any sunroof.

Steering column interface 108d comprises output control logic controllable by processor 105 to move the steering column in or out and up or down.

Seat interface 108e comprises output control logic controllable by processor 105 to (1) adjust the positions of the front seats forward or aft, and up or down; (2) tilt the front or rear of the seat cushion up or down; (3) adjust the seat back lumbar, width and angle forward or aft; (4) increase or decrease the cushion size and stiffness; (5) raise or lower the head restraint; and (6) raise or lower the seat belt height.

Climate control interface 108f comprises output control logic controllable by processor 105 to (1) turn the climate control system on or off; (2) select an air flow mode; (3) set fan speeds; (4) enable or disable seat heaters; (5) select fresh or recirculated air (for driver only); and (6) enable or disable front and rear defrosters, mirrors and steering wheel heaters (for driver only).

8

Windshield wiper interface 108g comprises output control logic controllable by processor 105 to (1) select a high, low, intermittent, single wipe or off mode; (2) set an intermittent delay; and (3) enable or disable front or rear washers. Interface 108g also includes control logic for controlling rain- and speed-sensitive wipers, and for activating an automatic wash in a single wide mode when the windshield is at a certain level of opacity.

Cruise control interface 108h comprises output control logic controllable by processor 105 to (1) turn the cruise control on or off, (2) set the vehicle speed, and (3) cancel or resume the set speed.

Light interface 108i comprises output control logic controllable by processor 105 to select an automatic on mode or off mode for parking lights, headlights and fog lights; and to turn on or off map or courtesy lights.

Clock interface 108j comprises output control logic controllable by processor 105 to set an initial date and time on a conventional clock (not shown) connected to interface 108j. System 100 relies on the current date and time kept by the clock to provide a time reference for the system functions.

Vehicle computer interfaces 110 include anti-lock brake computer interface 110a, engine computer interface 110b and supplemental restraint computer interface 110c for processor 105 to communicate with the computers controlling the anti-lock brakes, engine and supplemental restraints (e.g., back-up airbag deployers and seat belt tensioners), respectively. Interfaces 110 also include back-up interface 110d through which processor 105 receives and analyzes signals from the engine, anti-lock brake and supplemental restraint computers. These signals would indicate to processor 105 any failures of the computers. In response to a computer failure, processor 105 causes a corresponding back-up computer connected to interface 110d to provide a back-up function.

Vehicle control interfaces 112 include steering interface 112a, ride interface 112b, engine interface 112c, transmission interface 112d, traction control interface 112e, and security interface 112f.

Specifically, steering interface 112a comprises input monitoring and output control logic for processor 105 to lighten or tighten the steering effort ratio in response to changing road conditions. Through interface 102a, the user may opt for manual or automatic steering effort ratio control. Interface 112a is capable of adapting and storing data according to the driver's inputs. It also allows for steering of front and/or rear wheels for sporty or increased stability.

Ride interface 112b comprises input monitoring and output control logic for processor 105 to lighten or stiffen the ride control to front and/or rear of vehicle in response to changing road conditions. Through interface 102a, the user may also opt for manual or automatic ride control.

Engine interface 112c comprises input monitoring and output control logic allowing for shutting off a specified number of cylinders, and varying valve and cam timing to increase performance or fuel economy. This interface also allows for manual or automatic control of the engine components, and includes the capability of adapting and storing data according to the driver's inputs.

Transmission interface 112d comprises input monitoring and output control logic for selecting manual or automatic shifting of the transmission. In an automatic shifting mode, interface 112d is capable of adapting and storing data according to the driver's inputs. Interface 112d also allows for control of a variable differential ratio for fast acceleration and high economy cruise.

CALCAR 2383

EXHIBIT P
PAGE 211

US 6,459,961 B1

9

Traction control interface 112e comprises input monitoring and output control logic providing information on whether power is delivered to front and/or rear wheels of the vehicle and what proportion of the power is delivered to each wheel. This interface also allows for manual or automatic control, and such functions as yaw control in cooperation with the anti-lock brakes and an engine cylinder shutoff.

Security interface 112f comprises control logic for setting a security level, and enabling or disabling a number of security related functions such as the fuel supply cut-off, motion detector, brake locking, etc. Interface 112f also allows entry of a new or alteration of an existing personal identification number (PIN) for personalization of the vehicle functions, i.e., saving the vehicle functional preferences.

In accordance with an aspect of the invention, system 100 incorporates an anti-car-theft technique involving security interface 112f. In accordance with this inventive technique, security interface 112f further comprises a sensor for detection of a predetermined condition to trigger an anti-theft routine. It will be appreciated that a person skilled in the art will come up with many different triggering events causing the sensor to invoke the routine. For example, a passive way of triggering the anti-theft routine would be after the sensor detects that the engine is off and the user has opened, closed and locked the driver's door.

In any event, as soon as processor 105 receives from the sensor a signal requesting an invocation of the anti-theft routine, processor 105 retrieves from navigation interface 106d GPS information identifying the parking location of the automobile, as indicated at step 251 in FIG. 3A. Processor 105 then stores at step 253 the parking location GPS information in memory 115. At step 255, processor 105 determines whether the security measures remain on. By way of example, but not limitation, such determination is based on information from lock interface 108a indicating whether the driver's door is properly unlocked. If that door is properly unlocked, processor 105 determines that the security measures are called off, and the anti-theft routine comes to an end, as indicated at step 257.

Otherwise if processor 105 determines that the security measures remain on, processor 105 at step 259 retrieves from navigation interface 106d GPS information identifying the current location of the automobile. Processor 105 then compares at step 261 the current location GPS information with the parking location GPS information previously stored. If processor 105 at step 262 determines that the current location matches the parking location based on the comparison, the anti-theft routine returns to step 255 after a predetermined period. Otherwise if processor 105 determines that the current location does not match the parking location, processor 105 assumes that the automobile has been removed without authorization, i.e., stolen. At this point, if a conventional alarm system is connected to security interface 112f, processor 105 would cause an alarm to come on, gas to be cut off, etc.

In this example, a conventional transmitter (not shown) is connected to security interface 112f and transmits a predetermined sequence of signals receivable by a law enforcement agency or a suitable alarm monitor company when it is activated. Continuing the example, processor 105 translates the GPS information identifying the current vehicle location into the corresponding street address based on the map information stored in memory 115, as indicated at step 263. Processor 105 at step 265 looks up one or more phone

10

numbers pre-stored in memory 115 for reporting to the law enforcement agency (or the alarm monitor company) about the stolen status. Alternatively, a list of phone numbers associated with law enforcement agencies (or branches of the alarm monitor company) in many different geographic locations is pre-stored, along with the GPS information identifying the locations of the respective law enforcement agencies (or alarm monitor company branches). This being so, processor 105 locates the closest law enforcement agency (or alarm monitor company branch) and its associated phone number(s) by comparing the current vehicle location GPS information with the respective agency (or branch) location GPS information.

In any event, processor 105 at step 267 initiates a call to a law enforcement agency (or an alarm monitor company branch) through phone interface 106a using the phone number just located. After the phone connection is established, processor 105 provides through the connection information about the current address of the vehicle using conventional voice synthesizer circuitry (not shown) in audio interface 118, and the pre-recorded information about the vehicle itself such as its vehicle identification number (VIN), model, year, color, license number, etc., as indicated at step 269. Through the same phone connection, processor 105 may also provide information about the vehicle's owner such as his/her name and contact number so that the law enforcement agency (or alarm monitor company branch) can notify the owner of the incident. Processor 105 at step 271 activates the aforementioned transmitter connected to security interface 112f to generate the predetermined sequence of signals in case the stolen vehicle is in transit. For that matter, processor 105 can also repeatedly check on the latest vehicle location and report any new address different from the one previously reported. Thus, by tracking the signals in the vicinity of the latest reported vehicle location, the law enforcement agency (or alarm monitor company) would recover the vehicle in an efficient manner.

Referring back to FIG. 1, self-test interface 114 comprises input/output (I/O) control logic for performing an active self-test of system 100 on power up or at the user's request. Specifically, interface 114 polls every other interface in system 100 for a self-test result. Each interface, when polled, performs an active self-test and reports the test results to interface 114, where such test results are gathered and caused to be displayed on interface 102a.

Preferences interface 116 monitors changes made by the user in selected functions after the user logs on system 100, and prompts the user to save such preferences. These preferences are stored in memory 115 in association with the user's PIN. Functions affording the user choices include auto locks, an easy entry, auto lamps, the seat position, steering column position, mirror position, radio, steering, ride, transmission shift, engine performance, climate, and security level.

Audio interface 118 comprises I/O control logic for receiving audio signals from a radio/CD, TV, compact disk (CD) player, or phone interface, processing the received audio signals, providing proper amplifications thereto, and routing the resulting sound to appropriate speakers and headphones (not shown) connected to interface 118. In this illustrative embodiment, AUTO DIRECTOR display interface 102a and multifunction display interface 102b share the same speakers. Interface 118 also provides center and rear console display interfaces 102c and 102d with separate audio channels, speakers and headphone outputs. The front and rear speakers may be muted by the user as a preference.

Interface 118 also processes requests from other interfaces for pre-recorded digital sounds stored in a SOUNDSGOOD

CALCAR 2384

EXHIBIT P
PAGE 212

US 6,459,961 B1

11

library in memory 115 and routes the requested sounds to the appropriate interfaces. In addition, interface 118 comprises the conventional voice synthesizer circuitry for providing voice messages to the appropriate interfaces.

FIGS. 3B and 3C jointly illustrate routine 300 for accessing, through AUTO DIRECTOR display interface 102a, a main menu to obtain operational instructions, maintenance procedures, safety measures, and other information about the automobile, collectively referred to as "Quick Tips". Routine 300 is stored in memory 115 and initiated when SETUP switch 205g in FIG. 2 is pressed. Instructed by routine 300, processor 105 at step 301 elicits a PIN from the user by displaying a screen of FIG. 4A through interface 102a. As shown in FIG. 4A, a video key-pad comprising numeral keys "1" through "9", and "*" and "#" keys are displayed on screen 209. In response, the user enters a sequence of numerals by touching the corresponding displayed keys, followed by the "#" key.

It should be pointed out that in accordance with another aspect of the invention, when a displayed key or option is touched on the screen of AUTO DIRECTOR display interface 102a or multifunction display interface 102b, a tone pre-selected by the user from the SOUNDSGOOD library is generated through audio interface 118, indicating that the key or option has been touched on the screen. Advantageously, relying on the audio tone confirmation, as opposed to a visual confirmation, the user while driving can continually watch the road.

The user may alternatively enter the above numeral sequence using control panel 205 in a manner to be described. In any event, processor 105 then verifies at step 303 the PIN entry by comparing it with the user's preselected PIN. The latter is stored in memory 115, along with the user's preferences. In a standard way, the user is given a few chances to enter a correct PIN. Verification of the PIN entry identifies the user as a legitimate user. Thus, if the PIN entry is not valid, routine 300 comes to an end, as indicated at step 304.

Otherwise if the PIN entry is valid, processor 105 at step 305 causes interface 102a to display on screen 209 a "SELECT A FUNCTION" screen, which is illustrated in FIG. 4B. As shown in FIG. 4B, two options, namely, "NAVIGATION" and "QUICK TIPS", are displayed on screen 209. By default, NAVIGATION option 401 is highlighted yellow when the screen of FIG. 4B appears.

It should be pointed out that in this illustrative embodiment, a yellow highlight on an option indicates that the option is selected but not yet activated. Once a yellow highlighted option is activated, the option is highlighted blue. System 100 then performs according to the activated option.

Thus, in this instance, the user may activate the yellow highlighted NAVIGATION option by touching the option on screen 209 or by pressing ENTER switch 205b.

However, if QUICK TIPS option 403 is desired, the user may touch that option on screen 209, which would then be highlighted yellow. A second touch on the same option will change the highlight to blue, indicating the active status. As an alternative, the user may utilize knob 205d of FIG. 2 to select QUICK TIPS option 403 by first pushing the knob to the right. In response, processor 105 causes the yellow highlight to move from default NAVIGATION option 401 to QUICK TIPS option 403. The user can then select the QUICK TIPS option by pressing ENTER switch 205b. Upon selection, the yellow highlighted option will again turn blue.

Processor 105 at step 308 detects an activation of either NAVIGATION option 401 or QUICK TIPS option 403. If

12

NAVIGATION option 401 is activated, processor 105 at step 311 causes system 100 to enter into a navigation mode. In this mode, processor 105 causes navigational instructions to be displayed on screen 209 in a conventional manner. In providing the navigation instructions, the standard inertial guidance system connected to navigation interface 106d receives signals from a constellation of GPS satellites maintained and controlled by the U.S. Department of Defense. In response to these signals, the inertial guidance system identifies the location (in longitude and latitude) of the automobile. The system also detects the vehicle speed, and the direction in which the vehicle is headed. By accessing the map information stored in memory 115, the system is capable of visually and verbally providing the user with directions to a given destination through AUTO DIRECTOR display interface 102a and audio interface 118, respectively.

Otherwise if activation of QUICK TIPS option 403 is detected at step 308, processor 105 causes interface 102a to display an introduction screen on screen 209, as indicated at step 314. This introduction screen is illustrated in FIG. 5.

As shown in FIG. 5, system source identification, warning and instructional information appear on the introduction screen, along with two options, "MAIN MENU" and "READ ME". The default option in this instance is READ ME option 501 which is highlighted yellow. Processor 105 detects at step 317 whether MAIN MENU option 503 or READ ME option 501 is activated. If MAIN MENU option 503 is activated, routine 300 proceeds to step 340 to be described. Otherwise if READ ME option 501 is activated, routine 300 proceeds to step 320 where processor 105 causes a series of three screens to be displayed. The first screen of the series is a "MANUFACTURER" screen, which is illustrated in FIG. 6.

As shown in FIG. 6, a description of the QUICK TIPS system appears on the MANUFACTURER screen. If the text to be displayed exceeds one screen, which is the case here, scrolling options comprising scroll-up option 605 and scroll-down option 607 are provided. When option 605 is touched and activated on screen 209, additional text scrolls up one paragraph at a time. Option 607 performs an inverse function to option 605. Again, as an alternative, the user may maneuver PUSH TO SELECT knob 205d until the desired scroll option (or direction arrow) is highlighted yellow. The activation of the highlighted option is achieved by pressing ENTER switch 205b.

By default, displayed option 609 has the "AUTO VOICE" wording thereon and is highlighted blue as the MANUFACTURER screen comes on. Accordingly, a pre-recorded voice is activated by processor 105 through audio interface 118 to read the entire text associated with this screen without interruption, including the text which is not presently shown on screen 209 but otherwise shown upon scrolling. To alter the AUTO VOICE function, the user may touch option 609 on screen 209, or alternatively press ENTER switch 205b. By doing so, the "AUTO VOICE" wording on option 609 changes to "MANUAL VOICE", which is highlighted blue, indicating its active status.

In accordance with the MANUAL VOICE function, a pre-recorded voice reads the displayed text only, and stops reading until additional text is scrolled onto the screen. To silence the voice, the user may again touch option 609 on screen 209, or alternatively press ENTER switch 205b. By doing so, the "MANUAL VOICE" wording on option 609 changes to "VOICE OFF", and the voice is deactivated, with the option now highlighted yellow. The cycle of the AUTO VOICE, MANUAL VOICE and VOICE OFF functions can be repeated by successively touching option 609 or pressing switch 205b.

CALCAR 2385

EXHIBIT P
PAGE 213

US 6,459,961 B1

13

14

Other displayed options on the screen of FIG. 6 include PREVIOUS option 611 and NEXT option 613. As indicated at step 323, option 611 when selected causes routine 300 to return to step 314, where the introduction screen of FIG. 5 is again displayed. Otherwise, if option 613 is selected, routine 300 proceeds to step 326 in FIG. 3C where processor 105 causes a "SAFETY REMINDERS" screen to be displayed on screen 209. FIG. 7 illustrates such a screen.

As shown in FIG. 7, like the MANUFACTURER screen, the SAFETY REMINDERS screen includes option 609 displayed with the default wording "AUTO VOICE" thereon, PREVIOUS option 611, NEXT option 613, scroll-up option 605 and scroll-down option 607. This screen reminds the user of the safety features of the vehicle including, for example, air bags and seat belts. As indicated at step 329, option 611 when selected causes routine 300 to return to step 320 of FIG. 3B. Otherwise if option 613 is selected, routine 300 proceeds to step 332 where processor 105 causes a "THEFT PROTECTION FEATURES" screen to be displayed on LCD screen 209. FIG. 8 illustrates such a screen.

As shown in FIG. 8, the THEFT PROTECTION FEATURES screen similarly has thereon displayed options 605, 607, 609, 611 and 613. This screen describes to the user a theft-deterrent system including the anti-theft routine of FIG. 3A equipped in the vehicle. As indicated at step 335, option 611 when selected causes routine 300 to return to step 326. Otherwise if option 613 is selected, routine 300 proceeds to step 338 where processor 105 causes a "QUICK TIPS SET-UP" screen to be displayed on LCD screen 209. FIG. 9 illustrates such a screen.

As shown in FIG. 9, the QUICK TIPS SET-UP screen comprises two arrays of displayed options, denoted 901 and 903, respectively. Array 901 concerns the volume of the audio part of system 100. In this illustrative embodiment, the user may select the options in array 901 to respectively turn the volume off, to a "SOFT" level, to a medium level, and to a "LOUD" level. Array 903 concerns the display of LCD 119 of system 100. In this illustrative embodiment, the user may select the options in array 903 to respectively turn the display off, adjust it to a "DAY" setting, adjust it to a "NIGHT" setting, and have it automatically adjusted. When the QUICK TIPS SETUP screen comes on, by default, the volume is set to a medium level (i.e., the "MED" option in array 901 highlighted blue), and the display is set to be automatically adjusted (i.e., the "AUTO" option in array 903 highlighted blue).

Also shown in FIG. 9, is NEXT option 905. By selecting this option, routine 300 returns to step 340 of FIG. 3B where a "MAIN MENU" screen is displayed on LCD screen 209. After routine 300 is performed, the screen of FIG. 9 can be invoked at any time by pressing SETUP switch 205g to re-adjust the volume and the intensity of the LCD of system 100.

FIG. 10 illustrates the MAIN MENU screen. This screen comprises displayed options disposed in columns 1001, 1003, 1005, and 1007. For example, column 1001 includes DRIVER'S VIEW option 1001a, STEERING COLUMN CONTROLS option 1001b, LOCK option 1001c, DRIVING TIPS option 1001d, and INDEX option 1001e. It should also be noted that this screen can be invoked at any time by pressing MENU switch 205e.

When the MAIN MENU screen comes on, by default, DRIVER'S VIEW option 1001a is highlighted yellow, indicating that it is selected. However, the user may touch any other displayed option on screen 209 for re-selection. A further touch on the yellow highlighted option changes its color to blue and activates same. Again, the user may alternatively maneuver PUSH TO SELECT knob 205d to re-select any other displayed option, followed by a depression of ENTER switch 205b to activate the selected option. Since LCD screen 209 is compact, the display area for each option on the MAIN MENU screen is generally small. As a result, selection and activation of an option by touching the option on the screen is susceptible to errors, especially when the vehicle is in motion. Thus, in this situation it may be preferable to achieve the same result using knob 205d and switch 205b, instead.

In addition, because of the small display area allocated to each option on the MAIN MENU screen, the wording on the option is brief and thus tends to be cryptic. In accordance with a feature of the invention, after a predetermined time (e.g., a few seconds) has elapsed from the option's being highlighted yellow, processor 105 causes a voice to be generated on speakers 127 to explain the purpose of the option before the user activates it. For example, after a predetermined delay from DRIVER'S VIEW option 1001a's being highlighted yellow, a voice is activated, stating the option name, followed by an explanation of the purpose of the option such as "To provide location of dash mounted components." Thus, this inventive feature affords a preview of the option before the user commits to it, thereby avoiding unnecessary backtracking.

Continuing the example, after hearing the preview of option 1001a, the user decides to select that option. In response, processor 105 causes a "DRIVER'S VIEW" screen to be displayed on screen 209. Such a screen is illustrated in FIG. 11. When the DRIVER'S VIEW screen appears, VOICE option 1101 is highlighted blue, indicating that voice announcements are active. To disable the voice announcements, the user may touch VOICE option 1101 on screen 209, or alternatively press ENTER switch 205b. VOICE option 1101 would be highlighted yellow when disabled.

As also shown in FIG. 11, a view of the interior of the automobile from the driver's perspective is provided. Underneath that view, DASH-MOUNTED CONTROLS option 1103, INSTRUMENT PANEL option 1105, AUDIO SYSTEM option 1107, CLIMATE CONTROLS option 1109 and PREVIOUS option 1111 are displayed. By default, DASH-MOUNTED CONTROLS option is highlighted yellow. However, the user in this example decides to select INSTRUMENT PANEL option 1105, instead. By touching option 1105 on screen 209, the option is highlighted yellow. If VOICE option is not disabled, after a predetermined delay, an announcement such as "To provide information on gauges, meters and warning lights" comes on to preview the purpose or content of option 1105. Options 1103, 1107, and 1109 are similarly programmed. In this instance, selecting PREVIOUS option 1111 enables the user to return to the MAIN MENU screen of FIG. 10.

Continuing the example, assuming that the user activates option 1105 after hearing the preview, in response processor 105 causes an "INSTRUMENT PANEL" screen to be displayed on screen 209. Such a screen is illustrated in FIG. 12. As shown in FIG. 12, the previous screen format is generally maintained in that it provides a view of the object (the instrument panel of the automobile in this instance) pertinent to the option which has been selected, along with displayed options for further selection thereunder. Based on the disclosure heretofore, the design and operation of these screens by now are apparent to a person skilled in the art, and become self-explanatory.

CALCAR 2386

EXHIBIT P
PAGE 214

US 6,459,961 B1

15

16

In accordance with another feature of the invention, individual elements on the instrument panel shown in FIG. 12 are labeled with numerals "1", "2", "3", "4" and "5" which correspond to option 1201a designated "1. TACHOMETER AND WARNING LIGHTS", option 1201b designated "2. TURN SIGNAL/HAZARD WARNING", option 1201c designated "3. SPEEDOMETER AND WARNING LIGHTS", option 1201e designated "4. ODOMETER & TRIP METERS/OUTSIDE TEMPERATURE", and option 1201f designated "5. FUEL/ TEMP GAUGE AND WARNING LIGHTS", respectively. As such, the function of the displayed options is two-fold. First, the wording on each displayed option informs the user of what the corresponding element(s) represents. Second, each displayed option is also for selection to obtain more information about the corresponding element(s). In addition, with the above voice preview feature, the user is further apprised of the purpose or content of the option before he/she commits to it. For example, TACHOMETER AND WARNING LIGHTS option 1201a corresponds to a voice preview such as "To provide information on tachometer, malfunction, maintenance required, low oil pressure and charging system failure indicators."

Assuming that the user in this instance activates option 1201a, in response processor 105 causes a "TACHOM-ETER AND WARNING LIGHTS" screen to be displayed on screen 209. Such a screen is illustrated in FIG. 13.

FIG. 13 shows VOICE option 1301 similar to option 1101 described before, TIP option 1303, a tachometer of the automobile denoted 1305, warning lights collectively denoted 1307, and options 1309a through 1309f in display segment 1311.

When TIP option 1303 appears on screen 209, it indicates that helpful hints or reminders are available upon selection thereof. In accordance with another feature of the invention, the appearance of TIP option 1303 is accompanied by the playing of a sound segment associated therewith. This sound segment may be pre-selected by the user from the SOUNDSGOOD library. After an adaptation period, the user would be able to rely on the familiar sound segment, without looking at the screen, to alert him/her of the availability of the TIP option.

Similarly, the user may pre-select another sound segment associated with warnings. Such a sound segment should connote urgency or even emergency as such warnings include, for example, engine overheating, an extremely low fuel level caution, GPS emergency information from navigation interface 106d, etc. Under control of processor 115, audio interface 118 preempts any on-going announcement and momentarily substitute therefor any such warning as soon as it occurs, which is preceded by the associated sound segment.

In any event, if option 1303 is selected in this instance, a voice comes on and utters a tip regarding tachometer 1305 such as "To prevent engine damage, do not drive with needle in red zone." This tip is also momentarily displayed on segment 1311 in lieu of options 1309a through 1309f.

Similar to the elements on the INSTRUMENT PANEL screen, tachometer 1305 and warning lights 1307 on this screen are individually labeled and correspond to options 1309a, 1309b, 1309c, 1309e and 1309f, respectively.

Assuming in this example that MAINTENANCE REQUIRED option 1309c is activated, display segment 1311 would be replaced by new display segment 1411 illustrated in FIG. 14. As shown in FIG. 14, item 1401 indicates the subject selected, i.e., "MAINTENANCE

REQUIRED". Item 1403 explains what the MAINTE-NANCE REQUIRED warning light, when on, indicates. In this instance it states, "Maintenance required warning light comes on to indicate it is time for scheduled maintenance." PREVIOUS option 1405 enables the user to reactivate segment 1311 of FIG. 13.

Assuming further that at this point the user wants to learn about and also to program the air conditioning of the automobile, the user may access a "CLIMATE CONTROL" screen by successively pressing the PREVIOUS option to backtrack to the DRIVER'S VIEW screen of FIG. 11, where CLIMATE CONTROLS option 1109 is available. As a second alternative, the user may press MENU switch 205e to invoke the MAIN MENU screen of FIG. 10, where a "CLIMATE CONTROLS" option within column 1003 is available. A third alternative is provided in the event that the user cannot immediately relate "air conditioning" to the CLIMATE CONTROLS option. At the MAIN MENU screen of FIG. 10, the user may select Index option 1001e to be described. It suffices to know for now that this option allows the user to access the "CLIMATE CONTROL" screen using the term "air conditioning".

FIG. 15 illustrates the "CLIMATE CONTROL" screen. With the voice enabled, a first touch on any displayed option on screen 209 causes it to be highlighted yellow, indicating its selected status. A second touch causes it to be highlighted blue, indicating its active status. With the voice disabled, only one touch on any displayed option activates it.

As shown in FIG. 15, the MODE options include OFF option 1511, AUTO option 1513, A/C option 1515, HEAT option 1517, and SMART CLIMATE option 1519. It should be noted that only one of the MODE options can be active at a time. In this example, assuming that the voice is enabled, when OFF option 1151 is selected by a first touch, a voice explaining the option comes on, uttering "To disable climate control." A second touch on the same option would then shut the climate control off through climate control interface 108f.

When AUTO option 1153 is selected by a first touch, a voice comes on to explain the option, uttering "System automatically determines air-flow distribution and volume for optimum efficiency." A second touch on the same option enables the automatic control, followed by a voice utterance, "Set desired temperature." Temperature display 1535 then flashes with the current temperature setting, prompting the user to set a desired temperature in a manner to be described.

If the user neglects to set a temperature after a predeter-mined time, in accordance with another aspect of the invention, a temperature range is automatically maintained by processor 105 in response to the date and time informa-tion from clock interface 108j, and the GPS information from navigation interface 106d. Based on the date and time information, processor 105 knows what the current season (e.g., mid-winter versus mid-summer) and time of the day (e.g., night verse noon) are. Based on the GPS information, processor 105 knows the region (e.g, New England versus Southern California) where the vehicle is. Processor 105 looks up a table stored in memory 115 containing predeter-mined temperature ranges corresponding to different com-binations of the temporal and geographic parameters. It then prescribes an appropriate temperature range according to the table. This temperature range is updated by processor 105 periodically to reflect changes in the time of the day and the geographic location of the vehicle.

Similarly, A/C option 1515 and HEAT option 1517 respectively enable the user to activate air conditioning and heaters at a desired temperature or a default temperature range.

CALCAR 2387

US 6,459,961 B1

17

SMART CLIMATE option 1519 is designed to allow the user to program the climate control for the next ride before he/she leaves the vehicle. When SMART CLIMATE option 1519 is selected by a first touch, a voice comes on to explain the option, uttering "To enable pre-heating or pre-cooling of vehicle." A second touch on the option activates the function, followed by a voice utterance, "Set desired temperature. Set desired time using fan speed arrows." Temperature display 1535 then flashes the current temperature setting, prompting the user to set a desired temperature. Similarly, fan speed display 1541 then flashes the current date, followed by current time, prompting the user to set the date and time that the user plans to re-enter the vehicle. Through climate control interface 108f, processor 105 determines whether the current level of power from the car battery and any back-up power sources is sufficient. If it is insufficient, a message such as "Fail to pre-condition vehicle temperature" is issued through audio interface 118 to notify the user of the noncompliance. Otherwise, when it is close to the re-entry time, processor 105 determines the start-up time to effect the pre-conditioning, depending on the temperature difference between the inside and outside of the vehicle at that time. Processor 105 would then cause a combination of heaters and/or heat pumps (not shown) connected to interface 108f to pre-condition the vehicle temperature. In order to avoid substantially draining the power, in this illustrative embodiment, the requested temperature would be maintained up to an hour after the set re-entry time.

The Air options in FIG. 15 include FRESH option 1521 and RECIRCULATED option 1523. Only one of these two options can be active at a time. When FRESH option 1521 is selected by a first touch on the option, a voice comes on to explain the selected option, uttering "To select outside air to circulate in vehicle." A second touch on the option activates the selection to ventilate the vehicle with outside air. Similarly, RECIRCULATED option 1523 allows the user to select the inside air for recirculation in the vehicle.

The VENT options in FIG. 15 include FLOOR option 1525, FLOOR/DASH option 1527, DASH option 1529, DEFROST option 1531 and FLOOR/DEFROST option 1533. Only one of these five options can be active at a time. When FLOOR option 1525 is selected by a first-touch on the option, a voice comes on explaining the option, uttering "Main air distribution to floor." A second touch on the option directs an air flow toward the vehicle floor.

Similarly, FLOOR/DASH option 1527 enables the user to bifurcate the air flow between the floor and the dashboard. DASH option 1529 enables the user to direct the air flow from the dashboard. DEFROST option 1531 enables the user to direct the air flow toward the windshield and select fresh air if not selected. FLOOR/DEFROST option 1533 enables the user to bifurcate the air flow between the floor and windshield.

Temperature display 1535 displays the temperature selected by the user. Touching on up-arrow 1537 increases the selected temperature while touching on down-arrow 1539 decreases same. Continued touching on either up-arrow 1537 or down-arrow 1539 causes the temperature setting to change rapidly.

Similarly, fan speed display 1541 displays the fan speed (high, medium or low) selected by the user. Touching on up-arrow 1543 increases the selected fan speed while touching down-arrow 1539 decreases same.

The HEATERS options in FIG. 15 include SEAT option 1547, MIRROR option 1549, REAR WINDOW option

18

1551, STEERING WHEEL option 1553, and ALL option 1554. One or more of these options can be active at the same time. When SEAT option 1547 is selected by a first touch on the option, a voice comes on to explain the option, uttering "To enable seat heaters." A second touch on the option activates the seat heaters connected to climate control interface 108f.

Similarly, MIRROR option 1549 enables the user to activate outside mirror heaters. REAR WINDOW option 1551 enables the user to activate a rear window defroster. STEERING WHEEL option 1553 enables the user to activate a steering wheel heater. Finally, ALL option 1554 enables the user to activate all of the heaters simultaneously.

In personalizing the vehicle, preference interface 116 monitors any user adjustments to certain vehicle functions by comparing their current settings with the corresponding stored preferences in memory 115. Thus, for example, if the user changes any of the settings relating to the climate control such as the mode, vent, air, temperature, fan speed, etc. from its previous preferred setting, preference interface 116 causes a SAVE screen to appear on screen 209. This SAVE screen is illustrated in FIG. 16. As shown in FIG. 16, the user is prompted to save the change in the setting that he/she has just made. The user at this point may activate SAVE option 1601 to change the previous preferred setting. The SAVE screen thereafter disappears in favor of the previous screen. otherwise, he/she may activate CLOSE option 1603 to close the SAVE screen, without storing the latest setting, which is then treated as a temporary setting. In the latter case, for example, a restart of the automobile will obliterate such a temporary setting, and reinstate the stored preferred setting.

Climate control screens can similarly be invoked by the front passenger and rear passengers on display interfaces 102c and 102d, respectively. Such screens provide similar MODE options including OFF, AUTO, A/C and HEAT options; and VENT options including LOWER VENT, UPPER VENT and LOWER/UPPER vent options. They also provide for temperature and fan speed adjustments for the respective localized areas. However, no save screen is provided.

Using INDEX option 1001e of FIG. 10 to look up information on and/or to control various items in the automobile will now be described. After option 1001e is activated, a DATA ENTRY screen illustrated in FIG. 17 is exhibited on screen 209. As shown in FIG. 17, a message "Enter Letter Or Item Name" appears to prompt the user for an entry of the name of the item of interest or its beginning letter. For this purpose, entry options for letters A through Z arranged in a grid format are provided in section 1701 for selection. In addition, DONE option 1703, when activated, indicates to system 100 that the entry is completed. Subdisplay 1705 is used to echo the user's entry to ensure its correctness.

In this illustration, the user enters "AIR CONDITIONING" as exhibited on subdisplay 1705. In response, an INDEX screen shown in FIG. 18 appears on display screen 209, with the search item name "AIR CONDITIONING" highlighted yellow. It should be noted that other item names such as "Anti-lock Brake System Indicator" are also shown, and they are in alphabetical order following "AIR CONDITIONING". This stems from the design of system 100 whereby the user may conveniently enter the beginning letter of the search item name only. In that case, a list of item names in alphabetical order with the first item name having the same beginning letter highlighted yellow. For instance,

CALCAR 2388

EXHIBIT P
PAGE 210

US 6,459,961 B1

19                                          20

if the user had only entered "A" for "AIR CONDITIONING", a list of item names starting with "A" in alphabetical order would appear on screen 209 (although in this instance it would be the same list as shown in FIG. 18 as "AIR CONDITIONING" is the first item with a letter "A" in system 100). If the user cannot locate the name of the item of interest in the list, he/she may scroll the screen using scroll-up option 1801 or scroll-down option 1803 to review additional item names after or before the listed item names. Alternatively, the user may select PREVIOUS option 1805 to return to the screen of FIG. 17 to enter the complete item name.

In any event, after the user locates the item name on the INDEX screen, the user may then touch the item name to access information on that item. To that end, a look-up table is stored in memory 115. FIG. 19 illustrates such a look-up table, wherein left column 1901 lists each item name in alphabetical order in the index, and right column 1903 lists the corresponding instruction for processor 105 to carry out to access information on that item. For example, according to row 1905 of the table, the selection and activation of the item name "AIR CONDITIONING" causes processor 105 to connect the user to the CLIMATE CONTROL screen of FIG. 15 previously described.

The foregoing merely illustrates the principles of the invention. It will thus be appreciated that those skilled in the art will be able to devise numerous other systems which embody the principles of the invention and are thus within its spirit and scope.

For example, based on the disclosure heretofore, it is apparent that through system 100, the user can run diagnostics on selected parts of the automobile by voice command or touch-screen control.

In addition, in the disclosed embodiment, through system 100, the user is able to program the climate control for the next ride before he/she leaves the vehicle. It will be appreciated that the user will be able to achieve same remotely ahead of time via telecommunication means. For example, processor 105 may be programmed to accept climate control commands through phone interface 106a. In that instance, the user can call from anywhere to establish a phone connection with phone interface 106a using a predetermined phone number, through which the user communicates the commands to climate control interface 108f to program the climate control. Through the phone connection, the user may be provided with climate control options described above in a synthesized voice. The user may activate one or more of such options by pressing a predetermined touch-tone key on the telephone keypad corresponding to a "yes" or "no" response. Similarly, the user may achieve the relevant temperature and/or time settings by pressing the touch-tone keys corresponding to the numerals indicative thereof. Of course, telecommunication means other than the telephone including a radio frequency (RF) transmitter may also be used to communicate the climate control commands from a remote area.

In addition, in the disclosed embodiment, the user may access different screens provided by AUTO DIRECTOR display interface 102a to learn about and control certain vehicle functions. It will be appreciated that a person skilled in the art will develop a demonstration program wherein a series of such screens will be automatically presented to a user in a predetermined sequence. The presentation may include commentaries, and highlights on selected options displayed on each screen. Furthermore, the presentation may be coupled with the showing of actual vehicle functions. For example, in demonstrating the climate control screen of FIG. 15, while the function of a highlighted VENT option (e.g., Floor, Floor/Dash, Dash, Defrost or Floor/Defrost) is explained, it is activated so that the user in the automobile can feel an actual air flow from the corresponding direction. The above demonstration program may be invoked using a PIN provided by the automobile manufacturer. The program may run continually while the automobile is shown in a showroom, or may be invoked by the user occasionally to obtain relevant information.

Further, in the disclosed embodiment, the MAINTENANCE REQUIRED warning light comes on when it is time for scheduled maintenance. In accordance with another aspect of the invention, the maintenance is scheduled by system 100 according to the cumulative time of the tachometer reading above a predetermined RPM value. Such cumulative time reflects the extent of the engine wear, and if it exceeds a predetermined length of time without maintenance, the engine performance would degrade substantially. In measuring the cumulative time in question, a conventional comparator (not shown) is employed in system 100 to compare the instantaneous tachometer reading (provided by engine control interface 112c) with the predetermined RPM value. Each time when the tachometer reading exceeds the predetermined value, processor 105 is interrupted to register the length of such an occurrence. The latter is added to a running sum to update the cumulative time in question. This cumulative time may be displayed on instrument panel display interface 102e, along with the tachometer reading and the MAINTENANCE REQUIRED warning indicator. A second conventional comparator (not shown) is employed in system 100 to compare the cumulative time with the above predetermined time length. As soon as the cumulative time exceeds the predetermined length, processor 105 is interrupted and causes the MAINTENANCE REQUIRED warning light to come on, indicating that it is time for maintenance.

Still further, system 100 as described is highly adaptable in adjusting to new system requirements, and capable of "learning" new automobile features to be introduced into the system. Such learning may involve a modification or an upgrade in the system software stored in memory 115.

Moreover, other features of system 100 may include capabilities of communications with a third party remote from the vehicle. For example, system 100 may be programmed to transmit signals representing data on the current speed of the vehicle and its VIN receivable by a radar system, thus enabling the third party to monitor its speed. Furthermore, system 100 may be programmed by the third party to disable and subsequently enable the vehicle upon successful verification of a PIN pre-assigned to the third party. To that end, system 100 is capable of receiving remote transmission of the PIN, followed by the disable or enable code. The transmission may be encrypted for security reasons. Furthermore, more than one PIN may be used for different purposes. For example, a PIN may be assigned to a law enforcement agency to disable the vehicle because of a suspension of a license, or to temporarily disable the vehicle when the driver is intoxicated. Another PIN may be assigned to an environmental protection agency to disable the vehicle for failing to meet the emission requirements. Yet another PIN may be assigned to the vehicle owner to disable the vehicle when parked, thereby reducing the risk of a car theft. The disabling of the vehicle involves cutting off its gas, putting on its anti-lock brakes, etc.

Further, system 100 is capable of receiving a low-frequency, low-power broadcast covering an area of a lim-

CALCAR 2389

EXHIBIT P
PAGE 217

US 6,459,961 B1

**21**

ited radius, referred to as a "Cell". The broadcast may provide electronic GPS map and Yellow Page type information pertaining to the cell. This information, when received, may be downloaded onto AUTO DIRECTOR display interface 102a or multifunction display interface 102b. Such information includes a local directory indicating locations of nearby gas stations, restaurants and other facilities on the GPS map, with respect to the current location of the automobile. The local directory may be formatted in the form of "web pages" featuring the local businesses, and include additional information such as business hours, telephone numbers, and information on products and services provided by such businesses.

The above broadcast may also provide local weather information sponsored by a civic group or commercial entity. In the case of civic group sponsorship, the local civic events may be posted alongside the weather information, and in the case of commercial sponsorship, advertisements may be posted instead. Of course, as the automobile moves from cell to cell, the contents of the broadcast change accordingly.

In addition, while the radio in the automobile is tuned to a particular radio station, system 100 is also capable of receiving any electronic files broadcast from that radio station, along with the radio program. These electronic files, which may be in the form of web pages, can be downloaded onto the system. The system user may then scroll the pages to learn such information as program listings and coming events sponsored by the radio station.

Moreover, in the disclosed embodiment, system 100 is illustratively used in an automobile. It will be appreciated that a person skilled in the art may also employ the inventive system in another type of vehicle such as a boat, an airplane, etc.

Finally, although information and control system 100, as disclosed, is embodied in the form of various discrete functional blocks, the system could equally well be embodied in an arrangement in which the functions of any one or more of those blocks or indeed, all of the functions thereof, are realized, for example, by one or more appropriately programmed processors or devices.

We claim:

1. A system for use in a vehicle, the system being responsive to a notable condition and comprising:

a display element;

an output subsystem for providing information concerning at least one device in the vehicle;

a processor responsive to the notable condition for interrupting a provision of the information concerning the at least one device with a provision of information concerning the notable condition, an option for selection being provided on the display element in response to the notable condition, thereby prompting a user to select the option; and

an interface for receiving a selection of the option, selected information for coping with the notable condition being provided in response to the selection of the option.

2. The system claim 1 wherein the at least one device includes a fuel gauge.

3. The system of claim 1 wherein the at least one device includes a speedometer.

4. The system of claim 1 wherein the at least one device includes an odometer.

5. The system of claim 1 wherein the at least one device includes a tachometer.

**22**

6. The system of claim 1 wherein the at least one device includes a temperature gauge.

7. The system of claim 1 wherein the at least one device includes a climate control.

8. The system of claim 1 wherein the notable condition concerns engine overheating in the vehicle.

9. The system of claim 1 wherein the notable condition concerns a low fuel level in the vehicle.

10. The system of claim 1 wherein the selected information is provided via voice media.

11. The system of claim 1 wherein the selected information is provided textually.

12. A method for use in a system in a vehicle, the system being responsive to a notable condition, the system including a display element, the method comprising:

providing information concerning at least one device in the vehicle;

in response to the notable condition, interrupting a provision of the information concerning the at least one device with a provision of information concerning the notable condition, and providing an option for selection on the display element, thereby prompting a user to select the option;

receiving a selection of the option; and

in response to the selection of the option, providing selected information for coping with the notable condition.

13. The method claim 12 wherein the at least one device includes a fuel gauge.

14. The method of claim 12 wherein the at least one device includes a speedometer.

15. The method of claim 12 wherein the at least one device includes an odometer.

16. The method of claim 12 wherein the at least one device includes a tachometer.

17. The method of claim 12 wherein the at least one device includes a temperature gauge.

18. The method of claim 12 wherein the at least one device includes a climate control.

19. The method of claim 12 wherein the notable condition concerns engine overheating in the vehicle.

20. The method of claim 12 wherein the notable condition concerns a low fuel level in the vehicle.

21. The method of claim 12 wherein the selected information is provided via voice media.

22. The method of claim 12 wherein the selected information is provided textually.

23. Software including machine readable instructions stored in a tangible medium for performing a process, the process comprising:

providing information concerning at least one device in the vehicle;

in response to a notable condition, interrupting a provision of the information concerning the at least one device with a provision of information concerning the notable condition, and providing an option for selection on a display element, thereby prompting a user to select the option;

receiving a selection of the option; and

in response to the selection of the option, providing selected information for coping with the notable condition.

\* \* \* \* \*

CALCAR 2390

EXHIBIT P
PAGE 210

**EXHIBIT Q**

1    SYED A. HASAN, CA Bar No. 167323
     art.hasan@cph.com
2    BRIAN K. BROOKEY, CA Bar No. 149522
     brian.brookey@cph.com
3    G. WARREN BLEEKER, CA Bar No. 210834
     warren.bleeker@cph.com
4    CHRISTIE, PARKER & HALE, LLP
     350 West Colorado Boulevard, Suite 500
5    Post Office Box 7068
     Pasadena, California 91109-7068
6    Telephone: (626) 795-9900
     Facsimile: (626) 577-8800

7

8    Attorneys for Plaintiff,
     CALCAR, INC. and AMERICAN
     CALCAR, INC.

9

10            UNITED STATES DISTRICT COURT

11            CENTRAL DISTRICT OF CALIFORNIA

12    CALCAR, INC., a California       Case No. SACV07-00723 AG (JWJx)
     corporation; and AMERICAN
13    CALCAR, INC., a Delaware corporation,    **DECLARATION OF MICHAEL**
                           **OBRADOVICH IN SUPPORT OF**
14           Plaintiffs,              **PLAINTIFFS' MOTION FOR**
                           **PARTIAL SUMMARY**
15          vs.                   **JUDGMENT**

16    THE CALIFORNIA CARS        **DATE:**    **July 21, 2008**
     INITIATIVE, INC., an unknown      **TIME:**    **10:00 a.m.**
17    business entity; and FELIX KRAMER,    **CTRM:**    **10D**
     an individual,
18                              **Hon. Andrew J. Guilford**

19          Defendants.

20

21        I, Michael Obradovich, declare as follows:

22          1.      I am President and owner of Plaintiffs Calcar®, Inc. and American

23 Calcar®, Inc. (collectively, "Calcar®"). I have personal knowledge of the

24 contents of this declaration and, if called as a witness, could and would

25 competently testify thereto.

26          2.      For more than ten years, Calcar® has been designing and providing

27 the automotive industry with innovative products and services that furnish the end

28 consumer with quick and easy access to essential information about the operation

-1-

EXHIBIT Q
PAGE 229

1    of the consumer's vehicle. It has done so in multiple media, both electronic and
2    print.

3          3.    On the electronic side, Calcar® has invented and is marketing the
4    Auto Director® in-vehicle electronic screen display system that allows a vehicle's
5    driver to instantly survey and command a wealth of information about the
6    vehicle's systems, condition and operation, such as engine performance. This
7    system is marketed both to automakers and to the parts and systems suppliers,
8    sometimes called "tier one" suppliers, who feed those automakers.

9          4.    On the print side, Calcar® produces and sells to automakers and end
10   users the Quick Tips®, Quick Tips® Lite, and Start-up Tips® printed guides. To
11   date, Calcar® has sold or licensed over twelve million of these guides. Each
12   guide distills owner's manual information for a particular vehicle model into a
13   brief, easy-to-use reference. Unlike an owner's manual, however, these guides are
14   not loaded down with dry, linear text, but are instead organized in the modern,
15   "Just in time learning" manner that intuitively appeals to a public who embraces
16   E-mail, cell phones and iPods.

17         5.    One of the models for which a printed Calcar® Quick Tip® guide
18   has been sold, for Mazda, is a hybrid vehicle.

19         6.    Calcar® is still further expanding and into additional areas of
20   automotive technology, including researching, developing and patenting new
21   hybrid and other automotive technology. Calcar® has recently hired additional
22   technical R&D staff to develop this technology, and currently plans to hire more.

23         7.    The major automakers to whom Calcar® would market its products
24   are a small and well-known group, numbering about twenty. However, there are
25   far more tier one suppliers, and they are a large enough group that it is hard to pay
26   them all individual attention, or even to know who they all are.

27         8.    Calcar® attempts to reach and market to its target customer group in
28   a number of ways, among them personal contact, "cold calling," and mailings.

CISLETE, PARKER & HALE, LLP

-2-

EXHIBIT Q
PAGE 220

1      9.    In its business Calcar® both sells products and licenses technology.

2    American Calcar®, Inc. ("ACI") holds almost four dozen patents relating to

3    multimedia automobile information systems and other automotive safety, comfort

4    and control technology, including patents that concern or are useable with hybrid

5    vehicles. Calcar® aggressively markets its appropriate patents and technology to

6    automakers and suppliers to induce them to adapt and license this technology.

7      10.    Occasionally, Calcar® happens across companies who have already

8    begun to use its inventions without authorization. In these situations, Calcar® will

9    of course defend its patent rights, but always with an eye to promoting the

10   availability of its innovative technology through licensing and increasing the use

11   and distribution of that technology.

12     11.    A dispute arose with automaker BMW, as it appeared that BMW was

13   using American Calcar®'s inventions. This dispute led to federal litigation. That

14   litigation has been resolved, an accommodation has been reached with BMW, and

15   BMW is now a licensee of American Calcar®'s patented technology, directed

16   among other areas, to informative, interactive on-board displays.

17     12.    A dispute has also arisen with automaker Honda, as it appears that

18   Honda has been using American Calcar®'s inventions. This dispute has led to

19   federal litigation, currently ongoing. American Calcar® expects to resolve its

20   dispute and litigation with Honda.

21     13.    Calcar®, Inc. owns United States Trademark Registration No.

22   2,419,611 (the "'611 Registration") for the word mark CALCAR® with respect

23   to "[c]omputer hardware and computer software for use in telecommunications,

24   weather reporting, messaging, global positioning, database access, imaging, and

25   pre-recorded software on CD-Rom related to automobiles, advertising, global

26   computer networks, web sites, and telecommunications." A true and correct copy

27   of the '611 Registration is attached hereto as Exhibit A. The '611 Registration has

28   become incontestable.

CHRISTIE, PARKER & HALE, LLP

-3-

EXHIBIT Q
PAGE 231

14.    Calcar®, Inc. permits ACI (American Calcar®, Inc.) to use the CALCAR® mark in connection with ACI's business.

15.    Calcar® has continuously used the CALCAR® mark in connection with the goods and services it provides the automotive industry.

16.    I deal directly with many automakers, many of whom are Calcar® customers. Based on my dealings with those manufacturers, I know that the CALCAR® mark is well known within the industry, with automakers and others in the industry recognizing CALCAR® as a mark that is associated with the high-quality goods and services that Calcar® provides, and with Calcar® as the source of those goods and services.

17.    I am familiar with the notion of plug-in hybrid vehicles that CalCars advocates. Not all automakers are in favor of this notion or believe it to be practical. The impatient, heckling manner in which CalCars pushes its message is likely to alienate the automakers still further.

18.    After Calcar® filed its complaint against Defendants in the previous action, Mr. Kramer began harassing me, my wife, and my colleagues. For example, on the morning of May 3, 2007, Defendant Felix Kramer telephoned my office three times demanding to speak to me. He told my staff that he would keep calling unless he located me. He then started calling my house that day. At 10:06 a.m., he spoke with my wife, who asked him to leave her alone. At 10:16 a.m., he left a telephone message stating that he would not leave my wife alone until he found me. He called twice more and hung up without leaving any message; according to my answering machine, these telephone calls took place at 3:59 p.m. and at 8:23 p.m. He called me again at 9:06 p.m., at which time I told him to hire a lawyer, and to stop calling or I would get a restraining order. He called again at 9:08 p.m. During that call, Mr. Kramer threatened to tell the press false stories about Calcar® and me, and that no restraining order would stop him for doing so, or from continuing to contact me. I then hung up and unplugged the telephone.

-4-

CHRISTIE, PARKER & HALE, LLP

19.     There is a serious risk of irreparable harm to Calcar® if Defendants were to begin directing their vitriol and erratic behavior at Calcar®'s customers under the CALCARS banner. If Defendants were, while using the CALCAR® mark, to direct at automakers the type of harassment inflicted of my wife and me, the victimized manufacturers would likely stop doing business with Calcar®. There are only approximately 20 automakers in the United States, and Calcar® cannot afford to lose any as a customer. The financial harm to Calcar® could not be measured, because Calcar® would never know how much business it stood to lose over the years.

20.     Calcar® uses a website for marketing and conducting its business, using the domain name *www.calcar.net*.

21.     I have performed a search on the Google search engine, using the mark CALCAR® as the search term. The search returned results from both Calcar® and Defendant The California Cars Initiative using the phrase CALCARS. I found these results confusing as to who was CALCAR® and who was CALCARS. If I was confused by these results, as familiar as I am with the situation, I believe many of the people who perform such a search on Google must be confused as well.

22.     I received a telephone message from Stacey Spiegel of the environmental consulting firm Gladstone Anderson. Ms. Spiegel stated that she had read an article about Calcar®'s cars in a March 2007 San Francisco Chronicle article. Ms. Spiegel offered Calcar® space in an Ontario Auto Show at the end of April for 5 to display its environmental vehicle at the show. Ms. Spiegel also asked me if I would like to offer demonstrations of the car for several days after the show concluded.

23.     I have reviewed, and have attached hereto as Exhibit B a true and correct copy of, the article to which Ms. Spiegel appears to have been referring. Calcar® is not mentioned in that article. Instead, the article referred to Defendants

-5-

CHRISTIE, PARKER & HALE, LLP

EXHIBIT Q
PAGE 233

1   Kramer and The California Cars Initiative, gave their website address,

2   *www.calcars.org*, and referred to The California Cars Initiative as "Calcars,"

3   which is not that company's name.

4       24.    Calcar® is an established business that it is well-respected in the

5   automotive industry since 1993, while Defendants operate what is essentially a

6   politically-tinged "start-up" company having a decidedly commercial aim.

7   Calcar® risks being "tainted" by the activities of Defendants as confusion

8   continues.

9       25.    Calcar® faces actual irreparable harm if Defendants are permitted to

10   continue their willful infringement. Calcar® has spent years developing a

11   reputation in the automotive industry. It depends for its business on the

12   relationships it has developed with car manufacturers (including the technology

13   departments of those manufacturers, with whom Calcar® deals), and on the

14   goodwill it has established in the marketplace. That reputation and goodwill are

15   likely to be harmed irreparably if Defendants continue to confuse consumers, the

16   trade and the public.

17       26.    I personally selected the mark CALCAR®. I did not simply take the

18   words "California" and "cars" and put them together; that would have been

19   illogical, as there is nothing about Calcar®'s products that is tied to California.

20   Instead, I chose the mark because "calcar" is Latin for "spur." The mark was

21   chosen to convey the concept of a rider spurring on a willing horse, analogous to

22   the driver of a car, while reflecting technological innovation and leadership. That

23   same motif is carried through in the Calcar® graphic logo, which is a stylized

24   depiction of a horse's head.

25       27.    Attached as Exhibit C hereto is an accurate image of a display layout

26   for one of Calcar®'s Auto Director® electronic display systems.

27

28   I declare under penalty of perjury under the laws of the United States of

-6-

CHRISTIE, PARKER & HALE, LLP

EXHIBIT Q
PAGE 234

1    America that the foregoing is true and correct.

2         Executed on June 29, 2008.

3

4

5                                    _____

6                                    Michael Obradovich

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CHRISTIE, PARKER & HALE, LLP

EXHIBIT Q
PAGE 235

# Exhibit A

EXHIBIT Q
PAGE 220

Int. Cls.: 9 and 38

Prior U.S. Cls.: 21, 23, 26, 36, 38, 100, 101, and 104

**United States Patent and Trademark Office**

Reg. No. 2,419,611
Registered Jan. 9, 2001

## TRADEMARK
## SERVICE MARK
### PRINCIPAL REGISTER

## CALCAR

CALCAR, INC. (CALIFORNIA CORPORATION)
122 S. EL CAMINO REAL, #139
SAM CLEMENTE, CA 92672 BY CHANGE OF NAME;
BY CHANGE OF NAME CALCAR ADVERTISING,
INC. (CALIFORNIA CORPORATION) SAN
CLEMENTE, CA 92672

FOR: COMPUTER HARDWARE AND COMPUTER SOFTWARE FOR USE IN TELECOMMUNICATIONS, WEATHER REPORTING, MESSAGING, GLOBAL PO-SITIONING, DATABASE ACCESS, IMAGING, AND PRE-RECORDED SOFTWARE ON CD-ROM RELAT-ING TO AUTOMOBILES, ADVERTISING, GLOBAL COMPUTER NETWORKS, WEB SITES, AND TELE-COMMUNICATIONS, IN CLASS 9 (U.S. CLS. 21, 23, 26, 36 AND 38).

FIRST USE 3-0-1997; IN COMMERCE 3-0-1997.
FOR: PROVIDING TELECOMMUNICATIONS CON-NECTIONS TO A GLOBAL COMPUTER NETWORK, IN CLASS 38 (U.S. CLS. 100, 101 AND 104).

FIRST USE 3-0-1997; IN COMMERCE 3-0-1997.

SN 75-481,514, FILED 5-8-1998.

GERALD C. SEEGARS, EXAMINING ATTORNEY

EXHIBIT A
PAGE 8

**CALCAR 1805**

EXHIBIT Q
PAGE 237

# Exhibit B

EXHIBIT Q
PAGE 238

Case 3:08-mc-80083-MHP    Document 46-11    Filed 07/23/2008    Page 12 of 17
Case 8:07-cv-00723-AG-JWJ    Document 103    Filed 06/30/2008    Page 11 of 16
Cars that make hybrids look like gas guzzlers / Plug-in versions can go 100 miles on a gal... Page 1 of 4



SFGATE HOME · BUSINESS · SPORTS · ENTERTAINMENT · TRAVEL

[Search]  ◉ SFGate   ○ Web by Google

### San Francisco Chronicle

# Cars that make hybrids look like gas guzzlers
## Plug-in versions can go 100 miles on a gallon of gasoline

Sherry Boschert
Sunday, March 4, 2007

SHARE    [NEW] ▾ FONT SIZE: – +

Toyota Prius owners tend to be a proud lot since they drive the
fuel-efficient hybrid gas-electric car that's the darling of
mainstream environmentalists and one of the hottest-selling
vehicles in America. A few, however, felt that good was not good
enough. They've made "improvements" even though the
modifications voided parts of their warranties.

Ron Gremban of Corte Madera did it. So did Felix Kramer of
Redwood City, and Sven Thesen of Palo Alto. Why? Five words:
one hundred miles per gallon.

"We took the hybrid car to its logical conclusion," Kramer says, by
adding more batteries and the ability to recharge by plugging into
a regular electrical socket at night, making the car a plug-in
hybrid.

Compared with the Prius' fuel efficiency of 50 mpg, plug-in hybrids use half as much
gasoline by running more on cleaner, cheaper, domestic electricity. If owners forget to plug
in overnight, it's no big deal -- the car runs like a regular hybrid.

These trendsetters monkeyed with the car for more than their own benefit. They did it to
make a point: If they could make a plug-in hybrid, the major car companies could, too. And
should.

Kramer, Gremban and a cadre of volunteers formed the California Cars Initiative (online at
**calcars**.org), and in 2004 converted Gremban's Prius to a plug-in hybrid in his garage.
They added inexpensive lead-acid batteries and some innovative software to fool the car's
computerized controls into using more of the energy stored in the batteries, giving the car
over 100 mpg in local driving and 50 to 80 mpg on the highway. The cost of conversion is

**Opinion**
- Main Opinion Page
- Chronicle Sunday Insight
- Chronicle Campaigns

SF Chronicle Submissions
- Letters to the Editor
- Open Forum
- Sunday Insight

EXHIBIT D
PAGE 9

EXHIBIT Q
PAGE 239

Case 3:08-mc-80083-MHP    Document 46-11    Filed 07/23/2008    Page 13 of 17
Case 8:07-cv-00723-AG-JWJ    Document 103    Filed 06/30/2008    Page 12 of 16
Cars that make hybrids look like gas guzzlers / Plug-in versions can go ... miles on a gal...    Page 2 of 4

about $5,000 for a do-it-yourselfer.

**CalCars**' efforts to publicize plug-in hybrids were so successful that in January 2006 the Bush administration lifted a photo of the car peeking out from Gremban's garage and featured it on the White House Web site as a harbinger of good cars to come. Do-it-yourselfers in Illinois and elsewhere converted their hybrids to plug-ins. Several small companies like EnergyCS in Southern California started doing small numbers of conversions for fleets and government agencies using longer-lasting, more energy-dense lithium-ion batteries.

Kramer hired EnergyCS to convert his Prius and reported on a typical day of driving. He traveled 51 miles, mostly on the highway, at fuel efficiencies of 124 mpg of gas and about a penny's worth of electricity per mile. Compared with driving his Prius before the conversion, he used 61 percent less gas and spewed out two-thirds less greenhouse gases at a total cost of $1.76 for electricity and gasoline, instead of the $3.17 it would have required on gasoline alone.

Pacific Gas and Electric Co. acquired an EnergyCS plug-in Prius conversion, too. It so impressed Thesen, a PG&E supervisor in the clean air transportation group, that he offered his privately owned Prius to **CalCars** as a guinea pig. Back in Gremban's garage, **CalCars** and the Electric Auto Association converted it in November to a plug-in with lead-acid batteries as part of a video and educational package to guide do-it-yourselfers (www.eaa-phev.org).

Support for plug-in hybrids from a utility like PG&E, which still produces 45 percent of its electricity from polluting fossil fuels, makes some environmentalists nervous. The data on plug-in hybrids, however, have calmed their fears. On the U.S. electrical grid, which gets more than half of its power from dirty, nasty coal, plug-in cars produce fewer overall emissions of greenhouse gases and other pollutants than do other cars.

California's grid uses less coal, which makes plug-in cars even cleaner. As more wind and solar power get added to the energy mix, driving on electricity gets cleaner still. Driving on gasoline will only get dirtier as conventional sources dry up and we desperately turn to hard-to-extract oil that requires lots of energy to get at, producing lots more pollution.

Enthusiasm over plug-in hybrids has created strange bedfellows. Perched somewhat uneasily alongside PG&E and the former oil man in the White House, Sierra Club leaders representing 13 chapters in California and Nevada adopted a resounding endorsement of plug-in hybrids in the past year.

Former Sierra Club President Larry Fahn has been looking for a mechanic to convert his Prius for more than a year. Therein lies the problem. People want plug-in hybrids but can't get them. Dealers don't sell them yet, and the few conversion services cater to fleets.

There are only a few dozen plug-in hybrids in the world, while demand for them is growing

EXHIBIT D
PAGE 10

EXHIBIT Q
PAGE 230

Cars that make hybrids look lil' gas guzzlers / Plug-in versions can go      miles on a gal...    Page 3 of 4

rapidly. The city of Austin, Texas, which uses more renewable power than any other U.S. city, started a Plug-in Partners Campaign and gathered more than 8,000 advance orders for plug-in hybrids. In the Bay Area, San Francisco, Alameda, Berkeley and Marin County signed on as Plug-in Partners.

Are the automakers listening? Maybe.

Several showed plug-in hybrid prototypes in the 1990s but cast them aside during their battle to weaken California's Zero-Emission Vehicle Mandate. Stung by bad publicity from the 2006 documentary "Who Killed the Electric Car?", General Motors reversed course and showed the prototype plug-in hybrid Chevrolet Volt at a January auto show. In the past year, at least six major car companies have said they're developing plug-in vehicles, including Toyota officials, who seem none too happy about amateurs messing with the Prius.

Plug-in hybrids won't hit the market, though, until better batteries are developed, the automakers say. That doesn't sit well with drivers like Marc Geller of San Francisco, who co-founded the nonprofit group Plug In America (www.pluginamerica.org). The nickel-metal hydride batteries in Gellers' all-electric 2002 Toyota RAV4-EV give the compact SUV plenty of power, take him all over the Bay Area, and are expected to last the life of the car, based on utility company fleet tests.

Consumers appear to have three options to hasten the arrival of plug-in hybrids: Demand them ("Tell the automakers that you won't buy a new car unless it has a plug on it," Geller says), or push for government incentives or interventions. (The California Air Resources Board is planning to revise the zero-emissions mandate this year.)

Or, build your own plug-in hybrid.

*Sherry Boschert is the author of "Plug-in Hybrids: The Cars That Will Recharge America" and a member of Plug In America. She will speak about renewable energy and plug-in cars at a free public event on Thursday at 7 p.m. at Sierra Club headquarters, 85 Second St., third floor, San Francisco. Contact us at insight@sfchronicle.com.*

This article appeared on page E - 1 of the San Francisco Chronicle

SHARE

Ads by Google                                                                                What's This?

**Are You A Slacker Mom?**
15 fun questions that will tell you what type of parent you are!
www.AreYouASlackerMom.com

**Battered Women**
Learn the Red Flags to Choose Healthier Men in the Future.
www.HowToSpotADangerousMan.com

Surviving Abuse

**EXHIBIT B**
**PAGE 11**

**EXHIBIT Q**
**PAGE 231**

Cars that make hybrids look li... gas guzzlers / Plug-in versions can go ... miles on a gal...    Page 4 of 4

Receive Bible-based help with this downloadable guide for women.
TodaysChristianWomanStore.com

 Get up to 50% off home delivery of the Chronicle for 12 weeks!

Back To Top

| San Francisco Chronicle Sections | | Go | © 2007 Hearst Communications Inc. | Privacy Policy | Feedback | RSS F |

EXHIBIT B
PAGE 12

EXHIBIT Q
PAGE 232

# Exhibit C

EXHIBIT Q
PAGE 243



EXHIBIT C
PAGE 13

EXHIBIT Q
PAGE 224

# EXHIBIT R

| *Attorney or Party without Attorney:* | | *For Court Use Only* |
|---|---|---|
| CHRISTIE, PARKER & HALE<br>350 W. COLORADO BLVD.<br>SUITE: #500<br>PASADENA, CA 91105<br>*Telephone No:* 626 795-9900     *FAX No:* 626 577-8800 | | |
| *Attorney for:* Plaintiff | *Ref. No. or File No.:*<br>97408 | |

*Insert name of Court, and Judicial District and Branch Court:*

United States District Court Northern District Of California

*Plaintiff:* CALCAR, INC., AMERICAN CALCAR, INC., et al.

*Defendant:* THE CALIFORNIA CARS INITIATIVE, INC., et al.

| **PROOF OF SERVICE<br>SUBPOENA IN A CIVIL** | *Hearing Date:*<br>Mon, May. 19, 2008 | *Time:*<br>9:30AM | *Dept/Div:* | *Case Number:*<br>SACV07-00723 AG |
|---|---|---|---|---|

*1. At the time of service I was at least 18 years of age and not a party to this action.*

2. I served copies of the SUBPOENA IN A CIVIL CASE; NOTICE OF DEPOSITION OF DANIEL M. KAMMEN

3. a. *Party served:*               DANIEL M. KAMMEN
   b. *Person served:*           ALEXANDRA KAMEL, Legal Executive/Authorized to Accept Service

4. *Address where the party was served:*       UC BERKELEY DEPT. OF NUCLEAR ENGINEERING
                                            310 BARROWS HALL
                                            4152 ETCHEVERRY HALL
                                            BERKELEY, CA 94720

5. *I served the party:*
   a. **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on: Thu., May. 01, 2008 (2) at: 3:49AM
   b. *I received this subpena for service on:*      Wednesday, April 30, 2008

6. *Witness fees were offered or demanded, and paid:*      <u>$64.25</u>

7. **Person Who Served Papers:**
   a. TERRY GRAAP
   **b. CORPORATE LEGAL SERVICES**
      PO BOX 27975, Registration # 2296
      LOS ANGELES, CA 90027
   c. 213 202-6030, FAX 213 202-6045

                                      Recoverable Cost Per CCP 1033.5(a)(4)(B)
     d. *The Fee for Service was:*
     e. I am: (3) registered California process server
          (i)    Independent Contractor
          (ii)   *Registration No.:*      1027
          (iii)  *County:*             Santa Clara
          (iv)  *Expiration Date:*     Fri, Jan. 16, 2009

8. *I declare under penalty of perjury under the laws of the State of California and under the laws of the United States Of America that the foregoing is true and correct.*

Date:Fri, May. 02, 2008

Judicial Council Form<br>Rule 982.9.(a)&(b) Rev January 1, 2007

PROOF OF SERVICE<br>SUBPOENA IN A CIVIL

(TERRY GRAAP)

32349.chrpa.32349

EXHIBIT R<br>PAGE 235

# EXHIBIT S

1                    UNITED STATES DISTRICT COURT
2                    CENTRAL DISTRICT OF CALIFORNIA
3                         SOUTHERN DIVISION
4                            ---oOo---
5

6    CALCAR, INC., a California corporation,)
7                    Plaintiff,                    )
                                                   ) Case No.
8          vs.                                     ) SACV 07-00723
                                                   ) AG (JWJx)
9                                                  )
     THE CALIFORNIA CARS INITIATIVE, INC.,   )
10   an unknown business entity; and         )
     FELIX KRAMER, an individual,            )
11                                           )
                    Defendants.              )
12   _____)
13
14
15

         VIDEOTAPED DEPOSITION OF LAWRENCE FELIX KRAMER
16
                    THURSDAY, APRIL 3, 2008
17
18
19
20
21
22   Pages 1 - 253
23
24   CONFIDENTIAL - ATTORNEYS' EYES ONLY
25   Pages:    82 - 84, 95 - 97, 112, 163 - 164, 221 - 229

                                                              1

EXHIBIT S
PAGE 236

1       A.  No.

2       Q.  -- a payment?

3           That's never happened?

4       A.  No.

5       Q.  Has any company stated that they will make    01:38:10PM

6   you a payment?

7       A.  Some companies have stated their intention

8   to do so.

9       Q.  Those companies are listed on your Web

10  site?                                                   01:38:22PM

11      A.  Some of the companies listed on the Web

12  site have stated their intention to do so.  Others

13  have not.  They are all listed on the Web site.

14      Q.  Which ones have not?

15          MR. ROOKLIDGE:  Objection.  Vague.             01:38:36PM

16          Not what?

17          THE WITNESS:  Which ones have not what?

18          MR. HASAN:  I am going to admonish

19  Mr. Rooklidge here not to make speaking objections.

20          MR. ROOKLIDGE:  Okay.  If you could work on    01:38:52PM

21  making your questions a little clearer and focused,

22  we could do that.

23          MR. BROOKEY:  That is an inappropriate

24  ad hominem.  Mr. Rooklidge, that was a classic

25  coaching objection, to the extent that he repeats you

80

EXHIBITS
PAGE 237

1    after your objection word for word.  Mr. Hasan's

2    questions are fine and his admonishment to you was

3    more than appropriate.

4            MR. ROOKLIDGE:  Mr. Hasan, who is that

5    talking in the background?                        01:39:14PM

6    //

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    //

                                                            81

EXHIBIT S
PAGE 238

1    STATE OF CALIFORNIA    )

                            )  ss.

2    COUNTY OF SAN FRANCISCO)

3

4        I hereby certify that the witness in the

5    foregoing deposition, LAWRENCE FELIX KRAMER, was by

6    me duly sworn to testify to the truth, the whole

7    truth and nothing but the truth, in the

8    within-entitled cause; that said deposition was taken

9    at the time and place herein named; that the

10   deposition is a true record of the witness's

11   testimony as reported by me, a duly Certified

12   Shorthand Reporter and a disinterested person, and

13   was thereafter transcribed into typewriting by

14   computer.

15       I further certify that I am not interested in

16   the outcome of said action, nor connected with, nor

17   related to, any of the parties in said action, nor to

18   their respective counsel.

19       IN WITNESS WHEREOF, I have hereunto set my hand

20   and affixed my signature this 8th day of April 2008.

21

22

23

24   _____

25       DEBORAH LEE LUBIN, CSR No. 3234, RPR, CRP

                                                    250

EXHIBIT S
PAGE 239